# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIKTOK INC.,

    5800 Bristol Parkway
    Culver City, CA 90230

BYTEDANCE LTD.,

    c/o Vistra (Cayman) Ltd.
    P.O. Box 31119
    Grand Pavilion, Hibiscus Way
    George Town, KY1-1205
    Cayman Islands

                *Plaintiffs,*

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States,

    1600 Pennsylvania Avenue, N.W.
    Washington, DC 20500

WILBUR L. ROSS, JR., in his official capacity
as Secretary of Commerce,

    1401 Constitution Avenue, N.W.
    Washington, DC 20230

U.S. DEPARTMENT OF COMMERCE,

    1401 Constitution Avenue, N.W.
    Washington, DC 20230

                *Defendants.*

Civil Case No. 20-cv-2658

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiffs TikTok Inc. and ByteDance Ltd., for their Complaint against Defendants DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and the U.S. DEPARTMENT OF COMMERCE; allege as follows:

## INTRODUCTION

1.      This action seeks to prevent the government from impermissibly banning TikTok, a mobile software application that 100 million Americans use to create and share short videos composed of expressive content.  On September 18, 2020, the U.S. Department of Commerce identified the prohibited transactions (the "Prohibitions") covered by President Trump's August 6, 2020 executive order purportedly "Addressing the Threat Posed by TikTok" (the "August 6 order" and, together with the Prohibitions, the "TikTok ban").  Once fully in effect, the Prohibitions will prevent TikTok from operating in the United States.  Defendants took this extraordinary action of prohibiting a popular communication and information-sharing platform without affording its owners—Plaintiffs TikTok Inc. and ByteDance Ltd.—due process of law, and for political reasons rather than because of any "unusual and extraordinary threat" to the United States, which is a condition for the President to exercise his authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706.  The Prohibitions and August 6 order must be enjoined, because the TikTok ban is unconstitutional and *ultra vires*, and the Prohibitions violate the Administrative Procedure Act.

2.      IEEPA vests the President with significant power to prohibit certain transactions to protect U.S. national security.  Past presidents have used this power responsibly to protect the country from genuine threats from abroad, including terrorism and the proliferation of weapons of mass destruction.  President Trump, however, used IEEPA against TikTok Inc., a *U.S. company*— headquartered in Los Angeles with hundreds of employees across the United States—to destroy an online community where millions of Americans have come together to express themselves, share video content, and make connections with each other.  The TikTok ban imposes these restrictions despite express limitations in IEEPA barring executive regulation of personal

communications or the transmission of information or informational materials.  The TikTok ban is thus a gross misappropriation of IEEPA authority.

3.     The TikTok ban purportedly targets TikTok because of the speculative possibility that the application could be manipulated by the Chinese government.  But, as the U.S. government is well aware, Plaintiffs have taken extraordinary measures to protect the privacy and security of TikTok's U.S. user data, including by having the TikTok application ("TikTok") store such data outside of China (in the United States and Singapore) and by erecting software barriers that help ensure that TikTok stores its U.S. user data separately from the user data of other ByteDance products.  These actions were made known to the U.S. government during a recent U.S. national security review of ByteDance's 2017 acquisition of a China-based company, Musical.ly.  As part of that review, Plaintiffs provided voluminous material to the U.S. government documenting TikTok's security practices and made commitments that were more than sufficient to address any conceivable U.S. government privacy or national security concerns.

4.     Ignoring these demonstrable facts and commitments, President Trump's August 6 order authorized the Secretary of Commerce to prohibit "any transaction" with ByteDance and its subsidiaries, and the Commerce Department implemented that order by prohibiting, (i) as of September 20, 2020, TikTok from being available for download in the United States on mobile application stores, and, (ii) as of November 12, 2020, the services that enable the TikTok application to function, which will shut down the application on U.S. users' phones.

5.     It is revealing that the TikTok ban took no account of the federal agency national security review involving the Committee on Foreign Investment in the United States ("CFIUS" or "the Committee"), which was still pending at the time of the August 6 order.  Instead, President Trump issued the order abruptly after stating that TikTok Inc. did not "have any rights" and that

he would ban TikTok if Plaintiffs did not pay money to the U.S. Treasury to secure the U.S. government's approval for any sale—a payment the President has subsequently admitted would be unlawful.[1]

6.      Even after the order issued, Plaintiffs have continued to propose alternative mitigation proposals that would address the U.S. government's concerns, but nevertheless, without affording Plaintiffs any notice or opportunity to be heard regarding the President's purported concerns, on September 18, 2020, the Commerce Department issued the Prohibitions and mandated the destruction of TikTok in the United States.

7.      The TikTok ban is unlawful and unconstitutional for a number of independent reasons:

- The Prohibitions banning TikTok are arbitrary and capricious because the Department of Commerce ignored evidence of Plaintiffs' commitment to the privacy and security of TikTok's U.S. users, failed to consider reasonable and significant mitigation alternatives proposed by Plaintiffs, based its decision on purported justifications that are incongruent with what the record reveals about the agency's priorities and decision-making process, and attempted to implement an executive order that is in excess of its statutory authority and unlawful.

- By preventing TikTok from operating in the United States, the TikTok ban violates TikTok Inc.'s First Amendment rights, because TikTok Inc. is among the speakers whose expression the ban threatens to prohibit.  TikTok Inc. uses TikTok to create and share messages about a variety of issues and current events.  The TikTok ban also violates TikTok Inc.'s First Amendment rights in its code, an expressive means of communication.

- By prohibiting TikTok from operating in the United States without providing Plaintiffs notice or opportunity to be heard (whether before or after the fact), the TikTok ban violates the due process protections of the Fifth Amendment.

---

[1] Tyler Sonnemaker, *Trump admits there's no 'legal path' for TikTok to pay the US government as part of a sale to an American company*, Business Insider (Sept. 16, 2020), https://www.businessinsider.com/trump-admits-tiktok-cant-legally-pay-us-government-sale-2020-9 ("There's no legal path to doing that.").

- The TikTok ban is *ultra vires* because it is not based on a bona fide national emergency and authorizes the prohibition of activities that have not been found to pose "an unusual and extraordinary threat."

- The TikTok ban is *ultra vires* because it restricts personal communications and the transmission of information and informational materials, in direct violation of IEEPA.

- Concluding that the TikTok ban is *ultra vires* is also necessary to avoid a serious constitutional question because if the ban were found to satisfy IEEPA, then the President's overbroad and unjustified claim of authority in this matter demonstrates that IEEPA lacks any intelligible principle to guide or constrain the President's discretion and thereby violates the non-delegation doctrine.

- To the extent that the President continues to demand that Plaintiffs make a payment to the U.S. Treasury as a condition for the sale of TikTok, the President would be taking Plaintiffs' property without compensation in violation of the Fifth Amendment.

8.       Accordingly, ByteDance Ltd. and TikTok Inc. seek a declaratory judgment and order invalidating and preliminarily and permanently enjoining the Prohibitions and the August 6 order.

## JURISDICTION AND VENUE

9.       The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution, the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

10.       The Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; 5 U.S.C. § 702; and the Court's inherent equitable powers.

11.       Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1), because officers or employees of agencies of the United States acting in their official capacities and an agency of

the United States are defendants, and because a substantial part of the events or omissions giving rise to this action occurred in this district.[2]

## PARTIES

### A.    Plaintiffs

12.    Plaintiff TikTok Inc. is a company incorporated in California, with its principal place of business in Culver City, California.

13.    Plaintiff ByteDance Ltd. ("ByteDance") is a global company incorporated in the Cayman Islands, with offices in the United States, China, Singapore, and the United Kingdom, among others.  ByteDance owns and operates a variety of mobile software applications that enable people around the world to connect with, consume, and create entertainment content, including TikTok.  ByteDance also owns and operates other applications that are available in the United States, such as CapCut, a video editing application; Lark, a collaboration and communications software product; and GoGoKid, a platform for individuals in the United States—many of them teachers—to provide English-language lessons to students in China.

### B.    Defendants

14.    Defendant Donald J. Trump is the President of the United States, and is sued in his official capacity.  President Trump issued the August 6, 2020 executive order banning TikTok, purportedly acting under authority of IEEPA.

15.    Defendant Wilbur T. Ross, Jr. is the Secretary of Commerce and is sued in his official capacity.  President Trump's August 6 order tasked Secretary Ross with identifying the

---

[2] On August 24, 2020, Plaintiffs filed an action against Defendants in the Central District of California.  Following the issuance of the Prohibitions by the Department of Commerce on September 18, 2020, Plaintiffs dismissed their action in the Central District and hereby file this complaint.

transactions subject to the order and authorized him to issue the Prohibitions to implement the order.

16.     The Department of Commerce is the cabinet department of the federal government that issued the Prohibitions implementing the August 6 order.

## FACTUAL ALLEGATIONS

**I.     TikTok's Global Success Has Resulted From Private-Sector Entrepreneurial Innovation.**

17.     TikTok is an inclusive communication platform for making and sharing short-form videos through the TikTok mobile application.  It encourages users to celebrate what makes them unique, while finding a community that does the same.  TikTok's mission is to inspire creativity and bring joy.  It strives to build a global community, in which users can create and share authentically, discover the world around them, and connect with others across the globe.[3]

18.     The TikTok application enables users to create and upload short videos that are fifteen seconds to one minute in duration.  In this respect, TikTok operates much like other digital application platforms such as Snapchat, YouTube, and Instagram, in that users create and post content on the platform.  TikTok offers features such as background music and augmented reality effects, but users control which features to pair with the content of their self-directed videos, and TikTok serves as a host for the content created by its users.

19.     The TikTok application began as a product of private-sector entrepreneurship.  In 2012, 29-year-old entrepreneur Yiming Zhang founded TikTok Inc.'s parent corporation, ByteDance.  ByteDance is owned by Zhang, and has a number of major global institutional investors based in the United States, including Sequoia, General Atlantic, Coatue, and SIG.  No

---

[3] TikTok, *Our Mission*, https://www.tiktok.com/about?lang=en (last visited Sept. 18, 2020).

foreign government, or person controlled by or acting on behalf of a foreign government, owns any significant interest or any other affirmative or negative rights or powers in ByteDance.

20.    Since founding ByteDance, Zhang has developed multiple products and services, including TikTok, many of which are operated through subsidiaries and affiliates—such as TikTok Inc. in the United States.  TikTok is not offered in China, where ByteDance operates a similar but separate video-sharing platform called Douyin.

21.    TikTok's user base has grown at a rapid pace in the United States.  By January 2018, TikTok had 11,262,970 U.S. monthly active users.  By February 2019, TikTok's base more than doubled, with a total of 26,739,143 U.S. monthly active users.  By October of that same year, TikTok's total number of U.S. monthly active users had climbed to 39,897,768.  And by June 2020, TikTok's total number of U.S. monthly active users had soared to 91,937,040.  Today, based on quarterly usage, 100 million Americans use the TikTok application.[4]

22.    TikTok's growth in the United States paralleled its expansion worldwide.  By January 2018, TikTok had 54,793,729 global monthly active users.  By December of that year, TikTok had 271,188,301 global monthly active users.  And one year later, in December 2019, TikTok had 507,552,660 global monthly active users.  As of July 2020, TikTok had 689,174,209 global monthly active users, and by August 2020, TikTok surpassed two billion global downloads.

23.    As a result of its rapid growth and success, TikTok has been made available in more than 200 countries, and it currently has approximately 50 million daily active users in the United States.  TikTok has grown largely because of its appeal to those who value the blend of light entertainment, creativity, and humor that the application provides.

---

[4] These monthly and quarterly active users figures have not been de-duplicated, to account, for example, for the same user on multiple devices.

24.     TikTok is also used by its users to discuss more serious subjects, including political issues. "Society's struggles are on full display in TikTok," including in the many posts about "the tragic death of George Floyd[,] LGBTQ awareness[,] and tributes to healthcare workers [] who are on the frontlines of COVID-19."[5]   As of September 18, 2020, TikTok users had amassed approximately 7.3 million views of posts with the hashtag #RIPJohnLewis, 238.5 million views of posts about #Juneteenth, and 21.7 billion views of posts about #BlackLivesMatter.[6]   Prominent TikTok users like Sarah Cooper have attracted millions of views based on posts that satirize the President, as have posts that support the President with hashtags such as #MakeAmericaGreatAgain and #BuildThatWall.[7]   In June 2020, TikTok users claimed they used TikTok to coordinate mass ticket reservations for the President's re-election campaign rally in Tulsa, which inflated projected attendance in the days leading up to the event.[8]   Several American politicians are verified users on TikTok, including Governor Michael DeWine of Ohio, Senator Ed Markey of Massachusetts, Governor Gavin Newsom of California, and Senator Bernie Sanders of Vermont.

---

[5] Gene Del Vecchio, *TikTok Is Pure Self-Expression. This Is Your Must-Try Sampler.*, Forbes (June 6, 2020), https://www.forbes.com/sites/genedelvecchio/ 2020/06/06/tiktok-is-pure-self-expression-this-is-your-must-try-sampler/ #4e40f1f15a09.

[6] TikTok, *#RIPJohnLewis*, https://www.tiktok.com/tag/RIPJohnLewis?lang=en (last visited Sept. 18, 2020); TikTok, *#Juneteenth*, https://www.tiktok.com/tag/Juneteenth?lang=en (last visited Sept. 18, 2020; TikTok, *#BlackLivesMatter*, https://www.tiktok.com/tag/BlackLivesMatter? lang=en (last visited Sept. 18, 2020).

[7] Charles Trepany, *Who is Sarah Cooper? Viral Trump Impersonator appears at DNC, bags TV specials*, USA Today (Aug. 20, 2020), https://www.usatoday.com/story/entertainment/celebrities/ 2020/07/21/trump-impersonator-sarah-cooper-reflects-viral-social-media-stardom/5483534002/; TikTok, *#MakeAmericaGreatAgain*, https://www.tiktok.com/tag/MakeAmericaGreatAgain? lang=en (last visited Sept. 18, 2020) (approximately 117.2 million views); TikTok, *#BuildThatWall*, https://www.tiktok.com/tag/BuildThatWall?lang=en (last visited Sept. 18, 2020) (approximately 5.1 million views).

[8] Taylor Lorenz et al., *TikTok Teens and K-Pop Stans Say They Sank Trump Rally*, N.Y. Times (July 11, 2020), https://www.nytimes.com/2020/06/21/style/tiktok-trump-rally-tulsa.html.

25.     TikTok is an economic lifeline for many of its users, especially during the COVID-19 pandemic.  TikTok has given rise to new, non-traditional social media celebrities—"many of them working-class folks . . . in villages far from [] cosmopolitan megacities"—and has become "a livelihood for some people," providing "fame, empowerment and even a path out of poverty."[9] To reflect TikTok's increased financial importance to its users, TikTok recently announced the launch of the Creator Fund that will provide one billion dollars over the next three years to invest in more than a million creators in the United States who rely upon TikTok for their livelihoods.

## II.     TikTok Has Implemented Safeguards to Help Protect the Privacy and Security of U.S. User Data.

26.     Maintaining a safe and supportive environment for its users is a critical priority for Plaintiffs.  TikTok's business model rests on the principle that a safe environment is essential to helping people feel comfortable with expressing themselves openly and creatively.  Plaintiffs also aim to cultivate an environment for authentic interactions by working to keep deceptive content and accounts off TikTok.

27.     TikTok has been structured to help protect the privacy and security of U.S. user data.  Those protections begin with TikTok's practices in collecting user data.  TikTok collects limited data from its users in accordance with its privacy policy.[10]  TikTok prioritizes the secure storage of user data that is collected.  The current version of the TikTok application made available in the United States (*i.e.*, the version principally affected by Defendants' unlawful ban and the version on which this complaint focuses) stores all U.S. user data on servers in the United States

---

[9] Sushmita Pathak, *'TikTok Changed My Life': India's Ban On Chinese App Leaves Video Makers Stunned*, NPR (July 16, 2020), https://www.npr.org/2020/07/16/ 890382893/tiktok-changed-my-life-india-s-ban-on-chinese-app-leaves-video-makers-stunned.

[10] TikTok, *Privacy Policy* (last updated Jan. 1, 2020), https://www.tiktok.com/legal/privacy-policy?lang=en.

and Singapore, and does not store any U.S. user data in China.  While in storage, TikTok's U.S. user data is segregated from data relating to other ByteDance products and services by software-based controls.

28.     While in storage, U.S. users' names, birthdays, home addresses, phone numbers, emails, passwords, PayPal account information, phone contact lists, private videos, direct messages, and the date/time of the user's log-in history are currently encrypted using the industry-standard key management service ("KMS") encryption algorithm (AES 256 GCM), which is operated by TikTok's U.S. security team.

29.     The KMS algorithm also generates secret keys required to access encrypted data, and these keys are managed by the U.S. security team, under the control and direction of Roland Cloutier, the U.S.-based Global Chief Security Officer.  According to TikTok Inc.'s Data Access Approval Process, ByteDance's China-based engineering personnel supporting TikTok may access these encrypted data elements in decrypted form based on demonstrated need and only if they receive permission from TikTok's U.S.-based team.  TikTok has additional internal controls in place to prevent keys that decrypt U.S. user data from being accessed by ByteDance personnel without authorization from the U.S. security team.

30.     In addition to its storage security practices, TikTok takes steps to secure and encrypt user data while it is being transmitted.  TikTok currently uses Hypertext Transfer Protocol Secure ("HTTPS") by default for transmission of user data in the United States, the same industry-standard protocol used by major U.S. banks and e-commerce platforms to secure their online transactions.

31.     TikTok is committed to continually strengthening its data privacy policies to protect its users, to maintain sponsors' trust, and to comply with applicable legal and regulatory standards.

TikTok regularly reviews its security protections to identify and remediate any potential vulnerabilities.  This is part of a mature software development lifecycle program that involves both automatic and manual review of security controls at multiple points in the development process. TikTok also has a vulnerability reporting policy that invites security researchers to disclose information about vulnerabilities,[11] and it relies on respected American third-party vendors to validate its security controls and help ensure that U.S. user data is not subject to security vulnerabilities.

32.     In addition to safeguarding TikTok user data against data breaches, hackers, and other malicious actors, TikTok has security controls designed to protect the integrity of its source code.  For example, employees must demonstrate a need for information before they can access TikTok source code.  Even upon a showing of such a need, the employee still must obtain appropriate authorization to access the source code, and security controls embedded in the network monitor the employee's review and activities.  TikTok has also repeatedly engaged internal engineers and third-party vendors to perform quality and security checks and conduct intensive code reviews to help ensure that no back doors exist in TikTok's source code.

33.     As part of TikTok's source code integrity processes, Plaintiffs frequently update the software for the TikTok application, which users can download via app store updates.  The application updates made available to users through the app store often include security-related fixes that help to protect the privacy and security of user data.

34.     TikTok has reinforced its commitment to prioritizing the privacy and security concerns of U.S. users by placing U.S.-based executives in key leadership positions that shape the

---

[11]     TikTok, *Report   Security   Vulnerabilities*,   https://support.tiktok.com/en/privacy-safety/reportsecurityvulnerabilities-default#:~:text=Coordinated%20Disclosure%20Policy%20as%20defined,submission%2C%20whichever%20is%20sooner.%22.

direction of the company.  TikTok Inc. is led by a senior management team located in the United States.  ByteDance's interim global head of the TikTok business and TikTok Inc.'s Global Chief Security Officer, U.S. Head of Safety, and General Counsel are all U.S.-based persons.  These U.S.-based leaders came to TikTok from leadership positions in prominent U.S. companies like ADP, YouTube, and Microsoft.

35.    TikTok Inc. has broadened its commitment to hiring U.S. personnel beyond the highest levels of leadership as well, including by hiring dozens of highly qualified individuals with experience at leading U.S. technology companies.  TikTok has established a robust content moderation team in the United States to oversee all content moderation decisions for U.S. users.

36.    TikTok's U.S.-based leadership team has consistently stressed its commitment to prioritizing U.S. data privacy and security.[12]  Most recently, on July 29, 2020, TikTok announced the launch of its Transparency and Accountability Center for moderation and data practices, which will enable experts to "observe our moderation policies in real-time, as well as examine the actual code that drives our algorithms."[13]  As the announcement explained, this act of transparency is unparalleled by other major social media companies and "puts [TikTok] a step ahead of the industry."

37.    As these efforts reflect, Plaintiffs are committed to appropriately safeguarding U.S. user data against unauthorized access from outside the United States—including by any foreign government.  TikTok is not and has never been offered in China.  There is no connection between TikTok Inc. and the Chinese government, and the Chinese government does not have access to

---

[12] Vanessa Pappas, *Explaining TikTok's approach in the US*, TikTok (Nov. 5, 2019), https://newsroom.tiktok.com/en-us/explaining-tiktoks-approach-in-the-us.

[13] Kevin Mayer, *Fair competition and transparency benefits us all*, TikTok (July 29, 2020), https://newsroom.tiktok.com/en-us/fair-competition-and-transparency-benefits-us-all.

TikTok user data through TikTok Inc.'s parent company, ByteDance.  The key personnel responsible for TikTok, including its interim CEO, Global Chief Security Officer, and General Counsel, are all based in the United States—and therefore are not subject to Chinese law.  U.S. content moderation is likewise led by a U.S.-based team and operates independently from China, and, as noted above, the TikTok application stores U.S. user data on servers located in the United States and Singapore.

38.      Neither TikTok Inc. nor ByteDance provides TikTok user data to the Chinese government, and the Chinese government has never asked for data on TikTok users or to moderate TikTok content.  Plaintiffs would reject any such request.

**III.    Plaintiffs Proactively Engaged with the U.S. Government and Sought to Address Any Conceivable National Security Concerns.**

39.      As the foregoing reflects, as TikTok has grown, it has continued to refine and strengthen its data privacy protections and has done so voluntarily, reflecting its ongoing commitment to U.S. users.  As part of these efforts, Plaintiffs have also sought proactively to engage with the U.S. government to anticipate and address any concerns it might have.  These efforts have included responding separately and diligently to inquiries from CFIUS.  This lawsuit challenges the President's August 6 order issued under IEEPA and the Commerce Department Prohibitions implementing that order.  However, the CFIUS process and the President's August 14 order emanating from the CFIUS process provide important context for the August 6 order and the Prohibitions—for example, Plaintiffs' mitigation proposals made during the CFIUS process undercut the rationale not only for the August 14 CFIUS executive order, but also the President's August 6 IEEPA executive order.

40.      CFIUS is the federal regulatory body tasked with reviewing foreign acquisitions of U.S. businesses to determine their impact on national security.  CFIUS reviews transactions to

identify and address any unresolved national security concerns they might pose to the United States.  If CFIUS identifies such a risk that cannot be adequately and appropriately addressed by other legal authorities, the Committee or a lead agency may, on behalf of the Committee, negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security of the United States that arises as a result of the covered transaction.  Under its governing statute, CFIUS may refer a transaction to the President if CFIUS is unable to identify adequate and appropriate mitigation, *i.e.*, mitigation measures that it believes (a) can successfully address the identified risk, (b) allow for verifiable compliance, and (c) can be effectively monitored and enforced, consistent with the requirements of 50 U.S.C. § 4565(l)(3)(C).  The President is ultimately empowered to prohibit transactions that pose threats to national security that cannot be adequately and appropriately addressed through other authorities.

41.     In 2019, CFIUS contacted ByteDance to consider whether to review its acquisition of Musical.ly, a China-based video-sharing platform—even though Musical.ly was based in China and had very limited assets in the United States.  This review was highly unusual in that ByteDance had acquired Musical.ly two years earlier in 2017, Musical.ly was previously Chinese-owned and based in China, and ByteDance had predominantly abandoned Musical.ly's limited U.S. assets by the time of CFIUS's outreach in 2019.  Nevertheless, in March 2020, after months of evaluating its jurisdiction, CFIUS advised ByteDance that it intended to conduct a formal review of the acquisition of Musical.ly, and on June 15, 2020, CFIUS initiated that review.  The length of this pre-review deliberation by a U.S. government institution comprised of national security professionals underscores that, in fact, there was no national emergency in relation to TikTok or ByteDance's acquisition of Musical.ly.

42.     The Musical.ly acquisition did not affect—let alone undermine—TikTok Inc.'s commitments to the security and privacy of its U.S. user data, nor did it create any national security concerns.  In fact, after acquiring Musical.ly in 2017, ByteDance and TikTok migrated Musical.ly users to TikTok and, as noted above, effectively abandoned the Musical.ly code, brand, and business.  And since the Musical.ly acquisition, ByteDance and TikTok Inc. have sought to base more of the TikTok business, including the user data, in the United States.

43.     CFIUS nevertheless initiated a review of the Musical.ly acquisition, following, as noted, a lengthy period of evaluating whether there was a basis for such a review.  During this period, and through the course of the CFIUS review, ByteDance provided voluminous documentation and information in response to CFIUS's questions.  Among other evidence, ByteDance submitted detailed materials to CFIUS documenting TikTok's security measures to help ensure U.S. user data is safeguarded in storage and in transit and cannot be accessed by unauthorized persons—including any government—outside the United States.

44.     CFIUS never articulated any reason why TikTok's security measures were inadequate to address any national security concerns, and effectively terminated formal communications with Plaintiffs well before the conclusion of the initial statutory review period. Notwithstanding the U.S. government's failure to identify any security risk, in an effort to address any conceivable concerns that the U.S. government may have and to assure continuity for the U.S. users who had come to value and cherish the platform that TikTok provides, Plaintiffs took the extraordinary step of offering to restructure their U.S. business.  From the middle through the end of July 2020, ByteDance proposed various mitigation plans to the U.S. Treasury Department (which chairs CFIUS), including spinning out TikTok's U.S. business to American investors and/or trusted U.S. technology partners that would be responsible for maintaining and operating

TikTok in the United States.  On July 30, 2020, Plaintiffs also notified CFIUS that ByteDance had signed a non-binding Letter of Intent ("LOI") with Microsoft Corporation contemplating that, among other things, Microsoft could acquire the U.S. TikTok business and could serve as the trusted technology partner for TikTok's U.S. business.

45.     Despite these repeated efforts and concrete proposals to alleviate any national security concerns, the agency record reflects that CFIUS repeatedly refused to engage with ByteDance and its counsel about CFIUS's concerns.

46.     At 11:55 p.m. on July 30, 2020—the final day of the statutory CFIUS review period—the Committee issued a letter stating that "CFIUS has identified national security risks arising from the Transaction and that it has not identified mitigation measures that would address those risks."

47.     The CFIUS letter was principally based on outdated news articles, failed to address the voluminous documentation that Plaintiffs had provided demonstrating the security of TikTok user data, and was flawed in numerous other respects.  Most conspicuously, the CFIUS letter entirely failed to substantively address the actual mitigation proposals that were on the table— namely, ByteDance's willingness to restructure its U.S. business.

**IV.     Defendants Banned TikTok Without Providing Plaintiffs Due Process of Law and in Spite of Less Restrictive Alternatives.**

    **A.     Purporting to Act Under IEEPA, the President Issued an Extraordinary Executive Order Banning TikTok That Was Not Based on Any Bona Fide National Security Concern.**

48.     On August 6, 2020, notwithstanding ByteDance's ongoing good-faith efforts to pursue reforms and restructuring of the TikTok U.S. business, President Trump took the unprecedented step of issuing the executive order challenged here that imposed a ban on TikTok. The President took this extraordinary step independently from the CFIUS process that had been

considering a possible spin-off of TikTok, without affording Plaintiffs any notice or opportunity to engage in relation to any of the points raised in the order purportedly to justify the ban—all of which are speculative and not based on actual facts, as described below.

49.     The August 6 order, entitled "Addressing the Threat Posed by TikTok,"[14] cites the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*) ("IEEPA"), the National Emergencies Act (50 U.S.C. § 1601 *et seq.*), and 3 U.S.C. § 301 as the legal authority for issuing the order.

50.     IEEPA grants the President authority to regulate various international economic transactions during wartime or upon declaration of a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a). Before the President is empowered to exercise authority under IEEPA, the President must first declare a national emergency for purposes of the National Emergencies Act, 50 U.S.C. § 1601 *et seq.* ("NEA").

51.     Previous administrations have used IEEPA to impose sanctions on foreign states like Iran and North Korea, or individuals who have been placed on the Specially Designated Nationals and Blocked Persons List published by the U.S. Treasury Department's Office of Foreign Assets Control, because of the sanctioned entity's participation in terrorist activities or human rights abuses.  These uses of IEEPA have provided important protection against such external threats as international terrorism and the proliferation of weapons of mass destruction. The use of IEEPA to ban TikTok, however, marks a dramatic break from past practices.

---

[14] White House, *Executive Order on Addressing the Threat Posed by TikTok* (Aug. 6, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/.  The August 6 order was numbered 13942 and published in the Federal Register at 85 Fed. Reg. 48,637.

52.     On its face, the August 6 order fails to identify any unusual and extraordinary threat posed by TikTok—or any *actual* national security threat at all.  Rather, the order makes various unsubstantiated assertions to support its purported findings, as follows:

- "[TikTok's] data collection threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information — *potentially* allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."

- TikTok "also *reportedly* censors content that the Chinese Communist Party deems politically sensitive, such as content concerning protests in Hong Kong and China's treatment of Uyghurs and other Muslim minorities."

- TikTok "*may* also be used for disinformation campaigns that benefit the Chinese Communist Party, such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus."[15]

53.     As its equivocal language telegraphs, the August 6 order provides absolutely no evidence for any of its self-described findings.  The order cites no evidence that TikTok enables the Chinese government to track any U.S. persons, nor does the order substantiate its allegations regarding TikTok's supposed censorship or its use as a platform for disinformation.  It also fails to take account of any of the voluminous documentation provided to CFIUS, which details TikTok's policies, procedures, and operational teams in place to safeguard against precisely these hypothetical concerns.  While IEEPA does not require a risk to fully materialize before the President may invoke its authorities, the statute does not permit the President to rely on such unfounded speculation.

54.     The order uses equivocal language because, in fact, TikTok does none of these things:  TikTok has made it clear, through its actions and statements, that it shares no information with the Chinese government and will not do so—a conclusion reportedly shared by the CIA,

---

[15] *Id.* (emphasis added).

which found "no evidence" that Chinese intelligence services have ever accessed data from TikTok.[16]  TikTok also has a mature content moderation program designed to provide a safe forum for its users, and one that does not censor content to advance the political—or any other—objectives of any government, including the Chinese government.  And, there is zero evidence that TikTok has ever been used to spread disinformation or conspiracy theories for any government.

55.     Instead of identifying any threats related to TikTok, the August 6 order draws upon the previously declared "national emergency with respect to the information and communications technology and services supply chain declared in Executive Order 13873 of May 15, 2019 (Securing the Information and Communications Technology and Services Supply Chain)."

56.     That previous executive order was designed to address asserted U.S. national security concerns about Chinese telecommunications companies.  It found that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people," and that the use of these information and communications technology and services "constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."[17]

---

[16] Katie Canales, *CIA analysts reportedly told the White House there's 'no evidence' the Chinese government has accessed TikTok data*, Business Insider (Aug. 7, 2020), https://www.businessinsider.com/tiktok-cia-no-evidence-china-access-data-2020-8.

[17] White House, *Executive Order on Securing the Information and Communications Technology and Services Supply Chain* (May 15, 2019), https://www.whitehouse.gov/presidential-actions/executive-order-securing-information-communications-technology-services-supply-chain/.

57.     President Trump's August 6 order targeting TikTok purports to draw upon the national emergency established in Executive Order 13873, and newly declares that "the spread in the United States of mobile applications developed and owned by companies in the People's Republic of China" (China) continues to threaten the national security, foreign policy, and economy of the United States," and that "action must be taken to address the threat posed by one mobile application in particular, TikTok." [18]

58.     The August 6 order then prohibits "any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce," and declares that the prohibition will take effect starting 45 days after the issuance of the order, which is on September 20, 2020.  The August 6 order states that, "45 days after the date of this order," the Secretary of Commerce "shall identify the transactions" covered by the August 6 order—which the Secretary of Commerce did through the prohibitions he identified on September 17, 2020.[19]

### B.     The Government's Actions Following the August 6 Order Reflect the Lack of Foundation for the Ban.

59.     The government's subsequent actions have revealed the unsupported and unsupportable nature of the TikTok ban.  On August 14, 2020, the President accepted CFIUS's recommendation and issued an executive order titled "Regarding the Acquisition of Musical.ly by ByteDance Ltd."[20]  The CFIUS order asserts without explanation that there is "credible evidence

---

[18] White House, *Executive Order on Addressing the Threat Posed by TikTok* (Aug. 6, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/.

[19] *Id.*

[20] White House, *Order Regarding the Acquisition of Musical.ly by ByteDance Ltd* (Aug. 14, 2020),

that leads me to believe that ByteDance Ltd. . . . might take action that threatens to impair the national security of the United States," and based on this finding, the order prohibits "ownership by ByteDance of any interest in Musical.ly in the United States, whether effected directly or indirectly through ByteDance, or through ByteDance's subsidiaries, affiliates, or Chinese shareholders."[21]

60.     In this August 14 order, the President ignored the mitigation efforts by TikTok Inc. and ByteDance and imposed a strict timeline for the company to do something it had already offered to do:  the CFIUS order mandates that, within 90 days (or 120 days, if CFIUS chooses to provide a 30-day extension), ByteDance, its subsidiaries, affiliates, and Chinese shareholders must "divest all interests and rights in: (i) any tangible or intangible assets or property, wherever located, used to enable or support ByteDance's operation of the TikTok application in the United States, as determined by the Committee; and (ii) any data obtained or derived from TikTok application or Musical.ly application users in the United States."[22]  The fact that the CFIUS process culminated in an order mandating divestment by November 12, 2020 cannot be reconciled with the purported necessity of banning TikTok under IEEPA on August 6, 2020.

61.     Separately, on September 3, 2020, Plaintiffs received an 18-item administrative subpoena from the Department of Commerce.  This subpoena, issued nearly a month after the August 6 order, requested broad categories of records regarding Plaintiffs' data centers, domain names, business partners, content moderation, data collection, and employees, among other topics.

---

https://www.whitehouse.gov/presidential-actions/order-regarding-acquisition-musical-ly-bytedance-ltd/ (the "CFIUS order").  The CFIUS order was published in the Federal Register at 85 Fed. Reg. 51,295.

[21] *Id.*

[22] *Id.*

That Defendants were apparently unaware of the facts sought in the subpoena reinforces the lack of foundation for the August 6 order.

### C. The Commerce Department Implemented the August 6 Order with Prohibitions That Will Prevent TikTok's Operation in the United States.

62.    With the CFIUS discussions still ongoing, on September 18, 2020, the Department of Commerce released its Prohibitions implementing the August 6 order.  The Department of Commerce did not elaborate upon the President's August 6 purported justifications and simply incorporated them by reference.  The Prohibitions identify a series of prohibited transactions to take effect on September 20, 2020 and November 12, 2020.[23]

63.    As of September 20, 2020, the Prohibitions will proscribe any transactions involving "[a]ny provision of services to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store" available to individuals in the United States.[24]  This proscription will prevent TikTok from being available for download on U.S. app stores, with less than 48 hours' notice to Plaintiffs.

64.    As of November 12, 2020, the Prohibitions will proscribe transactions involving:

- "[a]ny provision of internet hosting services enabling the functioning or optimization of the TikTok mobile application,"

- "[a]ny provision of content delivery network services enabling the functioning or optimization of the TikTok mobile application within the [United States],"

- "[a]ny provision of directly contracted or arranged internet transit or peering services enabling the functioning or optimization of the TikTok mobile application within the [United States]," and

---

[23] U.S. Dep't of Commerce, *Identification of Prohibited Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain* (Sept. 18, 2020), https://www.federalregister.gov/documents/2020/09/22/2020-20920/identification-of-prohibited-transactions-to-implement-executive-order-13942-and-address-the-threat.

[24] *Id.*

- "[a]ny utilization of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the [United States]."[25]

Effective November 12, 2020, these prohibited transactions will prevent Plaintiffs and their commercial partners from providing the services that enable the TikTok application to function, and will effectively require the shutdown of TikTok for existing users in the United States.

### D.  Plaintiffs Will Suffer Irreparable Harm as a Result of the TikTok Ban.

65.   If allowed to remain in place, the TikTok ban will irreversibly destroy the TikTok business in the United States:  it will devastate TikTok's user base and competitive position; destroy the goodwill necessary for TikTok to maintain commercial partners in the United States; and cripple Plaintiffs' ability to attract and retain talent.

66.   First, the TikTok ban will decimate the app's user base.   Until the President intervened, TikTok was one of the fastest growing apps in the United States, and its continued rapid growth is necessary to maintain its competitive market position.   As a consequence of the Prohibitions, TikTok will no longer be available on the U.S. app stores as of September 20, which will halt the influx of daily new U.S. users.   Hundreds of millions of Americans who have not yet downloaded the app would be immediately shut out of the TikTok community, and many will instead build relationships with competing platforms.   Then, on November 12, 2020, the app will become unavailable for existing U.S. users.   Competitors will take advantage of this shutdown to entice TikTok creators and users to switch platforms.   And even if the ban is lifted after a period of weeks or months, the harm to TikTok's user base and competitive position will be permanent.

67.   Second, the Prohibitions will destroy the goodwill that Plaintiffs need to partner with other businesses and advertisers.   Once TikTok is removed from the app stores on September

---

[25] *Id.*

20 and as the November 12 shutdown approaches, commercial partners will increasingly move away from TikTok, leading not just to a loss of revenue but also extraordinary harm to Plaintiffs' reputation and goodwill, making it unlikely that these relationships could be salvaged even if the ban is later lifted.  In light of the market uncertainty generated by the government's decision to target Plaintiffs, major commercial partners have already backed out of partnerships with TikTok as a result of the ban, resulting in millions of dollars in losses and damage to Plaintiffs' relationships with these key business partners.  This trend will only accelerate in the coming days.

68.    Third, the Prohibitions will devastate Plaintiffs' U.S. workforce.  TikTok is a technology business; it competes fiercely for software engineers and other talent, and many of its employees are currently being aggressively recruited by competitors.  Given that the U.S. TikTok business will be shut down as a result of the ban, it will be extremely challenging to recruit and retain employees devoted to maintaining the service.

69.    Wholly independent of these harms to the TikTok business, the Prohibitions also harm Plaintiffs as speakers.  The TikTok ban will prevent TikTok Inc. from continuing to create and share messages about a variety of issues and current events, such as its support for small businesses and International Women's Day [26] and from expressing its ideas through dissemination and use of its code.

---

[26] TikTok Inc., *@SuperflyPresents #SupportSmallBiz to support at-risk small businesses. All donations go to Accion Opportunity Fund!*, TikTok (June 18, 2020), https://www.tiktok.com/@tiktok/video/6839775130407750917; TikTok Inc., *Happy International Women's Day! #shecandoit*, TikTok (Mar. 8, 2020), https://www.tiktok.com/@tiktok/video/6801895105885195526.

## V.   The Background and Timing of the TikTok Ban Plainly Suggest That Its Stated Justifications Were Pretextual.

70.     The TikTok ban purports to be based on national security, but that justification is pretext, as is reflected by the President's political decision to campaign on an anti-China platform and the circumstances surrounding the issuance of the TikTok ban.

71.     As the 2020 election approaches, President Trump has consistently referred to COVID-19 as the "Wuhan virus," "China virus," and "Kung Flu," despite previous public statements by officials in his own administration that such terms were "highly offensive" and "hurtful."[27]

72.     At his Tulsa campaign rally on June 20, 2020, for example, the President deployed the term "Kung Flu" in discussing COVID-19, and added:  "China sent us the plague, thank you very much."[28]   On July 14, 2020, the President returned to the theme, stating that "[n]o administration has been tougher on China than this administration," including by "hold[ing] China fully responsible for concealing the virus and unleashing it upon the world."[29]

73.     On July 30, 2020, the President again blamed China for the COVID-19 pandemic. When asked a question about providing unemployment insurance to workers impacted by the

---

[27] David Nakamura, *With 'kung flu,' Trump sparks backlash over racist language — and a rallying cry for supporters*, Wash. Post (June 24, 2020), https://www.washingtonpost.com/politics/with-kung-flu-trump-sparks-backlash-over-racist-language--and-a-rallying-cry-for-supporters/2020/06/24/485d151e-b620-11ea-aca5-ebb63d27e1ff_story.html.

[28] Rev Services, *Donald Trump Tulsa, Oklahoma Rally Speech Transcript* (June 21, 2020), https://www.rev.com/blog/transcripts/donald-trump-tulsa-oklahoma-rally-speech-transcript.

[29] White House, *Remarks by President Trump in Press Conference* (July 14, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-conference-071420/.

COVID-19 pandemic, the President responded: "The fact is, people don't like saying it — they know it's true: It's China's fault. Okay?"[30]

74.     The next day, on July 31, 2020, the President elaborated on his anti-China rhetoric. The President said that voters "love Trump on trade. . . . Look at what we did with China, we took in tens of billions of dollars. And before the plague came in, we were doing so great, we were doing better than any country has ever done. We were beating China at every level. . . . They were having the worst year and we were having the best year we have ever had." Before introducing the other speakers, he ended the first portion of his speech by saying: "We will make America great again, you've heard that before. . . . And we were there until the virus came upon us and we'll soon be there again. And China, we have not forgotten."[31]

75.     In the aftermath of the TikTok ban, government officials have acknowledged that the August 6 order was animated by China-focused considerations entirely unrelated to Plaintiffs. On August 20, 2020, Undersecretary of State Keith Krach acknowledged that the TikTok ban is "really about . . . three things": (i) "the Communist Party's surveillance state and 5G is the backbone"; (ii) "that great China Firewall where all data can go in, but none come out"; and (iii) "reciprocity, because our apps aren't allowed in China . . . look at YouTube or Google search."[32]

76.     President Trump and his campaign's targeting of TikTok follows not only the escalation of his anti-China rhetoric related to the pandemic; it also follows a recent political

---

[30] White House, *Remarks by President Trump in Press Briefing* (July 30, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-july-30-2020/.

[31] CSPAN, *President Trump Remarks to Florida Sheriffs* (July 31, 2020), https://www.c-span.org/video/?474419-1/president-trump-remarks-florida-sheriffs.

[32] Keith Krach, *Microsoft Potential Purchase of TikTok* (Aug. 21, 2020), https://keithkrach.com/microsoft-potential-purchase-of-tiktok/.

episode involving TikTok, in which TikTok users claimed that they used TikTok to coordinate

mass ticket reservations for the President's campaign rally in Tulsa.[33]  In the weeks after that rally,

the President's re-election campaign ran online advertisements targeting TikTok, asking

supporters to "sign the petition now to ban TikTok."[34]  It was in the context of this political

environment that the President issued the August 6 order and then asserted that any transaction

involving TikTok would require a payment to the United States Treasury, a requirement he later

withdrew, although he maintained that he is still "looking into" whether he can force a payment.[35]

## VI.    The Opinions of Independent Experts Underscore the Lack of Any Bona Fide National Security Justification for the TikTok Ban.

77.     The TikTok ban is not rooted in bona fide national security concerns.  Independent

national security and information security experts have criticized the political nature of the August

---

[33] Taylor Lorenz et al., *TikTok Teens and K-Pop Stans Say They Sank Trump Rally*, N.Y. Times (July 11, 2020), https://www.nytimes.com/2020/06/21/style/tiktok-trump-rally-tulsa.html; Kari Soo Lindberg, *Trump Campaign Urges Supporters to Back TikTok Ban in Online Ads*, Bloomberg News (July 18, 2020), https://www.bloomberg.com/news/articles/2020-07-18/trump-campaign-urges-supporters-to-back-tiktok-ban-in-online-ads.

[34] John D. McKinnon & Shan Li, *TikTok Could Be Tougher Target for Trump Administration*, Wall St. J. (July 26, 2020), https://www.wsj.com/articles/tiktok-could-be-tougher-target-for-trump-administration-11595755800; Kari Soo Lindberg, *Trump Campaign Urges Supporters to Back TikTok Ban in Online Ads*, Bloomberg News (July 18, 2020), https://www.bloomberg.com/news/articles/2020-07-18/trump-campaign-urges-supporters-to-back-tiktok-ban-in-online-ads.

[35] Fadel Allassan, *Trump says TikTok will be banned if not sold by Sept. 15, demands cut of sale fee*, Axios (Aug. 3, 2020), https://www.axios.com/trump-tiktok-banned-microsoft-fd45748d-1ee8-4f4a-812a-09ec76d6f8e2.html; Jason Murdock, *Trump Demanding Cut From Microsoft TikTok Sale Akin to 'Extortion,' Critics Say*, Newsweek (Aug. 4, 2020), https://www.newsweek.com/tiktok-microsoft-sale-president-donald-trump-extortion-1522597; White House, *Remarks by President Trump During Border Wall Construction and Operational Update | Yuma, AZ* (Aug. 18, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-border-wall-construction-operational-update-yuma-az/?utm_source=link;  Tyler Sonnemaker, *Trump admits there's no 'legal path' for TikTok to pay the US government as part of a sale to an American company*, Business Insider (Sept. 16, 2020), https://www.businessinsider.com/trump-admits-tiktok-cant-legally-pay-us-government-sale-2020-9 ("Amazingly, I find that you're not allowed to do that — you're not allowed to accept money. . . . There's no legal path to doing that.").

6 order, and expressed doubt as to whether its stated national security objective is genuine. For example, Steven Weber, a cybersecurity expert who currently serves as Associate Dean and Head of UC Berkeley School of Information, has stated that, "[i]n this political environment between the United States and China, you're guilty until proven innocent if you're a Chinese company."[36] Weber recognizes that, "[i]n theory, any app that collects users data (in other words, essentially every app) could be a national security risk," but his view "is that the issue here isn't really about TikTok; it's about the overall deterioration in Sino-American relations."[37] He stressed that this anti-China focus has been borne out by the Trump administration's recent actions: "This week the villain is TikTok, last month it was Zoom, and before that Huawei."[38] In this sense, the TikTok ban marks a continuation of what Michael Wessel, a commissioner on the US-China Economic and Security Review Commission, has called "an inappropriate conflation of two different policy goals—trade and national security."[39]

78.    Justin Sherman, fellow at the Atlantic Council's Cyber Statecraft Initiative, has similarly observed that "as soon as a Chinese company is in the news, all of a sudden that becomes the new target" for the Trump administration."[40] And Cybersecurity Policy and China Digital

---

[36] UC Berkeley School of Information, *Steve Weber Says Geopolitical Tensions to Blame for Rising Fear in TikTok Security* (July 15, 2020), https://www.ischool.berkeley.edu/news/2020/steve-weber-says-geopolitical-tensions-blame-rising-fear-tiktok-security.

[37] UC Berkeley School of Information, *Steve Weber Says Fed's Targeting of TikTok Related to Worsening US-China Relations* (July 13, 2020), https://www.ischool.berkeley.edu/news/2020/steve-weber-says-feds-targeting-tiktok-related-worsening-us-china-relations.

[38] *Id.*

[39] Clare Duffy, *Trump said he'd ease up on Huawei. Questions remain about what that means*, CNN Business (July 5, 2019), https://www.cnn.com/2019/07/03/tech/trump-huawei-restrictions/index.html.

[40] CNN, *TikTok is a national security threat, US politicians say. Here's what experts think* (July 9, 2020), https://wtop.com/cyber-security/2020/07/tiktok-is-a-national-security-threat-us-politicians-say-heres-what-experts-think/.

Economy Fellow Samm Sacks has stated that such a ban "sets a dangerous precedent in which the U.S. government can blacklist companies based on country of origin using blanket national security as justification."[41]  Former U.S. government officials have also explained that the Trump administration's handling of the CFIUS investigation involving ByteDance's acquisition of Musical.ly is well outside the norm of typical national security investigations.[42]

79.    The TikTok ban is an especially unprecedented use of IEEPA in light of the mitigation proposed by Plaintiffs—a restructuring of TikTok's U.S. operations to provide trusted and experienced U.S. owners with operational control over the infrastructure that services U.S. users and stores U.S. TikTok user data—which would completely address any conceivable national security concerns.  But instead of providing meaningful consideration of Plaintiffs' efforts at mitigation as required by statute and as a means of avoiding unnecessary destruction of property—indeed an entire business—the Trump administration wholesale rejected Plaintiff's proposal.

## CLAIMS FOR RELIEF

### Count 1: The Department of Commerce's Prohibitions Violate the Administrative Procedure Act. (5 U.S.C. § 706(2))

80.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

81.    The Department of Commerce's Prohibitions are unlawful under the Administrative Procedure Act (the "APA").

---

[41] Samm Sacks, *Banning TikTok is a terrible idea*, SupChina (July 16, 2020), https://supchina.com/2020/07/16/banning-tiktok-is-a-terrible-idea/.

[42] Emily Birnbaum, *'This has been botched': This is what makes Trump's TikTok tirade so unusual*, Protocol (Aug. 6, 2020), https://www.protocol.com/cfius-tiktok-not-how-this-works.

82.     Agency action taken pursuant to IEEPA is reviewable under the APA.  *See, e.g.*, *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003).  Both U.S. and foreign persons are entitled to seek APA review of IEEPA regulatory action.  *See Rakhimov v. Gacki*, No. CV 19-2554 (JEB), 2020 WL 1911561, at *5–6 (D.D.C. Apr. 20, 2020) (dismissing plaintiff's due process challenge to his designation as a specially designated national under IEEPA because he "ha[d] not established *any* connection to the United States" but holding that plaintiff nevertheless had a right to procedural review under the APA).

83.     The APA requires a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

84.     Under the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

85.     The Prohibitions banning TikTok are arbitrary and capricious for the following reasons, among others:

- Defendants took no account of the wealth of evidence presented by Plaintiffs as part of a national security review process involving CFIUS—evidence which demonstrates their commitment to the privacy and security of TikTok's U.S. users and responds to Defendants' stated concerns.

- The Department adopted the harshest measure possible—banning Plaintiffs within the United States—without considering the reasonable, significant mitigation alternatives proposed by Plaintiffs, as described above.

- Defendants' Prohibitions lack "a rational connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quotations omitted). The first prohibition, which will take effect on September 20, 2020, creates a risk of making TikTok's U.S. user data *less* secure, because it will prohibit Plaintiffs from providing U.S. users with "application updates," including routine security updates that help to protect the privacy of U.S. user data. The second set of prohibitions, which take effect on November 12, 2020, effectively delays the disabling of the TikTok application by almost two full months, a choice that further undercuts the government's purported conclusion that such prohibitions are necessary to address a national security emergency.

- Defendants' purported justifications are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 2575. Defendants' own statements—ranging from unsupportable demands that Plaintiffs' continued operation in the country was contingent upon a payment to the Treasury Department, to the President's increasing reliance on anti-Chinese rhetoric as economic conditions have deteriorated following the COVID-19 pandemic—reveal that their stated national security concerns are mere pretext for Defendants' real motivations, which are political and untethered to any supposed threat posed by Plaintiffs.

- The Prohibitions are arbitrary and capricious because they attempt to implement an executive order that is otherwise unlawful in a variety of ways. In particular, the Prohibitions restrict personal communications and the transmission of information or informational materials, in direct violation of IEEPA.

86. The Prohibitions also are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), because they restrict personal communications and the transmission of information or informational materials, in direct violation of IEEPA, 20 U.S.C. § 1702(b).

87. The Prohibitions implementing the August 6 order therefore violate the APA because they are arbitrary, capricious, and an abuse of discretion, are otherwise not in accordance with the law, and are in excess of statutory jurisdiction, authority, or limitations.

88. Defendants' APA violations will cause ongoing irreparable harm to Plaintiffs.

**Count 2: The TikTok Ban Violates the First Amendment Right to Free Speech.**

89.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

90.     The TikTok ban, which threatens to shutter a forum that millions of Americans use for speech and expression, unlawfully burdens the freedoms guaranteed by the First Amendment.

91.     Plaintiffs are among the speakers whose expression the order threatens to prohibit. Plaintiffs use TikTok to create and share messages about a variety of issues and current events, including, for example, their support for small businesses and International Women's Day.[43]  By prohibiting Plaintiffs from continuing to operate in the United States, the TikTok ban necessarily restricts Plaintiffs' own speech.

92.     By preventing TikTok from operating in the United States, the TikTok ban also violates Plaintiffs' First Amendment rights in and to its code.  "Like music and mathematical equations, computer language is just that, language, and it communicates information either to a computer or to those who can read it." *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435–36 (N.D. Cal. 1996); *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 86 (D.D.C. 2019). "Because computer source code is an expressive means for the exchange of information and ideas about computer programming[,] it is protected by the First Amendment." *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000).

93.     "As computer code—whether source or object—is a means of expressing ideas, the First Amendment must be considered before its dissemination may be prohibited or regulated," *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 326–27 (S.D.N.Y. 2000),

---

[43] TikTok Inc., *@SuperflyPresents #SupportSmallBiz to support at-risk small businesses. All donations go to Accion Opportunity Fund!*, TikTok (June 18, 2020), https://www.tiktok.com/@tiktok/video/6839775130407750917; TikTok Inc., *Happy International Women's Day! #shecandoit*, TikTok (Mar. 8, 2020), https://www.tiktok.com/@tiktok/video/6801895105885195526.

regardless of whether the executive order targets TikTok because of its content or the order has only an incidental effect on TikTok Inc.'s speech. Only "the *scope* of the protection for computer code depends upon whether the restriction on the code is because of its content," not the fact of protection itself. *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1099–100 (N.D. Cal. 2004) (emphasis added); *see also Junger*, 209 F.3d at 484.

94.     The August 6 order facially burdens TikTok Inc.'s speech for both functional and content-based reasons. The order specifically justifies targeting TikTok based in part on the content of the videos hosted on TikTok, citing concerns about videos on "politically sensitive" topics and videos about the "origins of the 2019 Novel Coronavirus."

95.     The Prohibitions will shut down TikTok, disabling its core functionality and barring its millions of U.S. users—including Plaintiffs themselves—from engaging in protected speech. These restrictions will impose a prior restraint that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969). Such restraints are reviewed for strict scrutiny and "bear a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

96.     At a minimum, such restrictions would receive "intermediate scrutiny" as content-neutral regulations, which requires that a speech restriction must be "narrowly tailored to serve a substantial government interest" and may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

97.     The TikTok ban does not satisfy this constitutional standard. Notwithstanding the substantial governmental interest in national security, the August 6 order and the Prohibitions are

far from narrowly tailored.  Instead of considering any of the alternatives that Plaintiffs proposed to address purported national security concerns asserted in the executive order—including Plaintiffs' proposals to restructure the U.S. TikTok business—Defendants acted to burden substantially more speech than necessary by completely extinguishing a forum used by millions of Americans.

98.     The scope of the Prohibitions is "greater than essential to the furtherance" of any government interest underlying the order. *321 Studios*, 307 F. Supp. 2d at 1100.  The vast majority of TikTok videos could not reasonably be construed to in any way relate to national security, nor is its U.S. user data more susceptible to collection by Chinese authorities than from any number of other sources.

99.     Because the August 6 order and the Prohibitions are broader than necessary to serve any governmental interest, the TikTok ban violates TikTok Inc.'s First Amendment rights.

100.     Defendants' violation of TikTok Inc.'s First Amendment rights will cause ongoing irreparable harm to Plaintiffs.

**Count 3:  The August 6 Executive Order and Commerce Department Prohibitions Violate the Due Process Clause of the Fifth Amendment.**

101.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

102.     The Fifth Amendment to the U.S. Constitution provides:  "No person shall . . . be deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  The Due Process Clause of the Fifth Amendment requires that parties deprived of their property receive adequate notice and an opportunity to be heard.  *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

103.    TikTok Inc., as a U.S. entity, is entitled to the protections of the due process clause. *N. Sec. Co. v. United States*, 24 S. Ct. 436, 444 (1904) ("Corporations are persons within the meaning of the constitutional provision forbidding the deprivation of property without due process of law, as well as a denial of the equal protection of the laws.").   And ByteDance, as a foreign entity that has substantial connections with and holds property located in the United States, is entitled to those protections as well.  *See Nat'l Council of Resistance of Iran v. Dept. of State*, 251 F.3d 192, 203 (D.C. Cir. 2001) (foreign organizations that have "entered the territory of the United States and established substantial connections with this country . . . are entitled to the protections of the Constitution."); *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931) (foreign organization that acquires or holds property in the U.S. may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention).

104.    The August 6 order deprives TikTok Inc. and ByteDance of their property rights by allowing the Secretary of Commerce to prohibit "any transaction" by any person, or with respect to any property, subject to U.S. jurisdiction, with ByteDance, TikTok Inc., or any of ByteDance's other subsidiaries.  The Prohibitions, in turn, deprive Plaintiffs of their property rights by shutting down the TikTok application altogether.

105.    Despite these ruinous consequences, Plaintiffs received no notice of the August 6 order before it was issued, nor did they receive any notice of what the implementing Prohibitions would ban before they were issued.  And neither the August 6 order nor the Prohibitions afforded Plaintiffs an opportunity to respond and be heard on the deprivation ordered in the ban.

106.    The CFIUS process is not a substitute for the due process that Plaintiffs were owed in connection with the August 6 order.  The CFIUS process is overseen by different authorities,

under a different statutory framework, and resulted in a distinct executive order mandating divestiture (but not a ban) of the U.S. TikTok business. If anything, the CFIUS review *reinforces* the lack of due process that Plaintiffs received. The CFIUS review suffered from its own due process flaws. Throughout that process, Plaintiffs proposed a range of mitigation proposals to address any conceivable national security concerns associated with ByteDance's ownership of TikTok—up to and including a spin-out of the TikTok business to U.S. investors. The complete failure of the TikTok ban challenged here to take those proposals into account highlights the lack of due process afforded Plaintiffs in connection with the TikTok ban.

107. The August 6 order is thus unconstitutional because it deprives Plaintiffs of their property rights without adequate due process.

108. Defendants' due process violations will cause ongoing irreparable harm to Plaintiffs.

**Count 4:  The August 6 Executive Order and Commerce Department Prohibitions are *Ultra Vires* Because They Are Not Based on a Bona Fide National Emergency. (50 U.S.C. §§ 1701–1706)**

109. Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

110. IEEPA grants the President authority to regulate various international economic transactions during wartime or upon declaration of a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a).

111. Before the President is empowered to exercise authority under IEEPA, the President must first declare a national emergency for purposes of the NEA, 50 U.S.C. § 1601 *et seq.*

112.    On May 15, 2019, President Trump declared that "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services, with potentially catastrophic effects, and thereby constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." *See* Executive Order 13873 (Securing the Information and Communications Technology and Services Supply Chain).

113.    In his August 6, 2020 executive order targeting TikTok, President Trump drew upon the emergency declared a year earlier in Executive Order 13873, asserting that "additional steps must be taken to deal with the national emergency with respect to the information and communications technology and services supply chain," and that, "[a]t this time, action must be taken to address the threat posed by one mobile application in particular, TikTok."

114.    But the actions directed in the August 6 order are not supported by the emergency declared in Executive Order 13873.

115.    That previous executive order was designed to address asserted U.S. national security concerns about certain telecommunications companies' ability to abuse access to "information and communications technology and services" that "store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions, including economic and industrial espionage against the United States and its people."

116.    TikTok Inc. is not a telecommunications provider and it does not provide the types of technology and services contemplated by the 2019 executive order.  Specifically, TikTok Inc.

does not provide the hardware backbone to "facilitate the digital economy," and TikTok Inc. has no role in providing "critical infrastructure and vital emergency services."  Rather, TikTok Inc. is a social media company, and the TikTok mobile application is a software platform on which users express their views and opinions in short form video.

117.    Apart from its misplaced reliance on Executive Order 13873, the order also fails on its face to identify *any actual threat* that TikTok poses to the national security of the United States. As noted above, the order states, without any explanation and in direct conflict with the voluminous agency record of TikTok's robust data security practices, that TikTok (i) engages in data collection practices that "*potentially* allow[] China" to make use of U.S. user data for nefarious purposes, (ii) "*reportedly* censors content," and (iii) "*may* be used for disinformation campaigns." [44]   These speculative assertions, made without evidentiary foundation, do not constitute a bona fide national emergency.

118.    The August 6 order, as well as the Commerce Department Prohibitions implementing that order, is accordingly *ultra vires* because it is not based on a bona fide national "emergency" as required by Congress to support IEEPA authority.  The text of IEEPA requires that an "emergency" be an "unusual and extraordinary threat."   50 U.S.C. § 1701(a).   The legislative history of IEEPA makes clear that emergencies within the meaning of the statute are "rare and brief" as opposed to "normal, ongoing problems."  *See* Revision of Trading With the Enemy Act: Markup Before the H. Comm. on Int'l Relations, 95th Cong. 4 (1977).

119.    Because President Trump issued the August 6 order targeting Plaintiffs for political and strategic purposes pertaining to his political campaign, and not to deal with an "unusual and

---

[44] White House, *Executive Order on Addressing the Threat Posed by TikTok* (Aug. 6, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-addressing-threat-posed-tiktok/ (emphasis added).

extraordinary threat" to the national security, foreign policy, or the economy of the United States, the August 6 order is *ultra vires*.

120.    Defendants' *ultra vires* violation will cause ongoing irreparable harm to Plaintiffs.

**Count 5: The August 6 Executive Order and Department of Commerce Prohibitions are Ultra Vires and Otherwise Unlawful Because They Restrict Personal Communications and the Transmission of Informational Materials in Violation of IEEPA.**
**(50 U.S.C. §§ 1701–1706)**

121.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

122.    The authority granted to the President under IEEPA "does not include the authority to regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value."  50 U.S.C. § 1702(b)(1).

123.    Nor does IEEPA provide the President with authority to regulate or prohibit, directly or indirectly, the import and export of "any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds," regardless "of format or medium of transmission," so long as the materials are not independently controlled for export through operation of specified regulations.  *Id.* § 1702(b)(3).

124.    The TikTok application transmits and stores both personal communications and informational materials within the meaning of IEEPA.

125.    By banning the TikTok application in the United States, the August 6 order and the Department of Commerce Prohibitions necessarily restrict personal communications and the transmission of informational materials.

126.    The August 6 order and the Department of Commerce Prohibitions are therefore *ultra vires* and otherwise unlawful because they authorize the prohibition of activities that exceed the unambiguous limit on the scope of Presidential authority under IEEPA.

127.    Defendants' violations will cause ongoing irreparable harm to Plaintiffs.

### Count 6:  IEEPA Violates the Non-Delegation Doctrine.

128.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth in this count.

129.    The U.S. Constitution provides for separation of powers between the branches of our government to avoid excessive concentration of power in any single branch.  The Constitution vests legislative power in the Congress, executive power in the President, and judicial power in the courts, U.S. Const., arts. I–III, and it limits the delegation of those powers to any other branch.

130.    Congress can delegate its legislative functions to another branch only if "Congress has supplied an intelligible principle to guide the delegee's use of discretion."  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019).

131.    In enacting IEEPA, Congress delegated legislative authority to the President, empowering the President to declare a national emergency and take action "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701.

132.    Concluding that the August 6 order is *ultra vires* is necessary to avoid a serious constitutional question, because the President's overbroad and unjustified claim of authority in this matter makes clear that if IEEPA authorizes this ban, then IEEPA lacks any intelligible principle to guide or constrain the President's action and thereby violates the non-delegation doctrine.  The ambiguity and breadth of President Trump's August 6 order highlights that the President's ability

to invoke a national emergency under IEEPA is so open-ended that Congress has not supplied an "intelligible principle" to guide Executive Branch decision-making authority.  *Gundy*, 139 S. Ct. at 2123.  Instead, Congress's passage of IEEPA has in practice amounted to "merely announc[ing] vague aspirations and then assign[ing] others the responsibility of adopting legislation to realize its goals."  *Id.* at 2133  (Gorsuch, J., dissenting).  Such an expansive delegation of authority runs afoul of core constitutional values of accountability and the separation of powers.

133.    The lack of any intelligible principle to guide or constrain the President's action is manifest in the August 6 order, which purports to ban a U.S. company based in part on the content of the communications transmitted on its platform and without any bona fide national security basis.  This overbroad exercise of authority confirms that the statute has become "nothing more than the will of the current President."  *Id.* at 2135 (Gorsuch, J., dissenting).

134.    The August 6 order is accordingly unconstitutional because IEEPA violates the non-delegation doctrine.

135.    President Trump's unconstitutional exercise of IEEPA authority will cause ongoing irreparable harm to Plaintiffs.

**Count 7: The August 6 Executive Order Violates the Takings Clause of the Fifth Amendment.**

136.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth in this count.

137.    The Takings Clause provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.

138.    The President has repeatedly made demands for a "very substantial" payment to the U.S. Treasury Department as a condition of approving a divestiture of TikTok Inc.'s U.S. assets and has made clear that, in the absence of such a divestiture and payment, he would ban TikTok.[45]

139.    There is no conceivable regulatory basis for such a demand—or for the August 6 order's destruction of Plaintiffs' business more generally—and this unjustifiable economic deprivation interferes with Plaintiffs' legitimate investment-backed expectations. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

140.    To the extent the President conditions Plaintiffs' continued operation in the United States upon a payment to the Treasury Department, such conduct violates the Takings Clause of the Fifth Amendment.

141.    Defendants' taking in violation of the Fifth Amendment will cause ongoing irreparable harm to Plaintiffs, for which there is no adequate remedy at law.

### <u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

(1)    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the Prohibitions are unlawful and unconstitutional;

(2)    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the President's August 6 order (No. 13942) is unlawful and unconstitutional;

(3)    Issue an order vacating and setting aside the Commerce Department's Prohibitions, preliminarily and permanently enjoining Defendants from implementing or enforcing the Prohibitions, and preserving the status quo.

---

[45] Fadel Allassan, *Trump says TikTok will be banned if not sold by Sept. 15, demands cut of sale fee*, Axios (Aug. 3, 2020), https://www.axios.com/trump-tiktok-banned-microsoft-fd45748d-1ee8-4f4a-812a-09ec76d6f8e2.html.

(4)    Issue an order invalidating the President's August 6 order (No. 13942), preliminarily and permanently enjoining Defendants from implementing or enforcing the August 6 order (No. 13942), and preserving the status quo;

(5)    Grant any other and further relief that this Court may deem just and proper.

DATED: September 18, 2020                    Respectfully submitted,


                                              /s/ John E. Hall 

Anders Linderot*                             John E. Hall (D.C. Bar. No. 415364)
COVINGTON & BURLING LLP                      Beth S. Brinkmann (D.C. Bar. No.477771)
The New York Times Building                  Alexander A. Berengaut (D.C. Bar. No. 989222)
620 Eighth Avenue                            Megan A. Crowley (D.C. Bar. No. 1049027)
New York, New York 10018-1405                Megan C. Keenan (D.C. Bar. No. 1672508)
Telephone: +1 (212) 841-1000                 COVINGTON & BURLING LLP
Facsimile: + 1 (212) 841-1010                One CityCenter
Email:  alinderot@cov.com                    850 Tenth Street, NW
                                             Washington, DC 20001
Mitchell A. Kamin*                           Telephone: +1 (202) 662-6000
COVINGTON & BURLING LLP                      Facsimile: + 1 (202) 778-6000
1999 Avenue of the Stars, Suite 3500         Email:  jhall@cov.com
Los Angeles, California 90067-4643                   bbrinkmann@cov.com
Telephone: + 1 (424) 332-4800                        aberengaut@cov.com
Facsimile: + 1 (424) 332-4749                        mcrowley@cov.com
Email:  mkamin@cov.com                               mkeenan@cov.com


*Pro Hac Vice motion forthcoming             Attorneys for Plaintiffs