# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TIKTOK INC., et al., | |
| *Plaintiffs*, | |
| v. | Case No. 20-cv-02658 (CJN) |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

<small>TABLE OF CONTENTS</small>

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 4

    A.    TikTok Is a Massively Popular Forum for Creative Expression and Political Speech, Akin to a Virtual "Town Square" for Over 100 Million Americans. ................................................................................ 4

    B.    TikTok Has Implemented Safeguards to Protect the Security of U.S. User Data. .......................................................................................................... 4

    C.    For Almost a Year Before the Ban, TikTok Participated Transparently in a National Security Review and Made Extensive Efforts to Fully Address All Purported Concerns. ............................................................................ 6

    D.    The Administration's Political Focus on China and on TikTok. ............. 7

    E.    President Trump Issues His August 6 Order Premised on a Purported Need to Ban TikTok, but Subsequent Administration Actions Immediately Undercut That Justification. ..................................................................... 8

    F.    The Commerce Department Issues Prohibitions That Will Ban TikTok in the United States. .................................................................................... 11

    G.    The Prohibitions Are Causing Plaintiffs Irreparable Harm. ................ 13

ARGUMENT ............................................................................................................. 15

I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ..................... 15

    A.    The Prohibitions Violate IEEPA Because They Regulate and Prohibit "Personal Communication" and "Informational Materials." .............. 15

        1.    IEEPA Prohibits the Commerce Department from Regulating "Personal Communication" and "Informational Materials." ......... 15

        2.    The Prohibitions Unlawfully Regulate "Personal Communications" and "Informational Materials." ............................................... 18

    B.    The Prohibitions Are Arbitrary and Capricious Because the Agency Failed to Consider Reasonable Alternatives and Offered a Pretextual Justification for Its Action. ........................................................................................ 20

        1.    The Agency Ignored the Evidence Before It and Failed to Consider Reasonable Alternatives to the Ban on TikTok. ....................... 20

        2.    The Stated Justification for the Prohibitions Is Pretextual. ....... 23

    C.    The Prohibitions Violate Plaintiffs' Constitutional Rights. ................ 27

        1.    The Prohibitions Infringe on Core Protected Speech in Violation of the First Amendment. ............................................................. 27

i

2.   The Prohibitions Deprive Plaintiffs of Their Constitutional Right to Due Process.............................................................................................. 30

D.   The Prohibitions and August 6 Order Violate IEEPA in Other Respects............. 31

II.   The Remaining Factors Require Injunctive Relief. .......................................................... 33

A.   The Prohibitions and August 6 Order Are Inflicting, and Will Continue to Inflict, Irreparable Harm. ......................................................................................... 33

B.   The Balance of Equities and Public Interest Require Injunctive Relief. ............... 36

CONCLUSION............................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
    686 F.3d 965 (9th Cir. 2012) ................................................................31

*Ala. Power Co. v. EPA*,
    40 F.3d 450 (D.C. Cir. 1994) ...............................................................31

*Alexander v. United States*,
    509 U.S. 544 (1993) .............................................................................28

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
    215 F.3d 61 (D.C. Cir. 2000) ...............................................................20

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ...............................................................................28

*Bayer HealthCare, LLC v. FDA*,
    942 F. Supp. 2d 17 (D.D.C. 2013) .......................................................34

*Beacon Theatres v. Westover*,
    359 U.S. 500 (1959) .............................................................................36

*Bernstein v. Dep't of State*,
    974 F. Supp. 1288 (N.D. Cal. 1997) .....................................................16

*Bernstein v. U.S. Dep't of State*,
    922 F. Supp. 1426 (N.D. Cal. 1996) .....................................................28

*Bracco Diagnostics, Inc. v. Shalala*,
    963 F. Supp. 20 (D.D.C. 1997) .............................................................36

*Brodie v. Dep't of Health and Human Servs.*,
    715 F. Supp. 2d 74 (D.D.C. 2010) .......................................................35

*Cernuda v. Heavey*,
    720 F. Supp. 1544 (S.D. Fla. 1989) .....................................................16

*Corp. of Presiding Bishop of Church of Jesus Christ
    of Latter-Day Saints v. Hodel*, 637 F. Supp. 1398 (D.D.C. 1986)..........25

*\*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ...............................................................23, 24, 26

iii

*Edwards v. District of Columbia,*
    755 F.3d 996 (D.C. Cir. 2014) ...................................................................29

*Elrod v. Burns,*
    427 U.S. 347 (1976) .........................................................................................33

*Feinerman v. Bernardi,*
    558 F. Supp. 2d 36 (D.D.C. 2008) ..........................................................36

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ...................................................................36

*Grace v. District of Columbia,*
    187 F. Supp. 3d 124, 149 (D.D.C. 2016) ..............................................33

*Greatness v. Fed. Election Comm.,*
    831 F.3d 500 (D.C. Cir. 2016) ...................................................................36

*\*Holy Land Found. for Relief and Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003) ...................................................................30

*Home Box Office, Inc. v. FCC,*
    567 F.2d 9 (D.C. Cir. 1977) ........................................................................24

*Junger v. Daley,*
    209 F.3d 481 (6th Cir. 2000) .....................................................................28

*\*Kalantari v. NITV, Inc.,*
    352 F.3d 1202 (9th Cir. 2003) ....................................................16, 17, 19

*KindHearts v. Geithner,*
    647 F. Supp. 2d 857 (N.D. Ohio 2009) .................................................31

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ..................................................................36, 37

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) .........................................................................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................21, 22

*N.E. Coal. v. NRC,*
    727 F.2d 1127 (D.C. Cir. 1984) ................................................................27

*Nalco Co. v. EPA,*
    786 F. Supp. 2d 177 (D.D.C. 2011) ................................................31, 34

*New York Times Co. v. United States*,
  403 U.S. 713 (1971)................................................................................29

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017)........................................................................27, 29

*Planned Parenthood v. Heckler*,
  712 F.2d 650 (D.C. Cir. 1983)................................................................15

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015)..........................................................37

*Ralls Corp. v. CFIUS*,
  758 F.3d 296 (D.C. Cir. 2014)................................................................30

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)................................................................................28

*Smoking Everywhere, Inc. v. FDA*,
  680 F. Supp. 2d 62 (D.D.C. 2010)......................................................35, 36

*Sterling Com. Credit-Michigan, LLC v. Phoenix Industries I, LLC*,
  762 F. Supp. 2d 8 (D.D.C. 2011).............................................................35

*Tummino v. Torti*,
  603 F. Supp. 2d 519 (E.D.N.Y. 2009) .....................................................24

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)................................................................................29

*U.S. WeChat Users Alliance v. Trump*,
  No. 3:20-cv-05910-LB (N.D. Cal. Nov. 19, 2020)..................................27

*\*United States v. Amirnazmi*,
  645 F.3d 564 (3d Cir. 2011)....................................................................17

*United States v. Playboy Entm't Grp.*,
  529 U.S. 803 (2000)................................................................................28

*United States v. Robel*,
  389 U.S. 258 (1967)................................................................................30

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
  749 F.2d 788 (D.C. Cir. 1984)............................................................21, 22

*Winter v. NRDC*,
  555 U.S. 7 (2008)....................................................................................15

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
   18 F.3d 854 (10th Cir. 1994) ..................................................................23

*Yakima Valley Cablevision, Inc. v. FCC*,
   794 F.2d 737 (D.C. Cir. 1986) ................................................................20

**Statutes**

5 U.S.C. § 706(2) ..................................................................... *passim*

50 U.S.C. § 1701(a) ...............................................................31, 32

50 U.S.C. § 1702(b) .................................................................. *passim*

50 U.S.C. § 4305 .............................................................................17

50 U.S.C. § 4565 ...............................................................................7

5 U.S.C. § 702 ........................................................................ *passim*

50 U.S.C. § 1601 ...........................................................................31

**Other Authorities**

31 C.F.R. § 560.210 ......................................................................19

31 C.F.R. § 560.315 ......................................................................19

31 CFR § 560.540(a)(1) ...............................................................19

Dep't of Justice Press Release (June 7, 2017), *available at*
   https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-ends-third-
   party-settlement-practice ...........................................................26

Office of the Attorney General, Prohibition on Settlement Payments to Third
   Parties (June 5, 2017), *available at* https://www.justice.gov/opa/press-
   release/file/971826/download ....................................................25

## INTRODUCTION

This motion seeks to enjoin the government from unlawfully banning TikTok—a mobile software application and online communication forum used by over 100 million Americans—from the United States.  On August 6, 2020, President Trump issued an executive order that invoked the International Emergency Economic Powers Act ("IEEPA") and purported to ban "any transactions" with TikTok in 45 days ("August 6 order").  The order directed the Department of Commerce to identify the specific transactions prohibited by the order.  On September 18, the Department of Commerce issued a list of the prohibited transactions ("the Prohibitions"), which it ordered to be implemented in two phases:  (i) an initial prohibition that prevents TikTok from being available for download or update in the United States on mobile application stores as of September 20, 2020; and (ii) a subsequent set of prohibited transactions necessary to maintain and support TikTok's core functionality that will force the complete shut-down of the application in the United States on November 12, 2020.  Thereafter, on September 21, 2020, the Commerce Department withdrew the above notice.  Then, on September 22, 2020, the Commerce Department issued a new notice, which will be published in the Federal Register on September 24, 2020, that extends the effective date of the initial Prohibition by one week, from September 20 to September 27, 2020.  As explained herein, Plaintiffs have made extraordinary efforts to try to satisfy the government's ever-shifting demands and purported national security concerns, including through changes in the ownership and structure of their business, and they are continuing to do so.  However, because the Prohibitions and the August 6 order dramatically exceed the agency's and the President's lawful power as authorized by Congress and permitted by the U.S. Constitution, they should be enjoined.

*First*, IEEPA specifically states that the President's authority does *not* extend to the direct or indirect regulation or prohibition of "personal communication" and the international flow of "information or informational materials" such as film, photographs, and artwork, regardless of the "format or medium of transmission." 50 U.S.C. § 1702(b)(1), (3). Here, the Prohibitions expressly violate this statutory command by prohibiting TikTok's users—including Plaintiffs—from (1) sending personal communications to one another over the platform, and (2) sharing with other users, including users in other countries, the very content (videos and artwork) that the statute identifies as beyond the President's authority.

*Second*, the Prohibitions are unlawful under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702(2)(A), which prohibits agency action that is "arbitrary, capricious, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The government's conduct is neither reasonable nor reasonably explained, and so is arbitrary and capricious in multiple respects. The Commerce Department ignored the evidence before it and failed to consider reasonable alternatives to the Prohibitions that would have addressed its purported national security concerns. Moreover, as the President's and other agency officials' confusing and contradictory statements about TikTok over many months demonstrate, the Prohibitions were not motivated by a genuine national security concern, but rather by political considerations relating to the upcoming general election.

*Third*, the Prohibitions violate the First and Fifth Amendments. Plaintiffs—as well as millions of Americans every day—engage in core protected speech on TikTok in pursuit of a wide variety of political, social, and cultural ends. The Prohibitions unlawfully restrict this speech in violation of the First Amendment. Furthermore, by prohibiting TikTok from operating in the United States without providing Plaintiffs notice or opportunity to be heard, the Commerce Department violated the due process protections of the Fifth Amendment.

**Fourth**, the Prohibitions and August 6 order exceed the Commerce Department's lawful authority because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat," as IEEPA requires.

Plaintiffs are likely to succeed on the merits of each of these claims, any of which would support a preliminary injunction enjoining the Prohibitions and August 6 order pending the resolution of this action.  There is simply no genuine emergency here that would justify the government's precipitous actions, as evidenced by the Commerce Department's 45-day delay in issuing the Prohibitions after the President identified the purported national security threat, as well as the additional one-week delay in implementing the first Prohibition, and the further seven-week delay in fully implementing the Prohibitions' restrictions.  And there is no plausible reason to insist the Prohibitions be enforced immediately.  This is particularly true for the first Prohibition, which eliminates only new TikTok users and allows continued use of the application in the United States for existing users, but does not allow updates (including security updates) to maintain that service—an action that will *contribute* to a data privacy risk instead of ameliorating it, undermining the very reason the Prohibitions were purportedly issued.

Meanwhile, if the Prohibitions are not enjoined, the harm to Plaintiffs will be irreparable.  When the Prohibitions first take effect on September 27, 2020, hundreds of millions of Americans who have not yet downloaded TikTok will be shut out of this large and diverse online community—six weeks before a national election.  And an American company that employs thousands of individuals will suffer devastating harm to its business, from which it cannot recover even if this Court concludes the government's conduct was unlawful.

The Prohibitions and August 6 order should accordingly be preliminarily enjoined pending the resolution of this action.

## STATEMENT OF FACTS

**A.     TikTok Is a Massively Popular Forum for Creative Expression and Political Speech, Akin to a Virtual "Town Square" for Over 100 Million Americans.**

TikTok is a social media application (or "app") that provides an online communication platform for users to create and share short-form videos.  *See* Decl. of Vanessa Pappas ("Pappas Decl.") ¶¶ 4, 17.  In this respect, TikTok operates much like other apps such as Snapchat, YouTube, and Instagram, in that users create and post content on the platform.  *Id.* ¶ 19.  Since its global launch in September 2017, TikTok's popularity has exploded, both in the United States and around the world.  Today, based on quarterly usage, over 100 million Americans use TikTok, and until recently, TikTok was adding 424,000 new daily U.S. users each day.  *Id.* ¶¶ 9, 18.  While many users are attracted to TikTok because of the blend of entertainment, creativity, and humor that the application provides, TikTok also is used to discuss more serious subjects, including political and social issues of all types and from all perspectives.  Ex. 1.

TikTok is operated by Plaintiff TikTok Inc., a California corporation headquartered in Los Angeles with a U.S.-based management team, and its parent company, Plaintiff ByteDance Ltd., is incorporated in the Cayman Islands, with offices in the United States, China, and elsewhere. TikTok was designed from the ground up to serve a user base outside of China and to be completely separate from ByteDance's China-facing applications.  Declaration of Roland Cloutier ("Cloutier Decl.") ¶ 8.  TikTok is not and never has been offered in China.  *Id.* ¶ 4.

**B.     TikTok Has Implemented Safeguards to Protect the Security of U.S. User Data.**

An important public policy issue affecting all social media companies is the security of user data.  Declaration of Steven Weber ("Weber Decl.") ¶ 4.  Security risks are indisputably an industry-wide issue.  *Id.*  Sophisticated organizations and information security professionals understand that malicious actors are constantly evolving, which means the data security threat

landscape is always changing.  *Id.* ¶ 5.  Even an organization that maintains best-in-class security practices across the board can never eliminate the risk that its data may be inadvertently accessed or disclosed.  *Id.*

The industry has developed a range of safeguards and best practices that can effectively counter these risks.  *Id.* ¶¶ 4, 9.  For example, it is preferable from a data security perspective to segment and tightly control access to sensitive data in order to minimize unauthorized access or other deviations from expected behaviors.  *Id.*  Sensitive user data should also be stored in encrypted form using industry-standard methods, so that even if the data is subject to unauthorized access, it will be indecipherable to the person or organization who lacks the encryption key.  *Id.*

TikTok's approach for dealing with data security risks is consistent with these industry best practices.  Weber Decl. ¶ 10.  For example, TikTok segments U.S. user data and imposes access control and auditing policies that limit and track access to customer data.  *Id.*  TikTok also encrypts user data in storage and during transmission using the same industry-standard protocols as major banks and e-commerce platforms, and limits management of encryption keys to TikTok's U.S.-based security team.  Cloutier Decl. ¶¶ 8-9; *see* Weber Decl. ¶ 10.

The corporate officer entrusted with protecting TikTok user data, Chief Security Officer Roland Cloutier, is an American citizen based in Florida.  Cloutier Decl. ¶¶ 1-2.  Vanessa Pappas, ByteDance's interim head of the global TikTok business, also is based in the United States.  Pappas Decl. ¶ 6.  As Mr. Cloutier and Ms. Pappas explain in their declarations, neither TikTok Inc. nor ByteDance provides TikTok user data to the Chinese government, and the Chinese government has never asked for data on TikTok users or to moderate TikTok content.  Cloutier Decl. ¶¶ 1-2; Pappas Decl. ¶ 15.  If they were to do so, Plaintiffs would reject such a request.  Cloutier Decl. ¶ 12; Pappas Decl. ¶ 15.  Moreover, before any ByteDance China-based engineering personnel

may access encrypted TikTok user data, they must receive express permission through a process overseen by TikTok's U.S.-based team.  Cloutier Decl. ¶ 12; Weber Decl. ¶ 10.

Another industry-wide policy issue raised by social media companies is the integrity of algorithms that are used to recommend content to users.  Weber Decl. ¶¶ 4, 13.  Here too, the industry has developed best practices to combat the use of algorithms to manipulate opinions or change perspectives in illegitimate ways.  *Id.* ¶ 13.  Consistent with these industry standards, TikTok maintains safeguards to protect the integrity of its source code, or "recommendation algorithm."  Cloutier Decl. ¶¶ 14-17.  There is no evidence that its source code has been compromised such that the app is being used to censor content or spread misinformation.  *See* Weber Decl. ¶¶ 14-17.  Like many multinational technology corporations, TikTok Inc. relies on engineers in China to help develop its code.  Cloutier Decl. ¶ 14.  To protect the integrity of its source code, TikTok Inc. deploys industry standard workflow systems that require employees to obtain appropriate authorizations to access source code.  *Id.*  Such access is continually monitored and logged, and TikTok's source code undergoes both internal and third-party reviews to guard against any potential vulnerabilities.  *Id.* ¶ 16.  Even further, in late July 2020, TikTok announced the creation of a "Transparency and Accountability Center," where outside experts will have the opportunity to examine the TikTok code, including the code driving the recommendation algorithms that determine what content is shown to users—an unprecedented step for a technology or social media company.  Ex. 2; *see* Weber Decl. ¶ 17.

### C. For Almost a Year Before the Ban, TikTok Participated Transparently in a National Security Review and Made Extensive Efforts to Fully Address All Purported Concerns.

In 2019, ByteDance was notified that the Committee on Foreign Investment in the United States ("CFIUS") was considering whether to review a 2017 acquisition by ByteDance of Musical.ly, a China-based video-sharing application that was merged with TikTok and largely

abandoned.[1]   From October 2019 through August 2020, Plaintiffs provided voluminous documentation in response to CFIUS's questions, including about Plaintiffs' data security safeguards that help ensure TikTok's U.S. user data is appropriately safeguarded in the United States and cannot be accessed by any unauthorized person.   Notwithstanding the U.S. government's failure to identify any security risk, Plaintiffs engaged extensively with the government in good faith to provide a constructive solution to any conceivable concerns the government may have.   Ex. 3.   Such a solution would have allowed the U.S. government to mitigate national security risks around data and algorithms *beyond* what it could achieve with TikTok's domestic competitors.   *See* Weber Decl. ¶ 18.

> **D.** **The Administration's Political Focus on China and on TikTok.**

While the CFIUS negotiations were ongoing, the political climate changed, and China, and ultimately TikTok, became an increasingly prominent political focus of the President.   In January 2020, President Trump stated on Twitter that the recently signed trade deal between the United States and China would "bring both the USA & China closer together in so many other ways" and that it was "[t]errific working with President Xi [Jinping], a man who truly loves his country." Ex. 4 at 3.   Even as the COVID-19 pandemic emerged, the President stated that he had "a great relationship with President Xi," Ex. 5 at 1, and that "[t]he United States greatly appreciates [China's] efforts and transparency [on the Coronavirus]," Ex. 4 at 3.

---

[1]      CFIUS is an interagency committee of the executive branch tasked with reviewing foreign acquisitions of U.S. businesses to determine their impact on national security.   *See* 50 U.S.C. § 4565.   CFIUS is empowered to mitigate these risks by imposing or otherwise reaching agreement with the transaction parties on conditions to address national security concerns.   *Id.*   If the risks to a particular transaction cannot be mitigated, the President is empowered to prohibit the transaction to the extent otherwise authorized by CFIUS.   *Id.*

As the COVID-19 pandemic spread across the United States and the domestic economy worsened, however, the President and members of his administration began to use increasingly harsh anti-Chinese political rhetoric and repeatedly sought to blame China for all of the manifest ills of the pandemic. *See, e.g.*, Ex. 6 at 18 ("China sent us the plague, thank you very much."); Ex. 7 at 11 ("The fact is, people don't like saying it—they know it's true: It's China's fault. Okay?"). On July 31, 2020, in a series of remarks he made in Florida, the President said: "We will make America great again, you've heard that before. And we were there until the virus came upon us and we'll soon be there again. And China, we have not forgotten." Ex. 8 at 5.

In the summer of 2020, the President and his campaign began targeting TikTok, shortly after it surfaced in public reporting that TikTok users had claimed they used the app to coordinate mass ticket reservations for the President's campaign rally in Tulsa, resulting in an embarrassment for the President's campaign when significantly fewer persons appeared for the rally than the campaign had projected in the days leading up to the event. Ex. 9. Shortly thereafter, Secretary of State Pompeo announced that the Administration was "looking at" banning TikTok, Ex. 10, and the President's re-election campaign ran negative Facebook advertisements targeting the app and asking supporters to "sign the petition now to ban TikTok," Ex. 11.

**E.    President Trump Issues His August 6 Order Premised on a Purported Need to Ban TikTok, but Subsequent Administration Actions Immediately Undercut That Justification.**

On August 6, 2020, President Trump issued an executive order entitled "Addressing the Threat Posed by TikTok." *See* Ex. 12. The order speculated—without any evidentiary support— that ByteDance's ownership of TikTok could allow China to access and misuse U.S. user data, and that the Chinese government may censor or use TikTok content for propaganda purposes. Invoking IEEPA, the order prohibits "any transaction" by "any person, or with respect to any property, subject to the jurisdiction of the United States," with "ByteDance Ltd. (a.k.a. Zijié

8

Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce." *Id.* It further directs the Secretary of Commerce to "identify the transactions subject to" the ban 45 days after the date of the order, and declares that the transactions are prohibited "beginning 45 days after" the August 6 order, i.e., September 20, 2020. *Id.*

The August 6 order was issued suddenly and without warning, on the heels of the anti-TikTok statements by the Administration and the Trump campaign. The order reflects nothing of the then-ongoing CFIUS process, and, indeed, the order's facial assertion that a complete U.S. ban is required is directly rebutted by those efforts. *See id.*

In the aftermath of the TikTok ban, senior government officials made statements demonstrating that the August 6 order was animated by China-focused considerations unrelated to Plaintiffs. On August 20, 2020, for example, Undersecretary of State Keith Krach candidly acknowledged that the TikTok ban is "really about . . . three things"—none of which have anything to do with the supposed national security threat alleged in the August 6 order: (i) "the Communist Party's surveillance state and 5G is the backbone"; (ii) "that great China Firewall where all data can go in, but none come out"; and (iii) "reciprocity, because our apps aren't allowed in China . . . look at YouTube or Google search." Ex. 13.

Meanwhile, on August 14, 2020, invoking CFIUS, the President issued a *separate* executive order titled "Regarding the Acquisition of Musical.ly by ByteDance Ltd.," which orders ByteDance to divest the U.S. TikTok business. Ex. 14 ("CFIUS order"). In the weeks following the CFIUS order, the President asserted that for him to approve a restructuring that would avoid the ban, the Treasury Department had to receive a "substantial portion" of any price paid by the U.S. acquirer or partner. Ex. 15; *see* Ex. 16 at 2. It is entirely improper for the President to demand

a payment in these circumstances—as the President himself has since admitted.  Ex. 17 ("Amazingly, I find that you're not allowed to do that — you're not allowed to accept money. . . . There's no legal path to doing that.").

On September 3, 2020, Plaintiffs received an 18-item administrative subpoena from the Department of Commerce.  Ex. 18.  This subpoena, issued nearly a month *after* the August 6 order, requested broad categories of records regarding, among other topics, Plaintiffs' data centers, domain names, business partners, content moderation, data collection, and employees—exactly the sort of information one would expect the government to assess *before* issuing anything as sweeping as the August 6 order.  *Id.*

On August 28, 2020, China's Ministry of Commerce and Ministry of Science and Technology issued regulations that prevent "technology based on data analysis for personalized information recommendation services" from being exported without a license.  Ex. 19; *see* Exs. 20, 21.  TikTok's recommendation engine technology was part of the contemplated restructuring of TikTok's U.S. operations, and this regulatory requirement accordingly affected the negotiations that Plaintiffs were then pursuing.

In light of this changing landscape, and even though Plaintiffs believed the August 6 order to be unlawful, they continued to work in good faith to explore alternative measures that might satisfy the Administration.  To this end, on September 13, Plaintiffs submitted another proposal to the U.S. government setting forth additional details on a multi-layered approach to security of the app and user data to fully address any concerns claimed in the August 6 and CFIUS orders.  *See* Ex. 22.

**F.      The Commerce Department Issues Prohibitions That Will Ban TikTok in the United States.**

With the discussions between TikTok and the U.S. government still ongoing, on September 18, 2020, the Department of Commerce issued a list of prohibited transactions to implement the August 6 ban.  Ex. 23 ("Prohibitions").  The Prohibitions simply incorporate by reference the President's purported justifications for the August 6 order, and offer no additional factual support for the ban.  The Prohibitions identify a series of prohibited transactions that were to take effect on September 20, 2020 and November 12, 2020, first requiring the removal of TikTok from U.S. app stores, and, then shutting down TikTok in the United States entirely.

On September 19, 2020, the President informed reporters that he had given his "blessing" and "approve[d] . . . in concept" an agreement between TikTok, Oracle, and Walmart to create a new U.S.-based entity called TikTok Global.  Ex. 24.  The President indicated that the agreement involved "about a $5 billion contribution toward education," but did not specify the source of the investment or the purpose for which it would be used.  Ex. 25.  The Commerce Department also issued a press release stating that, "in light of recent positive developments," the first phase of the Prohibitions banning TikTok from U.S. app stores would be postponed from September 20 until September 27, 2020.  Ex. 26.

The same day, TikTok released a statement regarding its proposed agreement to address the U.S. government's national security concerns.  Ex. 22.  Under the proposal, (1) Oracle would host all U.S. user data and secure associated computer systems to ensure that U.S. national security requirements are satisfied, (2) TikTok would enter into a commercial partnership with Walmart, and (3) both Oracle and Walmart would receive up to a 20 percent stake in TikTok Global.  *Id.*

During a campaign rally in Fayetteville, North Carolina that evening, however, the President announced to supporters what he alleged to be a new term of the proposed TikTok

agreement.  Specifically, he stated that the U.S. government had a "deal worked out," in which the parties to the deal would "pay $5 billion into a fund for education" so that "we can educate people as to the real history of our country."  Ex. 27.  Plaintiffs had not agreed to contribute to any such fund.  The following day, on September 20, 2020, ByteDance released a statement confirming it had first heard about the $5 billion education fund from media reports.  *See* Ex. 28.

On September 21, 2020, the Department of Commerce withdrew the September 18 document setting forth the Prohibitions.  Then, on September 22, 2020, it promulgated a new document that moved the implementation date for the initial Prohibition from September 20 to September 27, 2020.  Ex. 29.  The September 22 document, which will be published in the Federal Register on September 24, 2020, was otherwise identical to the Prohibitions.  *Id.*

As of September 27, 2020, the Prohibitions forbid transactions involving "[a]ny provision of services to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store" available to individuals in the United States, which prevents TikTok from being available for download on U.S. app stores.  *Id.*

As of November 12, 2020, the Prohibitions prohibit transactions involving:

- "[a]ny provision of internet hosting services enabling the functioning or optimization of the TikTok mobile application,"

- "[a]ny provision of content delivery network services enabling the functioning or optimization of the TikTok mobile application within the [United States],"

- "[a]ny provision of directly contracted or arranged internet transit or peering services enabling the functioning or optimization of the TikTok mobile application within the [United States]," and

- "[a]ny utilization of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the [United States]."

*Id.* This second set of Prohibitions will prevent Plaintiffs and their commercial partners from providing the services that enable the TikTok application to function, and will effectively shut down TikTok in the United States.

### G. The Prohibitions Are Causing Plaintiffs Irreparable Harm.

Absent preliminary injunctive relief, the Prohibitions will inflict devastating and irreparable harm on Plaintiffs during the pendency of this case.

The Prohibitions will decimate the app's user base, even ahead of the shut-down. Until the Administration's intervention, TikTok was one of the fastest growing apps in the United States, and its continued rapid growth is necessary to maintain its competitive market position. Pappas Decl. ¶ 17. As a consequence of the Prohibitions, TikTok will no longer be available on the U.S. app stores as of September 27, which halts the daily influx of new U.S. users. *Id.* ¶ 18. Hundreds of millions of Americans who have not yet downloaded the app will thereby be prevented from joining and communicating with the TikTok community, and many instead are already beginning to build relationships with competing platforms, where content creators will follow in order to attract new audiences. *Id.* ¶¶ 18-19, 21. And on November 12, 2020, the app will not be useable by existing U.S. users. *See* Ex. 29. Competitors are already taking, and will continue to take, advantage of this impending shutdown to entice TikTok creators and users to switch platforms. Pappas Decl. ¶¶ 21-22. Even if the ban is lifted after a period of weeks or months, the harm to TikTok's user base and competitive position will be permanent. *Id.* ¶ 19.

The Prohibitions also will destroy the goodwill that Plaintiffs need to partner with other businesses and advertisers. *Id.* ¶ 23. Once TikTok is removed from the app stores, commercial partners will increasingly move away from TikTok, leading not just to a loss of revenue but also extraordinary harm to Plaintiffs' reputation and goodwill, making it unlikely that these relationships could be salvaged even if the ban is later lifted. *Id.* Indeed, as a result of the market

uncertainty generated by the government's decision to target Plaintiffs, major commercial partners have already backed out of partnerships with TikTok, resulting in millions of dollars in losses and damage to Plaintiffs' relationships with these key business partners. *Id.* ¶¶ 23-24. This trend will accelerate as the ban against new users is imposed and the full ban against the app in the U.S. approaches. *Id.*

Even though the Prohibitions are limited to the United States, they will impact TikTok's business globally. Pappas Decl. ¶ 20. Because content created by U.S. users can comprise as much as 60 percent of the content in non-U.S. markets, the shutdown of the app in the United States will result in a massive decrease in global content, which in turn will negatively impact user and partner attraction and retention. *Id.* The harms explained above will have a devastating impact on Plaintiffs, completely destroying their business.

The Prohibitions also will greatly harm Plaintiffs' U.S. workforce. *Id.* ¶ 26. TikTok is a technology business; it competes fiercely for software engineers and other talent, and many of its employees are currently being aggressively recruited by competitors. *Id.* Given that the U.S. TikTok business will be shut down as a result of the ban, it will be impossible to recruit and retain employees devoted to maintaining the service. *Id.*

Finally, wholly independent of these harms to the TikTok business, the Prohibitions also cause irreparable harm to Plaintiffs' First Amendment rights. They will prevent TikTok Inc. from continuing to create and share messages about a variety of issues and current events, and from expressing its ideas through dissemination and use of its code. The Prohibitions also will have a profoundly negative impact on the public interest, unlawfully restricting core protected speech by millions of Americans in violation of their First Amendment rights at one of the most critical times—during the run-up to a national election.

**ARGUMENT**

A preliminary injunction should issue because Plaintiffs have established that (1) there is a likelihood of success on the merits, (2) they will face irreparable harm in the absence of preliminary relief, (3) the balance of equities favors preliminary relief, and (4) an injunction is in the public interest. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

**I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

As explained below, the Prohibitions and August 6 order (1) violate the express terms of IEEPA by exceeding the executive branch's delegated authority, (2) are arbitrary and capricious under the APA, (3) violate Plaintiffs' First and Fifth Amendment rights, and (4) otherwise violate IEEPA because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat," as IEEPA requires.

**A.      The Prohibitions Violate IEEPA Because They Regulate and Prohibit "Personal Communication" and "Informational Materials."**

Agency action must be set aside if it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Thus, it is "[a]n essential function of the reviewing court . . . to guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority." *Planned Parenthood v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983). Here, the Prohibitions squarely conflict with the limits placed on the Commerce Department's authority under IEEPA—a conclusion reinforced by the serious constitutional problems that would be created by the agency's reading of the Act.

       1.      IEEPA Prohibits the Commerce Department from Regulating "Personal Communication" and "Informational Materials."

In enacting and amending IEEPA, Congress carefully limited the powers delegated to the Executive Branch. Specifically, Section 1702(b) provides, in relevant part, that the authority granted to the President under IEEPA "does not include the authority to regulate or prohibit,

*directly or indirectly* … [any] **personal communication**, which does not involve a transfer of anything of value" or the importation or exportation "regardless of format or medium of transmission, of any **information or informational materials**, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. § 1702(b)(1), (3) (emphasis added).[2]   Through multiple statutory amendments, Congress repeatedly underscored that these limitations on the President's regulatory authority are to be given "broad scope." *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (quoting H.R. Conf. Rep. No. 103–482, at 239 (1994)).  Such an interpretation "avoids serious questions about the constitutionality" of IEEPA, and "prevent[s] the statute from running afoul of the First Amendment." *Cernuda v. Heavey*, 720 F. Supp. 1544, 1553 (S.D. Fla. 1989).

As originally enacted in 1977, Section 1702(b) excluded from the President's IEEPA authority the ability to regulate or prohibit "directly or indirectly" any "personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b); *see also Bernstein v. Dep't of State*, 974 F. Supp. 1288 (N.D. Cal. 1997) (analyzing limit on authority related to personal communications as applied to encryption software), *aff'd*, 176 F.3d 1132 (9th Cir. 1999), *reh'g granted, opinion withdrawn*, 192 F.3d 1308 (9th Cir. 1999); Declaration of Amanda L. Tyler ("Tyler Decl.") ¶ 19.

In 1988, Congress amended the statute to "expressly revoke[] presidential authority to regulate or prohibit the importation or exportation" of "information or informational materials." *Cernuda*, 720 F. Supp. at 1547 (citing Pub. L. No. 100–418, § 2502(a), 102 Stat. 1107, 1371

---

[2]        The full text of 50 U.S.C. § 1702 is attached hereto in the Addendum.

(1988)).[3]  That amendment (the "Berman Amendment") "was designed to prevent the executive branch from restricting the international flow of materials protected by the First Amendment." *Kalantari*, 352 F.3d at 1205.  *See also* Tyler Decl. ¶ 25 ("[The Berman Amendment] is the product of a Congress's determination that the authority granted to the President under the IEEPA should not be invoked in a way that undermines the free exchange of ideas and information.").

Six years later, Congress once again "expanded this limitation on executive authority by enacting the Free Trade in Ideas Act ['FTIA']."  *United States v. Amirnazmi*, 645 F.3d 564, 585 (3d Cir. 2011) (citing Pub. L. No. 103–236, § 525, 108 Stat. 382, 474 (1994)).  The FTIA amendment further "restrict[ed] the Executive from regulating transactions concerning informational materials 'regardless of format or medium of transmission,'" *id.* (quoting Pub. L. No. 103–236, § 525(c)(1)), and expanded the statute's "nonexclusive list of informational materials to include new media, such as compact discs and CD ROMs," *Kalantari*, 352 F.3d at 1205.  *See also* Tyler Decl. ¶¶ 23-24.  The Conference Report accompanying the FTIA reaffirmed that Section 1702(b) "was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope."  *Amirnazmi*, 645 F.3d at 585 (quoting H.R. Conf. Rep. No. 103–482, at 239 (1994)).

---

[3]      The amendment added identical text to IEEPA and the Trading with the Enemy Act of 1917, Pub. L. No. 65–91, § 5, 40 Stat. 411, 415 (1917), as amended, 50 U.S.C. § 4305 ("TWEA").  *See Kalantari*, 352 F.3d at 1205 n.3.

2. <u>The Prohibitions Unlawfully Regulate "Personal Communications" and "Informational Materials."</u>

Notwithstanding this unambiguous statutory language and clear Congressional intent, the Prohibitions directly contravene Section 1702(b) by regulating personal communications and the international transmittal of informational materials.[4]

Millions of TikTok users rely on TikTok to send "personal communication[s]" that "do[] not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1). TikTok is a social media platform—an online community where millions of Americans come together to express themselves, share video content, and make connections with each other. Pappas Decl. ¶¶ 4, 17. The Prohibitions will destroy this online community, first by requiring the removal of TikTok from the U.S. app stores, and, when the remaining Prohibitions come into effect on November 12, 2020, shutting down TikTok entirely. The Prohibitions will prevent TikTok's users—including Plaintiffs themselves—from expressing their viewpoints, interests, and beliefs with one another. The regulation and prohibition of such communications—precisely what the Prohibitions do here—is not permitted by IEEPA under the plain language of Section 1702(b)(1).

TikTok users also use the platform to share "information or informational materials" with users around the world. Pappas Decl. ¶¶ 4, 20. Section 1702(b)(3) provides a non-exclusive list of such materials over which the executive branch has no IEEPA authority, including "films . . . photographs . . . [and] artworks"—the exact media shared on TikTok. The Commerce Department lacks the authority to even ***regulate*** the international flow of these materials—either "directly or indirectly," and "regardless of format or medium of transmission"—let alone prohibit it. 50 U.S.C.

---

[4]     This is true for both the ban on new U.S. users, which will begin when the first Prohibition goes into effect on September 27, 2020, as well as the broader set of Prohibitions, which will go into effect on November 12, 2020.

§§ 1702(b)(3). The Prohibitions violate this statutory command by banning U.S. users—first new U.S. users on September 27, and then all U.S. users on November 12—from sharing content with TikTok users in other countries, and receiving content from such users.[5]  *See* Pappas Decl. ¶¶ 4, 20. At a minimum, the Prohibitions indirectly regulate this conduct, in direct violation of Section 1702(b)(3).

Furthermore, the TikTok application—a social media platform over which information is shared—is closely analogous to the "news wire feed" included in Section 1702(b)(3)'s non-exhaustive list of items over which the President lacks regulatory authority. *See* Oxford English Dictionary (Sept. 2003), *available at* www.oed.com/view/Entry/255044 (defining "newswire" as "a service which transmits up-to-the-minute news, usually electronically (esp. via the internet), to news media and the general public"). And blocking access to TikTok's platform for personal communication and information exchange undoubtedly raises the First Amendment concerns Section 1702(b) was designed to address. *See Kalantari*, 352 F.3d at 1205.

Apart from the plain language of the statute, which is dispositive, the Prohibitions conflict with the executive branch's historical practice of implementing its IEEPA authority. For example, the Treasury Department's Office of Foreign Assets Control ("OFAC"), which frequently implements IEEPA sanctions programs, recognizes that its prohibitions do not apply to the importation or exportation of information or informational materials, "regardless of the format or medium of transmission." *See, e.g.*, 31 C.F.R. § 560.210 (exempting "informational materials," as defined in 31 C.F.R. § 560.315, from the list of prohibited transactions); 31 C.F.R. § 560.315(a) (featuring same definition of "informational materials" as Section 1702(b), with such materials

---

[5]     U.S. content can comprise as much as 60% of the content in TikTok's non-U.S. markets. Pappas Decl. ¶ 20.

defined as including, but not limited to, films, photographs, and artworks, among others); Tyler Decl. ¶ 45.  And to the extent social media platforms are affected by sanctions programs, OFAC often incorporates general licenses to ensure those platforms remain available for personal communications.  *See, e.g.*, 31 CFR § 560.540(a)(1) (authorizing "[t]he exportation from the United States or by U.S. persons, wherever located, to persons in Iran of services incident to the exchange of personal communications over the Internet, such as instant messaging, chat and email, social networking, sharing of photos and movies, web browsing, and blogging, provided that such services are publicly available at no cost to the user"); Tyler Decl. ¶ 45.  OFAC has never used its authorities to target social media platforms used by millions of U.S. users.  Tyler Decl. ¶ 46.

**B.      The Prohibitions Are Arbitrary and Capricious Because the Agency Failed to Consider Reasonable Alternatives and Offered a Pretextual Justification for Its Action.**

Under the APA, a court must set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Here, the Prohibitions are arbitrary and capricious because the Commerce Department (1) ignored the evidence before it and failed to consider reasonable alternatives to the Prohibition's sweeping ban on TikTok, including the extensive mitigation measures Plaintiffs proposed, and (2) offered a pretextual national security justification that is unsupported and belied by the political motivations that prompted the August 6 order and the Prohibitions.

1.      The Agency Ignored the Evidence Before It and Failed to Consider Reasonable Alternatives to the Ban on TikTok.

To survive review under the APA, an agency must "consider significant alternatives to the course it ultimately chooses," and explain its rejection of those alternatives.  *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000).  "[T]he failure of an agency to

consider obvious alternatives has led uniformly to reversal."  *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

Here, the Prohibitions' stated justification is that TikTok poses a "threat" to the national security, foreign policy, and economy of the United States, as set forth in the August 6 order. Ex. 29.  That order, in turn, states that because TikTok is "owned by the Chinese company ByteDance Ltd.," there is a "potential" risk (i) that the "Chinese Communist Party [could] access . . . Americans' personal and proprietary information"; and (ii) that TikTok could "censor content that the Chinese Communist Party deems politically sensitive" or "for disinformation campaigns that benefit the Chinese Communist Party."  Ex. 12.

But the speculative language of the Prohibitions demonstrates that the government does not have *any* evidence that the Chinese government has ever obtained *any* TikTok U.S. user data. *See* Ex. 30.  Indeed, the evidence shows that TikTok stores that data outside of China, subjects it to robust data security safeguards that are "consistent with industry best practice," Weber Decl. ¶ 10, and keeps it under the control of a U.S.-based leadership team, Cloutier Decl. ¶¶ 7-13.  Nor is there *any* evidence that the platform has been used for censorship by the Chinese government. *See* Weber Decl. ¶¶ 10-17; Pappas Decl. ¶ 15.  Thus, the government's conduct does not reflect "a rational connection between the facts found and the choice made," as the APA requires.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary if it "failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before [it]").

Moreover, even if the Court were to credit the faulty conclusion that TikTok's data security safeguards are inadequate, the Prohibitions are arbitrary and capricious because the Commerce Department failed to "consider reasonably obvious alternatives to [its] proposed rule"

and explain its reasons for rejecting those alternatives. *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797, 803 (D.C. Cir. 1984). Indeed, there is no indication that the agency even considered Plaintiffs' extensive data security protections and the range of tools available pursuant to the CFIUS process—including the extensive measures suggested by Plaintiffs—let alone provided a sound explanation for rejecting them.

These measures are wide-ranging and robust. For example, on September 13, 2020, Plaintiffs offered to provide a trusted U.S. technology provider operational control over the infrastructure that services U.S. users and stores U.S. TikTok user data, and to give the government oversight of TikTok's U.S. information security. *See* Ex. 22. Plaintiffs further proposed that they restructure their business to create a separately-governed U.S.-based TikTok business with responsibility for all TikTok operations in the United States and all matters involving TikTok's U.S. users. *See id.* And they offered to implement other data security measures to fully address the purported concerns outlined in the August 6 and CFIUS orders. *See id.* These measures would have allowed the government to mitigate its purported concerns beyond what could be achieved with others in the industry. *See* Weber Decl. ¶¶ 11, 17, 18. Moreover, to the extent the ban is premised on TikTok's ownership "by the Chinese company ByteDance," Ex. 12, that can also be addressed by measures short of shutting down the app. Indeed, the CFIUS order mandates that ByteDance sell TikTok Inc. by November 12, 2020, Ex. 14, and, while a severe and manifestly unjustified order, with which Plaintiffs vehemently disagree, this measure is still less extreme than a total ban on TikTok operations in the United States.

"At the very least th[ese] alternative way[s] of achieving the [government's] objectives . . . should have been addressed and adequate reasons given for [their] abandonment." *State*

*Farm*, 463 U.S. at 48.  Instead, the government chose the harshest measure possible—a ban on TikTok in the U.S.—without considering these alternatives or trying to craft a narrower solution to addresses its purported national security concerns.  This failure, standing alone, renders the Prohibitions arbitrary and capricious—and therefore unlawful—under the APA.  *See Heckler*, 749 F.2d at 797.

### 2.    The Stated Justification for the Prohibitions Is Pretextual.

The Commerce Department's failure to consider reasonable alternatives to a complete ban on TikTok evinces not only a lack of rigor in the agency's process.  It also makes clear that the real reason for the agency's decision was something other than the stated national security concerns.  This is another, wholly independent ground on which to invalidate the Prohibitions.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019); *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994) (setting aside agency action because the "sole reason" for the action was "to provide a pretext" for the agency's "ulterior motive").

The Prohibitions purportedly target TikTok because of the speculative possibility (asserted in the August 6 order) that U.S. user data from the app could be manipulated by the Chinese government.  Ex. 29.  But, as discussed above, Plaintiffs have taken measures to protect the privacy and security of TikTok's U.S. user data, including by storing such data outside of China and by erecting software barriers that help ensure that TikTok stores its U.S. user data separately from the user data of other ByteDance products.  *See supra* pp. 4-7.  Moreover, the eagerness of a number of U.S. companies to serve as TikTok's trusted technology partner in the United States—and public statements confirming these companies' beliefs that such measures could address the government's purported national security concerns, *see* Exs. 31, 32—underscore the many options, short of a total ban on TikTok, that were available to the government.

Virtually every company, governmental entity, and non-governmental organization, regardless of ownership, faces risks to the security of the data it stores—whether on behalf of employees, customers, or others.  Weber Decl. ¶ 4.  Indeed, TikTok's approach for dealing with these issues is generally in line with—and in some respects markedly better than—industry best practices, even for companies that hold significant sensitive user data.  *Id.* ¶¶ 4, 10, 18; *see also id.* ¶ 17 (TikTok's Transparency and Accountability Center "sets a new 'gold standard' that other social media companies will be pressured to meet, to the overall good of the industry").  Thus, TikTok poses no national security concerns beyond the data security issues inherent in any social media platform, *id.* ¶¶ 4, 10, 18; Cloutier Decl. ¶¶ 4-18, and the divergent approach the agency took toward TikTok compared to other platforms suggests that "the sole stated reason [for the Prohibitions] seems to have been contrived," *Dep't of Commerce*, 139 S. Ct. at 2575. ¶

The Prohibitions were issued against the backdrop of a political reelection campaign in which the President has increasingly relied on anti-Chinese rhetoric.  *See, e.g.*, Ex. 7.  And there is no question that the first mention of the Trump Administration possibly banning TikTok came on the heels of the episode in which TikTok users claimed to have used the app to make it appear to the President's campaign that attendance for the President's Tulsa rally in June would be vastly larger than it actually was, Ex. 9, an embarrassment that led to the campaign running ads against TikTok, Ex. 11.  The record will make clear that these issues—not any purported national security concerns—were the actual rationale for the Prohibitions.  *See, e.g.*, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54-55 (D.C. Cir. 1977) (when an agency sets forth a "fictional account of the actual decisionmaking process" a reviewing court "must perforce find its actions arbitrary"); *Tummino v. Torti*, 603 F. Supp. 2d 519, 544-46 (E.D.N.Y. 2009) (agency action is arbitrary when articulated basis is "fanciful and wholly unsubstantiated" and other considerations are evident from record).

The claim that national security concerns were the agency's actual motivation for requiring a total ban of TikTok in the United States is contradicted by the President's persistent focus on extracting some type of financial bounty in exchange for permitting Plaintiffs to continue their lawful business in the United States.  On August 3, 2020—three days before the August 6 order was issued—the President stated that TikTok "[doesn't] have any rights" and that he would ban the company unless it were acquired through "an appropriate deal" in which "the Treasury . . . of the United States gets a lot of money."  Exs. 15, 16.  This demand for a payment to the Treasury is at odds with notion that banning TikTok is necessary to protect national security.

The President also demanded that the parties involved in the TikTok-Oracle-Walmart deal "pay $5 billion into a fund for education" so that "we can educate people as to the real history of our country."  Ex. 27.  Such a demand not only is completely untethered to the national security concerns on which the Prohibitions were purportedly based, but is entirely inappropriate.  Indeed, in analogous contexts, courts—as well as the government itself—have recognized the impropriety of the government demanding that a private party make a payment to a third party.  For example, the Supreme Court has long recognized that the government "effects an unconstitutional taking when it transfers property, without any justifying public purpose, from one private party to another."  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 637 F. Supp. 1398, 1406 (D.D.C. 1986), *aff'd*, 830 F.2d 374 (D.C. Cir. 1987) (citing *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) and *Thompson v. Cons. Gas Corp.*, 300 U.S. 55, 80 (1937)).

Likewise, the Department of Justice's *Justice Manual* explains that, except in limited contexts not relevant here, it is "not appropriate" for the government "to use a settlement agreement to require, as a condition of settlement, payment to non-governmental, third-party organizations

who are not victims or parties to the lawsuit."  Justice Manual § 1-17.000.  The *Justice Manual* accordingly instructs that "Department attorneys shall not enter into any agreement on behalf of the United States in settlement of federal claims or charges, including agreements settling civil litigation, accepting plea agreements, or deferring or declining prosecution in a criminal matter, that directs or provides for a payment to any non-governmental person or entity that is not a party to the dispute."  *Id.*; *see also* Office of the Attorney General, Prohibition on Settlement Payments to Third Parties (June 5, 2017), *available at* https://www.justice.gov/opa/press-release/file/971826/download (same).[6]

Furthermore, after expressing its purported national security concerns in the August 6 order, the government waited an additional 43 days to issue the Prohibitions, and a further 55 days beyond that before the Prohibitions go into full effect.  Ex. 22.  It also extended the first Prohibition's ban on TikTok from U.S. app stores for a week, from September 20 to September 27. Ex. 26.  If pressing national security concerns were the true motive for the agency's conduct, such a long delay would have been intolerable.  Likewise, when it finally *did* issue the Prohibitions, those restrictions were not crafted to respond to any purported national security threat.  The Prohibitions do not, for example, immediately ban TikTok throughout the United States.  Instead, they bar TikTok from mobile app stores, preventing new users from downloading the app and existing users from downloading updates to the app.  Ex. 29.  Such measures not only fail to address any pressing national security concerns, but actually *undermine* the very security concerns

---

[6]    In announcing this policy, former Attorney General Jeff Sessions explained that "[w]hen the federal government settles a case against a corporate wrongdoer, any settlement funds should go first to the victims and then to the American people—not to bankroll third-party special interest groups or the political friends of whoever is in power."  Dep't of Justice Press Release (June 7, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-ends-third-party-settlement-practice.

purportedly animating the agency's conduct by preventing existing users from downloading security updates to keep their data secure.

"Altogether, the evidence tells a story that does not match the Secretary's explanation for his decision." *Dep't of Commerce*, 139 S. Ct. at 2575. This record makes clear that the Prohibitions could not have been based upon a good faith belief that banning TikTok was necessary to protect national security, and that the stated national security justification was a pretext for other considerations. The Prohibitions should be enjoined. *See N.E. Coal. v. NRC*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984) (agency action is arbitrary and capricious where agency's stated reason is inconsistent with action taken).

C.     **The Prohibitions Violate Plaintiffs' Constitutional Rights.**

1.     The Prohibitions Infringe on Core Protected Speech in Violation of the First Amendment.

Social media applications like TikTok represent "the modern public square . . . [and] provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). The Prohibitions have shuttered this "modern public square," restricting Plaintiffs' protected speech in violation of the First Amendment. *See* Order Granting Mot. for Prelim. Inj., *U.S. WeChat Users Alliance v. Trump*, No. 3:20-cv-05910-LB (N.D. Cal. Nov. 19, 2020), ECF 59 (preliminarily enjoining similar restrictions against WeChat because "plaintiffs have shown serious questions going to the merits of their First Amendment claim that the Secretary's prohibited transactions effectively eliminate the plaintiffs' key platform for communication, slow or eliminate discourse, and are the equivalent of censorship of speech or a prior restraint on it").

Plaintiffs have two interests that are protected under the First Amendment. First, as users of the platform, Plaintiffs are speakers themselves on the TikTok application, and have the right

to communicate freely with other individuals over the platform.  *See* Exs. 33, 34.  The Supreme

Court has recognized that the "wide array" of speech on social media, on topics as "diverse as

human thought," is core protected speech.  *See Packingham*, 137 S. Ct. at 1735-36 ("It is

cyberspace—the 'vast democratic forums of the Internet' in general, and social media in

particular" that are "the most important places . . . for the exchange of views." (citation omitted)).

Second, Plaintiffs have a protected First Amendment interest in and to their source code.  "Because

computer source code is an expressive means for the exchange of information and ideas about

computer programming . . . it is protected by the First Amendment." *Junger v. Daley*, 209 F.3d

481, 485 (6th Cir. 2000); *see also Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435 (N.D.

Cal. 1996) (similar).

The Prohibitions unlawfully restrict these protected interests, violating Plaintiffs' First

Amendment rights.  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) (denial of use of

municipal facility for theater production was an unlawful prior restraint).  The Prohibitions will

shut down TikTok, disabling its core functionality and barring its millions of users—including

Plaintiffs themselves—from engaging in speech.  These restrictions will impose a prior restraint

by "forbidding certain communications when issued in advance of the time that such

communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993).  The

Supreme Court has "consistently" recognized "in a long line of cases" that government actions

that "deny use of a forum in advance of actual expression" or forbid "the use of public places [for

plaintiffs] to say what they wanted to say"—like the Prohibitions do here—are unconstitutional

prior restraints.  *Se. Promotions*, 420 U.S. at 552-53.

Such restraints are reviewed for strict scrutiny and "bear[] a heavy presumption against

[their] constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  The

government bears the burden of proof under strict scrutiny and must prove it has narrowly tailored the restraint to promote a compelling government interest while treading as lightly as possible on the right to speak. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000). "If a less restrictive alternative would serve the Government's purpose, the [government] *must* use that alternative." *Id.* (emphasis added). The government also must present supporting evidence "demonstrat[ing] that the recited harms are real, not merely conjectural, and that the [restraint] will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). At a minimum, the Prohibitions would receive "intermediate scrutiny," which requires that a speech restriction must be "narrowly tailored to serve a substantial government interest" and may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 137 S. Ct. at 1736 (citation omitted).

The Prohibitions do not satisfy either constitutional standard. Notwithstanding the substantial governmental interest in national security, the Prohibitions—banning any download of the TikTok app and, ultimately, any transactions with TikTok Inc.—are far greater than is necessary to further any compelling government interest, particularly one premised on such a speculative basis. *See New York Times Co. v. United State*s, 403 U.S. 713, 725–26 (1971) ("[T]he First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result."); *see also, e.g.*, Ex. 12 (noting that China could "potentially" access TikTok user data, which "*may* be used for disinformation campaigns"). Indeed, Plaintiffs offered to implement a range of measures, including restructuring the U.S. TikTok business, to address the government's purported national security concerns and allow the app to continue to be available in the United States. Instead of adopting these less-speech restrictive measures, the government rejected them out of hand and without explanation, choosing

instead to extinguish a forum used by millions of Americans, including Plaintiffs. *Edwards v. District of Columbia*, 755 F.3d 996, 1009 (D.C. Cir. 2014) ("Even assuming [the asserted] harms are real," the government "has provided no convincing explanation as to why a more finely tailored regulatory scheme would not work").

"For [more than] two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment." *United States v. Robel*, 389 U.S. 258, 264 (1967). Thus, "[i]t would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile." *Id.* Because the scope of the restraint on Plaintiffs' speech is "greater than essential" to the furtherance of the purported government interest, the Prohibitions violate the First Amendment.

2.    The Prohibitions Deprive Plaintiffs of Their Constitutional Right to Due Process.

When the government deprives private parties of their property rights under IEEPA, those actions must satisfy the Due Process Clause of the Fifth Amendment. *See Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 163 (D.C. Cir. 2003). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived" of a property or liberty interest. *Id.* Even in the national security context, "due process requires, at the least, that an affected party be informed of the official action, be given access to

the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls Corp. v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014).

Here, the government violated these requirements. At no point before or after the issuance of the Prohibitions have Plaintiffs received an adequate explanation for the government's action, let alone been afforded a meaningful opportunity to respond. As noted above, the Prohibitions rely exclusively on vague and speculative statements about the "possibility" that TikTok might be misused by the Chinese government, but cite no specific evidence that TikTok could rebut. *See supra* pp. 20-21. Nor did the Commerce Department ever give TikTok an opportunity to be heard on why these purported concerns are misplaced. This is insufficient. *See, e.g.*, *Holy Land*, 333 F.3d at 163 (to comply with due process requirements, OFAC is required to provide notice and "the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations"); *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 988, 1001 (9th Cir. 2012) (OFAC violated plaintiff's due process rights by, among other things, "failing to provide an adequate statement of reasons for its investigation" and failing to afford the plaintiff a meaningful opportunity to respond); *KindHearts v. Geithner*, 647 F. Supp. 2d 857, 905-08 (N.D. Ohio 2009) (similar).

## D.    The Prohibitions and August 6 Order Violate IEEPA in Other Respects.

In addition to the infirmities outlined above, the Prohibitions and August 6 order are *ultra vires* because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat," as IEEPA requires. Because the Prohibitions and August 6 order go beyond the scope of the President's statutory authority, they should be enjoined. *See, e.g.*, *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 187-89 (D.D.C. 2011) (granting preliminary injunction on this basis); *see also Ala. Power Co. v. EPA*, 40 F.3d 450, 456

(D.C. Cir. 1994) ("neither this court nor the agency is free to ignore the plain meaning of the statute and to substitute its policy judgment for that of Congress") (quotation marks omitted).

IEEPA provides, in relevant part, that after first declaring a national emergency under the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*, the President may regulate various international economic transactions "to deal with any unusual and extraordinary threat" to certain government interests, including the national security, as the President claimed here.  50 U.S.C. § 1701(a).  Before the President is empowered to exercise authority under IEEPA, however, he must first declare a national emergency for purposes of the NEA, 50 U.S.C. § 1601 *et seq*.  *See also* Tyler Decl. ¶ 17 (describing President's IEEPA authority).

The Prohibitions and the August 6 order cite Executive Order 13873 (issued in 2019), which declared that "the unrestricted acquisition or use in the United States of [certain] information and communications technology or services . . . augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services . . . [and] constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  Ex. 35.  But TikTok is not a telecommunications provider and it does not provide the types of technology and services contemplated by Executive Order 13873. *Id.*  It does not provide the hardware backbone to "facilitate the digital economy," and has no role in providing "critical infrastructure and vital emergency services."  *Id.*  Rather, TikTok Inc. is a social media company, and the TikTok mobile application is a software platform on which users express their views and opinions in short form video.  Pappas Decl. ¶¶ 4, 17.  Thus, the Prohibitions and the August 6 order are not supported by the emergency declared in Executive Order 13873.

Apart from their misplaced reliance on Executive Order 13873, the Prohibitions and the August 6 order also fail to identify *any actual threat* that TikTok poses to U.S. national security.

The August 6 order states that TikTok (i) engages in data collection practices that "*potentially* allow[] China" to make use of U.S. user data, (ii) "*reportedly* censors content," and (iii) "*may* [also] be used for disinformation campaigns." Ex. 12. These speculative assertions, made without evidentiary support, do not constitute a *bona fide* national emergency. *See* 50 U.S.C. § 1701(a) ("emergency" must be an "unusual and extraordinary threat"); Revision of Trading With the Enemy Act: Markup Before the H. Comm. on Int'l Relations, 95th Cong. 4 (1977) (emergencies under IEEPA are "rare and brief," not "normal, ongoing problems").

Because the Prohibitions and August 6 order were not issued to deal with an "unusual and extraordinary threat" to the national security of the United States, as IEEPA requires, they are unlawful and should be enjoined.

## II.    The Remaining Factors Require Injunctive Relief.

### A.    The Prohibitions and August 6 Order Are Inflicting, and Will Continue to Inflict, Irreparable Harm.

Absent preliminary injunctive relief, the Prohibitions and August 6 order will inflict substantial and irreparable harm on Plaintiffs during the pendency of this case.

As discussed above, Plaintiffs face an immediate restriction of their protected First Amendment rights to speak and receive information. *See supra* pp. 27-30. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Indeed, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149 (D.D.C. 2016) (citation omitted).

Plaintiffs also face a panoply of irreparable harms to their business. If allowed to remain in place, the Prohibitions will irreversibly destroy the TikTok business in the United States: they

will devastate TikTok's user base and competitive position, destroy the goodwill necessary for TikTok to maintain commercial partners in the United States, and cripple Plaintiffs' ability to attract and retain talent.

*First*, absent a preliminary injunction, Plaintiffs will suffer devastating and irreparable harm through the loss of TikTok's user base and the long-term erosion of market share.  Until the August 6 order, TikTok was one of the fastest growing apps in the United States, adding 424,000 new U.S. users each day.  *See* Pappas Decl. ¶ 18.  Continued growth is the lifeblood of a social media company like TikTok and essential to maintain its competitive market position. *See id.* ¶ 17.  By barring TikTok from U.S. app stores, however, the direct effect of the first Prohibition is to halt the influx of new users to TikTok, depriving hundreds of millions of U.S. citizens who have not yet downloaded TikTok of access to the TikTok app.  *Id.*  Even before the Prohibitions were announced, uncertainty over TikTok's availability in the United States began to drive  prominent TikTok content creators (and their fans) to other platforms.  *See id.* ¶¶ 21-22; *see also* Ex. 36.  And once users are established on a different application, they are unlikely to return to TikTok.  Pappas Decl. ¶¶ 21-22.

As the November 12th deadline for the remaining Prohibitions approaches, and TikTok is shut down entirely in the United States, this erosion of TikTok's competitive position will accelerate.  Even if the shutdown were lifted within two months, 40–50% of daily active users would be lost permanently, never to return.  Pappas Decl. ¶ 19.  If the ban is in place for six months, 80–90% of daily active users will not return.  *Id.*  Accordingly, even if the TikTok Ban were later reversed, TikTok would not be able to reverse the loss of users.  *Id.*  It is well-established that this sort of loss of market share to a competitor constitutes irreparable harm.  *See, e.g.*, *Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("Courts have recognized that

price erosion and diminished market share can constitute irreparable harm"); *Nalco,* 786 F. Supp. 2d at 188.

*Second*, the Prohibitions have already struck a serious blow to Plaintiffs' reputation and competitive strength.  Pappas Decl. ¶¶ 21-22.  TikTok's commercial partners and U.S. advertisers want to work with TikTok because of its vibrant community.  By destroying that community—first by shutting TikTok out of the app stores and then by shutting down TikTok entirely—the Prohibitions have caused and will cause lasting damage to TikTok's reputation and attractiveness as a commercial partner, causing current and prospective partners to forge relationships with its competitors, such as Instagram Reels, instead.  *Id.* ¶¶ 6, 23-25.  Businesses like TikTok place a premium on U.S. advertisers, which are often the most successful at generating revenue for the company because they typically pay better rates for their advertisements than advertisers in other markets.  *Id.* ¶ 25.  If TikTok is perceived to be an unreliable partner in the marketplace, advertisers will build partnerships with other platforms instead.  *Id.*; *see also Brodie v. Dep't of Health and Human Servs.*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010) ("harm to reputation has been recognized repeatedly as a type of irreparable injury").

Indeed, the market uncertainty generated by the government's decision to target Plaintiffs has already destabilized TikTok's business and its strategic partnerships, resulting in millions of dollars of losses and damage to Plaintiffs' relationships with major commercial partners and advertisers who backed out of deals with TikTok after the President issued the August 6 order.  *See* Pappas Decl. ¶¶ 24–25.  Now that the Prohibitions have been issued, Plaintiffs' business will be decimated, as the Prohibitions have destroyed Plaintiffs' ability to engage in the conduct on which their business depends:  growing users and developing good content.  *Id.* ¶ 17.  Likewise, by undercutting Plaintiffs' U.S. operations, the Prohibitions harm Plaintiffs' ability to attract and

retain top employees, some of whom have already rejected offers of employment based on the government's actions against TikTok.  *Id.* ¶ 26.

Although economic loss alone generally does not constitute irreparable harm, that is not so when the harm—as here—"is so severe as to cause extreme hardship to the business or threaten its very existence."  *Sterling Com. Credit-Michigan, LLC v. Phoenix Industries I, LLC*, 762 F. Supp. 2d 8, 15 (D.D.C. 2011) (citation omitted); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010). Moreover, when sovereign immunity bars a plaintiff from recovering damages from a federal agency—as is the case here—economic loss suffered by the plaintiff may be irreparable.  *See Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008); *Smoking Everywhere*, 680 F. Supp. 2d at 77 n.19.  *See also Beacon Theatres v. Westover*, 359 U.S. 500, 506-07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.").  The catastrophic economic loss Plaintiffs will suffer in the absence of action from this Court is thus precisely the type of injury that "tip[s] the balance in favor of injunctive relief."  *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997).

## B.     The Balance of Equities and Public Interest Require Injunctive Relief.

The final two elements of the test for provisional relief—the balance of the equities and the public interest—merge when the government is a party.  *See Pursuing Am.'s Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511 (D.C. Cir. 2016).  In assessing these factors, courts consider the impacts of the injunction on nonparties as well.  *See id.* at 511-12.

The public interest requires an injunction against the Prohibitions' unlawful restriction of core protected speech by millions of Americans in violation of their First Amendment rights. "[E]nforcement of an unconstitutional law is always contrary to the public interest."  *Id.* at 511. Moreover, "there is always a strong public interest in the exercise of free speech rights otherwise

abridged by an unconstitutional regulation." *Id.*; *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (similar). Here, absent preliminary injunctive relief, TikTok and its users will be "unable to exercise those rights." *Pursuing Am.'s Greatness*, 831 F.3d at 511.

Similarly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (collecting cases). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citation omitted). *See also, e.g.*, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) ("[A]s courts in this District have recognized, 'the public interest is served when administrative agencies comply with their obligations under the APA.'" (quoting *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009))).

On the other side of the ledger, the government will not face any harm if a preliminary injunction is granted. The Commerce Department's 45-day delay before issuing the Prohibitions, as well as the further delay until November 12 for them to go fully into effect, undercuts any purported urgency justifying immediate implementation of the Prohibitions. Moreover, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *R.I.L-R*, 80 F. Supp. at 191 (citation omitted).

Because the harm the Prohibitions inflict on Plaintiffs and third parties grossly outweighs any purported harm to the government that an injunction would impose, they should be enjoined.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

DATED: September 23, 2020                    Respectfully submitted,


                                             /s/ John E. Hall
                                             _____

Anders Linderot*                    John E. Hall (D.C. Bar. No. 415364)
COVINGTON & BURLING LLP             Beth S. Brinkmann (D.C. Bar. No. 477771)
The New York Times Building         Alexander A. Berengaut (D.C. Bar. No. 989222)
620 Eighth Avenue                   Megan A. Crowley (D.C. Bar. No. 1049027)
New York, New York 10018-1405       Megan C. Keenan (D.C. Bar. No. 1672508)
Telephone: +1 (212) 841-1000        COVINGTON & BURLING LLP
Facsimile: + 1 (212) 841-1010       One CityCenter
Email:  alinderot@cov.com           850 Tenth Street, NW
                                    Washington, DC 20001
                                    Telephone: +1 (202) 662-6000
Mitchell A. Kamin*                  Facsimile: + 1 (202) 778-6000
COVINGTON & BURLING LLP             Email:  jhall@cov.com
1999 Avenue of the Stars, Suite 3500         bbrinkmann@cov.com
Los Angeles, California 90067-4643           aberengaut@cov.com
Telephone: + 1 (424) 332-4800                mcrowley@cov.com
Facsimile: + 1 (424) 332-4749                mkeenan@cov.com
Email:  mkamin@cov.com

*Pro Hac Vice


                                    *Attorneys for Plaintiffs*

# **Addendum**



KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 50. War and National Defense (Refs & Annos)
    Chapter 35. International Emergency Economic Powers (Refs & Annos)

50 U.S.C.A. § 1702

§ 1702. Presidential authorities

Effective: October 26, 2001

Currentness

**(a) In general**

**(1)** At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise--

  **(A)** investigate, regulate, or prohibit--

    **(i)** any transactions in foreign exchange,

    **(ii)** transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

    **(iii)** the importing or exporting of currency or securities,

  by any person, or with respect to any property, subject to the jurisdiction of the United States;

  **(B)** investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and [1]

  **(C)** when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with

in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

**(2)** In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

**(3)** Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

**(b) Exceptions to grant of authority**

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly--

**(1)** any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

**(2)** donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or [2]

**(3)** the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or prohibition by this paragraph do not include those which are otherwise controlled for export under section 4604 of this title, or under section 4605 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

**(4)** any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

**(c) Classified information.**--In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

## CREDIT(S)

(Pub.L. 95-223, Title II, § 203, Dec. 28, 1977, 91 Stat. 1626; Pub.L. 100-418, Title II, § 2502(b)(1), Aug. 23, 1988, 102 Stat. 1371; Pub.L. 103-236, Title V, § 525(c)(1), Apr. 30, 1994, 108 Stat. 474; Pub.L. 107-56, Title I, § 106, Oct. 26, 2001, 115 Stat. 277.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 13290

<Mar. 20, 2003, 68 F.R. 14307, as amended by Ex. Ord. No. 13350, July 29, 2004, 69 F.R. 46055>

### Confiscating and Vesting Certain Iraqi Property

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.), and section 301 of title 3, United States Code, and in order to take additional steps with respect to the national emergency declared in Executive Order 13303 of March 20, 2003 [set out as a note under 50 U.S.C.A. § 1701], and expanded in Executive Order 13315 of August 28, 2003 [set out as a note under 50 U.S.C.A. § 1701],

I, GEORGE W. BUSH, President of the United States of America, hereby determine that the United States and Iraq are engaged in armed hostilities, that it is in the interest of the United States to confiscate certain property of the Government of Iraq and its agencies, instrumentalities, or controlled entities, and that all right, title, and interest in any property so confiscated should vest in the Department of the Treasury. I intend that such vested property should be used to assist the Iraqi people and to assist in the reconstruction of Iraq, and determine that such use would be in the interest of and for the benefit of the United States.

I hereby order:

**Section 1.** All blocked funds held in the United States in accounts in the name of the Government of Iraq, the Central Bank of Iraq, Rafidain Bank, Rasheed Bank, or the State Organization for Marketing Oil are hereby confiscated and vested in the Department of the Treasury, except for the following:

**(a)** any such funds that are subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoy equivalent privileges and immunities under the laws of the United States, and are or have been used for diplomatic or consular purposes, and

**(b)** any such amounts that as of the date of this order are subject to post-judgment writs of execution or attachment in aid of execution of judgments pursuant to section 201 of the Terrorism Risk Insurance Act of 2002 [set out as a note under 15 U.S.C.A. § 1610] (Public Law 107-297), provided that, upon satisfaction of the judgments on which such writs are based, any remainder of such excepted amounts shall, by virtue of this order and without further action, be confiscated and vested.

**Sec. 2.** The Secretary of the Treasury is authorized to perform, without further approval, ratification, or other action of the President, all functions of the President set forth in section 203(a)(1)(C) of IEEPA [subsec. (a)(1)(C) of this section] with respect

to any and all property of the Government of Iraq, including its agencies, instrumentalities, or controlled entities, and to take additional steps, including the promulgation of rules and regulations as may be necessary, to carry out the purposes of this order. The Secretary of the Treasury may redelegate such functions in accordance with applicable law. The Secretary of the Treasury shall consult the Attorney General as appropriate in the implementation of this order.

**Sec. 3.** This order shall be transmitted to the Congress and published in the Federal Register.

GEORGE W. BUSH

Notes of Decisions (92)

## Footnotes

1    So in original. The period probably should not appear.
2    So in original. The word "or" probably should not appear.

50 U.S.C.A. § 1702, 50 USCA § 1702

Current through P.L. 116-158.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.