## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIKTOK INC. and BYTEDANCE LTD.,

               *Plaintiffs*,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States; WILBUR L.
ROSS, JR., in his official capacity as Secretary
of Commerce; and U.S. DEPARTMENT OF
COMMERCE,

               *Defendants*.

Civil Case No. 20-cv-2658

## DECLARATION OF PROFESSOR AMANDA L. TYLER

I, Amanda L. Tyler, under penalty of perjury, hereby declare as follows:

### I. Introduction

#### A. Background of Case and Scope of Declaration

1.    I was retained by Covington & Burling LLP on behalf of ByteDance Ltd. with respect to the pending matter of TIKTOK INC. and BYTEDANCE LTD. v. DONALD J. TRUMP et al., 20-cv-2658 (D.D.C. 2020). I have been retained as an expert consultant in this matter, including for the purpose of rendering a declaration and opinions.

2.    TikTok Inc. and ByteDance Ltd. ("Plaintiffs") allege in this matter that President Donald J. Trump's "Executive Order on Addressing the Threat Posed by TikTok," Exec. Order No. 13942, issued on August 6, 2020, unlawfully bans the operation of the TikTok communication and information-sharing platform within the United States. Among other things, Plaintiffs allege that in issuing Executive Order 13942, the President acted beyond the authority granted to him under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§§ 1701–1706.   In this declaration, I offer an historical perspective on the IEEPA and its implementation.

**B. Overview of Qualifications**

3.      I am the Shannon Cecil Turner Professor of Law at the University of California, Berkeley School of Law ("Berkeley Law").   I have been a tenured member of the Berkeley Law faculty since 2012.   Between 2004 and 2012, I was an Associate Professor of Law at the George Washington University Law School (from 2009-2012, with tenure).   I have previously taught as a visiting professor at Harvard Law School, New York University School of Law, and the University of Virginia School of Law.   I was a Visiting Senior Fellow in the Law Department at the London School of Economics in 2017.   I have been an elected member of the American Law Institute since 2018.   I am a graduate of Harvard Law School, *magna cum laude*, and a former clerk at the Supreme Court of the United States.   I have attached a true and complete copy of my curriculum vitae to this declaration.

4.      My areas of expertise are constitutional law, federal courts, the separation of powers, and civil rights and civil liberties.   I teach courses on each of these subjects, including a seminar on how the United States Constitution functions during wartime and emergencies.   Since joining the academy sixteen years ago, my scholarship has focused primarily upon this same subject, studying executive power and civil liberties in times of war and emergency.   I am the author of several books, including the book *Habeas Corpus in Wartime: From the Tower of London to Guantanamo Bay* (Oxford University Press 2017).   Since 2016, I have also served as a co-editor of *Hart & Wechsler's The Federal Courts and the Federal System* (2016-2020 Supplements to the Seventh Edition; Eighth Edition in progress), the leading treatise and casebook in the field of federal courts.   I have also authored numerous law review articles.   I

have spoken about my scholarship to government agencies and at the National Constitution Center, published blog posts and op-eds, and served as a commentator on legal issues for national and local media. My scholarship has been cited and quoted by the Supreme Court of the United States.

5.      In the course of my engagement, I have reviewed and relied upon the materials referred to in this report, including the President's "Executive Order on Addressing the Threat Posed by TikTok," Exec. Order No. 13942, issued on August 6, 2020 ("the August 6 Order"). In addition, I have relied upon my prior education, professional experience, and legal work. I reserve the right to update this declaration and any opinions contained herein to the extent new information comes to my attention.

6.      I do not here opine on the ultimate question whether the August 6 Order represents a legal exercise of the President's authority under the IEEPA and the NEA. Instead, I have been retained by Plaintiffs to offer an historical perspective respecting the unusual nature of the August 6 Order as an exercise of presidential emergency powers.

## II. Historical Perspective on the IEEPA

7.      The United States Constitution vests all legislative powers in "a Congress of the United States." U.S. Const. art. I, § 1, cl. 1. It also vests Congress with the power "To declare War," *id.* at § 8, cl. 11, and "To regulate Commerce," *id.* at § 8, cl. 3, among many other powers.

8.      The decision to vest the power to declare war in the legislature was the product of careful deliberation by the Founding generation, born out of a belief that such decisions should not be taken lightly or expeditiously. The Founders believed that requiring Congress to control such decisions, moreover, would reduce the occasions in which the country would go to war. As James Wilson phrased things: "This system will not hurry us into war; it is calculated to guard

against it.  It will not be in the power of a single man, or a single body of men, to involve us in such distress, for the important power of declaring war is vested in the legislature at large. . . ." James Wilson, Remarks at the Pennsylvania Ratifying Convention (Dec. 11, 1787), *reprinted in* 1 The Founders Constitution 7: 17 (Philip B. Kurland and Ralph Lerner eds., 1986).

9.      For this reason, the Supreme Court has recognized that even in waging war, the President must ground his authority in either congressional authority or some inherent constitutional power.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) (holding that President Truman was without power to seize the country's steel mills in the wake of a nationwide strike to advance the Korean war effort).  Further, time and again, the Supreme Court has held that the executive may not—even in times of war or asserted national emergency—deprive those who fall within the protection of the United States Constitution of their rights to life, liberty, or property without due process of law.  *See id.*; *see also Ex parte Milligan*, 71 U.S. 2, 46 (1866) (holding that a citizen may not be tried by a military tribunal for violations of the laws of war "where the courts are open and their process unobstructed"); *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (holding that the executive may not detain a citizen as an alleged "enemy combatant" in the war on terrorism without affording him a hearing and opportunity before a neutral decisionmaker to contest the government's classification).

10.      Despite the original allocation of powers in the Constitution, over the course of the twentieth century, Congress has delegated substantial amounts of emergency powers to the President by statute.

11.      One example may be found in the Trading with the Enemy Act of 1917 ("TWEA"), 50 U.S.C. § 4305, which Congress enacted during World War I.  The TWEA

authorized the President, "[d]uring the time of war," to prohibit transactions with enemy powers by parties or with respect to property subject to the jurisdiction of the United States.

12.     Congress passed amendments to the Trading with the Enemy Act that significantly expanded the president's powers in 1917, 1918, 1933, 1940, and 1941. Cumulatively, these amendments allowed the President to declare a national emergency in times of peace and assume sweeping powers over both domestic and international transactions.   To give but one example of how this expansion played out, in 1933, President Franklin D. Roosevelt invoked his authority under the TWEA to proclaim a banking holiday during one of the lowest points in the Great Depression, suspending all transactions at all banking institutions located in the United States and its territories for four days.  *See* Pres. Proc. No. 2039 (Mar. 6, 1933).

13.     More generally, between 1945 and the early 1970s, TWEA became the primary means by which the executive imposed sanctions as part of government's Cold War strategy, invoked to block, among other things, international financial transactions, seize U.S.-based assets held by foreign nationals, restrict exports, impose tariffs on imports, and limit foreign investment in United States companies.

14.     The 1970s witnessed congressional efforts to limit the scope of its delegations to the executive to act in the face of asserted national emergencies, first by enacting the War Powers Resolution in 1973 over President Richard Nixon's veto.  *See* 50 U.S.C. § 1541 *et seq.*

15.     During this same period, a 1973 Senate bipartisan committee discovered that multiple presidentially-declared emergencies remained outstanding, including Roosevelt's 1933 proclamation.   Likewise, the committee identified 470 statutes without time limitations delegating emergency authority to the executive.   This spurred passage of the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*, which terminated all existing declared

national emergencies as of 1978.  The NEA imposed new constraints on the declaration of national emergencies that, among other things, require the President to report to Congress any such declaration, require biannual review of the same by Congress, and reserve to Congress the power to terminate the emergency through concurrent (now joint) resolution.[1]  *See id.*

16.     At the same time, Congress adopted the IEEPA in 1977 to grant "the President a new set of authorities for use in time of national emergency which are both more limited in scope than those of section 5(b) and subject to procedural limitations, including those of the [NEA]." P.L. 95-223 (Title II), 91 Stat. 1625 (1977); U.S. Congress, House, Trading with the Enemy Act Reform Legislation, Report of the Committee on International Relations on H.R. 7738, 95th Cong., 1st sess., H. Rep. No. 95-459 (1977), at 2.  As a House Report noted at the time, the IEEPA stemmed from Congress's desire to ensure that "[a] national emergency should be declared and emergency authorities employed only with respect to a specific set of circumstances which constitute a real emergency, and for no other purpose."  *Id.* at 11.

17.     The IEEPA vests the president with authority "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  In declaring a relevant national emergency, the President must comply with the procedures set forth in the NEA.  *Id.* § 1701(b).

---

[1] The NEA exempted from its terms § 5(b) of the TWEA, which Congress separately amended in 1977.  Those amendments grandfathered existing sanctions ordered under the TWEA and prospectively limited the executive's authority under the TWEA by deleting language in § 5(b) that permitted the President to invoke its powers based upon "any . . . national emergency declared by the President" and substituting in its place the limitation that the President may invoke such powers only "during a time of war."  P.L. 95-223 (Title I), 91 Stat. 1625 (1977).

18.     The IEEPA authorizes the president in the above circumstances to investigate, regulate, or prohibit transactions with respect to transactions involving "any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

19.     Congress has amended IEEPA eight times. Two relevant amendments are the 1988 so-called "Berman Amendment," P.L. 100-418; 102 Stat. 1107, 1371, and a 1994 amendment, P.L. 103-236; 108 Stat. 382. These amendments expanded the range of informational materials excepted from the President's authority under IEEPA.

20.     Specifically, the original version of the IEEPA denied the President the authority to regulate "any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value." *Id.* § 1702(b)(1).

21.     Together, the 1988 and 1994 amendments went further to provide that the President has no authority under the IEEPA to "regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." *Id.* § 1702(b)(3) ("the information materials exception").

22.     The 1988 Berman Amendment came in response to seizures at the United States border of shipments of magazines and books from embargoed countries. The amendment's legislative history emphasizes the importance of promoting the free exchange of ideas and information across borders and ensuring that IEEPA is not used to target information protected

by the First Amendment.  *See, e.g.*, H.R. REP. No. 40, 100th Cong., 1st sess., pt. 3, at 113 (1987).

23.     The 1994 amendment modified the informational materials exceptions to include the phrase "regardless of format or medium of transmission," and to add more examples to the list of enumerated media, including electronic media.  The 1994 amendment came in response to Congress's belief that the Office of Foreign Assets Control in the United States Department of the Treasury ("OFAC"), which manages sanctions programs put in place under the IEEPA framework, had interpreted the prior version incorrectly in limiting its scope to "tangible items." *See United States v. Amirnazmi*, 645 F.3d 564, 585-86 (3d Cir. 2011) (describing legislative history).

24.     According to the House Conference Report accompanying the 1994 amendment, Congress intended the amendment to reinforce that because of the informational materials exception, "no embargo may prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution." H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483. Further, in referencing the exception, the Report observed that "[t]he language was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope." *Id*.  Finally, the Report emphasized that Congress was adopting the 1994 amendment for the purpose of protecting "transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission. . . ." *Id*.

25.     The story of IEEPA is of a kind with the War Powers Resolution and other laws of its time.  The IEEPA represents an effort by Congress to scale back substantially the scope of delegated executive authority to address asserted national emergencies it had previously

delegated in the pre-1977 TWEA regime so that now the President may invoke the authority to address a "real emergency, and for no other purpose." H. Rep. No. 95-459 at 11. Further, unlike the pre-1977 TWEA regime, the IEEPA is directed at threats that have their "source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a). Finally, the addition of the informational materials exceptions to the IEEPA is the product of a Congress's determination that the authority granted to the President under the IEEPA should not be invoked in a way that undermines the free exchange of ideas and information.

### III.  Historical Perspective on the August 6, 2020 Executive Order

26.     The President purported to issue the August 6 Order pursuant to his authority under the IEEPA and the NEA.

27.     The August 6 Order "find[s] that additional steps must be taken to deal with the national emergency with respect to . . . the spread in the United States of mobile applications developed and owned by companies in the People's Republic of China (China)," which, the Order declares "continue[] to threaten the national security, foreign policy, and economy of the United States." The Order singles out "one mobile application in particular, TikTok."

28.     The August 6 Order goes on to prohibit, beginning 45 days after its issuance, "any transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries. . . ." The August 6 Order then delegates the authority to the Secretary of Commerce to identify the transactions subject to this prohibition 45 days after the date of this order.

29.     On September 18, 2020, the Department of Commerce identified the transactions that are subject to the prohibitions in the August 6 Order (the "Prohibitions"). Once fully

implemented on or before November 12, I understand the Prohibitions will have the effect of completely shutting down TikTok for existing users in the United States.  Complaint ¶ 66.

30.    The IEEPA authorizes civil and criminal penalties for the violation of the Executive Order.  *See* 50 U.S.C. § 1705.

31.    Since 1977, Presidents have invoked the IEEPA in over 50 declarations of national emergency, which have lasted an average of nine years.  *See The International Emergency Economic Powers Act: Origins, Evolution, and Use*, Congressional Research Service, R45618 (July 14, 2020), at 17 ("*The IEEPA: Origins, Evolution, and Use*").

32.    The first such invocation came in response to the November 4, 1979, seizure of the American Embassy in Tehran and holding of American diplomatic personnel as hostages when President Carter invoked his authority under the IEEPA to declare a national emergency and block the removal or transfer of "all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States. . . ."  Exec. Order No. 12170 (Nov. 14, 1979).  Successive Presidents have renewed this declared emergency annually through 2020.  *See The IEEPA: Origins, Evolution, and Use* at 18-19.

33.    In keeping with this example, presidents have invoked authority under the IEEPA to address declared emergencies relating to, among other things, international narcotics traffickers based in Colombia, *see* Exec. Order No. 12978 (Oct. 21, 1995), and the actions and policies of the North Korean government, *see* Exec. Order No. 13466 (June 26, 2008).

34.    Following the September 11, 2001 terrorist attacks on the United States, President Bush invoked the IEEPA and the NEA to declare a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United

States nationals or the United States." Exec. Order No. 13224 (Sep. 23, 2001). President Bush's order blocked all property and interests in property of the designated terrorist organizations. *See id.*

35.     In keeping with this example, presidents have invoked their authority under the IEEPA to address declared emergencies with respect to proliferation of chemical and biological weapons, *see* Exec. Order No. 12735 (Nov. 16, 1990), and malicious cyber-enabled activities, *see* Exec. Order No. 13694 (Apr. 1, 2015).

36.     As these examples demonstrate, presidents have invoked authority under the IEEPA typically to target specific foreign countries or governments, and/or to address foreign threats of a general nature, such as global terrorism.

37.     Presidents have on occasion issued orders invoking IEEPA authority that target specific groups or individuals, such as the Taliban, *see, e.g.*, Exec. Order No. 13129 (July 4, 1999) (prohibiting transactions with the Taliban); Exec. Order No. 12978 (prohibiting transactions with specified foreign narcotics traffickers), and OFAC has implemented Presidential orders under IEEPA by designating specific businesses and individuals with whom financial and business dealings are prohibited and to block their assets. *Specially Designated Nationals and Blocked Persons List*, Department of the Treasury, https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-and-blocked-persons-list-sdn-human-readable-lists (last accessed September 21, 2020).

38.     It is also the case that historically, executive orders invoking authority under IEEPA typically target foreign governments, entities, and individuals, with the stated objective of prohibiting United States parties from engaging in transactions with the designated target. Indeed, until 2001, presidents generally restricted the language in executive orders issued under

IEEPA as expressly applicable to "foreign persons." *See The IEEPA: Origins, Evolution, and Use* at 22. And although more recent orders have sometimes targeted the broader category of "persons" who engage in specified conduct and have been applied to United States parties, the August 6 Order is unusual insofar as it targets outright a single, specific company incorporated in the United States along with the activities of a substantial number of United States persons.

39. There are, moreover, only a handful of examples of which I am aware involving a presidential order under the IEEPA that has been applied by the Department of Treasury to United States entities to freeze all of their assets and effectively shut down their operations, as the Prohibitions would do here. Those examples of which I am aware involve OFAC determinations with respect to United States-based non-profits and individuals suspected of providing material support to terrorism.

40. In one such case in which OFAC issued a "Blocking Notice" freezing all of funds, accounts, and real property of a United State-based non-profit organization, the courts upheld OFAC's actions based upon a seven-volume, 3,130-page administrative record that the courts concluded provided substantial support for OFAC's determination that the organization acted for or on behalf of Hamas. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 64 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

41. In the case of another United States-based non-profit whose assets OFAC froze pending investigation and about which OFAC reached a provisional determination one year later that the entity was a Specially Designated Global Terrorist, a court held that OFAC had violated the organization's due process rights. *See KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2009). The court noted that the organization remained "largely uninformed about the basis for the government's actions," and "[t]o the extent

that it has become usefully informed, that information came only after long, unexplained and inexplicable delay and following multiple requests for information." *Id.* at 904.  This, the court held, violated the entity's "fundamental right to be told on what basis and for what reasons the government deprived it of all access to all its assets and shut down its operations." *Id.* at 906. The government chose not to appeal the decision.

42.     In yet another case, the Ninth Circuit also concluded that OFAC violated the due process rights of a United States-based non-profit organization by "failing to provide an adequate statement of reasons for its investigation," although the court deemed the constitutional error harmless in light of the administrative record as a whole. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't. of Treasury*, 686 F.3d 965, 988 (9th Cir. 2012).

43.     As these decisions highlight, United States parties enjoy the protection of the Due Process Clause, see U.S. Const. amend. V, which provides that the government may not deprive a person of life, liberty or property without notice and opportunity "to be heard." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

44.     An additional distinctive aspect of the August 6 Order is its impact on personal communications and the exchange of ideas and information.  TikTok alleges in its complaint that it is "a mobile software application that 100 million Americans use to create and share short videos composed of expressive content."  Complaint ¶ 1.  To my knowledge, this is the only instance in which a social media platform has been the target of an executive order issued under IEEPA.

45.     Indeed, in the past, in implementing executive orders issued under the IEEPA, OFAC has been careful to protect access to social media and other avenues for personal communication, even within the context of longstanding sanctions programs.  Thus, for example,

although the Iran sanctions program has been one of the most restrictive in place under the IEEPA, in 2014, OFAC issued a general license permitting the provision of services, software, and hardware to "promote the availability of personal communications over the Internet to Iranian citizens, including instant messaging, chat and email, social networking, sharing of photos and movies, web browsing and blogging." *See* 31 C.F.R. Part 560, General License D (May 30, 2013); 31 C.F.R. Part 560, General License D-1 (Feb. 7, 2014).

46.     Further, although past executive orders issued under the IEEPA have targeted cyber activities, *see, e.g.*, Exec. Order No. 13694 (Apr. 1, 2015) (blocking the property of parties engaging in malicious cyber-enabled activities); Exec. Order No. 13757 (Dec. 28, 2016) (expanding upon the earlier order), nothing in those executive orders purports to reach communicative or expressive content, and to my knowledge they have not been used by OFAC to designate companies that enable personal communications.

47.     A list catalogue of the historical invocation of the IEEPA authority by the executive branch may be found at *The IEEPA: Origins, Evolution, and Use*, at 51-66. A current list of all outstanding sanctions programs may be found at *Sanctions Program and Country Information*, Department of the Treasury, https://home.treasury.gov/policy-issues/financial-sanctions/sanctions-programs-and-country-information (last accessed September 16, 2020).

**IV. Conclusion**

48.     For each of the reasons explained above in Part III and in light of my review of the IEEPA's origins and historical application, I believe that in several respects the August 6 Order represents a significant departure from historic IEEPA practice.

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, I affirm that the foregoing facts are true and correct to the best of my knowledge.

Executed this 22nd day of September, 2020.

Amanda L. Tyler

**AMANDA L. TYLER**
UNIVERSITY OF CALIFORNIA, BERKELEY SCHOOL OF LAW
BERKELEY, CA 94720 • 510.664.4986
atyler@berkeley.edu

## ACADEMIC APPOINTMENTS

**University of California, Berkeley School of Law**, 2012-present
Shannon Cecil Turner Professor of Jurisprudence (2019-present); previously Professor of Law
Affiliated Faculty, Institute for European Studies

Courses:  The Federal Courts and the Federal System; Civil Procedure; Seminar on the
        Supreme Court and Constitutional Law; Seminar on the Constitution in Wartime; Public
        Law and Policy Workshop (various topics: Advanced Constitutional Law;
        Administrative Law; Civil Procedure & Federal Courts)

**London School of Economics and Political Science**, Spring 2017
Visiting Senior Fellow, Department of Law

**The George Washington University Law School**, 2004-2012
Associate Professor of Law; *with tenure*, 2009-2012

**New York University School of Law**, Spring 2011
Visiting Professor of Law

**University of Virginia School of Law**, Spring 2010
Visiting Professor of Law

**Harvard Law School**, Fall 2007
Visiting Associate Professor of Law

**Georgetown University Law Center**, Spring 2003
Visiting Researcher

## LEGAL EXPERIENCE

**Sidley & Austin**, Washington, D.C.
Associate (2000-2004)

**The Honorable Ruth Bader Ginsburg, Supreme Court of the United States**
Law Clerk (1999-2000)

**The Honorable Guido Calabresi, United States Court of Appeals for the Second Circuit**
Law Clerk (1998-1999)

## EDUCATION

**Harvard Law School,** J.D., *magna cum laude* (1998)
        *Harvard Law Review*:  Treasurer, Volume 111; Editor, Volume 110

James Barr Ames Moot Court Finals, Boykin C. Wright Memorial Fund Prize (1998):
> Best Team Award (Charles Hamilton Houston Memorial Team)
> George Leisure Award for Best Oralist

**Stanford University,** AB, Public Policy, with *Distinction* and *Honors* (1995)

## ACADEMIC PUBLICATIONS AND WORKS IN PROGRESS

**Books:**

SUPREME RBG: PURSUING GENDER EQUALITY AND A "MORE PERFECT UNION" THROUGH HER LIFE AND WORK, *with* the Honorable Ruth Bader Ginsburg (University of California Press, forthcoming 2021)

HABEAS CORPUS: A VERY SHORT INTRODUCTION (Oxford University Press, forthcoming 2021)

HABEAS CORPUS IN WARTIME: FROM THE TOWER OF LONDON TO GUANTANAMO BAY (Oxford University Press 2017) (paperback 2019)

HART & WECHSLER'S FEDERAL COURTS AND THE FEDERAL SYSTEM, with Richard H. Fallon, Jr., Jack L. Goldsmith, John F. Manning & David L. Shapiro (Foundation Press) (Eighth Edition in progress)

HART & WECHSLER'S FEDERAL COURTS AND THE FEDERAL SYSTEM, with Richard H. Fallon, Jr., Jack L. Goldsmith, John F. Manning & David L. Shapiro (Foundation Press) (2016, 2017, 2018, 2019, 2020 Supplements to the Seventh Edition)

**Articles, Essays, and Book Chapters:**

*Courts and the Executive in Wartime: A Comparative Study of the American and British Approaches to the Detention of Citizens During World War II*, in JUDGING NATIONAL SECURITY (Robert M. Chesney & Stephen I. Vladeck eds.) (forthcoming Oxford University Press 2021) (book chapter)

*Courts and the Executive in Wartime: A Comparative Study of the American and British Approaches to the Internment of Citizens During World War II and Their Lessons for Today*, 107 CALIF. L. REV. 789 (2019) (longer article treatment of subject)

*The "New Federalism" in Constitutional Interpretation: A Case Study in Partisan Gerrymandering*, in ITALIAN-AMERICAN DIALOGUES IN LAW (forthcoming University of California, Berkeley School of Law Press 2021) (book chapter)

*Direct Democracy and Judicial Review in the United States*, in MISINFORMATION IN REFERENDA (Sandrine Baume, Véronique Boillet & Vincent Martenet eds.) (Routledge 2020) (book chapter)

*Customary Law and the Domain of Federal Common Law Today*, in CUSTOMARY LAW (Laurent Mayali & Pierre Mousseron eds.) (Springer Verlag 2018) (book chapter)

Amanda L. Tyler                                                                    Page 3

*Habeas Corpus*, in The Cambridge Companion to the United States Constitution (Karren Orren & John Compton, eds.) (Cambridge University Press 2018) (book chapter)

*Habeas Corpus in the Anglo-American Legal Tradition*, 16 J. Korean L. 31 (2016)

*A "Second* Magna Carta*": The English Habeas Corpus Act and the Statutory Origins of the Habeas Privilege*, 91 Notre Dame L. Rev. 1949 (2016)

*Assessing the Role of History in the Federal Courts Canon: A Word of Caution*, 90 Notre Dame L. Rev. 1739 (2015)

*Habeas Corpus and the American Revolution*, 103 Calif. L. Rev. 635 (2015)

*The Forgotten Core Meaning of the Suspension Clause*, 125 Harv. L. Rev. 901 (2012)

*A Dialogue with Federal Judges on the Role of History in Interpretation*, 80 Geo. Wash. L. Rev. 1889 (2012) (with the Honorable Frank H. Easterbrook, Brett M. Kavanaugh, Charles F. Lettow, Reena Raggi, Jeffrey S. Sutton, and Diane P. Wood)

*The Counterfactual that Came to Pass: What If the Founders had not Constitutionalized the Privilege of the Writ of Habeas Corpus?*, 45 Ind. L. Rev. 3 (2011)

*Setting the Supreme Court's Agenda: Is There a Place for Certification?*, 78 Geo. Wash. L. Rev. 1310 (2010), republished in part in The Supreme Court Sourcebook 273-276 (Richard H. Seamon, Andrew Siegel, Joseph Thai & Kathryn Watts, eds. 2013)

*The Story of* Klein*: The Scope of Congress's Authority to Shape the Jurisdiction of the Federal Courts*, in Federal Courts Stories (Vicki Jackson & Judith Resnik eds., Foundation Press 2009)

*Suspension as an Emergency Power*, 118 Yale L. J. 600 (2009)

*Is Suspension a Political Question?*, 59 Stan. L. Rev. 333 (2006)

*Continuity, Coherence, and the Canons*, 99 Nw. U. L. Rev. 1389 (2005)

**Other Published Writing:**

*Thuraissigiam and the Future of the Suspension Clause*, Lawfare Blog (July 2, 2020), available at: https://www.lawfareblog.com/thuraissigiam-and-future-suspension-clause

*In Memoriam: Professor David L. Shapiro*, 133 Harv. L. Rev. 2454 (2020)

*Lessons from President Lincoln in the Age of Coronavirus*, San Francisco Chronicle (Mar. 27, 2020), available at: https://www.sfchronicle.com/opinion/openforum/article/Lessons-from-President-Lincoln-in-the-age-of-15160434.php

Amanda L. Tyler                                                                 Page 4

Habeas Corpus in Wartime *and Larger Lessons for Constitutional Law*, HARVARD LAW REVIEW ONLINE (April 2019), available at: https://blog.harvardlawreview.org/_habeas-corpus-in-wartime_-and-larger-lessons-for-constitutional-law/

*The Travel Ban and Judicial Deference to the Executive Branch on Matters of National Security: The Cautionary Tale of the Japanese American Internment*, USA TODAY (Jan. 24, 2018), available at: https://www.usatoday.com/story/opinion/2018/01/24/trump-travel-ban-supreme-court-japanese-american-internment-cautionary-tale-amanda-tyler-column/1055966001/

*The First "Citizen Enemy Combatants" and the War on Terror Today*, OXFORD UNIVERSITY PRESS BLOG (Jan. 4, 2018), available at: https://blog.oup.com/2018/01/first-citizen-enemy-combatants/?utm_source=twitter&utm_medium=oupacademic&utm_campaign=oupblog

ACLU v. Mattis *and the Citizen Enemy Combatant in* Hamdi v. Rumsfeld, LAWFARE BLOG (Dec. 12, 2017), available at: https://www.lawfareblog.com/aclu-v-mattis-and-citizen-enemy-combatant-hamdi-v-rumsfeld

*Honoring the Legacy of Mitsuye Endo*, SACRAMENTO BEE (August 25, 2016); also posted on LAWFARE BLOG (Aug. 25, 2016), available at: https://www.lawfareblog.com/honoring-legacy-mitsuye-endo

## BAR MEMBERSHIPS

Bars of the District of Columbia (active) and the State of New York (inactive)

Bar of the Supreme Court of the United States and various United States Courts of Appeals

## RECENT HONORS

University of California, Berkeley School of Law, 2020 Rutter Award for Teaching Distinction

American Law Institute, Elected Member, 2018

Order of the Coif Distinguished Visitor, 2017

## PROFESSIONAL ACTIVITIES

American Association of Law Schools: Scholarly Papers Selection Committee Chair (2019); Federal Courts Section Chair (2015) & Chair-Elect (2014); Federal Courts Section Executive Committee Member (2009-present); Federal Courts Section Daniel J. Meltzer Memorial Award Committee (2016); Federal Courts Section Best Untenured Article Selection Committee (2015); Scholarly Papers Selection Committee Member (2006)

Board of Overseers, *Harvard Law Review* Association (2008-present)

Panetta Institute for Public Policy, Annual speaker on the Supreme Court to the Institute's Congressional Internship Program (2013-2019)

Naval Postgraduate School, Center for Homeland Defense and Security Executive Leaders Program, Guest Lecturer on Constitutional Law issues (2016-present)

Alumni Council, Public Policy Program, Stanford University (2012-2016)

Member, American Society for Legal History

## **MANUSCRIPT REVIEWS**

For: Cambridge University Press, Oxford University Press, Yale University Press, University of California Press, *California Law Review*, *George Washington Law Review*, *Harvard Law Review*, *Stanford Law Review*, *Yale Law Journal*.

## **ACADEMIC & OTHER PRESENTATIONS**

Available upon request.