# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIKTOK INC., et al.,

        *Plaintiffs*,

   v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

        *Defendants*.

Case No. 20-cv-02658 (CJN)

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ...................................... 3

        A.      The Prohibitions Violate The APA.......................................................................... 3

                1.      This Court Has the Power to Review Plaintiffs' Claims Under The
                        APA.................................................................................................................. 4

                2.      The Government's Explanation for its Ban Is Inadequate.......................... 6

                3.      The Stated Justification for the Prohibitions Is Pretextual......................... 9

        B.      The TikTok Ban Unlawfully Regulates Personal Communications and
                Informational Materials in Violation of Section 1702(b) of IEEPA.................... 12

                1.      The TikTok Ban Unlawfully Prohibits Personal Communications. ......... 12

                2.      The TikTok Ban Unlawfully Prevents the Importation and
                        Exportation of Informational Materials. ..................................................... 14

        C.      The Prohibitions Violate the First Amendment. ................................................... 17

                1.      Defendants Failed to Satisfy First Amendment Standards. ...................... 17

                2.      The Prohibitions Directly Restrain Speech................................................. 19

        D.      The Prohibitions Violate Due Process. .................................................................. 21

        E.      The Prohibitions and August 6 Order Violate IEEPA in Other Respects............ 23

II.     The Remaining Factors Require Injunctive Relief. ........................................................... 24

        A.      Plaintiffs Face Immediate Irreparable Harm If Relief Is Not Granted. ............... 24

        B.      The Balance of Equities And Public Interest Require Injunctive Relief. ............. 25

CONCLUSION...................................................................................................................... 25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States*,
  509 U.S. 544 (1993)................................................................................................17

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
  215 F.3d 61 (D.C. Cir. 2000).................................................................................7

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986)..........................................................................................20, 21

*Armstrong v. Bush*,
  807 F. Supp. 816 (D.D.C. 1992)............................................................................25

*Barr v. Am. Ass'n. of Political Consultants, Inc.*,
  140 S. Ct. 2335 (2020).........................................................................................20

*Billups v. Charleston*,
  961 F.3d 673 (4th Cir. 2020) .................................................................................19

*CAIR v. DOJ*,
  264 F. Supp. 2d 14 (D.D.C. 2003)..........................................................................5

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996)................................................................................23

*Crowley Tech. Mgmt., Inc. v. United States*,
  123 Fed. Cl. 253 (2015).........................................................................................25

*De Jonge v. Oregon*,
  299 U.S. 353 (1937)...............................................................................................21

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019)...........................................................................................12

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999)..................................................................................25

*Dunlop v. Bachowski*,
  421 U.S. 560 (1975)................................................................................................4

*El-Shifa v. United States*,
  607 F.3d 836 (D.C. Cir. 2010)................................................................................24

*Elrod v. Burns*,
   427 U.S. 347 (1976)..........................................................................................24

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015)...................................................................25

*Gomez v. Trump*,
   2020 WL 5367010 (D.D.C. Sept. 4, 2020) ........................................................23

*Gorin v. United States*,
   312 U.S. 19 (1941)............................................................................................16

*Gray v. Schweiker*,
   652 F.2d 146 (D.C. Cir. 1980) ..........................................................................22

*Hi-Tech v. FCC*,
   224 F.3d 781 (D.C. Cir. 2000) ............................................................................5

*Hodgkins v. Peterson*,
   355 F.3d 1048 (7th Cir. 2004) ...........................................................................20

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)..............................................................................................18

*Holy Land Found. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ...............................................................4, 5, 6, 21

*Home Box Office, Inc. v. FCC*,
   567 F.2d 9 (D.C. Cir. 1977) ..............................................................................12

*Japan v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986)..........................................................................................23

*Judulang v. Holder*,
   565 U.S. 42 (2011)..............................................................................................5

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972)......................................................................................17, 20

*Kreis v. Sec'y of the Air Force*,
   866 F.2d 1508 (D.C. Cir. 1989) ..........................................................................5

*Mach Mining, LLC v. EEOC*,
   575 U.S. 480 (2015)............................................................................................4

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)..........................................................................................22

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................................6

*Nat'l Fed'n of Fed. Emps. v. Weinberger*,
  818 F.2d 935 (D.C. Cir. 1987) ..............................................................................5

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ................................................................................17, 18, 24

*OKKO Bus. PE v. Lew*,
  133 F. Supp. 3d 17 (D.D.C. 2015) .........................................................................4

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) .........................................................................................18

*Policy v. HHS*,
  313 F. Supp. 3d 62 (D.D.C. 2018) .........................................................................5

*Pursuing AM.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ............................................................................24

*Ralls Corp. v. CFIUS*,
  758 F.3d 296 (D.C. Cir. 2014) ............................................................................22

*Ramirez v. U.S. Customs & Border Protection*,
  477 F. Supp. 2d 150 (D.D.C. 2007) ....................................................................24

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) ................................................................................5

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ...............................................................................................6

*Sierra Club v. Jackson*,
  648 F.3d 848 (D.C. Cir. 2011) ..............................................................................5

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .............................................................................................20

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002) .............................................................................................19

*Tourus Records, Inc. v. DEA*,
  259 F.3d 731 (D.C. Cir. 2001) ..............................................................................7

*Trifax v. Dist. of Columbia*,
  314 F.3d 641 (D.C. Cir. 2003) ............................................................................21

*Turner Broad. Sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994).............................................................................................18

*U.S. WeChat Users Alliance v. Trump*,
    No. 3:20-cv-5910 LB, ECF 18 (N.D. Cal. Sept. 3, 2020)..........................................4

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011)................................................................................13

*United States v. Harper*,
    729 F.2d 1216 (9th Cir. 1984) ............................................................................16

*United States v. Menasche*,
    348 U.S. 528 (1955).............................................................................................15

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) ..........................................................................19

*Yakima Valley Cablevision, Inc. v. FCC*,
    794 F.2d 737 (D.C. Cir. 1986)..............................................................................9

*Zarmach v. Treas.*,
    750 F. Supp. 2d 150 (D.D.C. 2010) ......................................................................4

**Statutes**

18 U.S.C. § 793(e), (f) ...............................................................................................16

18 U.S.C. § 794........................................................................................................16

47 U.S.C. § 214........................................................................................................17

50 U.S.C. § 1702(b) .......................................................................................... *passim*

50 U.S.C. § 4565..................................................................................................8, 17

**INTRODUCTION**

The President has broad authority under the International Emergency Economic Powers Act ("IEEPA"), but it is not boundless.  It is limited by the statute itself and by the Constitution.  When the President acts under IEEPA through an administrative agency, as he did here, moreover, the agency must comply with the Administrative Procedure Act ("APA").

None of these limits were observed in this case.  Defendants' Opposition fails to rebut Plaintiffs' showing that the Prohibitions violated the APA, IEEPA, and the First and Fifth Amendments.  Each of these claims is an independent basis to enjoin the Prohibitions in their entirety, including Paragraph 1 (i.e., the app store ban) that enters into force tomorrow night.

But the Court need not reach all these claims to conclude, as it should, that the app store ban must be enjoined.  On its face, the separate September 27 implementation date of the app store ban is arbitrary and capricious.  Far from addressing the agency's ostensible concern about the security of U.S. user data, the app store ban would undermine data security by barring the distribution of security updates to the more than 100 million Americans that currently use TikTok.  Nor does it make any sense precipitously to shut out millions of Americans who have not yet joined this communication forum—so popular that new users have been joining it at a rate of more than 400,000 per day—when the government acknowledges that parallel discussions involving the Committee on Foreign Investment in the United States ("CFIUS") could address the purported necessity of the Prohibitions altogether.  Those CFIUS discussions are subject to a November 12, 2020 deadline—the same date the remaining paragraphs of the Prohibitions enter into force.  Particularly given that the Commerce Department waited 43 days to issue the Prohibitions, and has since delayed implementation of the app store ban for a week already, there is clearly no national security imperative for the ban to enter into force tomorrow.

Ordering a narrow injunction directed at the app store ban would allow the Court to consider the remaining APA, IEEPA, and constitutional issues on a non-emergency basis, and with the benefit of a full administrative record.  This is critical, because many of the facts alleged in the government's Opposition and the Commerce Department's decision memorandum ("Commerce Memo") on which it relies are unsubstantiated, outdated, and untrue.  Accordingly, in recognition of the Court's statement on Thursday that "the effective date of Paragraph 1 . . . is the question that I would be taking up on Sunday" (Tr. 21), Plaintiffs respectfully request that the Court preliminarily enjoin the app store ban, order the government to produce the administrative record, permit additional briefing, and hold a further hearing, which will enable the Court to consider Plaintiffs' remaining arguments—each of which applies to the Prohibitions in their entirety—with the benefit of the full record.

If the Court decides to reach these broader issues at this time, however, it should enjoin the Prohibitions in full pending resolution of this case.  Although the government portrays the Prohibitions as mere business-to-business restrictions, the reality is that they prohibit core constitutionally-protected speech: videos composed by millions of Americans containing a vast array of individual expression, ranging from art to political speech.  And while the government maintains that the Prohibitions are necessary to address national security concerns relating to TikTok, the Commerce Memo relies heavily on outdated or inaccurate news articles and fails to take account of TikTok's documented data security and content moderation safeguards.  Most critically, the government remains unable to explain why it is necessary to ban TikTok in light of the commitments the company has made to restructure its business through the CFIUS process.  Indeed, given that Plaintiffs are currently under a separate order to divest TikTok by November 12, 2020—and given that the entire premise of the Prohibitions is ByteDance's ownership of

TikTok—there is no justification for banning the TikTok application outright.   Plaintiffs accordingly are likely to succeed on each of their claims.

The remaining factors also support entry of a preliminary injunction.  Although Defendants seek to minimize Plaintiffs suffering as mere "economic harm," they concede that such harm can qualify as irreparable when it poses an existential threat to the movant.  That is manifestly the case here, where beginning Sunday night hundreds of thousands of new U.S. users who would have otherwise joined TikTok each day will be barred from joining the platform; as TikTok is prevented from servicing the app with updates necessary to maintain its functionality; as creators and strategic partners continue to forge relationships with TikTok's competitors; and as Plaintiffs' goodwill and competitive position steadily erode until November 12, when TikTok is shut down in the United States and their business here is destroyed.  These harms are irreparable.

Lastly, the government argues that the equities and public interest weigh against an injunction because this case involves national security and foreign affairs determinations by the President, as authorized by Congress in IEEPA.  But that authority has never been used like this: to shut down a U.S. social platform that more than 100 million Americans use to engage in protected speech.  Particularly given the government's delay in implementing the Prohibitions, and the importance of robust speech in the lead-up to an election, the public interest tilts decisively in favor of maintaining the status quo until this case is resolved.

## ARGUMENT

**I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

**A.     The Prohibitions Violate the APA.**

The Prohibitions violate the APA's bar on arbitrary or capricious agency action in at least two ways.  First, the agency has failed to provide an adequate explanation for its action, including its bifurcation of the ban on TikTok—imposed first on new U.S. users and then, seven weeks

later, on existing U.S. users—and because it fails to provide coherent reasons for reversing course and for rejecting reasonable, obvious alternatives.  Second, the agency provided a rationale for the Prohibitions that was mere pretext.

      1.     <u>This Court Has the Power to Review Plaintiffs' Claims Under the APA.</u>

The government's argument that this Court has no authority to review the Commerce Department's conduct ignores clear Circuit precedent that IEEPA decisions are subject to judicial review under the APA.  *See Holy Land Found. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 25 (D.D.C. 2015); *Zarmach v. Treas.*, 750 F. Supp. 2d 150, 156 (D.D.C. 2010).  In fact, the government argued in another case involving a similarly-structured executive order directed at WeChat, in which plaintiffs had moved for injunctive relief before the issuance of Commerce's regulations, that judicial review was premature and that plaintiffs should wait to assert an APA challenge after the regulations issue.  *See U.S. WeChat Users Alliance v. Trump*, No. 3:20-cv-5910 LB, ECF 18 at 4 (N.D. Cal. Sept. 3, 2020) ("Under the APA, Congress has created an orderly procedure to challenge governmental action").

In an about-face, the government now argues that this Court should decline to review Plaintiffs' APA claims because (1) IEEPA precludes judicial review; and (2) Commerce's exercise of IEEPA authority is committed to agency discretion.  Neither argument has merit.

The government bears a "heavy burden" to overcome the "strong presumption" in favor of judicial review under the APA.  *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015).  The government grasps at various provisions of IEEPA to try to support its argument, but none provides the express provision required to bar judicial review—a provision Congress easily could have written had it wanted to do so.  *See Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975) (no intent to preclude judicial review "[i]n the absence of an express prohibition").  Indeed, Section 1702(c) expressly acknowledges the availability of judicial review.  *See* 50 U.S.C. § 1702(c) (referencing

"any judicial review of a determination made under *this section*") (emphasis added).   The government's sweeping argument that the courts have no authority to review decisions related to "national security policy" cannot be squared with this Circuit's binding precedent that limitations on APA review depend on "the precise wording of the authorizing statute" and that review is not foreclosed simply because a case involves national security.  *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1513-14 (D.C. Cir. 1989).

The government fares no better in arguing that the Commerce Department's Prohibitions are "committed to agency discretion by law."  Opp. 20-22.  Pursuant to this "very narrow" exception, *Hi-Tech v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000), a court cannot review certain discretionary decisions taken by an agency, *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011).  However, and notably, this provision does not automatically apply where "a statute grants broad discretion to an agency[.]"  *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985).  "Rather, it is well established that an action is entirely committed to agency discretion only where 'a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"  *Policy v. HHS*, 313 F. Supp. 3d 62, 73 (D.D.C. 2018).  Here, Plaintiffs' claims seek to hold the agency to the basic standards of rationality that Congress imposed through the APA.  Thus, "familiar APA concepts" themselves "provide the core standards for judicial review."  *CAIR v. DOJ*, 264 F. Supp. 2d 14, 23 (D.D.C. 2003); *cf. Judulang v. Holder*, 565 U.S. 42 (2011).  Multiple sources of law aid the Court in applying those standards, including IEEPA and the First and Fifth Amendments to the Constitution.  *See, e.g.*, *Holy Land*, 333 F.3d at 162; *Nat'l Fed'n of Fed. Emps. v. Weinberger*, 818 F.2d 935, 941 n.11 (D.C. Cir. 1987) ("[T]here is clearly 'law to apply'—the Constitution.").

Finally, the government argues that Plaintiffs attempt "to use the APA as a basis for a back-door challenge to the President's Executive Order itself." Opp. 22. This argument can easily be rejected, as courts routinely review agencies' exercise of authority pursuant to executive orders issued under IEEPA. *See, e.g.*, *Holy Land*, 333 F.3d at 162.

2.   <u>The Government's Explanation for Its Ban Is Inadequate.</u>

On the merits, the Prohibitions are unlawful because Defendants' explanation fails the APA's baseline requirement that an agency "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). On key issues, the Prohibitions say either practically nothing or, in some cases, literally nothing at all—thereby leaving the Court to "chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).

*First*, the Prohibitions provide that TikTok will be banned from U.S. app stores at 11:59 p.m. on September 27, 2020, preventing anyone in the United States from downloading the app after that time. The app, however, will continue to operate on the devices of any users who already have the app until November 12, 2020, when the remaining Prohibitions become effective. The government has provided no logical explanation for this bifurcation. Indeed, the government conceded that, before it filed its brief, the Secretary had not "articulated a basis for . . . distinguishing between new users joining the platform and existing users." Sep. 24, 2020 Hr'g Tr. at 6:22-7:15. And while materials submitted by the government yesterday try to develop some explanation for that bifurcation, that explanation falls short of what the APA requires.

The Commerce Department attempts to explain this "phased manner" of banning TikTok by stating that "this transaction would have the biggest impact in mitigating national security risks" because it "limits the growth of U.S. user data at risk." Commerce Memo at 22. But the agency provides no explanation for why "growth" of U.S. user data is a greater risk than the

6

ongoing use of the app by the 100 million Americans who already have it.

As for Commerce's statement that removal from the app store "is the most foundational to the functionality of the TikTok app in the United States," *id.*, that disruption of functionality will *exacerbate* rather than mitigate any risks associated with the app.  The government acknowledges that the first Prohibition will "not prevent user data from being transmitted from user devices to TikTok data centers"—the very reason Defendants claim to have provided for the ban—but *will* result in "these apps . . . no longer hav[ing] the ability to be updated[,] rendering them less effective and functional." *Id.* at 23.  This inability to update existing U.S. users' apps will *undermine* U.S. user data security, because Plaintiffs will be unable to issue updates to the app that would include security-related fixes, which they generally do once or twice a week.  *See* Cloutier Decl. ¶ 16.  The government's Opposition fails even to acknowledge this risk, let alone explain why it is outweighed by the purported benefit of preventing the addition of new U.S. users.  And to the extent the government asserts a ban is required and must be implemented in a "phased manner," it fails to explain why its one-week delay in implementing Paragraph 1 does not create unacceptable national security risks, but a longer delay would.

In short, the agency's failure to provide an adequate reason for imposing the U.S. app store ban tomorrow, while allowing existing U.S. users to continue using the app, constitutes arbitrary and capricious agency action.  *See Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001).  Therefore, at a minimum, Paragraph 1 of the Prohibitions must be enjoined.

*Second*, another critical element of the agency's explanatory burden was wholly neglected: The government nowhere weighed or even mentioned any number of obvious and compelling alternatives to Defendants' chosen approach. *See Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) (agency must "consider significant alternatives to the

course it ultimately chooses," and explain its rejection of those alternatives).

The government has a range of tools at its disposal to impose less extreme remedies that would be sufficient to address any purported national security concerns. For example, CFIUS is empowered to mitigate national security risks by imposing or reaching agreement with a foreign acquirer of a U.S. business on conditions that address those risks. 50 U.S.C. § 4565(l)(3)(A). And Plaintiffs engaged with CFIUS for the better part of a year before the August 6 order banning TikTok was suddenly issued, providing extensive documentation of their data security and content moderation safeguards. The government offers no reason, other than conclusory statements, why those procedures—or additional mitigation measures short of a ban—could not address the national security concerns that purportedly animated the Prohibitions.

Instead, the government argues that the Secretary neither accepted nor rejected CFIUS alternatives but "prioritized the immediate protection of national security while allowing more time for the CFIUS process to play out." Opp. 26-27. Even on its own terms, this argument makes no sense. The Secretary fails to justify why, if the CFIUS process needs to "play out," an outright ban is necessary. The government further argues that the Secretary was not "obligated to consider CFIUS alternatives" because the action was taken under IEEPA, but it cites no authority for this supposed carve-out to basic APA review principles. *Id.* at 26. And regardless of the Secretary's obligation to consider whether a mitigation order by CFIUS would be sufficient, the Secretary explicitly *did* consider the ongoing CFIUS mitigations; what it failed to explain is why these processes are insufficient.

In any event, the government appears to concede that measures short of an outright ban are sufficient to mitigate its claimed security concerns. The Commerce Department explicitly found that, "[b]arring a complete divestiture of ByteDance from the TikTok application, TikTok

presents an immitigable risk to the national security, foreign policy, and economy of the United States." Commerce Memo at 22. But the President has already ordered such a divestiture— the appropriateness of which Plaintiffs dispute—and the Commerce Department provides no explanation for why national security would require both a divestiture *and* a ban. Indeed, the ongoing CFIUS process is Commerce's stated reason for the postponement of the second phase of Prohibitions until the date the CFIUS Order goes into effect. If the CFIUS process is sufficient to address the national security threat posed by having 100 million Americans' data transmitted over the app, there is no reason, nor does government articulate a coherent one, why action is required tomorrow to ban Americans who do not have TikTok, but who have been joining at a rate of over 400,000 per day, Pappas Decl. ¶ 18.

Because the agency failed to consider whether "obvious alternatives" to an outright ban accomplishes its purported objections, the Prohibitions should be vacated. *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("[T]he failure of an agency to consider obvious alternatives has led uniformly to reversal.").

3.    The Stated Justification for the Prohibitions Is Pretextual.

The Commerce Department's failure to articulate any credible basis for its action shows that national security was only a pretext for the Prohibitions. Although the government argues that U.S. government leaders have "expressed concern" about Chinese companies' collection of information from Americans, Opp. 1, the historical evidence cited by the government primarily relates to cyber espionage[1]—a concern that has no bearing on a ban of a social platform.

---

[1] Gov't Ex. 2 at 5 ("China remains the most active strategic competitor responsible for *cyber espionage* against the US Government, corporations, and allies." (emphasis added)); Gov't Ex. 3 at 1 (discussing "the counterintelligence and economic espionage threat from China").

Moreover, many of the allegations leveraged against TikTok by the government are equally applicable to any of TikTok's competitors, none of whom have been banned from the United States or even regulated to ensure the protection of U.S. user data.  The collection of data from users of TikTok is essential to the functioning of the app, as is the case with its competitors, but Plaintiffs' unrebutted declarations show that U.S. user data is under the control of U.S. based executives who would refuse any request from the Chinese government for such data.  Cloutier Decl. ¶ 12, Pappas Decl. ¶ 15.  The Commerce Department criticizes ByteDance for being unable to "account for surveillance that may be conducted on its operations without its explicit knowledge."  Commerce Memo at 20.  But that allegation could be made for any social platform, and essentially for any company and the U.S. government itself.  Indeed, the government's submission includes evidence that data collected by *other apps* have been used to influence elections and referendums, Gov't Ex. 4 at 6, and that other U.S. based applications have reported attempts by foreign governments to manipulate their platforms, Gov't Ex. 9 at 17.

Similarly, to the extent the government's issue with TikTok is that some China-based engineers need access to U.S. user data for authorized purposes, the same is true for many American tech companies, who have substantial engineering resources in China and, in some cases, data sharing agreements with Chinese companies.  Weber Decl. ¶ 11.  Moreover, based on inaccurate press reports, the government faults ByteDance for having "an internal corporate CCP committee," Opp. 1, but the government's exhibits acknowledge that this is true for every major Chinese company, many of whom do business in the United States, as well as for some American companies doing business in China.  *See* Gov't Ex. 3 at 10.  The Commerce Department has failed to articulate any reason why these concerns warrant a U.S. ban on TikTok, but no action against other companies in a similar situation.

Some of the news articles and secondary sources cited by the government concern prior content moderation practices that Plaintiffs have since updated.  *See* Commerce Memo at 12-13. TikTok's rapid initial growth was driven by its appeal to those who valued the app's offering of light entertainment.  Pappas Decl. ¶ 11.  To maximize growth, Plaintiffs first tried to minimize the spread of more serious or contentious discourse.  *See* Commerce Memo at 12.  Today, however, TikTok has many users who choose to express their political views on the platform, Pappas Decl. ¶ 11, and the Commerce Memo acknowledges that Plaintiffs have adopted a strategy of localized content moderation to facilitate civil but engaged political discourse, Commerce Memo at 12.  The remaining examples noted by Commerce are anecdotes and unsubstantiated allegations involving individual users, none of which show a concerted attempt to censor content.[2]

The Commerce Department acknowledges that TikTok's data collection is similar to those of other social and content platforms and that TikTok has *reduced* the amount of data it collects from users.  *See* Commerce Memo at 14-15.  The Secretary ignored these improvements and unreasonably intends to punish Plaintiffs for past practices that they have since improved.  The Secretary also failed to address Plaintiffs' encryption of U.S. user data and how that mitigates any security concerns associated with U.S. user data.  *See id.* at 15-19.

The reason why the Commerce Department relies on its hollow anecdotes is that national security was pretext for banning TikTok, and that the real reason was the President's wish to use such a U.S. ban, or what he could extract in return for lifting it, as political campaign fodder.  *See* Pls' Mem. at 23-27.  The government does not even address the compelling evidence of political-

---

[2] The Commerce Memo contains other factual errors, including in its characterization of the information Plaintiffs have provided to the government.  An additional reason to enter a limited injunction of the app store ban and conduct a further hearing with the benefit of the full administrative record is to enable a complete review of the factual issues raised by the Commerce Memo in the context of the entire record.

related animus shown by the timeline of events ahead of the President's abrupt executive order or the President's demand that any sale of the business include a substantial payment to the U.S. Treasury or a $5 billion contribution to an "education fund."  Instead, the government simply urges the Court to ignore the evidence because, it argues, the Court may not second-guess the President's national security determinations.[3]  Not so.  When an agency sets forth a "fictional account of the actual decisionmaking process," a reviewing court "must perforce find its actions arbitrary."  *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54-55 (D.C. Cir. 1977).  That is so where, as here, "the sole stated reason [for the Prohibitions] seems to have been contrived."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

**B.     The TikTok Ban Unlawfully Regulates Personal Communications and Informational Materials in Violation of Section 1702(b) of IEEPA.**

On their face, the Prohibitions constitute the prohibition or regulation of "personal communication" and "informational materials," which Section 1702(b) prohibits.  50 U.S.C. § 1702(b).  Congress has broadened this statutory text on multiple occasions to correct the government's overly-restrictive interpretations of Section 1702(b).  *See* Pls.' Br. 15-17.  This Court should reject the government's construction of Section 1702(b), which repeats this same error.

1.     <u>The TikTok Ban Unlawfully Prohibits Personal Communications.</u>

IEEPA provides the government broad—and powerful—regulatory authority.  The President's authority "does not," however, "include the authority to ***regulate or prohibit***, ***directly or indirectly*** . . . ***personal communication***, which does not involve a transfer of anything of value."  50 U.S.C. § 1702(b)(1) (emphasis added).  The Prohibitions, which will, starting on Sunday, prevent two-thirds of the country—and, starting on November 12, all Americans—from

---

[3] Plaintiffs strongly disagree with the government's unsupported, factually-inaccurate, and pretextual assessment that TikTok poses any threat to national security.

communicating with each other on TikTok, plainly prohibits personal communication.   At a minimum, it *indirectly* regulates such communications, in violation of § 1702(b)(1).   The government ignores the plain meaning of the statute and advances a series of flawed arguments.

The government's first argument that the TikTok ban prohibits "business-to-business transactions"—not "personal communications"—is a red herring.   Opp. 15.   Section 1702 expressly forbids the executive from regulating personal communications directly ***or indirectly***; there can be no reasonable dispute that the Prohibitions, which starting on Sunday will prevent individuals from downloading TikTok, indirectly prevent them from sharing and accessing communicative content on the platform.   Indeed, the complete U.S. ban on the app and the elimination of any communications by U.S. users on the app, is not merely incidental to Defendants' actions but indeed the express objective.   *See United States v. Amirnazmi*, 645 F.3d 564, 585 (3d Cir. 2011) (Section 1702(b) "was explicitly intended, by including the words 'directly or indirectly,' to have a broad scope" (quoting H.R. Conf. Rep. 103-482, at 239 (1994))).

Defendants further assert that even if the Prohibitions involve the regulation of personal communications, they are exempt from the reach of Section 1702(b) because "when users exchange communications on TikTok," they are "transfer[ing something] of value."   Opp. 16.   This argument is facially implausible.   Even if some communications on TikTok may be commercially valuable—for example, a user's posts that are sponsored by an advertiser—a wide swath of TikTok videos, public comments on TikTok videos, and private messages between friends about TikTok videos constitute personal communications with no economic value at all.

To the extent Defendants contend that Section 1702(b)(1) does not apply because Plaintiffs provide access to TikTok based on terms of service, Opp. 16, such an expansive interpretation would swallow Section 1702(b)(1)'s limitation on the President's IEEPA authority.   *All*

communication service providers—television and radio stations, publishers, internet service providers, and cellular and landline carriers—derive some value from customers' "presence on" or use of their services, and virtually all electronic communication services depend on an agreement between the user and provider, which permits the provider to use the user's data in various ways.[4]  Defendants' interpretation of "anything of value" would permit the government to regulate or prohibit virtually *all* communication that does not take place in person, contravening the fundamental purpose of the personal communications provision enacted by Congress and stripping Section 1702(b)(1) of all its force.

> 2.   The TikTok Ban Unlawfully Prevents the Importation and Exportation of Informational Materials.

Section 1702(b) contains another limitation on executive authority, which is violated here: as the plain language of Section 1702(b)(3) instructs, the President lacks authority to regulate or prohibit—"directly or indirectly," "regardless of format or medium of transmission," and "whether commercial or otherwise"—the importation or exportation of "information or informational materials."  50 U.S.C. § 1702(b)(3).  The government's argument that the TikTok ban does not, at a minimum, indirectly regulate informational materials is untenable.

TikTok's U.S. users routinely import and export films, music, photographs, and artworks in their use of the app.  The content that TikTok users post and view is not constrained by international borders.  Pappas Decl. ¶ 20.  Indeed, "U.S. content can comprise as much as 60% of the content in TikTok 's non-U.S. markets," *id.*, and U.S. users routinely import such content when they view posts created and shared by TikTok users in other countries.  This content is undoubtedly "informational material" outside the reach of the President's IEEPA authority.

---

[4] *See., e.g.*, Facebook Terms of Serv., *available at* https://www.facebook.com/terms.php; My Verizon Cust. Agmt., *available at* https://www.verizon.com/legal/notices/customer-agreement/.

Defendants' Opposition rests on a series of unworkable interpretations of "informational materials."  First, they contend the TikTok ban "simply prohibits business-to-business economic transactions that support certain aspects of TikTok's U.S. operations" but does not "prohibit any importing or exporting of information," and that the ban "does not say or do anything to TikTok users themselves."  Opp. 18.  This argument is plainly irreconcilable with the statutory text, which expressly forbids regulations that "directly *or indirectly*" prohibit the import or export of informational materials.  50 U.S.C. § 1702(b)(3).  At a minimum, by *indirectly* barring individuals from downloading TikTok on U.S. app stores after 11:59 p.m. on Sunday—and, more broadly, by preventing TikTok's U.S. users from using the app altogether after November 12—Defendants *indirectly* prohibit Americans from importing and exporting informational materials on TikTok.

Moreover, Section 1702(b)(3)'s prohibition on the regulation of informational materials "whether commercial or otherwise" further undercuts the government's argument.  If, as the government argues, "business-to-business" transactions cannot constitute "informational materials," there would be no reason for Congress to provide that informational materials that are "commercial" in nature cannot be regulated.  *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (court required "to give effect, if possible, to every clause and word of a statute").

Next, Defendants contend that "TikTok itself does not constitute 'information' or 'information materials'; rather, it is a set of services through which information of that type may be conveyed."  Opp. 17.  This argument fails for the reasons discussed above: regardless of whether TikTok *itself* is "information" or "informational materials," the content shared on TikTok—which is indirectly regulated, if not prohibited, by the TikTok ban—falls squarely within the statute's definition of informational materials.  *See* 50 U.S.C. § 1702(b)(3) (examples of "information or

15

informational materials" include film, photographs, and artwork).[5]

Defendants next argue that the TikTok ban is lawful because the informational materials exception does not apply to the transmission of "information relating to the national defense" to any foreign government with reason to believe it could "be used to the injury of the United States or to the advantage of a foreign nation" as defined in the Espionage Act.  Opp. 20 (citing 18 U.S.C. § 794(a)); *see also* 18 U.S.C. § 793(e), (f).  The films, photographs, and artwork restricted by the TikTok ban are, of course, not classified national defense information.  And, as the Supreme Court has recognized, the Espionage Act aims to prohibit the intentional, unauthorized disclosure of defense information—and in particular classified government materials—"relating to the national defense" to a foreign power.  *Gorin v. United States*, 312 U.S. 19, 26 (1941).[6]  Defendants' novel, broader interpretation is not facially plausible.

Finally, despite the plain language of IEEPA and the clear statutory intent to create broad protection for informational materials, Defendants contend that Plaintiffs' straightforward interpretation of Section 1702(b) is "unfathomable" because it "would amount to a wholesale truncation of the President's ability to protect the country's information supply chains in a way that Congress could not have intended."  Opp. 18.  But this is no ordinary case: the Prohibitions target speech itself, in direct violation of Section 1702(b) and the First Amendment.  *See*

---

[5] Defendants' suggestion that works shared on TikTok are "not fully created and in existence" prior to users' interactions with TikTok because users have to "interact with the TikTok application to create the content they will share on it" also fails because it is factually inaccurate.  For example, TikTok users can film a complete video using the iPhone Camera app and upload and share it as a post on TikTok, in which case the informational material would be "fully created and in existence" before it was shared on TikTok.  And, of course, OFAC's exclusion of materials "not fully created and in existence" from "informational materials" is not binding here.

[6] The government's prosecutions under the Espionage Act invariably focus on the unauthorized disclosure of classified defense information.  *See, e.g.*, *United States v. Harper*, 729 F.2d 1216, 1217-18 (9th Cir. 1984) (prosecution under 18 U.S.C. § 794 for "obtaining secret national defense information and knowingly and willfully transmitting it" to foreign officer).

Commerce Memo at 22 (Prohibitions "deny access to and reduce the functionality of the TikTok mobile app . . . with the objective of preventing . . . transmission . . . of U.S. user data"); *see also infra* Section I.C.   Moreover, while not necessary here in the absence of any national security threat, the government has other distinct authorities to address such threats in appropriate cases without being constrained by IEEPA's personal communications and informational materials limitations.  *See, e.g.*, 50 U.S.C. § 4565 (CFIUS); 47 U.S.C. § 214 (FCC's licensing authority for carriers with foreign market power).

   **C.     The Prohibitions Violate the First Amendment.**

   The Prohibitions' express purpose is to stop the flow of U.S. user communications data through the TikTok platform.  This violates Plaintiffs' First Amendment rights to communicate freely with other users on the platform and to their source code.

   1.     Defendants Failed to Satisfy First Amendment Standards.

   As Plaintiffs explained in their opening brief, rigorous constitutional scrutiny applies here because the Prohibitions impose a prior restraint by "forbidding certain communications when issued in advance of the time that such communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993).  Defendants contend that the Prohibitions impose no "direct, advance prohibition on any communications," but this is belied by the undisputed facts: As of September 27, the TikTok ban will completely prohibit new U.S. users from accessing and speaking on the TikTok app.  This will restrict not only new U.S. users' ability to speak, but the rights of existing U.S. users—including Plaintiffs—to receive information.  *See Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972).  Then, as of November 12, the TikTok ban will completely prohibit U.S. users from communicating on the TikTok app.  The government is not threatening to punish speech after the fact; rather, the government is banning U.S. users from accessing a forum where millions of users currently communicate, effectively "freez[ing]" speech before it can take place—the

hallmark of a prior restraint.  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

As the party seeking to impose a prior restraint, the government must overcome a "heavy presumption against its constitutional validity."  *Id.* at 558.  Defendants make no attempt to argue that the Prohibitions could overcome this heavy presumption.

Even if the Court concluded that the Prohibitions are subject to intermediate scrutiny, they would not survive because the Prohibitions plainly "burden substantially more speech" than necessary to further the government's asserted interests.  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017).  The government's stated purpose for the Prohibitions is to protect national security, but as discussed above, the government has failed to demonstrate how the Prohibitions actually serve that goal.  Merely positing that the government's goal is to protect national security is not enough to satisfy the First Amendment.  *Turner v. F.C.C.*, 512 U.S. 622, 664 (1994) (government "must do more than simply posit the existence of the disease sought to be cured").

Nor does *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), Opp. 33, suggest that courts should simply defer to the government's determination that a speech restriction is necessary to protect national security.  On the contrary, the Court in that case rested its decision on an extensive factual record and made clear that restrictions on speech must survive more exacting review, even in the national security context.  *Id.* at 27-28.  Thus, *Humanitarian Law Project* stands not for a rule of unquestioning deference to national security concerns, but for precisely the opposite: that judges reviewing claims relating to national security must do so closely to ensure that constitutional rights are not being unduly infringed.  *Id.* at 34.

Moreover, even accepting the government's purported national security concerns on their face, the ban "burden[s] substantially more speech than is necessary to further the government's legitimate interests."  *Packingham*, 137 S. Ct. at 1736.  As explained above, there are numerous

other non- and less-speech restrictive ways to address any national security concerns, short of a

total U.S. ban on TikTok, including the various mitigation measures that Plaintiffs offered in the

course of the CFIUS process.  The government does not explain "why these possibilities, alone or

in combination, would be insufficient" to further any national security interest that the Prohibitions

are purported to address.  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).  That,

however, is the least the government must do before trampling the free speech rights of Plaintiffs

and millions of Americans.[7]

2.    The Prohibitions Directly Restrain Speech.

Defendants repeatedly assert that the Prohibitions are directed at "business transactions,"

which, they claim, at most only indirectly restrain speech—and therefore are not subject to the

First Amendment at all.  Opp. 29-30.  "Keeping in mind that '[n]o law abridging freedom of speech

is ever promoted as a law abridging freedom of speech,'" this Court should "not find [Defendants']

argument persuasive."  *Wollschlaeger v. Governor*, 848 F.3d 1293, 1308 (11th Cir. 2017).

The Fourth Circuit recently held that government conduct "cannot be classified as a

restriction on economic activity that incidentally burdens speech" when it "it completely prohibits

unlicensed tour guides from leading visitors on paid tours—an activity which, by its very nature,

depends upon speech or expressive conduct."  *Billups v. Charleston*, 961 F.3d 673, 683-84 (4th

Cir. 2020).  Likewise, here, the Prohibitions cannot be reasonably understood to have only an

"incidental" effect on speech, as Defendants contend.  Opp. 30.  In contrast to generally applicable

regulations such as taxation or zoning regulations, which only have an incidental effect on speech,

here the *economic* effect is properly understood as incidental to the Prohibitions' *targeting of*

---

[7]  The government cites *Albertini* for the proposition that alternative approaches to banning TikTok are irrelevant to the First Amendment analysis.  To the contrary, alternative approaches demonstrate that the ban is a "restriction on . . . First Amendment freedoms . . . greater than is essential" to serve the government's stated interest.  *Albertini*, 472 U.S. 675, 687 (1985).

*communications*.  *See* Commerce Memo at 22 (Prohibitions "deny access to and reduce the functionality" of TikTok "with the objective of preventing … transmission … of U.S. user data").

Even accepting Defendants' argument that the Prohibitions primarily target economic activity, they still violate Plaintiffs' First Amendment rights.  In most cases, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  *Barr v. Am. Ass'n. of Political Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020).  But that principle does not apply when economic regulation is "aimed at particular speakers," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566-67 (2011), or at non-speech that is "intimately related to the expressive conduct at issue," *Hodgkins v. Peterson*, 355 F.3d 1048, 1058-59 (7th Cir. 2004), or if the regulation "impose[s] a disproportionate burden upon those engaged in protected First Amendment activities," even when the regulations are "directed at activity with no expressive component," *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704 (1986).

The Prohibitions present each of these problems: they are not generally applicable; they prevent a social platform, whose operations are by definition intimately related to speech, from providing communications services to users; and they impose a disproportionate burden on speakers, including Plaintiffs.  In addition to these harms to Plaintiffs, the Prohibitions prohibit Plaintiffs' would-be U.S. users from speaking and receiving information on the TikTok app.  It is "well established that the Constitution protects the right to receive information and ideas."  *Kleindienst*, 408 U.S. at 762.  And contrary to Defendants' suggestion, the Supreme Court has expressly declined to hold that the "existence of other alternatives extinguishes altogether any constitutional interest [in a] particular form of access."  *Id.* at 765.

In arguing otherwise, the government relies on *Arcara*, where the Supreme Court upheld a one-year closure of a book store due to repeated lewd conduct on the premises.  Although the Court

concluded that First Amendment scrutiny was not required, it explained that illegal sexual activity "manifests absolutely no element of protected expression." 478 U.S. at 705. Consequently, because the ordinance neither "regulate[d] conduct that was necessarily expressive" nor "impose[d] a disproportionate burden upon those engaged in protected First Amendment activities," the Court did not subject the regulation to First Amendment scrutiny. *Id.* at 702, 704. Moreover, the Court distinguished the case before it from prior cases where, as here, the non-speech subject to the government regulation was intimately related to expressive conduct protected under the First Amendment. As the Court explained, those cases uniformly held that the First Amendment applies. *Id.* at 706, n.3 (collecting cases).

### D.    The Prohibitions Violate Due Process.

Defendants take the extraordinary positions that the government's ban on a private party's ability to conduct business in the United States implicates no legally-protected interest, and that government action specifically targeting a single party is a "policy judgment" that requires no process. *See* Opp. 35-36. If adopted, these arguments would eviscerate due process.

The Prohibitions violate at least two cognizable liberty and property interests: Plaintiffs' right to their chosen line of business, *Trifax v. Dist. of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir. 2003), and their right to free speech, *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). At a minimum, due process requires the government to provide Plaintiffs notice and an opportunity to be heard before stripping them of these rights. *See Holy Land*, 333 F.3d at 163.

The process provided to Plaintiffs here—virtually none—was insufficient. At no point before or after the issuance of the Prohibitions have Plaintiffs received the unclassified information that formed the basis for the government's action, let alone been afforded a meaningful opportunity to rebut it before the agency. The first time that Plaintiffs have been presented with any record at

21

all was less than 24 hours ago, in the Commerce Memo attached as an exhibit to the government's Opposition.  If not for this litigation, one wonders when, or if, the government, would have ever provided any record to Plaintiffs.  Nor does the Commerce Memo or the CFIUS process cure these constitutional flaws.  The rationale in the Commerce Memo simply echoes the conclusory, unsubstantiated statements in the August 6 order.  This is insufficient.  *Rall*s *Corp. v. CFIUS*, 758 F.3d 296, 320 (D.C. Cir. 2014).

The government cannot escape due process requirements by arguing that "the nature of the policy judgment at issue precludes any entitlement to additional process."  Opp. 36.  The Prohibitions are not a policy or legislative judgment;[8] instead, they target one, named entity with an unmistakable intent to terminate the entity's U.S. operations.  *See Gray v. Schweiker*, 652 F.2d 146, 155 n.18 (D.C. Cir. 1980) ("[T]he case for due process protection grows stronger as the identity of the persons affected by a government choice becomes clearer.").

The court's decision in *KindHearts* is instructive.  There, the Treasury Department froze a U.S.-based entity's assets pending investigation under an executive order, and disclosed a partial set of unclassified documents.  Critically, however, the government failed to provide notice of the factual and legal bases for its actions.  Applying the due process test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), the court found that the private interest in not having the entirety of one's assets frozen indefinitely is substantial; "the failure to provide adequate and timely notice creates a substantial risk of wrongful deprivation;" and the government "has not explained . . . why it failed to provide timely notice of the basis and reasons for its blocking order, or why it took so long for it to provide the scanty information it ultimately has produced."  647 F. Supp. 2d 857, 904-05

---

[8] Even if it were, the Executive Order's list of reasons is conclusory and unsubstantiated.  Providing a list of unsupported and unsupportable reasons developed without any notice or opportunity to be heard does nothing to provide the necessary process that is due.

(N.D. Ohio 2009).  The same analysis holds here: As a result of the Prohibitions, TikTok will be shut down indefinitely; the risk of error with a one-sided process is at its zenith; and the government has offered no justification for failing to provide timely or meaningful notice.

> ### E.   The Prohibitions and August 6 Order Violate IEEPA in Other Respects.

As explained in Plaintiffs' opening brief, the Prohibitions and August 6 order also exceed the executive's IEEPA authority because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat," as IEEPA requires.  The government makes three arguments in response.

First, the government argues that Plaintiffs lack a cause of action to challenge the August 6 order, and cannot seek injunctive relief against it.  But the "D.C. Circuit has long recognized the availability of a 'non-statutory review action' aimed at the legality of presidential executive orders."  *Gomez v. Trump*, 2020 WL 5367010, at *16 (D.D.C. Sept. 4, 2020) (citing *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996)).  Moreover, the Circuit has explained that even when an agency's conduct "is essentially that of the President," that "does not insulate the entire executive branch from judicial review."  *Reich*, 74 F.3d at 1327-28.

Second, the government argues that "[t]he fact that the President determined that the TikTok restrictions were encompassed within his prior declaration of emergency should be the end of the matter," because national emergency determinations are "nonjusticiable political questions."  Opp. 38.  The political question doctrine has no application here, because "purely legal question[s] of statutory interpretation" are not political questions even if they "may have significant political overtones."  *Japan v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  Indeed, "[t]he Supreme Court has never applied the political question doctrine in cases"—as here— alleging "that the Executive Branch violated congressionally enacted statutes that purportedly

constrain the Executive." *El-Shifa v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010).

Third, the government argues that "TikTok plainly qualifies as a 'product or service primarily intended to fulfill communication by electronic means,'" under Executive Order 13873. Opp. 38.  But the Executive Order explained that it was addressing threats by entities who provide the hardware to "facilitate the digital economy," and "critical infrastructure and vital emergency services."  Because TikTok does not provide such hardware, infrastructure, or services, it falls outside the purview of Executive Order 13873.

## II.      The Remaining Factors Require Injunctive Relief.

### A.      Plaintiffs Face Immediate Irreparable Harm If Relief Is Not Granted.

"The loss of First Amendment 'freedoms,' … unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (same).  Defendants' assertion (based on a single, non-binding case) that Plaintiffs failed to show a "purposeful" unconstitutional suppression of speech, Opp. 42, is immaterial: courts in this Circuit have repeatedly recognized that "any violation of one's First Amendment rights constitutes irreparable harm." *Ramirez v. U.S. Customs & Border Protection*, 477 F. Supp. 2d 150, 159 (D.D.C. 2007).  Defendants also argue that the Prohibitions would not inflict irreparable harm because they would merely delay U.S. users' ability to download the app until the Prohibitions are lifted.  Opp. 41.  But the mere fact that the restraint on Plaintiffs' speech is not permanent does not render it constitutional.  *See Neb. Press Ass'n*, 427 U.S. at 559.

Finally, instead of meaningfully responding to Plaintiffs' evidence that the Prohibitions will irreversibly destroy the U.S. TikTok business—including evidence that the September 27 prohibition will stop TikTok from continuing to add more than 400,000 new users a day and prevent Plaintiffs from making security updates available to U.S. users, Pls.' Br. at 33-36—Defendants simply assert Plaintiffs' harms are speculative, even though Plaintiffs' unrebutted

evidence establishes this is not the case and courts routinely issue preliminary injunctions based on such showings. *See, e.g.*, *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015).

### B.     The Balance of Equities And Public Interest Require Injunctive Relief.

The balance of equities and public interest require preliminary injunctive relief to maintain the status quo pending resolution of Plaintiffs' legal challenge.  Denial of a preliminary injunction would violate the statutory and constitutional rights of Plaintiffs and millions of TikTok U.S. users, and would cause substantial harms to Plaintiffs' business and goodwill.  By contrast, granting a preliminary injunction would not harm the government; indeed, the government's long delay in issuing the Prohibitions, and its subsequent extension of their effective date, negates any assertion that they are urgently necessary to address a pressing national security concern.  While national security decisions are entitled to some deference, the government cannot rely on "conclusory assertions" of national security to "defeat [a] motion[] for injunctive relief." *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 266 (2015).

Finally, as to bond, Fed. R. Civ. P. 65(c) requires an applicant for preliminary relief to post security "in an amount that the court considers proper."  The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  Here, the Court should decline to impose a bond because Plaintiffs are seeking to protect millions of Americans' constitutional rights, "the public interest favors granting" the injunction, and there is no risk of monetary harm to Defendants. *See Armstrong v. Bush*, 807 F. Supp. 816, 823 (D.D.C. 1992).

### CONCLUSION

For the foregoing reasons, and those stated in Plaintiffs' opening Memorandum, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

DATED: September 26, 2020                    Respectfully submitted,


                                              */s/ John E. Hall*

Anders Linderot (Pro Hac Vice)          John E. Hall (D.C. Bar. No. 415364)
COVINGTON & BURLING LLP                 Beth S. Brinkmann (D.C. Bar. No. 477771)
The New York Times Building             Alexander A. Berengaut (D.C. Bar. No. 989222)
620 Eighth Avenue                       Megan A. Crowley (D.C. Bar. No. 1049027)
New York, New York 10018-1405           Megan C. Keenan (D.C. Bar. No. 1672508)
Telephone: +1 (212) 841-1000            COVINGTON & BURLING LLP
Facsimile: + 1 (212) 841-1010           One CityCenter
Email:  alinderot@cov.com               850 Tenth Street, NW
                                        Washington, DC 20001
Mitchell A. Kamin (Pro Hac Vice)        Telephone: +1 (202) 662-6000
COVINGTON & BURLING LLP                 Facsimile: + 1 (202) 778-6000
1999 Avenue of the Stars, Suite 3500    Email:  jhall@cov.com
Los Angeles, California 90067-4643              bbrinkmann@cov.com
Telephone: + 1 (424) 332-4800                   aberengaut@cov.com
Facsimile: + 1 (424) 332-4749                   mcrowley@cov.com
Email:  mkamin@cov.com                          mkeenan@cov.com

                                        *Attorneys for Plaintiffs*