UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TIKTOK INC., et al.,

       *Plaintiffs*,

  v.

DONALD J. TRUMP, President of the United States, et. al.,

       *Defendants*.

Civil Action No. 1:20-cv-02658 (CJN)

## MEMORANDUM OPINION

On May 15, 2019, acting pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–08, among other authorities, the President declared a national emergency relating to the "unrestricted acquisition or use in the United States of information and communications technology or services . . . supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries." On August 6, 2020, the President invoked that national emergency declaration; determined that additional steps were necessary with respect to Plaintiffs TikTok and its Beijing-based parent company ByteDance; provided that certain transactions with ByteDance or its subsidiaries would be prohibited; and directed the Secretary of Commerce to identify the prohibited transactions within forty-five days. On September 18, 2020, the Secretary published a list of five transactions to be prohibited with respect to ByteDance and its operations within the United States, and on September 19, revised the implementation date for one of the sets of prohibitions and re-published the list of prohibited transactions.

1

The first of those five prohibitions goes into effect at 11:59 p.m. today. On September 18, 2020, Plaintiffs filed this lawsuit alleging that the prohibitions exceed the President's and Secretary's authority under IEEPA, violate the Administrative Procedure Act ("APA"), and are unconstitutional under the First and Fifth Amendments and the Takings Clause. On September 23, Plaintiffs moved for preliminary injunctive relief, arguing that they have a likelihood of success on their claims and that, absent an injunction, they will suffer irreparable harm. Pls.' Mem. Supp. Mot. Prelim. Inj., ECF No. 15-1, 15 ("Pls.' P.I. Mot."). For the reasons discussed below, Plaintiffs' Motion is granted as to the prohibition that takes effect tonight.

## I. BACKGROUND

The United States has long used economic sanctions to prohibit transactions that threaten national security. In 1977, Congress enacted IEEPA, which provides peacetime authority to the President "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Once the President has declared such an emergency, the President is empowered to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States[.]

*Id*. § 1702(a)(1)(B).

On May 15, 2019, the President issued Executive Order 13873, *Securing the Information and Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22689 (May 15, 2019) ("ICTS Order"). The President found that the widespread use of "communications technology"

2

that may be exploited by foreign adversaries was creating an "extraordinary threat to the national security . . . of the United States." *Id*.  The President therefore declared a national emergency with respect to that threat and determined to prohibit certain transactions with foreign countries or foreign nationals that pose risks to the national security of the United States.  A year later, the President renewed that declaration, highlighting the pervasive threat posed by the close ties between China-based technology firms and the government of the People's Republic of China ("PRC").  *See Continuation of the National Emergency With Respect to Securing the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 29321 (May 13, 2020).

On August 6, 2020, the President invoked his powers under IEEPA and the national emergency declared in the ICTS Order by identifying TikTok Inc. as a source of emerging threats given its foreign ownership.  *See* Exec. Order No. 13942, *Addressing the Threat Posed by TikTok, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 48637 ("TikTok Order").  TikTok is a short-loop video sharing app presently used by over 100 million Americans.  Compl., ECF No. 1, ¶ 1.  The President determined that TikTok "automatically captures vast swaths of information from its users, including internet and other network activity information such as location data and browsing and search histories."  TikTok Order.

The President concluded that TikTok's foreign ownership and data collection pose a risk that the Chinese Communist Party ("CCP") can "access . . . Americans' personal and proprietary information—potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."  *Id.*  He also concluded that there is a risk of the CCP using TikTok to "censor[] content that the [CCP] deems politically sensitive," *id.*, and "for disinformation campaigns that

3

benefit the [CCP], such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus." *Id.*

To mitigate those risks, the President directed the Secretary of the U.S. Department of Commerce to identify a list of prohibited transactions with "ByteDance . . . or its subsidiaries," including TikTok. *Id.* at 48637–38. The President also separately ordered ByteDance to divest itself of TikTok's U.S. operations, including any interest it might have in U.S. user data. *See Regarding the Acquisition of Musical.ly by ByteDance Ltd.*, 85 Fed. Reg. 51297 (Aug. 14, 2020) ("Divestment Order").

Acting pursuant to the TikTok Order, on September 18, 2020, the Secretary of Commerce published a list of five sets of prohibited transactions. The Secretary later revised the implementation date for one of prohibitions. As a result, the list now prohibits:

> 1. Any provision of services, occurring on or after 11:59 p.m. eastern standard time on September 27, 2020, to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store[;]
>
> 2. Any provision of internet hosting services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[;]
>
> 3. Any provision of content delivery network services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[;]
>
> 4. Any provision of directly contracted or arranged internet transit or peering services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[; and]
>
> 5. Any utilization, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories[.]

U.S. Dep't of Commerce, *Identification of Prohibited Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 60061-01 (Sept. 24, 2020) ("Commerce Identification").

Before issuing those prohibited transactions, the Secretary reviewed and relied on a decision memorandum that assessed the threats posed by ByteDance and TikTok. U.S. Dep't of Commerce, Mem. for the Sec'y, *Proposed Prohibited Transactions Related to TikTok Pursuant to Executive Order 13942* (Sept. 17, 2020), ECF No. 22-1 ("Commerce Memo"); *see also* Defs.' Mem. Opp'n Pls.' P.I. Mot., ECF No. 22, 2 ("Defs.' Opp'n"). In particular, the Secretary of Commerce found that the PRC is "building massive databases of Americans' personal information" to help the "Chinese government to further its intelligence-gathering and to understand more about who to target for espionage, whether electronically or via human recruitment." Commerce Memo, ECF No. 22-1, 6.

The Secretary also found that the CCP will exploit "close ties" with ByteDance to further its foreign policy agenda. *See id.* 7–9. ByteDance is headquartered in Beijing and remains subject to the PRC's National Intelligence Law, which "permits Chinese intelligence institutions" to "take control of" any China-based firm's "facilities" and "communications equipment." *See id.* at 10. ByteDance has signed a cooperation agreement with a PRC security agency, closed one of its media platforms in response to CCP demands, and (as of August 2020) placed over 130 CCP committee members in management positions throughout the company. *Id.* at 7, 11; *see also* Defs.' Opp'n, ECF No. 22, 7–8. And because "ByteDance is subject to PRC jurisdiction, [and] PRC laws can compel cooperation from ByteDance, regardless of whether ByteDance's subsidiaries are

5

located outside the territory of the PRC," the data held by ByteDance's subsidiary companies may also be extracted by the PRC. Commerce Memo, ECF No. 22-1, 19.

As ByteDance owns TikTok, the Secretary determined that TikTok's Terms of Service and Privacy Policy for new users allow TikTok to collect and "share [a user's] information with [ByteDance]" and the PRC "to respond to government inquiries." *Id.* at 8–9; *see also* Ex. 8, ECF No. 22-8, 6. The information that TikTok gathers is substantial, including:

> 1) registration information, such as age, username and password, language, and email or phone number; 2) profile information, such as name, social media account information, and profile image; 3) user-generated content, including comments, photographs, videos, and virtual item videos that you choose to upload or broadcast on the platform; 4) payment information, such as PayPal or other third-party payment information (where required for the purpose of payment); 5) phone and social network contacts (names and profiles); 6) opt-in choices and communication preferences; 7) information in correspondence users send to TikTok; and 8) information sent by users through surveys or participation in challenges, sweepstakes, or contests such as gender, age, likeness, and preferences.

Defs.' Opp'n, ECF No. 22, 8. The Secretary also concluded that the TikTok data of U.S. users is especially vulnerable because TikTok keeps a backup of all its U.S. data in Singapore with a China-based company called Alibaba. Commerce Memo [Sealed], ECF No. 21-1, 15. Like ByteDance, "Alibaba is a Chinese company . . . beholden to PRC laws that require assistance in surveillance and intelligence operations." *Id.*

Rather than implement all five prohibitions at once, the Secretary opted for a "phased approach." *Id.* at 22. The first prohibition goes into effect tonight, while the rest become effective on November 12, 2020. Commerce Memo, ECF No. 22-1, 22. The Secretary explained that this phased approach would "mitigate some national security risk immediately," while giving other Executive actors freedom to negotiate a possible divestment of ByteDance's interest in TikTok before the November deadline. Commerce Memo [Sealed], ECF No. 21-1, 22. Because the first prohibition would, in practice, stop new U.S.-based users from downloading TikTok and block

6

existing U.S. users from updating the app, the Secretary viewed the first prohibition as the "easiest to implement" while also having "the biggest impact in mitigating national security risks." *Id.* The Secretary thus anticipated substantial reductions to TikTok's "national security risk" from the first prohibition, while giving TikTok and other stakeholders "time to prepare" for the four other prohibited transactions. *Id.* at 22–23.

The Secretary's Order states that these five prohibitions "only apply to the parties to business-to-business transactions." Commerce Identification, 85 Fed. Reg. at 60062. It also states that the prohibitions "do not apply to . . . [t]he exchange . . . of personal or business information" shared among TikTok users on the app, *id*, and that none of the prohibitions bars transactions related to restructuring TikTok in accordance with the President's August 14 Divestment Order.

On September 18, 2020, Plaintiffs filed this lawsuit alleging that the government's actions violate the Administrative Procedure Act (Count One), the First Amendment (Count Two), and the Due Process Clause of the Fifth Amendment; exceed the President's and Secretary's authority under IEEPA (Counts Four-Six); and violate the Takings Clause of the Fifth Amendment (Count Seven). Compl., ECF No. 1. On September 23, Plaintiffs moved for preliminary injunctive relief, arguing that they have a likelihood of success on some of these claims and that, absent an injunction, they will suffer irreparable harm. Pls.' P.I. Mot., ECF No. 15-1, 15–36. Following expedited briefing on the Motion, ECF Nos. 15, 21–22, 26, the Court heard oral argument on September 27, 2020.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A

plaintiff seeking such relief must demonstrate that (1) it has a likelihood of succeeding on the merits, (2) it faces irreparable harm if an injunction does not issue, (3) the balance of equities favors relief, and (4) an injunction is in the public interest.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs must make "a clear showing that" they are "entitled to such relief."  *Winter*, 555 U.S. at 22.  And while the D.C. Circuit has not yet directly held that Plaintiffs must make a clear showing on each of the four *Winter* factors, considered dicta in this jurisdiction favors that approach.  *See In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (demanding proof on all four prongs); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (Kavanaugh, J., concurring) (observing that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable" (internal quotation and citation omitted)).

## II. ANALYSIS

### A. Likelihood of Success on the Merits

The Court begins with the "most important factor"—Plaintiffs' likelihood of success on the merits.  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  As the Plaintiffs have demonstrated that the Secretary's prohibitions likely exceed the lawful bounds proscribed by IEEPA, the Court finds that this first factor weighs in favor of granting preliminary relief.

As noted above, IEEPA contains a broad grant of authority to declare national emergencies and to prohibit certain transactions with foreign countries or foreign nationals that pose risks to the national security of the United States.  But IEEPA also contains two express limitations

relevant here: the "authority granted to the President . . . does *not* include the authority to regulate or prohibit, directly or indirectly" either (a) the importation or exportation of "information or informational materials"; or (b) "personal communication[s], which do[] not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1), (3) (emphasis added). Congress has stressed that these limitations be given "broad scope." *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (quoting H.R. Conf. Rep. No. 103–482, at 239 (1994)); *see also See United States v. Amirnazmi*, 645 F.3d 564, 585 (3d Cir. 2011) (Congress added the words "directly or indirectly" to § 1702(b) to ensure that the limitation would "have a broad scope."). Plaintiffs contend that the Secretary's prohibitions on the transactions identified in the Commerce Identification represent, at a minimum, the indirect regulation of informational materials and personal communications. *See* Pls.' P.I. Mot., ECF No. 15-1, 19.

   *1. Informational Materials*

IEEPA's informational-materials limitation deprives the President of authority to regulate or prohibit—"directly or indirectly," "regardless of format or medium of transmission," and "whether commercial or otherwise"—the importation or exportation of "informational materials." 50 U.S.C. § 1702(b)(3). The phrase "informational materials" is immediately followed by a non-exhaustive list of examples, "including but not limited to, publications, films, . . . photographs, . . . artworks, . . . and news wire feeds." 50 U.S.C. § 1702(b)(3).

Plaintiffs argue that the Secretary's prohibitions are covered by this express carveout because the prohibitions will prevent U.S. users—both new U.S. users starting today at 11:59 p.m., and then all U.S. users on November 12—from sharing and receiving content on TikTok. Pls.' P.I. Mot., ECF No. 15-1, 18–19; *see also* Pappas Decl., ECF No. 15-3, ¶¶ 4, 20. They argue that over 100 million Americans currently use TikTok to share their films, photographs, art, and news

9

with users across international borders, Pappas Decl., ECF No. 15-3, ¶ 20, and that "U.S. content can comprise as much as 60% of the content in TikTok's non-U.S. markets." *Id.* This content, Plaintiffs argue, constitutes "informational materials" the importation and exportation of which cannot be regulated, either indirectly or directly, pursuant to IEEPA. Reply, ECF No. 26, 14.

Plaintiffs bolster their plain-meaning analysis by comparing TikTok to a "news wire feed," 50 U.S.C. § 1702(b)(3), which the Oxford English Dictionary defines as "a service which transmits up-to-the-minute news, usually electronically (especially via the internet), to news media and the general public." Newswire, *Oxford English Dictionary*, *available at* www.oed.com/view/Entry/255044. Like a news wire feed, TikTok facilitates the transmission of news but with a bonus: it also lets users publish other items on the list of informational materials, like short videos, photographs, and art. Pls.' P.I. Mot., ECF No. 15-1, 18.

In response, the government first argues that the Secretary has "simply prohibit[ed] business-to-business economic transactions that support certain aspects of TikTok's U.S. operations." Defs.' Opp'n, ECF No. 22, 18. The Secretary has not, the government argues, "prohibit[ed] any importing or exporting of information," or taken any action with respect "to TikTok users themselves." *Id.*

But that argument fails to grapple with IEEPA's text. Section 1702(b)(3) provides that IEEPA's grant of authority "does not include the authority to regulate or prohibit, directly or indirectly," the cross-border transmission of "information and informational materials." 50 U.S.C. § 1702(b)(3). The content exchanged by TikTok users constitutes "information and informational materials"; indeed, much of that content appears to be (or to be analogous to) "publications, films, . . . photographs, . . . artworks, . . . and news wire feeds." *Id.* And the purpose and effect of the Secretary's prohibitions is to limit, and ultimately reduce to zero, the number of U.S. users who

can comment on the platform and have their personal data on TikTok. Commerce Memo, ECF No. 22-1, 22. At a minimum, then, the Secretary's prohibitions "indirectly" "regulate" the transmission of "informational materials" by U.S. persons. *Id.*

Moreover, Section 1702(b)(3)'s express limitation applies to "commercial" informational materials. If prohibitions on business-to-business transactions could not constitute the regulation of "informational materials," then there would have been no reason for Congress to include the word "commercial" when defining the scope of § 1702(b)(3)'s limitation. *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (directing courts "to give effect, if possible, to every clause and word of a statue").

To be sure, TikTok (like a news wire, which is expressly identified in IEEPA's carveout) is primarily a conduit of "informational materials." In that sense, it is (among other things) a "medium of transmission," and IEEPA provides that this carveout applies "regardless of format or medium of transmission." 50 U.S.C. § 1702(b)(3). That is especially true where, as here, the transmitting medium is inextricably bound up with and exists primarily to share protected informational materials.[1]

---

[1] At oral argument, the government contended that the D.C. Circuit has read IEEPA's indirect regulation language as barring only executive actions targeting "informational materials" themselves, as opposed to prohibitions aimed elsewhere that merely burden "trade in informational materials." *See* Hr'n Tr., Sept. 27, 2020 (forthcoming) (citing *Walsh v. Brady*, 927 F.2d 1229, 1232 (D.C. Cir. 1991)). Not so. In *Walsh*, the plaintiff alleged that certain Treasury Department travel restrictions exceeded IEEPA's informational-materials limitation by indirectly burdening his trade in Cuban posters. 927 F.2d at 1230–31. The plaintiff argued that a previous version of § 1702(b)(3) "extinguish[ed] *any* executive authority to use [IEEPA] to impose *any* regulation that 'significantly burdens' trade in informational materials." *Id.* at 1232 (emphasis added). The Court of Appeals rejected that novel reading, affording deference to an agency assessment that "[s]uch travel was considered too *tangential* to the actual physical importation and exportation of informational materials to fall within the language of [§ 1702(b)(3)]." *Id.* at 1231 (emphasis added). Here, by contrast, the relationship between the Secretary's prohibitions and the informational materials U.S. users post on TikTok is neither "tangential" nor generic.

Defendants next contend that Plaintiffs' plain-language approach would create an IEEPA-free zone that "Congress could not have intended." Defs.' Opp'n, ECF No. 22, 18. As the government puts it, "it is unfathomable that Congress intended through section 1702(b) to limit the President's ability to prevent a foreign government . . . from dominating the country's data services. Yet that absurd conclusion would necessarily flow from interpreting subsection (b)(3) in the way Plaintiffs suggest." *Id.*

There is something to this argument, especially as foreign adversaries' use of information and data (and the United States' efforts to respond to and combat those efforts) becomes ever more important. But it does not find support in the text of the statute. In fact, subsection (b)(3) forecloses even the indirect regulation of news wires, another parallel kind of information medium that foreign adversaries could exploit to promote misinformation. To be sure, TikTok's users share more than just news, but that fact makes it more likely that the prohibitions here fit within the plain meaning of subsection (b)(3).[2]

Finally, the government proposes a novel reading of the Espionage Act. *See* Defs.' Opp'n, ECF No. 22, 20 (citing 18 U.S.C. § 794(a)). Section 1702(b)(3) contains an exception to its exception, so to speak, and permits the regulation of informational materials, "with respect to . . .

---

*See id.* at 1231, 1233. TikTok exists to facilitate communication and the Secretary's prohibitions aim to stop it.

[2] The government argues in passing that OFAC excludes "material not fully created and in existence at the date of the transactions" from the scope of the phrase "informational materials." Defs.' Opp'n, ECF No. 22, 19 (citing 31 C.F.R.§ 560.210(c)(2)). Even assuming OFAC's exclusion merits deference in this context, it would not allow the Secretary to effectively ban TikTok. Plaintiffs have shown that TikTok users can film and design content outside of TikTok's ecosystem (on the iPhone Camera app, for example) to post later. *See* Reply, ECF No. 26, 16 n.5. When users share pre-made videos, those videos are necessarily "fully created and in existence" before they reach TikTok, which places them outside of OFAC's exclusion.

acts . . . prohibited by chapter 37 of Title 18." That Title authorizes life imprisonment or the death penalty for those who share U.S. defense secrets (especially classified government materials) with foreign adversaries. *See Gorin v. United States*, 312 U.S. 19, 26 (1914); *see also United States v. Harper*, 729 F.2d 1216, 1217–18 (9th Cir. 1984) (prosecuting under 18 U.S.C. § 794 for sending "secret national defense information" to a foreign officer). But it is not plausible that the films, photos, art, or even personal information U.S. users share on TikTok fall within the plain meaning of the Espionage Act.

    2. *Personal Communications*

Like the informational-materials limitation, § 1702(b)(1) states that IEEPA's grant of authority does not include the "authority to regulate or prohibit, directly or indirectly . . . any . . . personal communication, which does not involve a transfer of anything of value." 50 U.S.C. 1702(b)(1). It is undisputed that the Secretary's prohibitions will have the effect of preventing Americans from sharing personal communications on TikTok. Reply, ECF No. 26, 12. As Plaintiffs put it, the prohibitions "will destroy this online community, first by requiring the removal of TikTok from . . . U.S. app stores, and, when the remaining Prohibitions come into effect on November 12, 2020, shutting down TikTok entirely." Pls.' P.I. Mot., ECF No. 15-1, 18; *see also* Pappas Decl., ECF No. 15-3, ¶¶ 4, 17.

The government counters by arguing that some communications on TikTok do have economic value. Defs.' Opp'n, ECF No. 22, 16. Fair enough. But "a wide swath of TikTok videos, public comments . . . , and private messages between friends about TikTok videos" are "personal communications with no economic value at all." Reply, ECF No. 26, 13. The government also argues that, even if the communications were of no value to the creators, they benefit TikTok as a platform. Defs.' Opp'n, ECF No. 22, 16. But such an expansive reading of

the phrase "anything of value" would write the personal-communications limitation out of the statue.  All communication service providers—from televisions stations and publishers to cellular phone carriers—get some value from a user's "presence on" their platform.  Reply, ECF No. 26, 15.  Congress enacted § 1702(b)(1) to protect personal communications, but even the letter a person drops in the mail adds some value to the mail carrier; it cannot be that IEEPA authorizes the targeting of such communications.  *See King v. Burwell*, 576 U.S. 473, 494 (2015) (rejecting an interpretation because it was "implausible that Congress meant the Act to operate in this manner").

* * * * *

In sum, the TikTok Order and the Secretary's prohibitions will have the intended effect of stopping U.S. users from communicating (and thus sharing data) on TikTok.  To be sure, the ultimate purpose of those prohibitions is to protect the national security by preventing China from accessing that data and skewing content on TikTok.  And the government's actions may not constitute *direct* regulations or prohibitions of activities carved out by 50 U.S.C. 1702(b).  But Plaintiffs have demonstrated that they are likely to succeed on their claim that the prohibitions constitute *indirect* regulations of "personal communication[s]" or the exchange of "information or informational materials."[3]

### B. Irreparable Harm

The Court next considers whether Plaintiffs have made a showing of irreparable harm. "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury

---

[3] Because the Court concludes that Plaintiffs have demonstrated a likelihood of success under IEEPA, it need not analyze Plaintiffs' other statutory and constitutional claims to decide whether Plaintiffs are entitled to preliminary relief.  But the Court does note that Plaintiffs appear to have presented at least serious questions on their other claims.

is '*certain, great and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). In addition, "the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The movant must "substantiate the claim that irreparable injury is likely to occur" and "provide proof . . . indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674. That is because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Plaintiffs have demonstrated that, absent injunctive relief, they will suffer irreparable harm. It is undisputed that as of the date of the TikTok Order, TikTok was one of the fastest growing apps in the United States, adding 424,000 new users each day. *See* Pappas Decl., ECF No. 15-3, ¶ 18. Barring TikTok from U.S. app stores would, of course, have the immediate and direct effect of halting the influx of new users, likely driving those users to alternative platforms and eroding TikTok's competitive position. *Id.* In fact, TikTok has proffered unrebutted evidence that uncertainty in TikTok's future availability has already driven, and will continue to drive, content creators and fans to other platforms. *See* Pls.' P.I. Mot., ECF No. 15, 34. The nature of social media is also such that users are unlikely to return to platforms that they have abandoned. *See id.* Thus, if the first prohibition were to take effect tonight but was later held to be unlawful, TikTok would not be able to recover the harm to its user base. Pls.' P.I. Mot., ECF No. 15-1, 33–35; *see*

*also* Pappas Decl., ECF No. 15-3, ¶ 19.  Plaintiffs have also proffered evidence that they have been harmed, and will continue to be harmed, by the erosion of TikTok's attractiveness as a commercial partner.  Pappas Decl., ECF No. 15-3, ¶ 23.  TikTok's business relies on commercial partners and advertisers that work with it because of its robust user base and popularity as a video- and information-sharing platform.  *Id.*  Finally, TikTok has shown that, in the absence of injunctive relief, it will be unable to recruit and retain employees to build—or even maintain—its business.  Pappas Decl., ECF No. 15-3, ¶ 26.

The Secretary's prohibitions, including the prohibitions scheduled to take effect tonight, will inflict irreparable economic and reputational harm on Plaintiffs.  This factor therefore weighs in favor of granting preliminary relief.

### C. Balance of the Equities and Public Interest

The Court now turns to the final two *Winter* factors—the balance of the equities and the public interest.  When the government is the nonmovant in a request for a preliminary injunction, the harm to the opposing party and public interest merge and are considered "one and the same." *Pursuing America's Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511 (D.C. Cir. 2016).  That is because "the government's interest *is* the public interest."  *Id.*  In assessing these factors, courts consider the impacts of the injunction on nonparties as well.  *See id.* at 511–12.

The government argues that a preliminary injunction would displace and frustrate the President's decision on how to best address a national security threat—an area where the courts typically defer to the President's judgment.  *See* Pls.' P.I. Mot., ECF No. 15-1, 43.  The Court must, of course, give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land*

*Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002). Here, the government has provided ample evidence that China presents a significant national security threat, although the specific evidence of the threat posed by Plaintiffs, as well as whether the prohibitions are the only effective way to address that threat, remains less substantial. At a minimum, the Court cannot adopt Plaintiffs' argument that "the government will not face *any* harm if a preliminary injunction is granted." Pls.' P.I. Mot., ECF No. 15-1, 37.

But for the reasons discussed above, Plaintiffs have demonstrated that they are likely to succeed on their IEEPA claims, and the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). That is because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

Weighing these interests together with Plaintiffs' likelihood of succeeding on their IEEPA claim and the irreparable harm that Plaintiffs (and their U.S. users) will suffer absent an injunction, the Court concludes that a preliminary injunction is appropriate.

### III. SCOPE OF RELIEF

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Although Plaintiffs' IEEPA arguments are equally as applicable to the Secretary's November prohibitions as they are to

17

paragraph 1 of the Commerce Identification, the only truly imminent and immediate harm that Plaintiffs will suffer absent an injunction relates to paragraph 1 of the Commerce Identification. The Court therefore agrees with the government that injunctive relief should be limited to the prohibitions contained in paragraph 1, and that the other paragraphs of the Commerce Identification should appropriately be the subject of separate proceedings, which can be briefed and decided (potentially through cross-motions for summary judgment, and on a full administrative record) prior to those restrictions' effective date of November 12. Such a course is consistent with the Court's direction to the parties on September 24. *See* Hr'g Tr. at 21 ("[T]he immediate issue before me, as I see it, is whether September 27th, whether paragraph 1 should be permitted to take effect or should be enjoined.").[4]

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is granted as to paragraph 1 of the Commerce Identification. An Order will accompany this memorandum opinion.

DATE: September 27, 2020

CARL J. NICHOLS
United States District Judge

---

[4] The Court does not agree with the government, however, that a bond is appropriate here. Plaintiffs seek to vindicate important interests, and there is no risk that Defendants will suffer monetary harm. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).