```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   TIKTOK, INC., et al.,          .
                                    .  Case Number 20-cv-2658
 4            Plaintiffs,           .
                                    .
 5        vs.                       .
                                    .
 6   DONALD J. TRUMP, et al.,       .  September 27, 2020
                                    .  9:34 a.m.
 7            Defendants.           .
     - - - - - - - - - - - - - - - -

 8

 9             TRANSCRIPT OF TELEPHONIC MOTION HEARING
               BEFORE THE HONORABLE CARL J. NICHOLS
10                  UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the Plaintiffs:        JOHN HALL, ESQ.
                                ALEXANDER BERENGAUT, ESQ.
14                              BETH BRINKMANN, ESQ.
                                MEGAN CROWLEY, ESQ.
15                              MEGAN KEENAN, ESQ.
                                Covington & Burling LLP
16                              850 10th Street Northwest
                                Washington, D.C. 20001
17
                                ANDERS LINDEROT, ESQ.
18                              Covington & Burling LLP
                                600 Eighth Avenue
19                              New York, New York 10018

20                              MITCHELL KAMIN, ESQ.
                                Covington & Burling LLP
21                              1999 Avenue of the Stars
                                Los Angeles, California 90067
22

23                        -- continued --

24

25
```

```
1    APPEARANCES (CONTINUED):

2    For the Defendants:         DANIEL SCHWEI, ESQ.
                                 SERENA ORLOFF, ESQ.
3                                United States Department of Justice
                                 Civil Division
4                                Federal Programs Branch
                                 1100 L Street Northwest
5                                Washington, D.C. 20530

6                                STUART ROBINSON, ESQ.
                                 United States Department of Justice
7                                Civil Division
                                 Federal Programs Branch
8                                450 Golden Gate Avenue
                                 Suite 7-5395
9                                San Francisco, California 94102

10

11   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
12                               U.S. Courthouse, Room 4704-B
                                 Washington, D.C. 20001
13                               202-354-3284

14
     Proceedings recorded by stenotype shorthand.
15   Transcript produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

```
1              P R O C E E D I N G S

2        (All participants present telephonically.)

3              THE COURTROOM DEPUTY:  This is Civil Case Year

4    2020-2658, TikTok, Incorporated, et al., versus Donald J. Trump,

5    et al.

6        Counsel, please introduce yourselves for the record,

7    beginning with the plaintiffs.

8              MR. HALL:  Good morning, Your Honor.  This is John

9    Hall from Covington & Burling for the plaintiffs.  I'm joined

10   today by several of my colleagues from Covington.  The only one

11   who will participate in the argument besides myself is Alexander

12   Berengaut.  May I introduce Mr. Berengaut.

13             MR. BERENGAUT:  Good morning, Your Honor.

14             THE COURT:  Good morning, Mr. Hall and Mr. Berengaut.

15   So Mr. Hall, only you and Mr. Berengaut will be speaking on

16   behalf of plaintiffs this morning, so I don't think we need to

17   go through the other folks on the call.

18        Why don't we do appearances for defendants, please.

19             MR. SCHWEI:  Good morning, Your Honor.  This is Daniel

20   Schwei from the Department of Justice on behalf of the United

21   States.  I will be doing the speaking this morning, but I am

22   joined by Diane Kelleher, Serena Orloff, and Stuart Robinson,

23   also from the Department of Justice, and Michael Walsh from the

24   Department of Commerce.

25             THE COURT:  Good morning, Mr. Schwei.
```

1      Is anyone else on the phone representing any of the

2  parties?  Okay.  Thank you.

3      I want to make just a few preliminary observations before

4  we begin.  First, this is obviously a telephonic hearing, and

5  like our last conference in this matter, if the speaker could,

6  please, introduce him or herself before speaking so the court

7  reporter is clear who is doing the talking, that would be

8  helpful.  And obviously, there may be some technological snafus

9  that we could potentially encounter, and if so, we will just be

10  accommodating and deal with them.

11      The second is that I had originally sealed this hearing

12  because the government's opposition to plaintiffs' motion was

13  filed under seal at the time I set this hearing.  The government

14  later, as it had indicated it would do, filed a redacted version

15  of its opposition and supporting materials, which placed much,

16  though not all, of the relevant information here on the public

17  record.  And then, of course, plaintiffs filed their reply

18  brief, which was filed entirely on the public record.

19      I, therefore, do believe it is appropriate to proceed with

20  an on-the-public-record hearing.  This is, therefore, not a

21  sealed hearing.  My intent is through my questions at least to

22  not reveal any material that might potentially be subject to the

23  current seal.  I would ask counsel for the parties to try to the

24  maximum extent possible to answer my questions or to present

25  argument in a way that does not reveal sealed information.  And

 1    in the event that it is critical that we discuss sealed

 2    information, please raise that, and we can decide whether it

 3    makes sense to do a separate sealed hearing.

 4        Finally, as it relates to the argument this morning, I have

 5    reviewed all of the materials.  I think it is fair to say I am

 6    quite up to speed on all of the issues, and in particular, I

 7    understand the parties' positions quite well with respect to the

 8    injunctive relief factors of irreparable harm, balance of

 9    equities, and public interest.

10        As a result, I would like to focus potentially exclusively,

11    certainly to focus in the main on the questions relating to

12    whether plaintiffs have demonstrated a likelihood of success on

13    the merits.

14        So with that, Mr. Hall, let's turn to you.  It's your

15    motion.  You have a number of claims that you've argued you have

16    a likelihood of success on.  So why don't you begin wherever you

17    would like to begin with respect to your claims.  I will have a

18    series of questions.  Again, if possible, let's try to keep this

19    argument focused on unsealed material, and if that becomes

20    necessary, we can decide how to deal with it.

21        Mr. Hall.

22            MR. HALL:  Thank you, Your Honor.

23        Our preliminary injunction motion that we filed last

24    Wednesday was directed to the president's executive order and to

25    the entirety of the Commerce Department's prohibitions.  We are

mindful, however, of the Court's direction from the Thursday
hearing that the issue you would be taking up today is whether
paragraph 1 of the Commerce Department's prohibition should be
enjoined.  And so we structured our reply and we would propose
to structure our argument here to reflect that, specifically to
argue first -- and this is the portion of the argument that I
will be handling -- likelihood of success on the APA arguments
that are particular to the paragraph 1 prohibition.

We believe we have made a strong showing of likelihood of
success of paragraph 1, including specifically its bifurcated
effective date at midnight tonight versus the November 12th
effective date of the remaining prohibitions as arbitrary and
capricious and, therefore, violates the APA.

I realize that you may not wish to hear further argument
about it, but we also think we have made compelling showing of
irreparable harm if the ban is allowed to take effect, and
balance of equities and public interest are strongly in favor of
at least temporarily enjoining that prohibition.

And as we noted in our reply, were you to do so, it would
effectively preserve the status quo, allow the orderly
consideration of the broader issues in our briefing on a more
reasonable schedule and with the benefit of a full agency
record.

I want to be clear, we allege that paragraph 1 is unlawful
for all of the reasons that are set forth in our papers, in

addition to violating the APA.  That contravenes the express

language in the IEEPA statute that forbids the government from

regulating or prohibiting directly or indirectly personal

communication or informational materials; second, that it is

unconstitutional and that it violates plaintiffs' First

Amendment free speech rights and Fifth Amendment due process

rights; and third, that it is otherwise ultra vires, exceeding

executive authority.

As I've said, with the Court's permission, I would like to

address first the likelihood of success on the APA argument as

it relates to paragraph 1 of that, and I would have

Mr. Berengaut address the other legal arguments, to the extent

you wish to hear them.

THE COURT:  I think it would be helpful to start

there.  I think in your argument about paragraph 1, I do think

it would be helpful for you to -- in some respects, of course,

paragraph 1 is a question, as you've noted, about its date

vis-a-vis other dates.  But there is a backdrop here of

whether -- I think your view is whether any of these actions,

paragraph 1 or the others, are adequately justified in either

the president's order or the secretary's lift.

And so the issues do blend together.  I don't want to

preempt any particular argument you have, but I think it's

important to the analysis about the order portion that goes into

effect tonight to understand whether what the secretary has done

1    more generally is lawful or not.

2            MR. HALL:  Thank you, Your Honor.  I will try to

3    follow that direction.

4        You are correct that we believe we have an APA argument

5    that goes to the entirety of the prohibitions, and we have

6    continued to pursue that argument in reply.  We simply, you

7    know, in deference to the direction of the Court from last

8    Thursday, tried to focus it on the exigency that exists today,

9    the fact that it --

10           THE COURT:  I fully appreciate that, Mr. Hall, and I

11   think it was an appropriate decision.  I just for the purposes

12   of this morning think it's important for us to -- and I've read

13   your motion, and I understand the arguments that were presented

14   there, and to some extent, they overlap.  So I don't want you to

15   feel foreclosed from presenting broader arguments about what

16   either the president or the secretary did here because there is

17   also the narrower question of today's date vis-a-vis the others.

18   That's really all I'm saying.

19           MR. HALL:  Understood, Your Honor.  Thank you.

20       May I -- before I jump to the APA argument, I would

21   appreciate the opportunity just to make a couple of overarching

22   points.

23       The first one is that the government focuses almost

24   exclusively in its brief on national security.  And to be very

25   clear, plaintiffs don't disagree for a second that national

security is a weighty subject and plainly relevant here, but so is freedom of expression and communication, because that's also what this case is about, and that is inherent from the nature of the business that has been targeted here with these prohibitions.

Yes, TikTok is an app., but of course, it is much more than that.  TikTok is a modern-day version of the town square.  That's the way we've described it, and it is accurately described.  It is a community forum, a means of communication in this electronic age, made even more important at this time when we are suffering this physical isolation due to the pandemic.

And it is huge, Your Honor, 100 million users in the United States, nearly a third of the country, over 400,000 new persons looking to join it every single day.  The consequence for those people -- and this does focus on the immediacy of what is happening tonight.  If that prohibition goes into effect at midnight tonight, the consequences immediately are grave.  It would be no different than the government locking the doors to a public forum, roping off that town square, telling two-thirds of the country who were not members of this community that you're not going to be permitted in, you won't hear from those people, they won't hear from you.  That's exactly what tonight's prohibition seeks to do, and the government would be taking this extraordinary action at the very time that the need for free, open, and accessible communication in America is at its zenith,

1    37 days before a national election.

2        Second overarching point I want to get out before I jump

3    into the rest of the argument, and that is, much of the

4    government might wish to portray what is happening here as a

5    mainstream exercise of executive power.  It is anything but.

6    These prohibitions target a single specific business, including

7    one incorporated in the United States.

8        That is totally unprecedented.  As Professor Tyler notes in

9    her declaration attached to our motion, there are only a handful

10   of examples of IEEPA being used to shut down the operations of a

11   U.S. entity.  The only prior example she could identify are

12   U.S.-based nonprofits and individuals suspected of providing

13   materials for terrorist organizations, and that, obviously, does

14   not resemble what's happening here.  These are prohibitions that

15   would ban a social media platform that enables personal

16   communication by millions of Americans.

17       Judge, we recognize that an injunction of any duration is

18   extraordinary relief, but this is an extraordinary case, and all

19   of these weighty issues should be considered together.  It's one

20   of the reasons why we have argued in the reply brief that it

21   would be best to do so, I recognize carefully, on the basis of a

22   full record.  The best way to do that would be to enjoin

23   paragraph 1 today, which we believe to be, as I will argue,

24   arbitrary and capricious in violation of the Administrative

25   Procedure Act on this record, and that would preserve the status

1    quo and afford time for the just consideration of all of the

2    issues.  That is our -- that is our pitch to you today as we

3    engage in this emergency hearing on a Sunday.

4         So let me move to the APA.  Your Honor is well aware that

5    under the APA a court must set aside an agency action if it is,

6    quote, arbitrary and capricious, an abuse of discretion, or

7    otherwise not in accordance with law.  Here, the app. store

8    prohibition, as well as the broader set of prohibitions that

9    would be -- that would become effective much later are arbitrary

10   and capricious.

11        Focusing specifically on the, we've called it, "app. store

12   ban" that would take effect tonight at midnight, there is, in

13   our view, no rational connection between that ban and the

14   ostensible justification for this prohibition, which is to

15   protect user data, and because the agency failed to consider

16   reasonable alternatives to that prohibition, specifically the

17   CFIUS divestiture process, which it acknowledges would address

18   its purported concern, and for that reason postpone the

19   effective date of all of the other prohibitions until six weeks

20   from now.  They just didn't do it for this one, and that makes

21   no sense to us except as an arbitrary way to just stick it to

22   this business.

23             THE COURT:  Mr. Hall, let's assume that, for the sake

24   of argument, the government has adequately justified its

25   national security concerns with respect to TikTok, both the

1   concern about the potential flowing of data to the Chinese

2   government and the concern about Chinese influence on content on

3   TikTok.

4       And obviously, one way to handle those concerns is the

5   divestiture procedures that would -- or divestment procedure

6   that would occur through CFIUS to be, I guess, finished in

7   November.  Another way would be to have the implementation of

8   paragraphs 2 through 5 of the secretary's list.

9       But if you assume, for the sake of argument, that those

10  are -- that paragraphs 2 through 5 of the list are not arbitrary

11  and capricious, why isn't it reasonable or at least not

12  arbitrary and capricious for the secretary to say, we have these

13  concerns, and that's why we're going to do in November what we

14  are going to do, but as an interim measure, to essentially cap

15  the harm that will occur between now and mid-November, we would

16  allow TikTok to continue to have its existing user base, but we

17  just don't want the harm to increase, the potential harm, so we

18  want no new users?

19      Why is that arbitrary and capricious if you assume that the

20  determinations about November 12 are lawful?

21           MR. HALL:  Because the app. store ban concededly does

22  nothing, Your Honor, to enhance or improve the security of the

23  data of the 100 million users that are already on the platform.

24      I mean, you correctly point to the justification that we

25  just saw from the Commerce Department memo, because again there

1    is nothing in the notice of the regulations that purports to

2    explain it, but having seen that now what was attached to the

3    government's opposition, it says that the purpose of this app.

4    store ban to enter into effect tonight is to mitigate the

5    security risk by stopping the users from joining the platform.

6        But in fact, Commerce acknowledges in that very same memo

7    that this prohibition will prevent existing users from receiving

8    updates, including security updates, which as we've documented

9    happen at least once or twice a week.  So for 100 million users

10   that are already on the platform whose data security is

11   supposedly the motivating purpose of this action, the actual

12   consequences of this app. store ban will be to erode security.

13       THE COURT:  Mr. Hall, can I interrupt here.  This is a

14   question I will ask the government, but it seems to me that the

15   government's data security risk isn't about third-party hacking

16   or security updates, but it's that China could force TikTok to

17   send its data to China.

18       And what do weekly or twice-a-week security updates have to

19   do with that concern?

20       MR. HALL:  As described in our declarations, Your

21   Honor, I mean, the core issue really is about data security, and

22   it is a legitimate risk.  It's a legitimate risk for all social

23   media platform companies.  It's not a risk that's unique to

24   TikTok.  This is an industrywide issue for which there are

25   industrywide mitigations, and those mitigations include ensuring

1    the security of users, and that's why there are regular updates.

2    That's a critical part of the security apparatus for TikTok and

3    for all such companies, and to remove those protections --

4    because that's ultimately what the issue is, is someone's

5    personal data going to be released and used for an improper

6    purpose.

7         The core protection relates to those security updates, and

8    it's utterly illogical, in our view, that those would be

9    diminished, eroded, removed in any way.  That, as I say, far

10   from serving the purpose of what's said to be the justification

11   for these regulations, it undermines it.  It's not mitigation as

12   the way it is described in the Commerce Department memo.

13   There's just no rational connection here between the facts as

14   stated and this selected action of the app. store ban going into

15   effect tonight.

16        As you pointed out, we also -- we also have an argument

17   around the timing of it, which likewise makes no sense to us.

18   All of these other prohibitions in the Commerce Department rule

19   take effect on November 12th.  November 12th is the deadline

20   under the separate CFIUS order for divesting the TikTok

21   business.  Commerce made November 12 the effective date of all

22   of these other prohibitions because it wanted, it says, the

23   CFIUS process to play out.  And our broader argument is that the

24   entirety of these prohibitions, the entirety of this ban is

25   arbitrary and capricious under the APA precisely because there

is self-evidently a less drastic alternative than a ban to accomplish the government's supposed objectives here.

But that only makes the irrationality of this app. store ban even more glaring. Everything else is being put off, but how does it make sense to impose this app. store ban tonight when there are negotiations underway that might make it unnecessary. The whole way this is structured just belies any suggestion that what, you know, Commerce is doing here is to, oh, let's just chip away at the user base, that's the way to address the security problem, and as you said, it's sort of like stop digging the hole, stop adding more users.

That's plainly not the plan. To call it that would be -- it's completely a fish out of water. The only conclusion that really can be reached here given the way they have structured it is that this is just punitive. This is just a blunt way to whack the company now while doing nothing to achieve the stated objective of the prohibition.

THE COURT: If I could interrupt you for one second to make sure I understand one thing you alluded to.

Is it your position that, assuming that the government's national security risks are legitimate and justified and supported by evidence, that the less drastic alternative is, in fact, the divestment that has been proposed, and then whether it's in the CFIUS process or otherwise, that that would be a nonarbitrary and capricious approach to the government's

1    concerns?

2            MR. HALL:  Yes, Your Honor.  The Commerce Department

3    memo, indeed, states that that process, complete divestment --

4    and I want to be clear.  My clients don't take the position that

5    that is justified by the facts here, but it certainly is -- the

6    national security mitigation process through CFIUS allows the

7    government to obtain security assurances from a foreign company,

8    and it is certainly a less drastic alternative than an outright

9    ban and destruction of this business.

10           That is, indeed, a core part of our argument.  As I said,

11   it applies to all of the prohibitions, including this complete

12   ban, but it applies a special force to the app. store ban and

13   this, you know, bifurcated timing going into effect tonight.

14           THE COURT:  It seems to me that you also argue that

15   there are a series of, I will put it this way, even less

16   restrictive alternatives that the government should have adopted

17   which relate to -- I will put it in the most general sense --

18   commitments by TikTok, even given its current ownership

19   structure, to make the government comfortable with how it

20   operates its business?

21           MR. HALL:  Correct.

22           THE COURT:  Something like that?

23           MR. HALL:  Correct.  As I say, I do want to be clear,

24   my clients don't agree that divestment is the only way to

25   satisfy these data security objectives.  We don't agree with

1    that.  But the point is, nevertheless, a compelling one that

2    divestment, which even the Commerce Department in its memo

3    agrees could address the problems, a less drastic alternative

4    than banning the app. in the United States serving 100 million

5    people.  And that clearly in and of itself makes this an

6    arbitrary and capricious action.  That's our position.

7         THE COURT:  Thank you, Mr. Hall.  I think I would like

8    to turn to the other arguments, unless there is something you

9    really want to say on arbitrary and capricious.  I'm going to

10   allow you to have a rebuttal after the government argues.  So

11   there will be time to say more if you desire.  I think I've got

12   a pretty good handle on the arbitrary and capricious question,

13   but I do have some questions on the other claims.

14        So if it's okay with you, could we turn to your colleague?

15             MR. HALL:  Certainly.

16             MR. BERENGAUT:  Good morning, Your Honor.

17        With the Court's permission, I will turn first to the

18   communication and informational materials provisions of IEEPA,

19   although if the Court has particular questions about the other

20   claims, I am happy to take them in whatever order the Court

21   prefers.

22             THE COURT:  No, I would like to start there, please.

23   Thank you.

24             MR. BERENGAUT:  From our perspective, Your Honor,

25   there are just a few basic points to make about these plain

language arguments.  The first is that both of the provisions on which we rely, (b)(1) and (b)(3), use the same broad formulation that prohibits the president from regulating or prohibiting, directly or indirectly, personal communications or the import or export of informational materials.  This "directly or indirectly" language is key, and the legislative history makes clear that these provisions were intended to have broad scope.

The second point is that what users share on TikTok plainly qualifies as personal communications and informational materials.  Indeed, one of the specifically enumerated informational materials in (b)(3) is film.

And the third is that the administration has effectively recognized that this exception protects social media platforms, and both act -- incorporates general licenses to ensure that these platforms are available for personal communications, even in the context of other sanctions programs.

So from our perspective, the plain language here is dispositive, because the prohibitions, whether you're looking just at the first paragraph or more generally, at the very least indirectly prohibit personal communications and the import and export of informational material.

The government's argument is that the ban doesn't fall within these prohibited provisions because it applies only to business-to-business transactions.  That's how they characterize it.  But nowhere does the government have an answer to the

language in the statute that talks about regulation or
prohibition directly or indirectly.  The immediate prohibition
might apply to the transactions between TikTok and the app.
stores or between TikTok and content delivery networks, but
indirectly and clearly the targeted effect of these prohibitions
is to regulate and ultimately to prohibit the ability of
millions of Americans to communicate with each other on the
TikTok platform.

THE COURT:  The government argues, I think, that
whatever the text might point us toward, your interpretation
would create something of an IEEPA-free zone for social media
companies because -- I will put it this way.  This is my
paraphrase or perhaps my sort of take on it:  Because social
media companies are necessarily in the business of personal
communications and the transmission, importation, exportation of
information or informational materials, that's what they do, and
so anything or practically anything that the executive branch
might wish to do with respect to a social media company is going
to fit within your interpretation of what it means to indirectly
regulate either the communications or the informational
materials, and it would be preposterous or absurd, I forget the
word they used, to create such an IEEPA-free zone for what seems
to be a pretty important segment of the international market.

What's your response to that?

MR. BERENGAUT:  A couple responses to that, Your

Honor.

The first is, even just on the plain language, it doesn't create a fully IEEPA-free zone.  There is a provision as a part of (b)(3) that carves out certain information, the transmission of certain information that do have a pronounced national security component to it.  So the government is free to regulate the transmission of classified information.  Or another aspect of Chapter 37 prohibits photography or videos of defense installations, for example.  That -- the government would be free to continue to regulate that information through IEEPA.

But more broadly, it should not be so remarkable that for companies like social media platforms that are effectively engaged in the business that is at the heart of the First Amendment, which is what the Supreme Court recognized in the *Packingham* case recently, that the informational materials and personal communications provisions of IEEPA were intended to have a very significant limiting effect on the administration's ability to regulate in this space.  Because if you look at the legislative history, there is a continual effort on the part of Congress to make clear that they were serious about protecting information that's rich with First Amendment expressive content, and that's plainly the case with the social media companies.

My last point, Your Honor -- sorry.

THE COURT:  Can I interrupt you there for one second.  If TikTok had not made some of the commitments that it

1  identifies in your papers about data security and maintaining

2  the information in the United States and the like, could the

3  government, consistent with these provisions of IEEPA, have

4  ordered those steps unilaterally to protect against the national

5  security concerns identified by the president?

6         MR. BERENGAUT:  Yes, Your Honor.  This is one of the

7  points we made in our reply brief, that just because IEEPA is

8  not available to the government when it comes to certain

9  categories of expressive content, personal communications and

10  informational materials, doesn't mean that the government

11  doesn't have other tools at its disposal to address national

12  security concerns.  And one of those tools is the CFIUS process,

13  which allows the government to review transactions where a

14  foreign company is acquiring a U.S. business and to get these

15  types of security commitments with the ultimate power of

16  divestment, which as Mr. Hall says we don't believe is warranted

17  here, but the government has those powers to regulate in a space

18  where that IEEPA power doesn't exist because of these

19  carve-outs.

20         THE COURT:  I'm asking a slightly different question.

21  I understand that point.

22         My question is, would the government be able to use IEEPA

23  to, for example, impose requirements on TikTok that are not

24  about divestment but are about how and where it houses data from

25  U.S. persons?

1          MR. BERENGAUT:  I see, Your Honor.

2          THE COURT:  It's a question about IEEPA, and would

3     that obligation -- imagine hypothetically that the government,

4     instead of the list of prohibited transactions here and the

5     president's TikTok order, basically said we are invoking IEEPA,

6     and you are ordered, TikTok, to do the following eight things, I

7     don't know what they would be, but eight things, 10 things,

8     whatever, the purpose of which is to ensure that the data of

9     U.S. users never leaves the United States and never makes it

10     into the hands of China.

11          Is that not or is it an indirect regulation of either

12     personal communications or information or informational

13     materials?

14          MR. BERENGAUT:  Your Honor, it's clear that under

15     IEEPA that there is that broad power to regulate.  The

16     underlying IEEPA authority in 1702(a) doesn't talk just about

17     prohibitions.  It also speaks of regulations.

18          And so I think the question would boil down to, Your Honor,

19     whether those eight things would directly or indirectly intrude

20     upon these exceptions.

21          It's possible to conceive of a lot of security mitigations

22     that wouldn't interfere with the ability of people to

23     communicate on the app., share information and videos on the

24     app.  It's also possible to conceive of restrictions that are so

25     burdensome that they would effectively disable the functionality

of the app.  So I think the devil would be in the detail on

those.

THE COURT:  Thank you.  I know you were about to say

something else on IEEPA, but I am mindful of the time.  Could

you move -- obviously, if there is something else you would like

to add, please do, but I would like to hear you on the

constitutional claim.

MR. BERENGAUT:  Yes, Your Honor.  I will turn next to

the First Amendment, because that's pretty intimately connected

with the communication and informational materials provisions,

and then I can just very briefly address the Fifth Amendment.

It seems undisputed from our perspective that we have

rights here that are protected by the First Amendment.  We

articulated two:  Our rights as speakers on the platform, our

rights in our code.  Our understanding is that the government

disputes the rights to the code, but as to our rights to

speakers, they basically say you have rights to speakers, but

they are the same as the rights of any speaker on the platform.

And we don't disagree with that.  That's common ground.

So where we part company with the government is whether

this agency action impinges on those First Amendment rights.

The government argues that this is just a commercial regulation

of business-to-business transactions and that any impact on

speech is incidental.  And their main authority for this, Your

Honor, is the *Arcara* case where a bookstore was shut down

because of lewd conduct that occurred there.  But this case is
not in the same ballpark as *Arcara*.  There's no separate
regulatory objective here like the desire to regulate the lewd
conduct in *Arcara* where the burden on speech is a mere incident
to it.  Shutting down speech is the reason the government has
imposed these restrictions, and that's what the Commerce memo
expressly says.

And *Arcara* itself recognizes this point where it notes that
while the Court accepts a regulation of activity with no
expressive conduct, it notes that it's not appropriate to have a
regulation of commercial conduct where it imposes a
disproportionate burden on those engaged in First Amendment
activity.  And that's exactly what is happening here, and that's
why we believe the First Amendment is engaged in this context.

On the level of scrutiny, our view is that this is a prior
restraint.  It is shutting down speech, and strict scrutiny is
the appropriate standard.  But at a minimum, it should be
evaluated under the intermediate scrutiny standard which was
analyzed by the Supreme Court recently in *Packingham* in the
context of a social media platform.  And the question there is
one of the elements that the government has to meet is whether
the restraints on speech burden substantially more speech than
is necessary to further the government's legitimate interests.

And this just takes us right back to Mr. Hall's point about
the availability of less restrictive alternatives than what the

1    government is doing here in fully banning the app., and I won't

2    belabor those.

3        So this burdens a huge amount of speech, and it is simply

4    not necessary.  So from our perspective, that is the reason why

5    the restraint here doesn't satisfy intermediate scrutiny.

6            THE COURT:  Thank you.

7            MR. BERENGAUT:  And then just briefly on the Fifth

8    Amendment, Your Honor, the government disputes that we have

9    cognizable liberty or property interests to which the due

10   process clause applies, but we clearly have a right not to be

11   shut out of a business that our clients have developed, and

12   that's the clear --

13           THE COURT:  I wouldn't worry too much about that

14   argument.  I do think the -- the more relevant question is what

15   process is really due in this context and has there been enough.

16           MR. BERENGAUT:  Yes, Your Honor.

17       In the context of IEEPA in the *Holy Land* case, the D.C.

18   Circuit recognized that when you are dealing with parties being

19   targeted in the context of IEEPA, they need to have the

20   opportunity to present evidence to rebut the administrative

21   record or otherwise negate the premise of their being targeted.

22       The government resists that *Holy Land* sets out the test

23   here.  Their view is that we are in a broad policymaking context

24   where the bimetallic line of cases should apply, but those cases

25   are really about truly legislative agency action where you're

addressing entire classes of affected persons, not where you're

picking out and targeting a specific company for a depravation.

And that's obviously what's happened to us and why we believe we

should be entitled to the process that's typically mandated in

the context of IEEPA.

So then the question is whether we received the process

that the due process clause directs, whether before or after the

EO, and the answer to that is clearly no.  After the executive

order, our clients received no notice or opportunity to be heard

about the concerns that were apparently animating the Commerce

memo.  Instead, they just received an administrative subpoena,

but no explanation or opportunity to rebut.

And the CFIUS process, which was playing along but going

along a separate track, is no substitute to the process that we

are owed under IEEPA.  That process had its own issues.

But more importantly for these purposes, the authorities

are different, and the remedy is different.  The most that CFIUS

can result in is a divestment order, but here, we are dealing

with an outright ban, which is a much more profound depravation,

and we simply received no process as to that.

THE COURT:  Thank you.

I would like to turn, Mr. Schwei, to you to hear from the

government, obviously.  As I indicated earlier, I would like to

focus entirely or principally at least on likelihood of success

questions.  You've heard and you have seen plaintiffs'

1    arguments.  Clearly, if there is something you would like to

2    address on the harm questions, you should, but if we could start

3    first with the government's arguments about why plaintiffs do

4    not have a likelihood of success on any of their claims.  I'm

5    happy to have you take their arguments in any order you would

6    prefer.

7              MR. SCHWEI:  Thank you, Your Honor.  This is

8    Mr. Schwei.

9         So I will just go ahead and start directly with the

10   Administrative Procedure Act arbitrary and capricious claims.

11   And the first problem with those claims is something the

12   plaintiffs did not address today and did not meaningfully

13   address in their reply, which is that the arbitrary and

14   capricious claims themselves are not reviewable.

15        And I think essentially what the plaintiffs are asking this

16   Court to do is evaluate the executive national security

17   determination and decisions about what transactions need to be

18   prohibited in order to mitigate the national security threat.

19   And binding D.C. Circuit precedent compels that these claims are

20   unreviewable.

21        The first case is the *People's Mojahedin Organization of

22   Iran v. Department of State* decision that was cited in our

23   briefs, and there, the D.C. Circuit held that the question

24   whether activity constitutes terrorist activity that threatens

25   the security of the United States is a nonjusticiable question,

and I would add that plaintiffs' own cited authority likewise
holds that these types of determinations are nonjusticiable, and
that's the *Ralls Corporation* decision from the D.C. Circuit that
at page 314 of that decision the D.C. Circuit again reiterates
that determinations about whether certain actions constitute
threats to the national security and what transactions need to
be mitigated in order to address that threat, those
determinations under the *People's Mojahedin* decision are not
reviewable.

And I think plaintiffs' only response on the reviewability
point is to point to other types of IEEPA decisions like the
*Holy Land* case, but that is a fundamentally different
circumstance where the executive order at issue sets out clear
standards about who the agency should exercise IEEPA authority
against, and then courts are able to review sort of a narrow
factual question about whether the entity fits within that
standard.

And so for example, in *Holy Land*, the question was simply
whether that particular foundation acted for or on behalf of
Hamas.  That is a fundamentally different type of determination
than what the plaintiffs here are asking this Court to do, which
is to evaluate national security determinations and what
transactions are necessary to mitigate the threats identified by
the president and the secretary of Commerce.

Even if the Court were to conclude that the APA claims here

1    are reviewable --

2            THE COURT:  Mr. Schwei, can I interrupt you for one

3    second, because I think you're going to get to the heart of the

4    substance of whether the decision is arbitrary and capricious,

5    but I just want to understand one think about reviewability.

6        I understand that your view is that plaintiffs' APA claim

7    is not reviewable or that there -- cannot review whether the

8    decisions here were arbitrary and capricious.

9        Do you agree, however -- and I know this is getting to the

10   next argument you are likely to address -- that I can decide or

11   it is reviewable whether at least some, maybe all of the actions

12   here are consistent with IEEPA's, I'll call it, carve-out,

13   whether IEEPA in effect forecloses the steps that were taken

14   here?  Is that a reviewable question, in your view?

15           MR. SCHWEI:  I think to the extent plaintiffs are

16   claiming that the agency acted outside of its statutory

17   authority by acting contrary to the permissions in 1702(b), I

18   think that is probably reviewable.  Obviously, we are litigating

19   on a compressed time frame, and so I would like to reserve the

20   right to sort of -- if we come to a different conclusion later,

21   to revisit that issue.  But as of today, we think claims about

22   statutory authority are fundamentally different than arbitrary

23   and capricious type of claims asking the Court to evaluate the

24   agency's exercise of discretion, and at a minimum, those

25   arbitrary and capricious claims are nonreviewable.

1          THE COURT:  Fair enough.  And I note the marker you

2     laid down about not waiving a contrary argument.

3          So I interrupted you on the arbitrary and capricious.  I

4     think you were about to argue why -- assuming hypothetically

5     from your perspective plaintiffs have a reviewable arbitrary and

6     capricious claim, why the government's actions here were not

7     arbitrary and capricious.

8          MR. SCHWEI:  Yes, Your Honor.  Specifically with

9     respect to transaction 1, the prohibitions in paragraph 1, I

10     think Your Honor correctly noted in the colloquy with my

11     colleague that the concern here is about data security risks and

12     leaving data vulnerable to access by the Chinese government.

13     And so I think the secretary in the decision memo made clear

14     that this is the most immediate national security threat.  It is

15     a threat today.  It's a risk today.  And therefore, it deserve

16     to be addressed today, even while other things are ongoing and

17     playing out.

18          And I think it is completely rational for the secretary of

19     Commerce to say, regardless of whatever happens we need to

20     mitigate the most immediate danger that we are facing today.

21     And the only argument that the plaintiffs really make in

22     response is by trying to focus on the fact that existing users

23     are not able to receive application updates as a result of the

24     prohibition 1 transaction.

25          But I would say a couple of things about that.  Number 1 is

1   that this concern is purely hypothetical.  Unless TikTok is

2   saying that there is currently a security flaw in the app. that

3   they would like to fix between now and November 12th, this

4   concern is purely hypothetical, and I don't think the secretary

5   was required to give great weight to it.

6       And number 2 is just as a technological matter, what the

7   secretary did is ordered that the app. be removed from app.

8   stores, which had technological consequence of both preventing

9   new users from downloading the app. but also necessarily means

10  that existing users cannot receive automatic updates of the app.

11  And that's born out by page 23 of the secretary's decision memo

12  where the discussion of paragraph 1 makes it implicit that by

13  removing it from the app. store, it has both of these

14  consequences.

15      And so I think the secretary is entitled as you laid out to

16  address the most important immediate threat to national

17  security, which is new users continuing to sign up and making

18  their data vulnerable to access by the Chinese government, even

19  if it has the consequence of preventing automatic updates going

20  to existing users as a result of the action necessary to address

21  the emergency for future users.

22      And the only other argument that plaintiffs make on

23  arbitrary and capricious is their continued focus on whether the

24  secretary should have ordered or relied on the CFIUS process

25  instead.  I guess as an initial matter, plaintiffs here are not

1    challenging an agency action under CFIUS regulatory authority.

2    So I am not sure why the secretary is required to consider those

3    actions when exercising his authority under an entirely

4    different regulatory scheme.

5         But even setting that aside, plaintiffs here are

6    challenging and saying they don't agree with the CFIUS process

7    itself or the divestiture order.  So I don't think they can have

8    it both ways by saying those are better alternatives but, by the

9    way, those alternatives are also wrong.

10        And in any event, the secretary's decision memo makes clear

11   that the secretary did consider those alternatives.  And under

12   the APA, agency actions are arbitrary and capricious when they

13   fail to consider something or inadequately rejected, but here,

14   the secretary acknowledged this separate parallel process is

15   ongoing and said, I'm going to allow that process to play out,

16   but I am also going to mitigate the most immediate threat to

17   national security by preventing new users from signing up as of

18   11:59 on September 27th.  And I think that's perfectly rational.

19        Unless Your Honor has any further questions about the APA

20   claims, I will turn to the statutory IEEPA claims.

21             THE COURT:  No, please do.  On IEEPA, in particular

22   subsection (b), does the government agree that when users are, I

23   will put it this way, communicating on TikTok by disseminating

24   videos or news or other content, that those communications are

25   or at least sometimes are personal communications on the one

1   hand and on the other potentially the importation or exportation

2   of information or informational materials?  Does the government

3   concede that, and so the only question under IEEPA is whether

4   the order and prohibition -- prohibitions constitute the direct

5   or indirect regulation of those things?

6           MR. SCHWEI:  So with respect to personal

7   communication, I think we would agree that there are some

8   circumstances in which communications occurring on the platform

9   are personal in nature, but that doesn't necessarily bring them

10  within the meaning of the statute, because the statute also

11  requires that there be no exchange of anything of value.  And so

12  I don't think we would agree that communications occurring on

13  the platform sort of meet the overall standard set forth in that

14  (b)(1).

15          THE COURT:  Doesn't that require that every personal

16  communication on TikTok involve a transfer of anything of value,

17  and is it the government's position that every personal

18  communication that occurs on TikTok necessarily involves a

19  transfer of anything of value?  And so why --

20          MR. SCHWEI:  Yes, because pursuant to TikTok's terms

21  of service, every time a user creates an account or signs in or

22  takes an activity on TikTok, that is communicating -- that is

23  giving information of value to TikTok itself, and particularly

24  with respect to content, it's granting TikTok an irrevocable

25  license to use that content for TikTok's purposes however it

1     wants.

2         And so every interaction that occurs on the platform under

3     the binding contractual agreement that TikTok says exists

4     between them and their users, every interaction necessarily

5     involves exchange of information of value between users and

6     TikTok.

7         THE COURT:  And what about information or

8     informational materials?  There is no limitation there that it

9     not involve the transfer of anything of value.  Do you agree

10    that at least certain things that are exchanged on TikTok

11    constitute information or informational materials?

12        MR. SCHWEI:  Again, I think there is some information

13    exchanged on TikTok, but it's not necessarily within the

14    statutory meaning of those terms due to separate carve-outs and

15    separate historical interpretations of those terms, for example

16    the requirement under the OFAC regulation the plaintiffs

17    themselves rely on requiring that the works be fully created and

18    in existence prior to any transaction and also the separate

19    statutory carve-out at the end regarding Chapter 37 of Title 18,

20    which I am happy to address separately or later in the argument.

21    But I think we agree there is some information exchanged, but we

22    don't necessarily agree that it meets the statutory standard

23    within subsection (b)(3).

24        THE COURT:  Fair enough.  Let's assume -- I understand

25    your arguments.  Let's assume that there are at least some

1    personal communications that don't involve transfer of anything

2    of value and that there is some importation or exportation of

3    information or information materials.  Assume that.  I

4    understand you do not agree with that.

5        But if that's the case, that at least some of the things

6    that TikTok users post are such personal communications as

7    contemplated by the statute or information or informational

8    materials as contemplated by the statute, why isn't a ban on

9    TikTok's operation in the United States or even just a

10   limitation tonight on the offering of the app. on the app. store

11   and, therefore, the consequence of that being that no new users

12   could exchange such materials, why aren't the government's

13   actions, at a minimum, indirect regulation or regulations of

14   those things?

15           MR. SCHWEI:  Your Honor, let me start by referring the

16   Court to a decision from the D.C. Circuit that was admittedly

17   not cited in the parties' briefs.  We did not find this decision

18   until last night in the course of preparing for argument.  And

19   upon finding it, I provided the citation to my friends on the

20   other side in advance of today's hearing so that they would be

21   aware of it as well.

22       But the citation is *Walsh* v. *Brady*, 927 F.2d 1229.  It's a

23   D.C. Circuit decision from 1991.  And at pages 1232 and 1233,

24   the D.C. Circuit interprets the "directly or indirectly"

25   language with respect to a companion provision of the Trading

with the Enemy Act, which as our brief explains is closely

related to IEEPA, but that act contains a very similar provision

to what exists in 1702(b)(3) with respect to information and

informational materials.

And so just to walk through what that decision is about --

THE COURT:  I'm familiar with Judge Williams's opinion

and that decision.  But that was an interpretation of a

different -- an earlier version of this statute in a different

context, and I think, though tell me if I'm wrong, that there

were -- a fair amount of the discussion was whether and to what

extent to defer to OFAC under Chevron.  Some of those things

seem relevant to me, including that that was a different --

somewhat different statute and that the Chevron posture may be

different here.

So I don't want to cut off your argument at all, but I do

want you to know that I am familiar with the opinion.

MR. SCHWEI:  Thank you.  So I think it is true that it

was a prior version of that language, but I don't think the

prior version differed in any material way.  As I understand it,

the enactment that occurred after that decision was issued

changing the language really only had to do with clarifying the

"tangible and intangible" language of the statute but didn't

intend to expand the scope of the statute or contradict the

interpretation of the "directly or indirectly" language that the

D.C. Circuit adopted in that decision.  And I think that's what

1    we believe is particularly relevant.

2        And even setting aside sort of complicated questions about

3    deference and whether the Secretary of Commerce's interpretation

4    would be entitled to deference and setting all of that aside for

5    the moment, I think the D.C. Circuit's decision stands for the

6    proposition that as a matter of plain language and statutory

7    history and sort of Chevron step 1 principles, that although the

8    statute says "directly or indirectly," that does not mean that

9    any regulation that significantly burdens the importation of

10    these materials violates the statute.  And so I think that

11    holding is equally applicable here.

12        And just to sort of talk through why that is and what that

13    actually means here, I think it's fundamentally different to,

14    for example with informational material, regulate or block the

15    importation of the underlying information itself versus to

16    regulate the medium of transmission of the information.  And in

17    fact, 1702(b)(3), the plain language uses those terms,

18    distinguishing between the medium of transmission and the

19    underlying information or informational material.

20        And so, you know, to take an example, the plaintiffs

21    mention the example of a film.  If the president pursuant to

22    IEEPA banned all importation of a particular film, that might be

23    regulation of informational material, but if pursuant to IEEPA

24    the president said there is a particular movie-streaming service

25    that has close ties to the government of China and collects a

1      lot of information about users when it streams movies to those

2      U.S. users and that presents national security risks and so I'm

3      going to regulate the streaming service itself but not any of

4      the underlying film, I think that's exactly analogous here where

5      the action is about the medium of transmission, not the

6      materials themselves.

7          And any contrary interpretation like the one plaintiffs

8      propose would have extraordinary scope, which again is something

9      that the *Walsh* decision focused on.  For example, if the Court

10     were to interpret the personal communication statutory language

11     as broadly as plaintiffs suggest, then the president could not

12     use IEEPA to prohibit travel to Cuba, because that would

13     indirectly infringe on personal communications involving

14     individuals who want to personally communicate in Cuba.  But of

15     course, the Supreme Court upheld exactly that restriction in

16     *Regan v. Wald*.

17         The idea that these statutory terms could be interpreted so

18     broadly as to prevent the president from regulating the means of

19     transmission is also inconsistent with the broader statutory

20     structure in 50 U.S.C. 1708, which specifically focuses on the

21     ability to prohibit transactions for those who engage in

22     economic or industrial espionage in cyberspace.

23         And so I think the overall statutory structure makes clear

24     that Congress is distinguishing between the means of

25     transmission versus the underlying materials themselves.

1          THE COURT:  Thank you.  What about the First Amendment

2    argument, Mr. Schwei?

3          MR. SCHWEI:  So our first argument is that the

4    plaintiffs do not have -- their First Amendment rights are not

5    implicated in the same way that users' rights are not

6    implicated, because what the Commerce prohibitions do is

7    regulate business-to-business economic transactions based on

8    national security reasons, which is the exact same as what the

9    Supreme Court said in *Arcara* and in *Virginia v. Hicks* about how,

10   for example *Virginia v. Hicks*, a trespass statute can validly be

11   applied even when someone wants to trespass on property to

12   engage in First Amendment activity, because neither the basis

13   for the application of the trespass statute nor its purpose has

14   anything to do with the First Amendment protected activity.

15         And that's exactly the same here with respect to TikTok

16   where it's completely irrelevant to the analysis the fact that

17   this particular application involves what plaintiffs say is

18   expressive activity.  It's -- the national security basis and

19   justification would exist and be the exact same if this

20   application were simply a calculator application that had no

21   expressive activity at all but still collected massive amounts

22   of user information about U.S. individuals and makes that data

23   vulnerable to access by the Chinese government.

24         It's just a contingent fact that happens to be the case

25   here that this particular application involves videos.  But

that's irrelevant to the national security basis for the restrictions.  And so the First Amendment expressive activity doesn't bring the government restrictions within the realm of challenge, just the same way that the booksellers' First Amendment activity in *Arcara* did not give them the ability to challenge the public nuisance law that was the basis for shutting them down.

And I think plaintiffs try to say, well, it's different here because we are being directly targeted, but the -- I think the Court has to look at the general theme and prohibition as a general matter and not look to the individual application.  I'm sure the booksellers in *Arcara* felt like they were being individually targeted as well, but here, the overall scheme is about regulating national security risks.  Specifically with respect to this determination of emergency, it's about preventing foreign influence in the technological and communications sector, and the fact that TikTok is one application in which those risks exist doesn't make it targeted by the overall scheme.

And that's also clear from *Arcara* where the example they give is a tax that existed with respect to bulk collection or bulk purchase of ink which was meant specifically to target newspapers.  Here, the overall IEEPA scheme and the president's overall executive order are not meant to target any one particular company, even though obviously it gets applied

1   against particular companies.

2       And so setting aside the no First Amendment interests

3   implicated at the outset, even if the Court applies some

4   standard of First Amendment scrutiny, I think it is clear that

5   the September 27th restrictions are not prior restraint.  They

6   don't restrain the company from speaking at all.  It only

7   potentially restricts future users from downloading the

8   applications.  But of course, those future users are not

9   presently here before the Court.  The Court only had the company

10  itself, and under intermediate scrutiny, I think the plaintiffs'

11  only argument is that this is not narrowly tailored because the

12  government should have adopted other alternatives.

13      But respectfully, I think that gets intermediate scrutiny

14  analysis wrong, and specifically, the Supreme Court's decision

15  in *United States v. Albertini* at specifically 472 U.S. at 689,

16  the Supreme Court made clear that the presence of other

17  alternatives that hypothetically might burden speech less does

18  not mean that the challenged regulation is invalid under the

19  First Amendment.  And I think that essentially forecloses the

20  plaintiffs' only arguments against intermediate scrutiny.

21          THE COURT:  So let's turn to due process, and I don't

22  want you to try and convince me why there is no interest

23  protected by the clause here, but I think I would rather focus

24  on why the process that plaintiffs received here was sufficient,

25  because it seems to me, at least based on the facts before me,

1 that this was largely a unilateral decision with very little

2 opportunity for plaintiffs to be heard, and the result, whether

3 we're talking about November or tonight, is a fairly significant

4 depravation.  But feel free to argue why there is no interest

5 here and probably more important to me at least to tell me why

6 the process that did occur here was constitutionally sufficient.

7    MR. SCHWEI:  Certainly, Your Honor.  And I will not

8 dwell on the first part of the analysis, but I would refer Your

9 Honor to the D.C. Circuit's decision in *Crooks v. Mabus* at 845

10 F.3d 412 where -- the plaintiff here has claimed a liberty

11 interest in their right to their chosen line of business.  The

12 D.C. Circuit in that decision said, you know, essentially for

13 that interest to be implicated, you have to be deprived of your

14 entire profession.  It's not enough to just lose a particular

15 job or have a small depravation.  You have to be essentially

16 foreclosed from your profession.

17   And I don't think the plaintiffs here with respect to the

18 paragraph 1 prohibition can establish that the inability to have

19 future users download the app. is going to basically destroy

20 their profession.

21   So just setting that part of the analysis aside, even if

22 the Court were to disagree and evaluate whether sufficient

23 process here has been provided, I think it has.  The executive

24 order was issued in early August.  The plaintiffs were given

25 notice of the president's findings at that time.  They also, as

1    they say in their own filings, have been engaged for the better

2    part of a year with the government on these issues.   If

3    plaintiffs think that the CFIUS process is relevant to their

4    other claims, then surely it should be relevant to the due

5    process analysis as well.

6        And even setting aside the CFIUS process, plaintiffs today

7    admit that they received an administrative subpoena and have the

8    opportunity to submit factual information with respect to the

9    issues here.  And so I think they have received a significant

10   amount of notice and more than is frequently received even in

11   those narrow types of IEEPA cases like I was alluding to

12   previously.

13       For example, the district court in the *Holy Land Foundation*

14   case held that predepravation notice was not required.  And

15   here, the plaintiffs have received notice about the factual

16   findings of the president.  They've now received the secretary's

17   decision memo which sets forth his factual basis, and I think

18   they have received a significant amount of information that

19   would itself satisfy due process, even setting aside the fact

20   that what the secretary of Commerce did here is exercise broad

21   policy judgment about how to address the national security risks

22   identified by the president, which again is different than the

23   type of narrower IEEPA cases that the D.C. Circuit frequently

24   sees.

25       And so when the secretary of Commerce is exercising this

1    broad policy judgment, the Supreme Court has held, going back to

2    bimetallic, that members of the public are not entitled to

3    additional process to participate in that policymaking exercise.

4         And so we think the claim fails for legal reasons, as well

5    as factual reasons.

6         THE COURT:  Thank you.  I've asked you to focus on

7    likelihood of success questions.  Do you want a minute or two to

8    address the other factors?

9         MR. SCHWEI:  You Honor, we briefed them aptly.  All I

10   would say here is plaintiffs here, their claims are necessarily

11   challenging a formal national security determination by the

12   president, as well as the judgment of the secretary of Commerce

13   about what is necessary to mitigate those national security

14   harms.  And I think the Court owes significant deference to

15   that.

16        And even if plaintiffs had established a likelihood of

17   success or some modicum of irreparable harm, the strong public

18   interests and weight owed to these formal national security

19   determinations is an independent reason that forecloses

20   plaintiffs' relief.

21        THE COURT:  Thank you.

22        Mr. Hall and Mr. Berengaut, I am happy to hear from either

23   of you in rebuttal.  I think it would be helpful to hear from

24   Mr. Berengaut on *Walsh*, but Mr. Hall, I am happy to have you

25   take the issues, frankly any issues you would like in whichever

1    order you would prefer.

2         MR. HALL:  Very briefly, Your Honor, on the issue of

3    reviewability of IEEPA decisions under the APA.  The law is

4    clear there is a strong presumption of reviewability under the

5    APA.  IEEPA certainly has prohibited it.  Indeed, the statute

6    itself in 1702(c) speaks specifically to judicial review.  The

7    D.C. Circuit reviewed actions of Treasury under IEEPA in

8    *Holy Land*.  It's not meaningfully different from this situation.

9        And finally, even the government said in an action

10   involving this very same type of executive order, in the WeChat

11   executive order, that the right way to challenge that, when an

12   action was brought ahead of the issuance of the Commerce

13   regulations, was to wait until Commerce issues its regulations

14   and then bring any viable claims under the APA.  So we agree

15   with what the government said in the WeChat case, not what

16   they're saying here.

17       Second point, on the argument that this app. store ban is

18   rational because the marginal hypothetical risk of data from new

19   users being shared with the Chinese would, according to the

20   government's argument, be rational even if it actually puts at

21   risk the data of 100 million current users to, you know,

22   nefarious parties all around the world.  I just respectfully

23   submit that lopsided analysis can't be rational.

24       And if that's what they think, that at least they have the

25   obligation to explain it, to lay it out in a reasoned way.  And

obviously, this regulation, this prohibition doesn't do that.
It doesn't provide a reasoned explanation for that, and for that
reason, it's arbitrary and capricious.

Final point just on this CFIUS argument, Your Honor, I just
want to be clear, the issue here today is not whether the
exercise of CFIUS authority and that order that was issued that
calls for the divestment is lawful or not.  That's not before
this Court.  It's whether the prohibitions implementing the
August 6 IEEPA order of the president are lawful.

And as we look at that question under standard APA review,
one separate question is whether the agency considered relevant
alternatives.  There is just no question about that.  The law
requires that.

And here, there is a clear alternative.  It does address
the government's concerns without needing to ban the company,
and that's the CFIUS process.  And that's our argument.  That's
what makes it arbitrary and capricious.

I would just say finally, Your Honor, on the -- I won't
also belabor the irreparable harm or the balance of equities.  I
spoke to some of that in my -- when I talked about the
overarching themes in this case, but the harms to this business
from this app. store ban tonight are unquestionably significant
and irreparable.  They are supported in detail by the
declaration of the head of the business, Vanessa Pappas.  This
app. has grown incredibly.  It's one of the fastest-growing

apps. in the world.  In two years, a sixfold increase in its
user base.  And as Ms. Pappas attests, those new users are truly
the life blood of this business, and that's true for any social
media platform.  To remain competitive, you have to grow.

And notwithstanding this app.'s superior technology and
innovation, if it disappears from the app. stores as the
government wants to do tonight, the effect will be devastating
with respect to the business, with respect to users, content
creators, damaging the company's reputation and goodwill with
advertisers and commercial partners, its ability to retract
and -- attract and retain talent.  I just don't think there's
any question, and indeed that's the reason, I believe, that the
Court granted this hearing today on a Sunday, recognizing the
serious impact and irreparable harm that would be occasioned by
that app. store ban going into effect tonight at midnight.

On the balance of equities, I will just say, this is --
we're talking about 100 million users of this app.  We're
talking about over 400,000 who would join it every day.  As I
say, if that goes into effect tonight, their right of
communication and association with millions of other Americans
is being destroyed.

I don't think there is any question that the balance of
equities here favors our position, especially when you consider
the timing.  There's simply no urgency here, Your Honor.  This
executive order was issued on August the 6th.  The Commerce

1    Department did not issue its list of prohibited transactions for

2    43 days after that.  It then set the effective date for the full

3    set of prohibitions for another 53 days after that, to

4    November 12th.  And even this app. store ban has already been

5    extended for one week.  And the only thing we are talking about

6    today, and this is what we are urging you to do, is to enjoin,

7    to extend this app. store ban effectively for another couple

8    weeks so that this entire challenge can be heard carefully and

9    on a full record.

10        We would, from my part, urge you to find that we have met

11   our burden to prevail on likelihood of success on the APA claim

12   and enter the request for injunction.

13        I will turn it over to Mr. Berengaut.

14        THE COURT:  Mr. Berengaut, I obviously mentioned to

15   Mr. Hall that I would like any thoughts you have on *Walsh*, which

16   you didn't have, I don't think, the opportunity to brief.  So

17   this may be a little bit on the fly.

18        But why is the government wrong to argue that that case

19   seems to stand for the proposition that the -- when Congress is

20   talking about regulation, it's talking about something that

21   seems to be more directed at either the communication or the

22   information than a regulation of something like the entity or

23   the platform or, frankly, the medium of communication?

24        MR. BERENGAUT:  Yes, Your Honor.

25        Let me come at *Walsh* by way of the hypothetical the

government gave about the fact that a rule barring the actual
import or export of film reels would fall within (b)(3).  Well,
that would be an example of a direct prohibition on the importer
and exporter of film, and it raises the question which the
government has never answered of what would be an indirect
regulation or prohibition.  And as to *Walsh*, *Walsh*, as Your
Honor noted, involved an earlier version of the statute that
predated the 1994 amendments where Congress again rejected a
narrow interpretation of the provision, and the legislative
history expressly notes that the "directly or indirectly"
language was intended to have broad scope.  The case also has
the Chevron overlay, which this case does not.

        But even if you set all that aside and you look at *Walsh*
for what it has to say about direct or indirect, our argument is
that it supports our case.  If you look at what Mr. Walsh was
doing in that case, he said he wanted to go to Cuba because he
wanted to look into the possibility of a business where he could
import some Cuban posters.  He said he wanted to go there, he
wanted to have some meetings, he wanted to make technical,
financial, and transportation arrangements, then maybe enter
into a business contract, and then maybe, if it all works out,
he would then bring some posters back into the United States and
set up that business.

        And the chain of connotation there is pretty attenuated.
Whereas here, we have regulations, prohibitions that are

1    directed at business relationships, not because the government

2    has any interest in those business relationships themselves, but

3    instead for the express purpose of depriving people the ability

4    to exchange personal communications and informational materials

5    on this platform.  So it's an entirely different scenario than

6    what was going on in *Walsh*.

7        And that's clear not just from the facts of that case, but

8    also *Walsh* similarly had both the statutory and the First

9    Amendment components to it.  And they play into each other.  And

10   in the First Amendment discussion, the Court noted that there

11   was no showing that the ban on Mr. *Walsh*'s travel had a material

12   burden on people being able to get posters if they wanted them.

13       And the same could just not be said here.  The purpose of

14   these regulations, of these prohibitions, as I mentioned with

15   respect to the First Amendment argument, is a desire to

16   expressly target the expressive conduct, the communitive conduct

17   that is the core protected speech that the First Amendment is

18   intended to safeguard.

19       And this is no mere incidental burden on those rights.

20   Those rights are what are being targeted here.

21          THE COURT:  Okay.  Thank you.  Any additional points

22   you would like to make on the constitutional questions?

23          MR. BERENGAUT:  Just very briefly on due process, Your

24   Honor.  What I heard from the government is we got to see the

25   executive order when it came out, we got our -- whatever process

1    we received in the CFIUS process, we had the opportunity to

2    respond to the subpoena, and then we got to see the decision

3    memo in this lawsuit when the government filed a response.

4         But even taking all of those as granted, that doesn't

5    satisfy the *Holy Land* standard.  We never have received an

6    opportunity to respond to the concerns, and that's really the

7    crux of the due process prong.

8         Thank you.

9         THE COURT:  Thank you.  Thank you, Counsel, for the

10   excellent briefs and the argument this morning.  I know it's a

11   Sunday.

12        I am going to take this matter under advisement.  My intent

13   is to issue an opinion and order some time later today but

14   before 11:59 p.m. when paragraph 1 of the secretary's list takes

15   effect.

16        Because of the sealed material in this case, my plan is to

17   do something along the lines of the following, which is to enter

18   a public order that would just contain essentially the bottom

19   line, either the granting of relief or the denial of relief, to

20   issue the opinion under seal to the parties, and to direct the

21   parties to review hopefully fairly quickly and by some time

22   tomorrow that opinion to let us know whether there is anything

23   that needs to be redacted.

24        I believe that we will likely have an opinion that does not

25   contain any sealed materials, but I want to be sure about that,

1    and I think the better course is to have the parties review the

2    opinion after it is issued to the parties to ensure that.

3         So I think that's pretty clear, and that will all be in

4    orders that we issue.  So again, a public order some time before

5    11:59 p.m. tonight containing just the bottom line on whether

6    I'm granting relief or not.  That's the first thing.  The second

7    thing is a sealed opinion that will go to the parties, and then

8    three, I think it will be a separate order just sealing the

9    opinion for some limited period of time and requiring the

10   parties to inform the Court by a deadline tomorrow about whether

11   there are any materials in the opinion that would have to be

12   treated as sealed and redacted before publication on the public

13   record.

14        Any questions about how I at least intend to proceed?

15        MR. HALL:  John Hall.  Thank you, Your Honor.  We

16   appreciate again very much your attention to this, including on

17   a Sunday.

18        THE COURT:  Of course.

19   Mr. Schwei, anything on how I at least intend to proceed

20   that you want to ask about or are unclear about?

21        MR. SCHWEI:  Your Honor, I would note that in my

22   experience, any opinion entered under seal on ECF is unavailable

23   to the parties, and therefore, some alternate means of

24   transmission to the parties is required in order for them to

25   have access to it.

1        No objection to the Court's proposal for how to proceed.  I

2   just want to ensure that we do, in fact, receive the opinion in

3   order to comply with the Court's separate order about timing.

4        THE COURT:  That is a good reminder, and we will very

5   likely have Ms. Lesley e-mail the opinion out in parallel with

6   it being posted as a sealed opinion.  So thank you for that.

7        MR. SCHWEI:  Thank you.

8        THE COURT:  Anything else from counsel this morning?

9   Again, thank you for the excellent briefs and strong

10  advocacy this morning, and assuming no further issues to

11  address, we will get those orders and opinion out today.

12       MR. HALL:  Thank you, Your Honor.

13       MR. SCHWEI:  Thank you, Your Honor.

14       MR. BERENGAUT:  Thank you, Your Honor.

15       (Proceedings adjourned at 11:04 a.m.)

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3         I, Sara A. Wick, certify that the foregoing is a

 4    correct transcript from the record of proceedings in the

 5    above-entitled matter.

 6

 7         Please Note:  This hearing occurred during the

 8    COVID-19 pandemic and is, therefore, subject to the

 9    technological limitations of court reporting remotely.

10

11

12    /s/ Sara A. Wick                September 28, 2020

13    SIGNATURE OF COURT REPORTER          DATE

14

15

16

17

18

19

20

21

22

23

24

25
```