# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIKTOK INC., et al.,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

        *Defendants*.

Case No. 20-cv-02658 (CJN)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
RENEWED MOTION FOR PRELIMINARY INJUNCTION
AGAINST COMMERCE DEPARTMENT PROHIBITIONS 2-5**

**Table of Contents**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

      A.     TikTok Is a Massively Popular Forum for Creative Expression and
           Political Speech, Akin to a Virtual Town Square for More Than 100
           Million Americans. ............................................................................................... 2

      B.     TikTok Has Safeguards to Protect the Security of U.S. User Data. ...................... 3

      C.     TikTok Has Effective and Fair Content Moderation Policies and Practices. ......... 4

      D.     For Almost a Year Before the Ban, TikTok Provided Information to
           CFIUS and Made Extensive Efforts to Fully Address Any National
           Security Concerns. ................................................................................................ 5

      E.     The Administration's Political Focus Moved to China and TikTok...................... 6

      F.     President Trump Issued His August 6 Order Premised on a Purported
           National Security Need to Ban TikTok, but Subsequent Administration
           Actions Immediately Undercut That Justification. ............................................... 6

      G.     The Commerce Department Issued Prohibitions That Will Ban TikTok in
           the United States. .................................................................................................. 8

      H.     Plaintiffs Filed this Action and the Court Preliminarily Enjoined the First
           Prohibition............................................................................................................ 10

      I.     The Government Provided An Administrative Record That Relies on
           Inaccurate, Outdated, And Irrelevant Materials, And Includes
           Recommendations for Restrictions Far Short of a Ban. ....................................... 10

      J.     The Remaining Prohibitions Will Cause Plaintiffs Irreparable Harm. ................. 12

ARGUMENT ........................................................................................................................ 13

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the
      Remaining Prohibitions Are Unlawful and Unconstitutional.......................................... 13

      A.     The Remaining Prohibitions Violate IEEPA Because They Regulate and
           Prohibit  "Personal Communication" and "Informational Materials,"
           Thereby Exceeding Express Limitations Imposed by Congress........................... 13

           1.     IEEPA Forbids Government Regulation of "Personal
                 Communication" or "Informational Materials" ..................................... 14

           2.     The Remaining Prohibitions Unlawfully Regulate Personal
                 Communication........................................................................................ 15

           3.     The Remaining Prohibitions Unlawfully Regulate Informational
                 Materials. ................................................................................................. 17

B. The Remaining Prohibitions Are Arbitrary and Capricious in Violation of the APA Because the Agency Provided an Inadequate Explanation Based on Inaccurate, Outdated, and Irrelevant Materials, Failed to Consider Reasonable Alternatives, and Offered a Pretextual Justification for Its Action. ............................................................................................... 21

1. The Remaining Prohibitions are Reviewable Under the APA ................. 21

2. The Commerce Department Provided an Inadequate Explanation That Is Not Supported by the Record, And Which Relies on Inaccurate, Outdated, and Irrelevant Materials. ....................................... 23

3. The Agency Failed to Consider or Explain Why Reasonable Alternatives That Are Set Forth in the AR Itself Were Not Adequate. .................................................................................................. 28

4. The Commerce Department's Stated Justification for the Prohibitions Is Pretextual. ........................................................................ 30

C. The Remaining Prohibitions Violate Plaintiffs' Constitutional Rights. ............... 33

1. The Remaining Prohibitions Infringe on Plaintiffs' First Amendment Right to Speech. .................................................................. 33

2. The Remaining Prohibitions Violate Plaintiffs' Due Process Rights. ..................................................................................................... 38

D. The Remaining Prohibitions Violate IEEPA in Other Respects. .......................... 41

II. All of the Other Elements Required for Injunctive Relief Are Easily Established. ......... 42

A. The Remaining Prohibitions Are Inflicting, and Will Continue to Inflict, Irreparable Harm. .................................................................................................. 42

B. The Balance of Equities and Public Interest Require Injunctive Relief. .............. 44

CONCLUSION ...................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)..................................................................................................22

*\*Al Haramain Islamic Found., Inc. v. Dep't of Treasury*,
686 F.3d 965 (9th Cir. 2012) ....................................................................................39

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000).....................................................................................28

*Bayer HealthCare, LLC v. FDA*,
942 F. Supp. 2d 17 (D.D.C. 2013).............................................................................43

*Billups v. Charleston*,
961 F.3d 673 (4th Cir. 2020) .....................................................................................35

*Boswell v. Heckler*,
749 F.2d 788 (D.C. Cir. 1984)...................................................................................30

*Brodie v. HHS*,
715 F. Supp. 2d 74 (D.D.C. 2010).............................................................................44

*CAIR v. DOJ*,
264 F. Supp. 2d 14 (D.D.C. 2003).............................................................................23

*Cernuda v. Heavey*,
720 F. Supp. 1544 (S.D. Fla. 1989) ..........................................................................14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)...................................................................................................22

*Clark Cty. v. FAA*,
522 F.3d 437 (D.C. Cir. 2008)...................................................................................23

*Corp. of Presiding Bishop of Church of Jesus Christ
of Latter-Day Saints v. Hodel*,
637 F. Supp. 1398 (D.D.C. 1986)..............................................................................32

*DeJonge v. Oregon*,
299 U.S. 353 (1937)...................................................................................................38

*\*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019)....................................................................................23, 30, 33

*Edwards v. District of Columbia,*
    755 F.3d 996 (D.C. Cir. 2014) ...........................................................................38

*Elrod v. Burns,*
    427 U.S. 347 (1976) ..........................................................................................44

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ...........................................................................45

*Grace v. District of Columbia,*
    187 F. Supp. 3d 124 (D.D.C. 2016) ...................................................................44

*Hawaii Housing Auth. v. Midkiff,*
    467 U.S. 229 (1984) ..........................................................................................32

*Healy v. James,*
    408 U.S. 169 (1972) ..........................................................................................35

*\*Holy Land Found. for Relief and Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003) ...........................................................22, 23, 38, 39

*Home Box Office, Inc. v. FCC,*
    567 F.2d 9 (D.C. Cir. 1977) ......................................................................31, 33

*INS v. St. Cyr,*
    533 U.S. 289 (2001) ..........................................................................................42

*Judulang v. Holder,*
    565 U.S. 42 (2011) ............................................................................................23

*\*Kalantari v. NITV, Inc.,*
    352 F.3d 1202 (9th Cir. 2003) .....................................................................14, 15

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ..............................................................................45

*Lovell v. Griffin,*
    303 U.S. 444 (1938) ..........................................................................................35

*Mach Mining, LLC v. EEOC,*
    135 S. Ct. 1645 (2015) ................................................................................21, 22

*\*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ....................................................................................38, 40

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ....................................................................................36, 37

iv

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983).............................................................................23, 30

Nalco Co. v. EPA,
    786 F. Supp. 2d 177 (D.D.C. 2011) .................................................41, 43

Nat'l Cable Tel. Ass'n v. United States,
    415 U.S. 336 (1974).........................................................................42

Nat'l Fed'n of Fed. Emps. v. Weinberger,
    818 F.2d 935 (D.C. Cir. 1987) ..........................................................23

Neb. Press Ass'n v. Stuart,
    427 U.S. 539 (1976).....................................................................35, 36

OKKO Bus. PE v. Lew,
    133 F. Supp. 3d 17 (D.D.C. 2015) ...................................................22

*Packingham v. North Carolina,
    137 S. Ct. 1730 (2017) .......................................................33, 34, 36, 37

Planned Parenthood v. Heckler,
    712 F.2d 650 (D.C. Cir. 1983) ..........................................................13

R.I.L-R v. Johnson,
    80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................45

*Ralls Corp. v. CFIUS,
    758 F.3d 296 (D.C. Cir. 2014)......................................................38, 40

Reeve Aleutian Airways v. United States,
    982 F.2d 594 (D.C. Cir. 1993) ..........................................................38

Se. Promotions, Ltd. v. Conrad,
    420 U.S. 546 (1975).....................................................................34, 35

Thompson v. Cons. Gas Corp.,
    300 U.S. 55 (1937)...........................................................................32

Thompson v. W. States Med. Ctr.,
    535 U.S. 357 (2002)........................................................................37

Trifax Corp. v. District of Columbia,
    314 F.3d 641 (D.C. Cir. 2003) ..........................................................38

U.S. WeChat Users All. v. Trump,
    2020 WL 5592848 (N.D. Cal. Sept. 19, 2020) ................................17, 34

*United States v. Amirnazmi,*
  645 F.3d 564 (3d Cir. 2011)........................................................14, 15

United States v. Menasche,
  348 U.S. 528 (1955)......................................................................19

*United States v. Playboy Entm't Grp.,*
  529 U.S. 803 (2000)......................................................................36

Walsh v. Brady,
  927 F.2d 1229 (D.C. Cir. 1991).....................................................20

Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.,
  139 S. Ct. 361 (2018)....................................................................22

Whitman v. American Trucking Ass'n,
  531 U.S. 457 (2001)......................................................................42

Winter v. NRDC,
  555 U.S. 7 (2008)..........................................................................13

Woods v. Dep't Interior,
  18 F.3d 854 (10th Cir. 1994) .........................................................30

Yakima Valley Cablevision, Inc. v. FCC,
  794 F.2d 737 (D.C. Cir. 1986) .......................................................29

**Statutes**

5 U.S.C. § 701(a)(1).........................................................................22

5 U.S.C. § 706(2)(A).........................................................................21

47 U.S.C. § 214.................................................................................20

50 U.S.C. § 1701(a) ....................................................................41, 42

50 U.S.C. § 1702 ....................................................................... *passim*

50 U.S.C. § 4565 .......................................................................20, 29

Pub. L. No. 100-418 § 2502, 102 Stat. 1107, 1371 (1988)...............14

Pub. L. No. 103-236, § 525 (1994) ...................................................15

**Other Authorities**

31 C.F.R. § 560.................................................................................21

Dep't of Justice Press Release (June 7, 2017), *available at*
    https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-ends-third-
    party-settlement-practice.............................................................................................32

Office of the Attorney General, Prohibition on Settlement Payments to Third
    Parties (June 5, 2017), *available at* https://www.justice.gov/opa/press-
    release/file/971826/download ......................................................................................32

Oxford English Dictionary (Sept. 2003), *available at*
    www.oed.com/view/Entry/255044 .............................................................................18

## INTRODUCTION

This motion seeks to enjoin the government from banning TikTok in the United States as of November 12, 2020—a ban that would eliminate an online communication forum used by 100 million Americans, on which an average of 46 million videos and 80 million private direct messages are shared *every day*.  On September 27, 2020, this Court entered a preliminary injunction against the first of five Prohibitions issued by the Department of Commerce.  That first Prohibition, scheduled to go into effect that night, would have prevented TikTok from being available for download or update on mobile application stores in the United States.  The Court held that Plaintiffs were likely to succeed on their claim that the Prohibition impermissibly regulates "personal communication" and "informational materials" in contravention of the International Emergency Economic Powers Act ("IEEPA").

The remaining four Prohibitions set forth in paragraphs 2-5 of the Commerce Department notice ("Remaining Prohibitions"), which inarguably threaten imminent, irreparable harm by requiring the complete shut-down of the TikTok app in the U.S. on November 12, also violate IEEPA.  Indeed, this Court has already recognized that its ruling that the first Prohibition exceeds the limits of executive authority under IEEPA is "equally as applicable" to the Remaining Prohibitions.  ECF No. 30 at 17.  Those Prohibitions are unlawful for other reasons as well.  They are arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), because the Commerce Department provided an inadequate explanation that relied on inaccurate, outdated, and irrelevant information; failed to explain the rejection of reasonable alternatives; and offered a pretextual justification for the ban.  The Remaining Prohibitions also violate Plaintiffs' constitutional rights by restricting their protected speech in violation of the First Amendment, and depriving them of liberty and property interests without notice and an opportunity to be heard, as

the Fifth Amendment requires.  Finally, the Remaining Prohibitions are unlawful under IEEPA because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat."

Plaintiffs' first preliminary injunction motion advanced these same claims against all the Prohibitions.  Because the Court concluded that Plaintiffs had demonstrated a likelihood of success on the first Prohibition under IEEPA, however, it "[did] not analyze Plaintiffs' other statutory and constitutional claims to decide whether Plaintiffs are entitled to preliminary relief."  ECF No. 30 at 14 n.3.  The Court "note[d]," however, "that Plaintiffs appear to have presented at least serious questions on their other claims."  *Id.*

This renewed motion seeks an injunction against the Remaining Prohibitions based on all of the claims in Plaintiffs' first motion.  This motion (i) addresses the Administrative Record produced by the government after the last round of briefing, and (ii) incorporates supplemental declarations from company representatives and a national security expert that contain additional facts relevant to these claims.  While the gravamen of Plaintiffs' arguments remains the same, these updates reinforce the merits of Plaintiffs' claims and demonstrate even more clearly that Plaintiffs are entitled to an injunction against the Remaining Prohibitions, which exceed the limits of the executive branch's power under federal statute and the Constitution.

## STATEMENT OF FACTS

### A.    TikTok Is a Massively Popular Forum for Creative Expression and Political Speech, Akin to a Virtual Town Square for More Than 100 Million Americans.

TikTok is an application (or "app") that provides an online communication platform for users to create and share short-form videos.  *See* Pappas Decl. ¶ 4, ECF No. 15-3.  TikTok is operated by Plaintiff TikTok Inc., an American company incorporated in California and headquartered in Los Angeles with a U.S.-based management team, and its parent company,

Plaintiff ByteDance Ltd. ("ByteDance"), which is incorporated in the Cayman Islands and has offices in the United States, China, and elsewhere. TikTok is not and never has been offered in China, Cloutier Decl. ¶ 4, ECF No. 15-2, and TikTok was designed to be completely separate from ByteDance's China-facing applications, *id.* ¶ 8. *See also* Supp. Cloutier Decl. ¶¶ 4-6.

TikTok users communicate on TikTok in a variety of ways. Users can record videos within the TikTok application, or they can record videos on their device outside the app, and then upload them to the app. Supp. Pappas Decl. ¶ 8. Users can post these videos on the platform in both public and private modes. *Id.* They also can communicate directly with other users in a variety of ways. For example, users can send private direct messages to one another, *id.* ¶ 7; use the "Livestream" function to communicate live with their followers, who in turn can post comments that the user can respond to in real time, *id.* ¶ 9; comment on videos and "tag" other users in the comments, *id.* ¶ 10; and use the "Duet" or "Stitch" functions of the app to create new content that incorporates content created by others, *id.* ¶¶ 12, 14.

Today, based on quarterly usage, more than 100 million Americans use TikTok, and until recently, it was adding 424,000 new U.S. users each day. Pappas Decl. ¶¶ 9, 18. On an average day, U.S. users send 80 million private direct messages on TikTok, and five million U.S. users view communications shared using TikTok's Livestream function. Supp. Pappas Decl. ¶¶ 7, 9.

### B. TikTok Has Safeguards to Protect the Security of U.S. User Data.

TikTok confronts the same data security risks as other entertainment and social media platforms, and its approach for dealing with such risks is consistent with industry best practices. Weber Decl. ¶¶ 9-10, ECF No. 15-4. TikTok segments U.S. user data and imposes access controls and auditing policies that limit and track access to such data. *Id.* TikTok also encrypts user data in storage and during transmission using the same industry-standard protocols as major banks and e-commerce platforms, and limits management of encryption keys to TikTok's U.S.-based security

team.  *See id.* ¶ 10; Cloutier Decl. ¶¶ 8-9.  Before any China-based engineering personnel may access encrypted U.S. TikTok user data, they must receive express permission through a process overseen by TikTok's U.S.-based team.  Cloutier Decl. ¶ 12; Weber Decl. ¶ 10.

Another industry-wide policy issue faced by entertainment and social media platforms is the integrity of algorithms that are used to recommend content to users.  Weber Decl. ¶¶ 4, 13.  There is no evidence that TikTok's source code has been compromised in a way that would allow the app to be used to censor content or spread misinformation.  *See id.* ¶¶ 14-17.  To protect the integrity of its source code, TikTok deploys industry standard workflow systems that require employees to obtain appropriate authorizations to access source code.  *Id.*  Such access is continually monitored and logged, and TikTok's source code undergoes both internal and third-party reviews to guard against any potential vulnerabilities.  Cloutier Decl. ¶¶ 16-17.

**C.**     **TikTok Has Effective and Fair Content Moderation Policies and Practices.**

Plaintiffs have invested substantially in capabilities to remove content that violates its Community Guidelines—such as hate speech and child sexual exploitation materials.  Han Decl. ¶¶ 5-6.  Content posted on TikTok is reviewed by automated software tools as well as by human moderators enforcing the Community Guidelines.  *Id.* ¶ 6.  To actually remove content, TikTok uses software tools that are entrusted to Plaintiffs' U.S. Safety team, based in Los Angeles and led by an American, Eric Han, who has prior content moderation experience at a number of U.S. companies, including Google and Twitter.  *Id.* ¶ 10.  This U.S.-based team supervises TikTok's front-line human moderation teams, none of which are located in China.  *Id.* ¶ 11.  If a determination is made that a user's content should be removed, the user can appeal, and a member of the U.S. Safety Team will then determine who removed the content, why, and whether it was consistent with TikTok's policies.  *Id.* ¶ 13.

TikTok has continuously improved its content moderation policies and practices. When TikTok was launched in 2017, its content moderation policies drew upon existing policies for legacy and other products. *Id.* ¶ 15. Beginning in 2018, those policies were revised and replaced by localized policies reflecting local norms and customs in each country where TikTok is available, including in the United States. *Id.* In 2019, Mr. Han was appointed as head of the U.S. Safety team, overseeing U.S. content moderation teams, and later received responsibility for all content moderation policy for the U.S. market, thus separating all U.S. content moderation from the global team. *Id.* ¶ 16. In March 2020, TikTok established a Content Advisory Council consisting of U.S. academics to strengthen TikTok's content moderation policies and practices, and its overall transparency in that area. *Id.* ¶ 17.

### D. For Almost a Year Before the Ban, TikTok Provided Information to CFIUS and Made Extensive Efforts to Fully Address Any National Security Concerns.

In 2019, ByteDance was notified that the Committee on Foreign Investment in the United States ("CFIUS") was considering whether to review a 2017 acquisition by ByteDance of Musical.ly, a China-based video-sharing application that was merged with TikTok and largely abandoned. From October 2019 through August 2020, Plaintiffs provided voluminous documentation in response to CFIUS's questions, including about Plaintiffs' data security safeguards. Notwithstanding the U.S. government's failure to identify any security risk, Plaintiffs provided extensive information to the government in good faith to address any conceivable concerns the government might have. Ex. 3.[1] They also proposed a number of mitigation strategies, which would allow the U.S. government to mitigate any claimed national security risks

---

[1] The exhibits cited herein are those filed with Plaintiffs' first motion, ECF No. 15.

around TikTok's user data and algorithms *beyond* what it could achieve with TikTok's domestic competitors.  *See* Weber Decl. ¶ 18.

     **E.**     **The Administration's Political Focus Moved to China and TikTok.**

While Plaintiffs were responding to CFIUS's requests, the political climate changed, and China, and ultimately TikTok, became an increasingly prominent political focus of the President. In early 2020, President Trump stated that he had "a great relationship with President Xi," Ex. 5 at 1, and that "[t]he United States greatly appreciates [China's] efforts and transparency [on the Coronavirus]," Ex. 4 at 3.  But, soon thereafter, as the COVID-19 pandemic spread across the U.S. and the domestic economy worsened, the President and members of his Administration began to use increasingly harsh anti-Chinese political rhetoric and repeatedly sought to blame China for the pandemic.  *See, e.g.*, Ex. 8 at 5.

In the summer of 2020, it was reported that TikTok users had used the app to coordinate mass ticket reservations for the President's campaign rally in Tulsa, resulting in an embarrassment for the President's campaign when significantly fewer persons appeared for the political rally than projected.  Ex. 9.  Shortly thereafter, Secretary of State Pompeo announced that the Administration was "looking at" banning TikTok.  Ex. 10.  The President's reelection campaign then ran Facebook advertisements asking supporters to "sign the petition now to ban TikTok."  Ex. 11.

     **F.**     **President Trump Issued His August 6 Order Premised on a Purported National Security Need to Ban TikTok, but Subsequent Administration Actions Immediately Undercut That Justification.**

On August 6, 2020, President Trump issued an executive order entitled "Addressing the Threat Posed by TikTok."  *See* Ex. 12.  The order speculated—without any evidentiary support— that ByteDance's ownership of TikTok could allow China to access and misuse U.S. user data, and that the Chinese government may censor or use TikTok content for propaganda purposes. Invoking IEEPA, the order prohibits "any transaction" by "any person, or with respect to any

property, subject to the jurisdiction of the United States," with "ByteDance Ltd. (a.k.a. Zìjié Tiàodòng), Beijing, China, or its subsidiaries, in which any such company has any interest, as identified by the Secretary of Commerce." *Id.*  It directs the Secretary of Commerce to "identify the transactions subject to" the ban within 45 days and declares that the transactions are prohibited "beginning 45 days after" the August 6 order, *i.e.*, September 20, 2020.  *Id.*

In the following weeks, statements by senior government officials made clear that the August 6 order was inspired by considerations other than any supposed national security concerns attributable to the use of the TikTok app.  On August 20, for example, Undersecretary of State Keith Krach acknowledged that the TikTok ban is "really about . . . three things"—none of which have anything to do with the supposed national security threat alleged in the August 6 order: (i) "the Communist Party's surveillance state and 5G is the backbone"; (ii) "that great China Firewall where all data can go in, but none come out"; and (iii) "reciprocity, because our apps aren't allowed in China . . . look at YouTube or Google search."  Ex. 13.

On August 14, 2020, invoking CFIUS, the President issued a *separate* executive order titled "Regarding the Acquisition of Musical.ly by ByteDance Ltd.," which purported to order ByteDance to divest the U.S. TikTok business.  Ex. 14 ("CFIUS order").  In contrast to the August 6 order, which stated that TikTok must be banned from the U.S., the premise of the CFIUS order was that divestment of the business would address the President's purported national security concerns.  Indeed, on September 19, 2020, the President explicitly embraced an approach that did *not* require banning the TikTok app.  He informed reporters that he had given his "blessing" and "approve[d] . . . in concept," Ex. 24, a mitigation solution whereby (1) Oracle would host all TikTok U.S. user data and secure associated computer systems to ensure that U.S. national security requirements are satisfied, (2) TikTok would enter a commercial partnership with Walmart, and

(3) both Oracle and Walmart would receive up to a 20 percent stake in TikTok Global, Ex. 25. President Trump also stated that he was imposing a new term wholly unrelated to national security: the parties to the deal would "pay $5 billion into a fund for education" to "educate people as to the real history of our country." Ex. 27. Plaintiffs had not agreed to, and first heard about, this supposed $5 billion fund from media reports of the President's statements. *See* Ex. 28.

### G. The Commerce Department Issued Prohibitions That Will Ban TikTok in the United States.

Notwithstanding the ongoing discussions between TikTok and the U.S. government regarding a potential mitigation, on September 18, 2020, the Department of Commerce issued a list of prohibited transactions to implement the August 6 ban. Ex. 23. The first Prohibition required the removal of TikTok from U.S. app stores on September 20, followed by four Remaining Prohibitions that would shut down TikTok in the U.S. entirely on November 12. On September 21, 2020, the Department of Commerce withdrew its September 18 notice, and then on September 22, 2020, issued a new notice that postponed the implementation date for the first Prohibition from September 20 to September 27, 2020. Ex. 29.

The first Prohibition, which was scheduled to take effect on September 27, 2020, would have prohibited transactions involving "[a]ny provision of services to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store" available to individuals in the United States. Had it not been preliminarily enjoined by this Court before it went into effect, the Prohibition would have prevented TikTok from being available for download on U.S. app stores and prevented existing users from receiving updates to the app. *Id.* The four Remaining Prohibitions, which are scheduled to take effect on November 12, 2020, prohibit the following transactions:

- "[a]ny provision of internet hosting services enabling the functioning or optimization of the TikTok mobile application,"

- "[a]ny provision of content delivery network services enabling the functioning or optimization of the TikTok mobile application within the [United States],"

- "[a]ny provision of directly contracted or arranged internet transit or peering services enabling the functioning or optimization of the TikTok mobile application within the [United States]," and

- "[a]ny utilization of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the [United States]."

*Id.* These Remaining Prohibitions will prevent Plaintiffs and their commercial partners from providing the services that enable the TikTok application to function, effectively shutting down TikTok in the United States. Pappas Decl. ¶¶ 19-26.[2]

The Commerce Department's notice announcing these Prohibitions incorporated by reference the unsubstantiated speculation in the August 6 order, but otherwise offered no additional factual support to explain why they were issued. Plaintiffs were afforded no opportunity to review or rebut the speculation in the August 6 order, nor were they given notice of or permitted to respond to any unstated justification on which the agency may have relied. Instead, the Commerce Department issued a subpoena to Plaintiffs on September 3, 2020, seeking broad categories of information that one would have expected the government to have collected before the August 6 order was issued. The Administrative Record produced in this litigation includes Plaintiffs'

---

[2] The Commerce Department notice also includes a sixth paragraph, which purports to prohibit "[a]ny other transaction by any person, or with respect to any property, subject to the jurisdiction of the United States, with ByteDance Ltd., or its subsidiaries, including TikTok Inc., in which any such company has any interest, as may be identified at a future date under the authority delegated under Executive Order 13942." Ex. 29. As it states, this paragraph does not prohibit anything today, but rather merely provides that one or more transactions that "may be identified at a future date" will be prohibited. *Id.* In accordance with the Court's earlier ruling, ECF No. 30 at 18, it does not appear that there is any "truly imminent and immediate harm" from the sixth paragraph at this time. Accordingly, while Plaintiffs do not seek an injunction against the sixth paragraph through the instant motion, they reserve their right to seek immediate injunctive relief as to any transaction that that the Commerce Department may, in the future, choose to identify pursuant to this paragraph and the August 6 order.

response to that subpoena, *see* AR-1800-28, along with other news reports and other materials described below that Plaintiffs received for the first time when produced in this litigation.

**H.    Plaintiffs Filed This Action and the Court Preliminarily Enjoined the First Prohibition.**

On September 18, 2020, the day the Prohibitions were issued, Plaintiffs filed this action challenging the August 6 order and those Prohibitions.  ECF No. 1.  The Prohibitions were withdrawn and then reissued a few days later, on September 22, 2020, and the following day, Plaintiffs moved for a preliminary injunction against Defendants to enjoin the implementation or enforcement of the Prohibitions.  ECF No. 15.

On September 27, 2020, this Court entered a preliminary injunction against the first Prohibition—the app store ban—before it went into effect.  This Court ruled that Plaintiffs are likely to succeed on their claim that "the prohibitions constitute *indirect* regulations of 'personal communication[s]' or the exchange of 'information or informational materials,'" in violation of the express limitations of IEEPA, and that Plaintiffs met the other requirements for preliminary injunctive relief.  ECF No. 30 (quoting 50 U.S.C. § 1702(b)).  Although the Court found that "Plaintiffs' IEEPA arguments are equally as applicable to the Secretary's November prohibitions as they are to paragraph 1 of the Commerce Identification," the Court denied Plaintiffs' motion for a preliminary injunction as to the Remaining Prohibitions because, at the time the Court issued its order, "the only truly imminent and immediate harm that Plaintiffs [would] suffer absent an injunction relates to paragraph 1 . . . ."  *Id.* at 17-18.

**I.    The Government Provided an Administrative Record That Relies on Inaccurate, Outdated, And Irrelevant Materials, And Includes Recommendations for Restrictions Far Short of a Ban.**

The government filed, in support of its opposition to the preliminary judgment motion, a memorandum by Deputy Assistant Secretary John Costello dated September 17, 2020, regarding

"Proposed Prohibited Transactions Related to TikTok Pursuant to Executive Order 13942."  ECF No. 21-1 (the "Commerce Memo"); *see also* AR-3-26.  That Commerce Memo, which is dated the same day that the Commerce Secretary signed the Prohibitions, Ex. 23 at 9, purports to provide justification for the Prohibitions.

In conjunction with this second motion for preliminary injunction, the Government on October 5, 2020, served Plaintiffs with a copy of every document in the Administrative Record ("AR"), except for one classified document from the Office of the Director of National Intelligence.  *See* ECF No. 33.  The AR includes the September 17 Commerce Memo, the sources cited therein and appendices thereto.  It spans 2,230 pages,[3] but consists almost entirely of:

- reports of Chinese espionage entirely unrelated to Plaintiffs or to TikTok (788 pages);

- uncorroborated news and opinion articles (499 pages);

- general summaries of Chinese law and corporate governance practices (308 pages);

- the websites and public filings of companies *other* than Plaintiffs (267 pages);

- reports from an Australian think tank and interviews with the authors of those reports (194 pages); and

- TikTok's privacy policy, transparency report and blog posts (47 pages).

Other than the Commerce Memo, the AR contains only one unclassified government assessment of the national security risks associated with TikTok—a five-page report dated September 2, 2020, prepared at the Commerce Department's request by the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA").  AR-1597-1601.  In that report—which discusses both TikTok and WeChat (an entity that is not affiliated

---

[3] In addition to the 1850 pages reflected in the table of contents filed with the Court, *see* ECF No. 33-2, the government produced 380 non-paginated pages of the sources cited in Appendix C to the Commerce Memo.

with TikTok) and relies on the same public news articles as the Commerce Memo—CISA recommended only that TikTok "not be permitted on the devices of State, Local, Tribal, and Territorial (SLTT) partners and critical infrastructure operators." AR-1600.

The AR contains no technical reports regarding the operation of the TikTok app; no evidence that the TikTok source code has ever been compromised, shared or used for nefarious purposes; no evidence that the Chinese government has ever obtained access to any TikTok user data, let alone that of U.S. users; and no evidence that TikTok's recommendation engine systematically biases Chinese (or any other) political interests.

**J.      The Remaining Prohibitions Will Cause Plaintiffs Irreparable Harm.**

This Court previously determined that "[t]he Secretary's prohibitions, including the [first set of] prohibitions scheduled to take effect tonight, will inflict irreparable economic and reputational harm on Plaintiffs." ECF No. 30 at 16. This reasoning applies with special force to the Remaining Prohibitions, which would completely shut down TikTok in the U.S. First, there would be permanent, devastating harm to TikTok's user base and competitive position, even if the government ban were to be lifted after a period of weeks or months. Pappas Decl. ¶ 19. TikTok has been one of the fastest growing apps in the United States, and its continued rapid growth is necessary to maintain its competitive market position. *Id.* ¶ 17. Competitors have already taken advantage of the government's highly-publicized intention to shut down the app to entice TikTok creators and users to switch platforms. *Id.* ¶¶ 21-22. Second, by shuttering the app, the Remaining Prohibitions will destroy Plaintiffs' valuable commercial partnerships with businesses and advertisers, leading not just to a loss of revenue but harm to their reputation and goodwill, making it unlikely these relationships could be salvaged even if the ban is later lifted. *Id.* ¶ 23. Third, the shutdown of the TikTok app in the United States will result in a massive decrease in *global* content, which in turn will negatively impact TikTok's ability to attract and retain users and partners around

the world.  *Id.* ¶¶ 23, 25.  Lastly, in an industry where competition for talent is especially intense, the ban will cause TikTok to lose employees critical to the app's success and permanently damage Plaintiffs' ability to recruit new employees, both inside the United States and around the world, even if the ban were later lifted.  *Id.* ¶ 26.

## ARGUMENT

The Court should enter a preliminary injunction against Prohibitions 2-5 because Plaintiffs have established that (1) there is a likelihood of success on the merits, (2) they will face irreparable harm in the absence of preliminary relief, (3) the balance of equities favors preliminary relief, and (4) an injunction is in the public interest.  *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

**I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims That the Remaining Prohibitions Are Unlawful and Unconstitutional.**

As explained below, the Remaining Prohibitions (1) violate the express terms of IEEPA by exceeding the executive branch's delegated authority, (2) are arbitrary and capricious under the APA, (3) violate Plaintiffs' First and Fifth Amendment rights, and (4) otherwise violate IEEPA because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat," as IEEPA requires.[4]

**A.      The Remaining Prohibitions Violate IEEPA Because They Regulate and Prohibit "Personal Communication" and "Informational Materials," Thereby Exceeding Express Limitations Imposed by Congress.**

It is "[a]n essential function of the reviewing court . . . to guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority."  *Planned Parenthood v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983).  Here, Plaintiffs are likely to succeed on their claim that the Remaining Prohibitions violate the plain language of

---

[4] All of Plaintiffs' claims except for the APA claim render the President's August 6 order unlawful as well.  Given that the August 6 order is inoperative in the absence of the Prohibitions, however, the only government action that must be preliminary enjoined at this time are the Prohibitions.

Section 1702(b) by, at a minimum, indirectly regulating "personal communication[s]" and the exchange of "information or informational materials." 50 U.S.C. § 1702(b)(1), (3). The Court correctly enjoined the first Prohibition on this basis, ECF No. 30 at 8-14, and a preliminary injunction against the Remaining Prohibitions is warranted on the same grounds. *Id.* at 17-18.

<ol start="1">
<li>IEEPA Forbids Government Regulation of "Personal Communication" or "Informational Materials."</li>
</ol>

IEEPA authorizes broad regulatory authority, but it explicitly limits such authority in two provisions relevant here: the "authority granted to the President . . . does ***not*** include the authority to ***regulate or prohibit***, ***directly or indirectly***" either (1) "[any] ***personal communication***, which does not involve a transfer of anything of value," or (2) the importation or exportation "whether commercial or otherwise, regardless of format or medium of transmission, of any ***information or informational materials***." 50 U.S.C. § 1702(b)(1), (3) (emphasis added). The statutory text was "explicitly intended, by including the words 'directly or indirectly,'" to have "broad scope." *United States v. Amirnazmi*, 645 F.3d 564, 585 (3d Cir. 2011) (quoting H.R. Conf. Rep. No. 103-482 (1994)); ECF No. 30 at 9 (Congress "stressed that these limitations be given 'broad scope'").

As originally enacted, Section 1702(b) contained only the "personal communication" limitation, but Congress amended the statute in 1988 to "expressly revoke[] presidential authority to regulate or prohibit the importation or exportation" of "information or informational materials." *Cernuda v. Heavey*, 720 F. Supp. 1544, 1547 (S.D. Fla. 1989). That amendment "was designed to prevent the executive branch from restricting the international flow of materials protected by the First Amendment." *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (citing Pub. L. No. 100-418 § 2502, 102 Stat. 1107, 1371 (1988) ("Berman Amendment")). *See also* Tyler Decl. ¶ 25, ECF No. 15-5.

In 1994, Congress further "expanded this limitation on executive authority by enacting the Free Trade in Ideas Act ['FTIA']," which "restrict[ed] the Executive from regulating transactions concerning informational materials 'regardless of format or medium of transmission.'" *Amirnazmi*, 645 F.3d at 585 (citing Pub. L. No. 103-236, § 525 (1994)).  The FTIA also expanded the statute's "nonexclusive list of informational materials to include new media, such as compact discs and CD ROMs." *Kalantari*, 352 F.3d at 1205.

        2.    <u>The Remaining Prohibitions Unlawfully Regulate Personal Communication.</u>

This Court previously held that Plaintiffs are likely to succeed on their argument that the Prohibitions violate the express limitation on the executive's regulation of "personal communication, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1). This conclusion is manifestly correct and is further strengthened by the additional evidence and analysis below.

TikTok is an online community where millions of Americans come together to express themselves, share video content, and make connections with each other.  Pappas Decl. ¶ 4.  TikTok users can communicate with each other on the platform in a variety of ways, from the "Message" function that operates as a private chatroom, to the "Duet" and "Stitch" functions that enable users to communicate with and respond to other users by clipping and integrating scenes from their videos into the user's own videos, to the "Livestream" feature that allows users to communicate with their followers in real time.   Supp. Pappas Decl. ¶¶ 7-14.   Users can even co-host conversations via the Livestream function, where TikTok both facilitates virtual face-to-face communications between two users and broadcasts those communications to the rest of the TikTok community. *Id.* ¶ 9.  TikTok users employ these features to communicate with each other tens of millions of times every day. *Id.*  TikTok Inc. itself engages with this community through its

TikTok account, where it publishes posts with messages about topics of interest and importance to the company, such as its support for small businesses. *Id.* ¶ 6. *See generally id.* ¶ 14.

The Remaining Prohibitions will shut down these personal communications among members of this vibrant online community, preventing TikTok's users—including Plaintiffs themselves—from expressing their viewpoints, interests, and beliefs with one another using the variety of means offered by the TikTok platform. The regulation and prohibition of such personal communication—which is exactly what the Remaining Prohibitions do—is forbidden by the plain language of Section 1702(b)(1).

In opposing Plaintiffs' first preliminary injunction motion, the government argued that its ban on TikTok prohibits only "business-to-business transactions"—*i.e.*, not "personal communications." ECF No. 21 at 15. This argument cannot be squared with the plain text of Section 1702, which expressly forbids the executive from regulating personal communication directly *or indirectly*. There can be no reasonable dispute that the Remaining Prohibitions, at a minimum, indirectly prevent TikTok users from engaging in personal communication through sharing and accessing communicative content on the platform. Indeed, the complete ban of the app in the U.S., which self-evidently precludes all personal communications on the app by U.S. users, is not merely incidental to the challenged government action; it is the express objective. *See* ECF No. 30 at 10-11 ("the purpose and effect of the Secretary's prohibitions is to limit, and ultimately to reduce to zero, the number of U.S. users who can comment on the platform").

Defendants have maintained that even if the Prohibitions involve the regulation of personal communication, they are exempt from the reach of Section 1702(b) because "content provided via TikTok plainly involves 'a transfer of anything of value.'" ECF No. 21 at 16. This is wrong. Even if some communications on TikTok may be commercially valuable—for example, a user's

posts that are sponsored by an advertiser—a wide swath of the 46 million TikTok videos, 89

million comments on videos, and 80 million private messages shared *every day* on the TikTok

application constitute personal communications without economic value.  *See* Supp. Pappas Decl.

¶¶ 7, 8, 10.  Nor does the fact that TikTok generates revenue from the platform place the personal

communications on the app outside Section 1702(b)(1)'s reach.  *All* communication service

providers derive some value from customers' "presence on" or use of their services.[5]  Indeed,

"even the letter a person drops in the mail adds some value to the mail carrier; it cannot be that

IEEPA authorizes the targeting of such communications."  ECF No. 30 at 14.  In short, Defendants'

interpretation of "anything of value" would permit the government to regulate under IEEPA

virtually *all* personal communication that does not take place face-to-face, contravening the

fundamental purpose of the personal communication provision and stripping it of its force.

       3.      <u>The Remaining Prohibitions Unlawfully Regulate Informational Materials.</u>

Section 1702(b)(3) states that the executive lacks authority under IEEPA to regulate or

prohibit—"directly or indirectly," "regardless of format or medium of transmission," and "whether

commercial or otherwise"—the importation or exportation of "information or informational

materials."  50 U.S.C. § 1702(b)(3).  The Remaining Prohibitions violate this unambiguous

statutory command.

Millions of Americans use TikTok to share "information or informational materials" with

users around the world—including films, music, photographs, and artworks.  Pappas Decl. ¶¶ 4,

20; Supp. Pappas Decl. ¶¶ 5, 13-14.  The content shared on TikTok undoubtedly constitutes

"informational material" outside the reach of the President's IEEPA authority.  Indeed, Section

---

[5] *See, e.g.*, Facebook Terms of Serv., *available at* https://www.facebook.com/terms.php; My
Verizon Cust. Agmt., *available at* https://www.verizon.com/legal/notices/customer-agreement/.

1702(b)(3) sets out a non-exclusive list of examples of informational materials, "including but not limited to, publications, films, . . . photographs . . . [and] artworks"—the precise media shared on TikTok.  50 U.S.C. § 1702(b)(3).  And the informational materials that TikTok users post and view readily cross international borders.  Pappas Decl. ¶ 20.  Each of the means of communicating on TikTok—including direct messages, videos, comments, hashtags, duets, stitches, and livestreams—can be created by the user so that they can be viewed, shared, and engaged with by users in other countries.  Supp. Pappas Decl. ¶ 13.  U.S. users share *46 million videos* on the TikTok application *every day*, and this U.S. content can comprise as much as 60% of the content in TikTok's non-U.S. markets; likewise, U.S. users routinely import informational materials when they view posts created and shared by TikTok users in other countries.  *Id.* ¶¶ 5, 13; Pappas Decl. ¶ 20.  The Commerce Department lacks the authority even to *regulate* the international flow of these materials—either "directly or indirectly," and "regardless of format or medium of transmission"—let alone to prohibit it.   50 U.S.C. § 1702(b)(3).  For this reason alone, the Remaining Prohibitions violate Section 1702(b)(3).

Furthermore, the TikTok application itself—a communication platform over which tens of millions of informational materials are shared every day—is analogous in this sense to the "news wire feed" included in Section 1702(b)(3)'s non-exhaustive list of "informational materials."  Like a news wire feed, TikTok connects users across the world and provides a medium through which users can share videos and communications with each other, including in real time as events unfold.  *See* Supp. Pappas Decl. ¶ 5; Oxford English Dictionary (Sept. 2003), *available at* www.oed.com/view/Entry/255044 (defining "newswire" as "a service which transmits up-to-the-minute news, usually electronically (esp. via the internet), to news media and the general public").  Thus, as the Court correctly observed, "[l]ike a news wire feed, TikTok facilitates the transmission

of news but with a bonus: it also lets users publish other items on the list of informational materials, like short videos, photographs, and art."  ECF No. 30 at 10.

As with Section 1702(b)(1), Defendants' argument that the Prohibitions preclude only business-to-business economic transactions, not informational materials, "fails to grapple with IEEPA's text," *id.* at 10, which expressly forbids the "direct[] *or indirect*[]" prohibition or regulation of the import or export of informational materials, 50 U.S.C. § 1702(b)(3).  "[T]he purpose and effect of the Secretary's prohibitions is to limit, and ultimately reduce to zero, the number of U.S. users who can comment on the platform and have their personal data on TikTok."  ECF No. 30 at 10-11 (citation omitted).  "At a minimum, then, the Secretary's prohibitions 'indirectly' 'regulate' the transmission of 'informational materials' by U.S. persons."  *Id.* at 11.[6]

This plain-language interpretation of Section 1702(b) is consistent with the overall structure of IEEPA and would not eliminate the President's power to regulate information supply chains.  IEEPA authorizes the executive to "regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).  This broadly-worded provision would empower

---

[6] Additional language in Section 1702(b)(3) further demonstrates the flaw in the government's interpretation: IEEPA's limitation on the executive's authority to regulate informational materials explicitly applies to such materials, "whether commercial or otherwise." 50 U.S.C. § 1702(b)(3). If, as the government argues, "business-to-business" transactions cannot constitute "informational materials," there would be no reason for Congress to have specified that IEEPA does not authorize regulation of informational materials that are "commercial" in nature. *See United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (court required "to give effect, if possible, to every clause and word of a statute").

the President to regulate transactions involving information technology companies (by any person, or with respect to any property, subject to U.S. jurisdiction), so long as the exercise of that authority does not directly or indirectly impinge on the limitations set forth in Section 1702(b).[7]

The D.C. Circuit's decision in *Walsh v. Brady*, 927 F.2d 1229, 1232 (D.C. Cir. 1991), on which Defendants have relied, further confirms that the Court's interpretation of Section 1702(b)(3) leaves ample room for the exercise of the executive's IEEPA authority.  In *Walsh*, the plaintiff alleged that Treasury Department travel restrictions exceeded IEEPA's informational-materials limitation by indirectly burdening his trade in Cuban posters.  The plaintiff argued that an earlier version of Section 1702(b)(3) "extinguish[ed] any executive authority to use [IEEPA] to impose *any* regulation that 'significantly burdens' trade in informational materials."  *Id.* at 1232.  The court rejected that interpretation, affording deference to the agency's assessment that "[s]uch travel was considered too tangential to the actual physical importation and exportation of informational materials to fall within the language of [§ 1702(b)(3)]."  *Id.* at 1231.  *Walsh* thus stands for the proposition that the executive retains authority to regulate conduct that is only "tangential[ly]" related to the cross-border exchange of informational materials.  But here, in contrast to *Walsh*, "the relationship between the Secretary's prohibitions and the informational materials U.S. users post on TikTok is neither 'tangential' nor generic."  ECF No. 30 at 11 n.1.  Instead, eliminating the posting of those informational materials is the Prohibitions' express "objective."  *See* Commerce Memo at 22.[8]

---

[7] Similarly, while not necessary here in the absence of a national security threat, the government has other distinct authorities to address such threats in appropriate cases involving the information technology industry without being constrained by Section 1702(b)'s limitations.  *See, e.g.*, 50 U.S.C. § 4565 (CFIUS); 47 U.S.C. § 214 (FCC's licensing authority for carriers with foreign market power).

[8] In addition to conflicting with the plain language of the statute, the Remaining Prohibitions also

Accordingly, as this Court correctly concluded with regard to Plaintiffs' first preliminary injunction motion, "Plaintiffs have demonstrated that they are likely to succeed on their claim that the prohibitions constitute indirect regulations of 'personal communication[s]' or the exchange of 'information or informational materials,'" and the Remaining Prohibitions therefore should be preliminarily enjoined. ECF No. 30 at 14.

**B.     The Remaining Prohibitions Are Arbitrary and Capricious in Violation of the APA Because the Agency Provided an Inadequate Explanation Based on Inaccurate, Outdated, and Irrelevant Materials, Failed to Consider Reasonable Alternatives, and Offered a Pretextual Justification for Its Action.**

Plaintiffs are also likely to succeed on their claim that the Remaining Prohibitions are "arbitrary and capricious" under the APA, 5 U.S.C. § 706(2)(A). The Remaining Prohibitions are arbitrary and capricious because the Commerce Department (1) provided an inadequate explanation that relied on inaccurate, outdated, and irrelevant information; (2) failed to consider reasonable alternatives to the Remaining Prohibitions' sweeping ban of TikTok; and (3) offered a pretextual national security justification that is unsupported and belied by the political justifications that were articulated contemporaneously by Administration officials.

1.     The Remaining Prohibitions are Reviewable Under the APA.

"Congress rarely intends to prevent courts from enforcing its directives" to the Executive Branch. *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015). "[L]egal lapses and violations

---

conflict with the executive branch's historical practice of implementing its IEEPA authority. For example, the Treasury Department's Office of Foreign Assets Control ("OFAC"), which frequently implements IEEPA sanctions programs, recognizes that its prohibitions do not apply to the importation or exportation of information or informational materials, "regardless of the format or medium of transmission." *See, e.g.*, 31 C.F.R. § 560.210 (exempting "informational materials," as defined in 31 C.F.R. § 560.315, from the list of prohibited transactions); 31 C.F.R. § 560.315(a) (featuring same definition of "informational materials" as Section 1702(b), with such materials defined as including, but not limited to, films, photographs, and artworks, among others); Tyler Decl. ¶ 45. OFAC has never used its authorities to target entertainment and social media platforms used by millions of U.S. users. Tyler Decl. ¶ 46.

occur, and especially so when they have no consequence." *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Mach Mining*, 135 S. Ct. at 1652-53). "That is why [courts have] so long applied a strong presumption favoring judicial review of administrative action." *Id.* To overcome that presumption, the government bears the "heavy burden" of showing that the relevant statute precludes review, *id.*, or that the action is "committed to agency discretion by law," 5 U.S.C. § 701(a) (1), (2). *See also Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967).

There is no evidence that Congress intended to preclude judicial review of agency actions under IEEPA. Rather, the statute's text points in the opposite direction. *See* 50 U.S.C. § 1702(c) (referencing "any judicial review of a determination made under this section"). Moreover, clear precedent from this Circuit establishes that that IEEPA decisions *are* subject to judicial review. *See, e.g.*, *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (reviewing claim that OFAC's designation of entity as a Specially Designated Global Terrorist pursuant to an executive order issued under IEEPA was arbitrary and capricious); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 25 (D.D.C. 2015) (similar).[9]

The Remaining Prohibitions do not fall within Section 701(a)(2)'s "very narrow exception" to the strong presumption of judicial review for agency actions "committed to agency discretion by law." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). This exemption applies only in "'rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"

---

[9] In fact, the government's position in a related case involving WeChat supports the conclusion that the Remaining Prohibitions are reviewable. There, the plaintiffs had moved for injunctive relief before the issuance of Commerce's regulations. The government argued that judicial review was premature and that plaintiffs should wait to assert an APA challenge until after the regulations issued—precisely what Plaintiffs have done here. *See* Joint Disc. Letter Br., *U.S. WeChat Users All. v. Trump*, No. 3:20-cv-5910 (N.D. Cal. Sept. 3, 2020), ECF No. 18 at 4 ("Under the APA, Congress has created an orderly procedure to challenge governmental action").

*Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).  Here, Plaintiffs' claims seek to hold the agency to the basic standards of rationality that Congress imposed through the APA. Thus, "familiar APA concepts" themselves "provide the core standards for judicial review." *CAIR v. DOJ*, 264 F. Supp. 2d 14, 23 (D.D.C. 2003); *cf. Judulang v. Holder*, 565 U.S. 42, 53 (2011) (unanimously rejecting policy as arbitrary and capricious because the agency did not "exercise its discretion in a reasoned manner" and concluding that the policy therefore could not "pass muster under ordinary principles of administrative law").  Multiple sources of law aid the Court in applying those standards, including IEEPA and the First and Fifth Amendments to the Constitution.  *See, e.g.*, *Holy Land*, 333 F.3d  at 162; *Nat'l Fed'n of Fed. Emps. v. Weinberger*, 818 F.2d 935, 941 n.11 (D.C. Cir. 1987) ("[T]here is clearly 'law to apply'—the Constitution.").

          2.    <u>The Commerce Department Provided an Inadequate Explanation That Is Not Supported by the Record, and Which Relies on Inaccurate, Outdated, and Irrelevant Information.</u>

To survive APA scrutiny, "the agency must examine the relevant data and articulate a satisfactory explanation for its action [that is] based on a consideration of the relevant factors . . . ."  *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action "is arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency."  *Id.*  The agency's decision should be upheld only if "its decision is adequately explained and supported by the record."  *Clark Cty. v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008) (citation and quotation marks omitted).

The Commerce Department's explanation for its ban against TikTok is unsupported by the AR.  The Court, in enjoining the first Prohibition, noted that the government's papers, which included the Commerce Memo, contained "evidence that China presents a significant national security threat," but that "the specific evidence of the threat posed by Plaintiffs, as well as whether the prohibitions are the only effective way to address that threat, remains less substantial."  ECF

No. 30 at 17.  The AR is consistent with that observation and wholly inadequate to support the ban.  The AR contains no technical reports prepared by government agencies regarding the operation of the TikTok app, its recommendation algorithm, or its data collection.  Instead, it relies exclusively on uncorroborated third-party reports of questionable reliability.[10]  Moreover, the materials in the AR that came from Plaintiffs were submitted in response to a unilateral administrative subpoena that did not explain to Plaintiffs the Commerce Department's concerns and did not afford Plaintiffs an opportunity to review or respond to any of the inaccurate, outdated, and irrelevant materials that the Commerce Department offers to support its flawed decision.  Had the Commerce Department provided Plaintiffs with the due process to which they were entitled, *see infra* at 38-41, these flaws in the record could have been rectified.  On this record, the Remaining Prohibitions must be set aside because they do not reflect the reasoned decision-making required by the APA to support the extraordinary action of banning a U.S. communication forum.

*First*, the AR demonstrates that nothing about TikTok's collection of U.S. user data— which is necessary for the functioning of the app—is unusual or nefarious.  The Commerce Memo acknowledges that TikTok's data collection practices are "similar to other major social media platforms," AR-15, and that TikTok has over time *reduced* the amount of data it collects, AR-15-16.  An independent blogger's investigation on which the government relied "tried to understand what data does TikTok regularly send back to its servers" and found that "TikTok doesn't have . . . suspicious behavior and is not exfiltrating unusual data. . . . [W]e would obtain similar results with Facebook, Snapchat, Instagram and others."  AR-1006-07.  In fact, determining what data is

---

[10] Some third-party materials on which the agency purported to rely are not included in the AR. For example, footnote 141 of the Commerce Memo cites a variety of sources purportedly describing Chinese law.  Several sources are either missing from the AR entirely or are included but reflect no substantive content.  *See* AR-1499-1500.

collected by "these other popular social media apps is even more difficult [than with TikTok], as they are using a technique . . . to defeat [data] traffic inspection."  AR-1038.

The Commerce Department's specific examples of the purported security "vulnerability" associated with TikTok's practices with respect to user data likewise fails to support the conclusion that TikTok should be banned.  For example, the Commerce Memo repeatedly faults TikTok for its "access to clipboard data."  AR-15, AR-20.  The Memo itself acknowledges, however, that this is a "pretty standard" practice related to combating automated bot and spam behavior.  AR-15 n.115.  Moreover, the record shows that 32 other apps, including Fox News, The New York Times, NPR, the Wall Street Journal, and Bed, Bath & Beyond all had the same feature.  AR-1013, AR-1088-89.  Had Plaintiffs been permitted to respond to these allegations, Roland Cloutier, TikTok's Chief Security Officer, would have confirmed that the clipboard access was an anti-spam feature that has since been removed.  Supp. Cloutier Decl. ¶¶ 23-24.  The agency simply fails to explain why a "pretty standard" feature common to dozens of apps—and which has since been removed entirely from TikTok—could possibly support the extraordinary step of banning the app.

Similarly, the agency's assertion that "some data from the TikTok app may be directly transmitted to China," AR-17, is likewise based on inaccurate and outdated information from a third-party, rather than on information obtained from Plaintiffs and/or verified by the government.   Here again, had the Commerce Department sought such information from Plaintiffs, the Department would have learned that the report on which it relied was based on outdated versions of the app, which has since been updated as many as 86 times.  Supp. Cloutier Decl. ¶ 13.  Meanwhile, an American third-party information security firm recently conducted a security review of the current version of TikTok and found that its source code was connecting to four IP addresses in China.  *Id.* ¶ 14.  The security expert determined that the four IP address

connections were inactive remnants left behind from outdated versions of the product and found

no actual data traffic between TikTok and the Chinese IP addresses.  *Id.*  TikTok's internal

security team further analyzed these four IP addresses and determined that two were actually

pointing to servers in Singapore, and the other two did not appear in the source code itself, but

rather were in code comments (annotations added by software engineers to help explain the

code)—meaning that of the four IP addresses identified by the security expert, none pointed to

China in the source code and none reflected active connections to servers in China.  *Id.*

*Second*, although the Commerce Department attempts to portray ByteDance's operations

in China as a national security threat, the record fails to substantiate this concern.  For example,

the Commerce Memo's assertion of "significant and close ties" between ByteDance and the

Chinese Communist Party ("CCP") is based on a selective reading of the AR.  While some of

ByteDance's 60,000 employees doubtless are members of the CCP, that reflects the reality of life

in China, where the CCP has nearly 90 million members, AR-820.  As the Commerce Memo

acknowledges, moreover, 70 percent of privately held companies in China have party committees,

AR-8; such committees are required under Chinese law in any company with at least three party

members and do not have any "management or governance role," AR-470; *see also* AR-474-475,

AR-536.    That  same  requirement    applies  to  foreign  companies—including  American

companies—that operate in China, AR-470, many of which have party committees, AR-536.

The  Commerce  Memo's  descriptions  of  TikTok's  underlying  infrastructure  are

unsupported and inaccurate.  The agency's assertion that "the infrastructure that underlies the

TikTok application is not wholly separate from the Chinese application and the systems of

ByteDance" is flat wrong.  AR-16.  Although some underlying technology is used for multiple

ByteDance products, they are replicated and integrated separately into each product, such that the

entire TikTok "software stack"—including all source code and user data—is maintained separately from other ByteDance products.  Supp. Cloutier Decl. ¶¶ 5-6.

To the extent the government's concern is that some China-based ByteDance engineers need access to TikTok U.S. user data for authorized purposes, the Commerce Department failed to address TikTok's existing protections for this data, let alone explain why they are insufficient. In fact, China-based staff may access U.S. user data only based on demonstrated need and with permission from the U.S.-based security team.  Cloutier Decl. ¶ 10.  Moreover, TikTok user data is encrypted, which is a common best practice for mitigating data security risk.  Supp. Weber Decl. ¶ 8.  "Discussing perceived vulnerabilities in TikTok's data security safeguards without discussing its encryption practices would be like discussing the security of money in a bank without considering whether or not the bank kept the money in a vault."  *Id.*

Similarly, the Commerce Memo asserts that TikTok's storing user data on servers leased from Alibaba Cloud in Singapore and from China Unicom (Americas) Operations Ltd. ("CUA") in the United States creates "significant risks" because of these entities' asserted ties to China. AR-16-17.  Yet this assertion mischaracterizes the nature of the cloud storage services those entities provide and Plaintiffs' control over the data centers.  To begin, CUA provides only datacenter space (*i.e.*, the building itself and electricity) in its capacity as a reseller; it does not actually provide any server machines.  Rather, ByteDance owns and operates all servers that are stored within the CUA facility.  The ByteDance servers are located in a locked cage inside the facility, and CUA personnel must apply for onetime badge access each time they access the cage. ByteDance also has its own security team monitoring the technical access environment.  Supp. Cloutier Decl. ¶ 8.

Even where Plaintiffs have leased server capacity from other companies, those companies provide only raw storage and computing capacity.  *Id.* ¶ 10.  Plaintiffs provide their own proprietary operating system, software stack for the application, and security controls to restrict companies that provide server space from accessing TikTok's software.  *Id.*  And even if someone with access to the physical premises that hosts TikTok data were somehow able to circumvent the software controls (which has never happened), they would nevertheless be unable to extract U.S. user data, both because many categories of user data is encrypted and also because it is "sharded," meaning that it's broken down into separate pieces across many different servers.  *Id.* ¶ 11.

*Third*, the Commerce Memo's conclusions regarding TikTok's content moderation similarly relies upon inaccurate, outdated, or incomplete information.  The Memo points to outdated content moderation policies and practices that have not existed in the U.S. for a year or longer,  and it relies upon articles that incorrectly state that content moderators in China have final say over removal of content, when in fact that decision-making power is vested in TikTok's U.S.-based content moderation leadership team.  Han Decl. ¶¶ 10, 16, 19.  The Memo also relies on two anecdotes of content removal and on the basis of those two examples—out of hundreds of millions of daily users around the world—concludes that TikTok is "exercising a CCP-aligned censorship campaign."  AR-13-14.  Setting aside the absurdity of banning an app used by 100 million Americans because of the experiences of two users, both of these incidents are readily explained as one-off errors, not a concerted campaign of censorship.  Han Decl. ¶ 22.

3.  <u>The Agency Failed to Consider or Explain Why Reasonable Alternatives That Are Set Forth in the AR Itself Were Not Adequate.</u>

An agency must "consider significant alternatives to the course it ultimately chooses," and explain its rejection of those alternatives.  *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000).  "[T]he failure of an agency to consider obvious alternatives has led uniformly

to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986). Here, the government had a range of tools at its disposal to achieve its national security objectives while imposing less harm on Plaintiffs and TikTok users in the United States.

For example, CFIUS is empowered to mitigate national security risks by imposing or reaching a national security mitigation agreement with a foreign acquirer of a U.S. business.  50 U.S.C. § 4565(l)(3)(A).  The Commerce Department noted the ongoing CFIUS negotiations, in which it has been publicly reported that Plaintiffs have proposed a mitigation solution that President Trump has "approve[d] . . . in concept," Ex. 24, and acknowledged that CFIUS could, if it achieves a resolution with Plaintiffs, fully mitigate any national security risk, obviating the need for any ban, *see* AR-23.  Yet the Commerce Department provided no explanation for how national security could require a ban if such a mitigation is achieved.  Indeed, even the CFIUS order's requirement of divestment—while itself unnecessarily severe and manifestly unjustified—is less extreme than a total ban on TikTok's operations in the United States.  And as discussed above, *see supra* at 19-20, IEEPA itself encompasses a power to "regulate," as well as "prohibit," that vests the President with a range of powers to address national security concerns short of an outright ban.

It is clear, therefore, that the government had multiple tools at its disposal to achieve its objectives without a ban.  And the AR contains concrete alternatives that the Commerce Department ignored.  For example, ASPI, an Australian think tank whose reports comprise almost one-tenth of the AR, found it "imperative" that governments *not* hold TikTok and other "Chinese social media networks to different standards," as Defendants have done here.  AR-1099.  Instead, they recommend that "governments implement transparent user data privacy and user data protection frameworks . . . ."  *Id.*  Only "[i]f companies refuse to comply with such frameworks" should they be prevented from operating in the jurisdiction.  *Id.*  Even the intelligence assessments

prepared at the Commerce Department's request propose alternatives short of a ban on TikTok that the agency failed to take into account or explain their inadequacy to meet any government concerns.  AR-1597, 1600 (recommending that TikTok "not be permitted on the devices of State, Local, Tribal, and Territorial (SLTT) partners and critical infrastructure operators").

"At the very least th[ese] alternative way[s] of achieving the [government's] objectives . . . should have been addressed and adequate reasons given for [their] abandonment." *State Farm*, 463 U.S. at 48.  Instead, the government chose the harshest measure possible—a ban on TikTok in the U.S.—without considering alternatives, trying to craft a narrower solution to address its purported national security concerns, or explaining why a ban was justified over such alternatives. This failure, standing alone, renders the Remaining Prohibitions arbitrary and capricious—and therefore unlawful—under the APA.  *See Boswell v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984).

4.    The Commerce Department's Stated Justification for the Prohibitions Is Pretextual.

The Commerce Department's reliance on inaccurate, outdated, and irrelevant information and its failure to consider or explain why it found inadequate reasonable alternatives to a complete ban on TikTok show that the agency's action was not in fact based on the stated national security concerns.  This is another independent ground on which to invalidate the Remaining Prohibitions. *See Commerce*, 139 S. Ct. at 2575; *Woods v. Dep't Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994).

The Prohibitions were issued against the backdrop of a political reelection campaign in which the President has increasingly relied on anti-Chinese rhetoric.  *See, e.g.*, Ex. 7.  And there is no question that the first mention of the Trump Administration possibly banning TikTok came on the heels of the episode in which TikTok users claimed to have used the app to make it appear to the President's campaign that attendance for the President's Tulsa political rally in June would be vastly larger than it actually was, Ex. 9, an embarrassment that led to the campaign running ads

urging that TikTok be banned, Ex. 11.  As further demonstrated by Administration officials'
contemporaneous statements that August 6 order is "really about" various concerns regarding
China that are entirely unrelated to any purported security concerns involving TikTok, the
inescapable conclusion is that it was politics—not national security—that led to these severe
Prohibitions.[11]  *See, e.g.*, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54-55 (D.C. Cir. 1977) (when
an agency sets forth a "fictional account of the actual decisionmaking process" a reviewing court
"must perforce find its actions arbitrary").

     The claim that national security concerns were the agency's justification for requiring a
total ban of TikTok in the U.S. is further contradicted by the President's persistent focus on
extracting some type of financial bounty in exchange for permitting Plaintiffs to continue their
lawful business in this country.  On August 3, 2020—three days before the August 6 order was
issued—the President stated that TikTok "[doesn't] have any rights" and that he would ban the
company unless it were acquired through "an appropriate deal" in which "the Treasury . . . of the
United States gets a lot of money."  Exs. 15, 16.  This demand for a payment to the Treasury is at
odds with notion that banning TikTok is necessary to protect national security.

     The President also demanded that the parties involved in the TikTok-Oracle-Walmart deal
"pay $5 billion into a fund for education" so that "we can educate people as to the real history of
our country."  Ex. 27.  Such a demand is untethered to any national security concerns on which

---

[11] Ex. 10 ("The United States is 'looking at' banning TikTok [and] Pompeo's remarks come during
a time of heightened tensions between the United States and China."); Ex. 11 at 2 ("Trump
Campaign Urges Supporters to Back TikTok Ban in Online Ads," weeks after TikTok users
interfered with campaign rally); *id.* at 3 ("the president has suggested that banning the [TikTok]
app . . . could be one way to retaliate against China's approach to tackling the coronavirus"); Ex.
13 at 3 (Undersecretary of State Krach stating that the banning of TikTok and WeChat is "really
about . . . three things": "the Communist Party's surveillance state and 5G is the backbone," "that
great China Firewall where all data can go in, but none come out," and "reciprocity, because our
apps aren't allowed in China.").

the Prohibitions were purportedly based.  Indeed, in analogous contexts, courts—as well as the government itself—have emphasized the impropriety of the government demanding that a private party make a payment to a third party.  For example, the Supreme Court has long recognized that the government "effects an unconstitutional taking when it transfers property, without any justifying public purpose, from one private party to another."  *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Hodel*, 637 F. Supp. 1398, 1406 (D.D.C. 1986), *aff'd*, 830 F.2d 374 (D.C. Cir. 1987) (citing *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) and *Thompson v. Cons. Gas Corp.*, 300 U.S. 55, 80 (1937)).

Likewise, the Department of Justice's *Justice Manual* explains that, except in limited contexts not relevant here, it is "not appropriate" for the government "to use a settlement agreement to require, as a condition of settlement, payment to non-governmental, third-party organizations who are not victims or parties to the lawsuit."  Justice Manual § 1-17.000.  The *Justice Manual* accordingly provides that "Department attorneys shall not enter into any agreement on behalf of the United States in settlement of federal claims or charges, including agreements settling civil litigation, accepting plea agreements, or deferring or declining prosecution in a criminal matter, that directs or provides for a payment to any non-governmental person or entity that is not a party to the dispute."  *Id.*; *see also* Office of the Attorney General, Prohibition on Settlement Payments to Third Parties (June 5, 2017), *available at* https://www.justice.gov/opa/press-release/file/971826/download (same).[12]

---

[12] In announcing this policy, former Attorney General Jeff Sessions explained that "[w]hen the federal government settles a case against a corporate wrongdoer, any settlement funds should go first to the victims and then to the American people—not to bankroll third-party special interest groups or the political friends of whoever is in power."  Dep't of Justice Press Release (June 7, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-ends-third-party-settlement-practice.

Finally, after expressing its purported national security concerns in the August 6 order, the government waited an additional 43 days to issue the Prohibitions, and a further 59 days beyond that to implement the Remaining Prohibitions.  Ex. 22.  It also extended the first Prohibition's ban on TikTok from U.S. app stores for a week, from September 20 to September 27.  Ex. 26.  If pressing national security concerns were the genuine justification for the agency's action, such a long delay would be intolerable.  Likewise, when the agency finally *did* issue the Prohibitions, those restrictions were not even crafted to respond to the asserted national security threat upon which they were purportedly based.  In particular, the first Prohibition would have barred TikTok from U.S. app stores, thereby preventing new users from downloading the app, but it also would have prevented existing users from downloading updates to the app, including security fixes. Ex. 29*.*  That action would *undermine* the very security concerns that supposedly justified the government's actions.

"Altogether, the evidence tells a story that does not match the Secretary's explanation for his decision."  *Commerce*, 139 S. Ct. at 2575.  When an agency sets forth a "fictional account of the actual decisionmaking process," a reviewing court "must perforce find its actions arbitrary." *Home Box Office*, 567 F.2d at 54-55.  That is so where, as here, "the sole stated reason [for the Prohibitions] seems to have been contrived."  *Commerce*, 139 S. Ct. at 2575.

### C.     The Remaining Prohibitions Violate Plaintiffs' Constitutional Rights.

#### 1.     The Remaining Prohibitions Infringe on Plaintiffs' First Amendment Right to Speech.

For the 100 million Americans who use TikTok, the app serves as "the modern public square" and "provide[s] perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Absent injunctive relief, the Remaining Prohibitions will shutter this "modern public square" on

November 12, 2020, restricting Plaintiffs' protected speech in violation of the First Amendment. *See U.S. WeChat Users All. v. Trump*, 2020 WL 5592848, at *10 (N.D. Cal. Sept. 19, 2020) (granting preliminary injunction of parallel WeChat ban because plaintiffs raised sufficiently "serious questions going to the merits of their First Amendment claim that the Secretary's prohibited transactions effectively eliminate the plaintiffs' key platform for communication, slow or eliminate discourse, and are the equivalent of censorship of speech or a prior restraint on it").

a)      *Plaintiffs' Speech Is Protected by the First Amendment.*

Plaintiffs indisputably have interests that are protected under the First Amendment.  As users of the platform, Plaintiffs are speakers themselves on the application, and have the right to communicate freely with other users over the platform.  *See* Supp. Pappas Decl. ¶ 6 (TikTok Inc. publishes "posts with messages about topics of interest and importance to the company"); Exs. 33, 34.  The Supreme Court has recognized that the "wide array" of speech on social media, on topics as "diverse as human thought," is core protected speech.  *See Packingham*, 137 S. Ct. at 1735-36 ("It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular" that are "the most important places . . . for the exchange of views." (citation omitted)).

By shutting down TikTok and thereby barring its millions of users—including Plaintiffs themselves—from engaging in speech, the Remaining Prohibitions impose a prior restraint in violation of Plaintiffs' First Amendment rights.  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) (denial of use of municipal facility for theater production was an unlawful prior restraint); *see also* ECF No. 30 at 13 ("It is undisputed that the Secretary's prohibitions will have the effect of preventing Americans from sharing personal communications on TikTok.").  The government is not threatening to punish speech after the fact; rather, it has banned users from accessing a forum where millions of users communicate on a daily basis, including in real time as ongoing events unfold.  In other words, the government has placed an advance prohibition on communications

34

and effectively "fr[ozen]" speech before it can take place—the hallmark of a prior restraint. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Indeed, the Supreme Court has "consistently" recognized in a "long line" of cases that government actions that "deny use of a forum in advance of actual expression" or forbid "the use of public places [for plaintiffs] to say what they wanted to say"—like the Remaining Prohibitions do here—are unconstitutional prior restraints. *Se. Promotions*, 420 U.S. at 552-53; *see also Healy v. James*, 408 U.S. 169, 184 (1972) (college's decision not to recognize Students for a Democratic Society chapter operated as a prior restraint because it denied access to a "range of associational activities").

Defendants cannot avoid the First Amendment consequences of their actions by claiming to target only business-to-business transactions. *See Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 720 (1931) ("Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint."); *Lovell v. Griffin*, 303 U.S. 444, 451 (1938) (ordinance restricting distribution of pamphlets unlawful because "[w]hatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship").

Nor do the Remaining Prohibitions impose merely an "incidental" burden on speech, as Defendants have asserted. *See* ECF No. 21 at 30. Government conduct "cannot be classified as a restriction on economic activity that incidentally burdens speech" when "it completely prohibits . . . an activity which, by its very nature, depends upon speech or expressive conduct." *Billups v. Charleston*, 961 F.3d 673, 683-84 (4th Cir. 2020). Here, the Remaining Prohibitions "completely prohibit" the use of TikTok in the U.S.—"an activity which, by its very nature, depends upon speech or expressive conduct." *Id.* In contrast to generally applicable regulations such as taxation or zoning regulations, which have only an incidental effect on speech, here the economic effect is

properly understood as incidental to the Prohibitions' express purpose "to limit, and ultimately reduce to zero, the number of U.S. users who can comment on the platform and have their personal data on TikTok." ECF No. 30 at 10-11; *see also* Commerce Memo at 22 (Prohibitions "deny access to and reduce the functionality" of TikTok "with the objective of preventing . . . transmission . . . of U.S. user data").

<em>b)      The Remaining Prohibitions Fail First Amendment Scrutiny.</em>

Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. As the party seeking to impose a prior restraint, the government must overcome a "heavy presumption against its constitutional validity." *Id.* at 558. Such restraints are reviewed under strict scrutiny, under which the government bears the heavy burden to prove it has narrowly tailored the restraint to promote a compelling government interest while treading as lightly as possible on the right to speak. *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816 (2000). "If a less restrictive alternative would serve the Government's purpose, the [government] *must* use that alternative." *Id.* (emphasis added). The Remaining Prohibitions cannot overcome the heavy presumption against their constitutional validity, as they are not narrowly tailored and the least restrictive means available to effectuate the government's purported national security interests. *See infra* at 37-38. *See also supra* at 28-30.

Moreover, even if the Court were to conclude that the Remaining Prohibitions are subject to intermediate scrutiny because they only incidentally burden speech, they would not survive review. Intermediate scrutiny requires that a speech restriction be "narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). This means that it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 137 S. Ct. at 1736 (quoting *McCullen*, 573 U.S. at 486). Tailoring "demand[s] a close fit between ends and means." *McCullen*, 573 U.S. at 486.

36

The government's stated purpose for the Prohibitions is to protect national security. Although that interest is undoubtedly significant, there has been no showing that banning TikTok is necessary to protect that interest.  *See supra* at 23-30.  The government "must do more than simply posit the existence of the disease sought to be cured." *Turner Broad. Sys.*, 512 U.S. at 664 (plurality).  Rather, it "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.*  Yet conjecture is all the government has offered.  *See, e.g.*, Ex. 12 (noting that China could "potentially" access TikTok user data, which "*may* be used for disinformation campaigns"); AR-1599 (noting the risk of "a cyber actor" executing an attack, and that use of TikTok "could" lead to "data theft"); AR-21 (speculating that "intelligence operations" by the Chinese government "could ostensibly occur without ByteDance's express knowledge or awareness at a corporate level").

The ban also "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 137 S. Ct. at 1736.  As part of the ongoing CFIUS negotiations, Plaintiffs offered to implement a range of potential mitigation solutions to address the government's purported national security concerns.  Likewise, there are a number of steps, short of a total ban on TikTok, that the government could have taken to address its purported national security concerns.  Indeed, the Commerce Department's own Administrative Record identifies alternative and less restrictive measures to address any national security concerns.  *See supra* at 28-30.  The government has not explained "why these possibilities, alone or in combination, would be insufficient" to further any national security interest that the Prohibitions are purported to address.  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).  That, however, is the least the government must do before trampling the free speech rights of Plaintiffs

and millions of Americans.  *See Edwards v. District of Columbia*, 755 F.3d 996, 1009 (D.C. Cir. 2014) ("Even assuming [the asserted] harms are real," the government "has provided no convincing explanation as to why a more finely tailored regulatory scheme would not work").

    2.  <u>The Remaining Prohibitions Violate Plaintiffs' Due Process Rights.</u>

  When the government deprives private parties of their property rights, those actions must satisfy the Due Process Clause of the Fifth Amendment.  *See Holy Land*, 333 F.3d at 163.  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted).  The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived" of a property or liberty interest.  *Id.*  Even in the national security context, "due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence."  *Ralls Corp. v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014).  Here, the government satisfied none of these requirements.

  The Remaining Prohibitions violate at least two cognizable liberty and property interests: Plaintiffs' rights to their chosen line of business and their rights to free speech.  *First*, Plaintiffs enjoy a liberty interest in "avoiding the damage to their reputation and business caused by a stigmatizing suspension."  *Reeve Aleutian Airways v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993), *as amended on denial of reh'g* (Mar. 26, 1993); *see Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003).  *Second*, Plaintiffs also enjoy a liberty interest in their free speech rights.  *See DeJonge v. Oregon*, 299 U.S. 353, 364 (1937).  Therefore, at a minimum, the due process clause requires the government to provide notice and the opportunity to be heard when it acts to deny these rights.  *See Holy Land*, 333 F.3d at 163.  No such process was provided here.

  The government did not provide Plaintiffs with constitutionally adequate notice of the

reasons for the Prohibitions.    The Prohibitions themselves rely exclusively on vague and speculative statements about the "possibility" that TikTok might be misused by the Chinese government, but cite no specific evidence related to TikTok.  *See supra* at 9-10, 23-38.  Instead, the first time the government provided any explanation for its actions was in the Commerce Memo attached as an exhibit to the government's opposition to Plaintiffs' first motion for a preliminary injunction—*after* the Prohibitions already had been issued.  This is insufficient to comply with due process requirements.  *See, e.g.*, *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 988, 1001 (9th Cir. 2012) (OFAC violated plaintiff's due process rights by, among other things, "failing to provide an adequate statement of reasons for its investigation" and failing to afford the plaintiff a meaningful opportunity to respond).

The government's failure to provide Plaintiffs with the reasons for its decision necessarily meant that Plaintiffs did not have an opportunity to adequately respond to the government's purported concerns.  *See id.*  But the constitutional flaws in the Commerce Department's process are even more fundamental, as Plaintiffs were provided no opportunity to be heard at all.  They were never given "the opportunity to present, at least in written form, . . . evidence . . . to rebut the administrative record or otherwise negate the proposition" that they pose a national security risk. *Holy Land*, 333 F.3d at 163.  Instead, "this was largely a unilateral decision with very little opportunity for plaintiffs to be heard, and the result . . . is a fairly significant depravation."  Hr'g Tr. at 42:1-4.  This is insufficient.[13]  *See, e.g.*, *Holy Land*, 333 F.3d at 163; *Ralls*, 758 F.3d at 320

---

[13] Indeed, the Commerce Department itself appears to have recognized that an entity subject to regulation under the national emergency declared in Executive Order 13873—purportedly including Plaintiffs here—should be provided written notice and an opportunity to respond before any final action is taken.  The proposed rule that the agency promulgated to implement Executive Order 13873 stated that, upon a preliminary determination by the Secretary that a transaction was subject to the order, the regulated entity should be given "written notice" with "[a]n explanation of the basis for such preliminary determination to the extent such explanation can be provided

("That Ralls had the opportunity to present evidence to CFIUS and to interact with it, then, is plainly not enough to satisfy due process because Ralls never had the opportunity to tailor its submission to the Appellees' concerns or rebut the factual premises underlying the President's action.").

The court's decision in *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2009) is instructive.  There, the Treasury Department froze a U.S.-based entity's assets pending investigation under an executive order, and disclosed a partial set of unclassified documents.  Critically, however, the government failed to provide notice of the factual and legal bases for its actions.  Applying the due process test in *Mathews*, the court found that (1) the private interest in not having the entirety of one's assets frozen indefinitely is substantial; (2) "the failure to provide adequate and timely notice creates a substantial risk of wrongful deprivation;" and (3) with respect to the burden of providing greater process, the government "has not explained . . . why it failed to provide timely notice of the basis and reasons for its blocking order, or why it took so long for it to provide the scanty information it ultimately has produced." *Id.* at 904-06.  The same analysis applies here, where Plaintiffs had to bring suit to obtain any reasoning for the ban.  As a result of the Remaining Prohibitions, TikTok will be shut down, not just indefinitely, as in *KindHearts*, but permanently; the consequences of error through a one-sided process are enormous; and the government has offered no justification whatsoever for failing to

---

consistent with national security," and "[w]ithin 30 days after receipt of the notice, the specific party may submit an opposition and information in support of such opposition to the preliminary determination or information on proposed measures for mitigation."  U.S. Dep't of Commerce Securing the Information and Communications Technology and Services Supply Chain (Nov. 7, 2020),          https://www.federalregister.gov/documents/2019/11/27/2019-25554/securing-the-information-and-communications-technology-and-services-supply-chain.   The proposed rule instructed that the "Secretary shall take into consideration any comments received pursuant to th[is] process . . . in making a final determination."  *Id.*

provide timely notice.  Thus, the Remaining Prohibitions violate Plaintiffs' due process rights.

### D.     The Remaining Prohibitions Violate IEEPA in Other Respects.

In addition to the grounds stated above, the Remaining Prohibitions are *ultra vires* because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat," as IEEPA requires.  By exceeding the scope of the President's statutory authority, the Remaining Prohibitions are unlawful and should be enjoined.  *See, e.g.*, *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 187-89 (D.D.C. 2011).

IEEPA provides, in relevant part, that after first declaring a national emergency under the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*, the President may regulate various international economic transactions "to deal with any unusual and extraordinary threat" to certain government interests, including the national security, as the President claimed here.  50 U.S.C. § 1701(a).  Before the President is empowered to exercise authority under IEEPA, however, he must first declare a national emergency for purposes of the NEA, 50 U.S.C. § 1601 *et seq*.  *See also* Tyler Decl. ¶ 17 (describing President's IEEPA authority).

The Prohibitions cite Executive Order 13873 (issued in 2019), which declared that "the unrestricted acquisition or use in the United States of [certain] information and communications technology or services . . . augments the ability of foreign adversaries to create and exploit vulnerabilities in information and communications technology or services . . . [and] constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  Ex. 35.  But TikTok is not a telecommunications provider and it does not provide the types of technology and services contemplated by Executive Order 13873.  *See, e.g.*, AR-51, 53 (categorizing Huawei as an "internet and telecommunications" company, whereas ByteDance is an "internet technology company").  It does not provide the hardware backbone to "facilitate the digital economy," and has no role in providing "critical infrastructure and vital emergency

services."  Ex. 35.  Rather, TikTok Inc. is an entertainment and social media platform, and the

TikTok mobile application is a software platform on which users express their views and opinions

in short form video.  Pappas Decl. ¶¶ 4, 17; Commerce Memo at 2, 4 (describing TikTok as a

"messaging and social media application" and a "short-form video app").  Thus, the Remaining

Prohibitions are not supported by the emergency declared in Executive Order 13873.

Apart from their misplaced reliance on Executive Order 13873, the Prohibitions also fail

to identify *any actual threat* that TikTok poses to U.S. national security.  *See supra* at 9-10, 23-

28.  The speculative concerns the government identified, made without evidentiary support, do not

constitute a *bona fide* national emergency.  *See* 50 U.S.C. § 1701(a) ("emergency" must be an

"unusual and extraordinary threat"); Revision of Trading With the Enemy Act: Markup Before the

H. Comm. on Int'l Relations, 95th Cong. 4 (1977) (emergencies under IEEPA are "rare and brief,"

not "normal, ongoing problems").[14]

## II.    All of the Other Elements Required for Injunctive Relief Are Easily Established.

### A.    The Remaining Prohibitions Are Inflicting, and Will Continue to Inflict, Irreparable Harm.

If allowed to go into effect, the Prohibitions "will inflict irreparable economic and

reputational harm on Plaintiffs."  ECF No. 30 at 16.  The Court reached this conclusion with

respect to the first Prohibition, and it applies *a fortiori* to the Remaining Prohibitions, which will

---

[14] This conclusion is required not just by the plain language of IEEPA and the NEA, but by the serious constitutional problems that otherwise would be raised.  The nondelegation doctrine requires Congress to articulate an "intelligible principle" when it confers decision making authority upon the executive branch.  *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 472 (2001).  Here, if the Court were to conclude that the sweeping and unjustified ban imposed on TikTok is valid under IEEPA, then that statute would lack any "intelligible principle" to guide Executive Branch decision-making authority, in violation of the nondelegation doctrine.  This Court should "construe the statute to avoid such problems."  *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (citations omitted); *see also Nat'l Cable Tel. Ass'n v. United States*, 415 U.S. 336, 340-41 (1974) (construing assessment as "fee" rather than a "tax" to avoid non-delegation question).

irreversibly destroy the TikTok business in the United States:  they will decimate TikTok's user base and competitive position, destroy the goodwill necessary for TikTok to maintain commercial partnerships in the United States, and cripple Plaintiffs' ability to attract and retain talent.  "This factor therefore weighs in favor of granting preliminary relief."  *Id.*

Until the August 6 order, TikTok was one of the fastest growing apps in the United States, adding 424,000 new U.S. users each day.  *See* Pappas Decl. ¶ 18.  Continued growth is the lifeblood of a communication platform like TikTok and essential to maintain its competitive market position.  *See id.* ¶ 17.  Even before the Prohibitions were announced, uncertainty over TikTok's availability in the United States due to the August 6 order began to drive prominent TikTok content creators (and their fans) to other platforms.  *See id.* ¶¶ 21-22; *see also* Ex. 36.  And once users are established on a different application, they are unlikely to return to TikTok.  Pappas Decl. ¶¶ 21-22.  *See also* ECF No. 30 at 15 ("TikTok has proffered unrebutted evidence that uncertainty in TikTok's future availability has already driven, and will continue to drive, content creators and fans to other platforms.").

Even if the shutdown were lifted within two months, 40-50% of daily active users would be lost permanently, never to return.  Pappas Decl. ¶ 19.  If the ban is in place for six months, 80-90% of daily active U.S. users will not return.  *Id.*  Accordingly, even if the TikTok Ban were later lifted, TikTok would not be able to reverse the loss of users.  *Id.*  It is well-established that this sort of loss of market share to a competitor constitutes irreparable harm.  *See, e.g.*, *Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013); *Nalco*, 786 F. Supp. 2d at 188.

Finally, the Remaining Prohibitions, if not enjoined, will irreversibly harm Plaintiffs' reputation and competitive strength.  Pappas Decl. ¶¶ 21-22; *see also* ECF No. 30 at 16 ("Plaintiffs have also proffered evidence that they have been harmed, and will continue to be harmed, by the

erosion of TikTok's attractiveness as a commercial partner."). TikTok's commercial partners and U.S. advertisers want to work with TikTok because of its vibrant community. By destroying that community, the Remaining Prohibitions will cause lasting damage to TikTok's reputation and attractiveness as a commercial partner, causing current and prospective partners to forge relationships with its competitors. Pappas Decl. ¶¶ 6, 23-25. Advertisers also will build partnerships with other platforms. *Id.*; *see also Brodie v. HHS*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010). Moreover, the Remaining Prohibitions will harm Plaintiffs' ability to attract and retain top employees, some of whom have already rejected offers of employment based on the government's actions against TikTok. Pappas Decl. ¶ 26; *see also* ECF No. 30 at 16 ("TikTok has shown that, in the absence of injunctive relief, it will be unable to recruit and retain employees to build—or even maintain—its business."). In short, even if the app is later restored, the damage will have been irrevocably done.

Lastly, TikTok Inc. also faces an immediate restriction of its protected First Amendment right to speak. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149 (D.D.C. 2016) .

### B.     The Balance of Equities and Public Interest Require Injunctive Relief.

As this Court rightly concluded with respect to the preliminary injunction against the first Prohibition, the final two elements of the test for injunctive relief—the balance of equities and public interest—tilt in favor of granting injunctive relief here as well. ECF No. 30 at 16-17.

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (collecting cases). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (citation omitted). Here, Plaintiffs

have demonstrated that they are likely to succeed on their claims, "and the government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'"  ECF No. 30 at 17 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).  Likewise, the public interest requires an injunction against the Prohibitions' restriction of the speech of millions of Americans in violation of their First Amendment rights.  *Id.* at 511 ("there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation"); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (similar).  Finally, the Commerce Department's 43-day delay after the August 6 order before it issued the Prohibitions, as well as the further delay until November 12 for them to go fully into effect, belies any claimed urgency justifying immediate implementation of the Remaining Prohibitions to protect the government's purported national security interests.

Because the harm the Remaining Prohibitions would inflict on Plaintiffs and third parties grossly outweighs any harm to the government from an injunction, this final requirement for the issuance of injunctive relief is more than satisfied.

## CONCLUSION

Plaintiffs respectfully urge the Court to grant the instant motion and to issue as soon as possible, and in all events no later than November 12, 2020 at 11:59 p.m., a preliminary injunction preventing the Remaining Prohibitions from taking effect.

DATED: October 14, 2020                   Respectfully submitted,

                                           */s/ John E. Hall*

Anders Linderot*                          John E. Hall (D.C. Bar. No. 415364)
COVINGTON & BURLING LLP                   Beth S. Brinkmann (D.C. Bar. No. 477771)
The New York Times Building               Alexander A. Berengaut (D.C. Bar. No. 989222)
620 Eighth Avenue                         Megan A. Crowley (D.C. Bar. No. 1049027)
New York, New York 10018-1405             Megan C. Keenan (D.C. Bar. No. 1672508)
Telephone: +1 (212) 841-1000              COVINGTON & BURLING LLP
Facsimile: + 1 (212) 841-1010             One CityCenter
Email:  alinderot@cov.com                 850 Tenth Street, NW
                                          Washington, DC 20001
                                          Telephone: +1 (202) 662-6000
Mitchell A. Kamin*                        Facsimile: + 1 (202) 778-6000
COVINGTON & BURLING LLP                   Email:  jhall@cov.com
1999 Avenue of the Stars, Suite 3500              bbrinkmann@cov.com
Los Angeles, California 90067-4643                aberengaut@cov.com
Telephone: + 1 (424) 332-4800                     mcrowley@cov.com
Facsimile: + 1 (424) 332-4749                     mkeenan@cov.com
Email:  mkamin@cov.com

*Pro Hac Vice


                                          *Attorneys for Plaintiffs*