# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TIKTOK INC. and BYTEDANCE LTD., *Plaintiffs*, v. DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and U.S. DEPARTMENT OF COMMERCE, *Defendants*. | Civil Case No. 20-cv-2658 |

## DECLARATION OF ERIC HAN

I, Eric Han, under penalty of perjury, hereby declare as follows:

1. I am the head of the U.S. Safety team at TikTok Inc. I am a U.S. citizen with prior experience in content moderation for several U.S. companies, including Google and Twitter.

2. My responsibilities include supervision and oversight of the content moderation and policy decisions for TikTok's U.S. operations. For clarity, references in this declaration to "TikTok Inc." are to the U.S. corporate entity and references to "TikTok" are to the software application and business unit.

3. The purpose of this declaration is to explain TikTok's content moderation policies and to respond to several of the government's assertions about our content moderation policies and practices in the Department of Commerce September 17, 2020 memorandum (the "Commerce Memo") that was issued in relation to the Executive Order dated August 6, 2020 regarding TikTok, as well as statements made in the government's brief filed on September 25, 2020.

4. This declaration is based upon my personal knowledge and belief and/or upon my review of business records of TikTok Inc. and ByteDance.

A. **TikTok's Approach to Content Moderation in the United States**

5. The foundation of TikTok's content moderation policy is its publicly-available Community Guidelines.[1] These Guidelines provide a baseline standard for when we remove content—including video, audio, image, and text—that violates our rules in relation to the following ten topics: (1) hate speech; (2) violent and graphic content; (3) suicide, self-harm, and dangerous acts; (4) harassment and bullying; (5) adult nudity and sexual activities; (6) minor safety; (7) integrity and authenticity; (8) threats to platform security; (9) dangerous individuals or organizations, and (10) illegal activities and regulated goods.

6. We have invested enormous resources in technology that acts as the first line of defense against content that violates our Community Guidelines, such as displays of extreme violence, child exploitation, pornography, or spam. Our second line of defense consists of human moderators operating on the basis of our Community Guidelines.

7. As the head of TikTok's U.S. Safety team, I am in charge of our content moderation process as well as our ongoing and continual process of refining and improving TikTok's content moderation policy. We have dedicated teams devoted to each of these functions, and these teams work together to reinforce the objectives of each process.

8. Our policy team is tasked with transforming our Community Guidelines into playbooks that TikTok moderators can use to implement the Guidelines in practice. The policy team also creates the new trainings that moderators receive any time TikTok's policy is refined and improved.

---

[1] https://www.tiktok.com/community-guidelines?lang=en

9.  Our moderation team is tasked with implementing TikTok's content moderation policy, as well as sustaining and scaling implementation of our policies as user growth expands. Content moderators help to ensure that (1) we make consistent and accurate decisions based on our Community Guidelines/playbooks and (2) our policies are continually refined based on their feedback.

10. All of TikTok's U.S. policy and moderation decisions ultimately are overseen by my Safety team, which consists of 60 full-time employees who are based in our Los Angeles office. Our U.S. Safety team retains supervisory authority over the other global offices with respect to U.S. and Canadian content moderation, and our team alone is authorized to use our content moderation software tools to remove a video from TikTok. I have day-to-day operational responsibility for deciding whether content should be removed under our policy; the ultimate responsibility for content moderation decisions resides with Vanessa Pappas, the head of TikTok Inc. and interim head of the global TikTok business. Although Ms. Pappas has been involved in some important content moderation decisions, her participation is always collaborative and we have reached decisions by consensus.

11. Our U.S. Safety team is supported by a second full-time team in Kuala Lumpur that receives input and guidance from our U.S. team, as well as by moderation sites staffed by contracted vendors around the globe, four of which are located in the United States and two of which are in the Philippines. In total, there are six content moderation sites and one team in Kuala Lumpur—none of our content moderation teams are in located in China. Our U.S.-based Safety team communicates regularly with these global operations and policy teams about platform-wide, cross-border, and other technical issues, and our policy and moderation decisions in the United

States often inform content moderation policy and decisions for TikTok's operations in other countries.

12. Content is flagged for our content moderation team's review in various ways, including because of user reporting, law enforcement reports, notices from copyright owners, machine learning (including key-word flagging), and high viewership. Our human moderation teams make the vast majority of decisions regarding whether to remove content in the U.S. market, based on our Community Guidelines and content moderation policies. (In the most extreme cases of policy violations—for example, viral videos of very graphic self-harm—our machine learning tools can detect and immediately remove video, with guidance from a member of my team to ensure we limit the risk of false positives.)

13. After a video is removed from TikTok, an appeal process is available to the user whose content was removed. If a user appeals the removal of content that the user believes was improperly removed based on the Community Guidelines, a member of our content moderation team would review the appeal. If the removal was not supported by TikTok's content moderation policy, our U.S. Safety Team would further investigate to determine who removed the content and why to better improve our practices.

14. In addition to the appeal process, our quality assurance team analyzes representative samples of content removed from TikTok to determine whether our content removal practices comport with our content moderation policy.

**B.  The Evolution of TikTok's Content Moderation Policy and Responses to U.S. Government Statements**

15. When TikTok was first launched, its content moderation policies drew upon the policies for other products. In late 2018, however, as the business grew, TikTok changed its content moderation policies to establish localized policies that more specifically reflected the local

4

norms and customs in each of the countries where TikTok was available, including in the United States. The development of more organized, integrated, and substantively sound content management processes and policies accelerated and improved as TikTok Inc. hired experienced personnel in the United States to take on key roles in content moderation.

16. On April 30, 2019, I was appointed to serve as head of the U.S. Safety team, with responsibility for managing the U.S. content moderation teams. As I transitioned into the role, the company also gave me responsibility for overseeing content moderation policy for the U.S. market as well, thereby completing the process of separating the U.S. content moderation team from the global team.

17. In addition, in light of the breadth, complexity, and fast moving nature of content moderation challenges—including, for example, the malicious use of synthetic media or so-called "deepfakes"—we have established a Content Advisory Council comprised of outside experts to further strengthen the company's teams, moderation policies, and overall transparency.[2] The Content Advisory Council meets quarterly, and it held its first meeting on March 31, 2020.

18. Many of the policies and practices highlighted in the Commerce Memo are either described inaccurately or are based upon dated information that does not reflect TikTok's current content moderation policy.

19. Specifically, the Commerce Memo cites a November 2019 Washington Post article that includes inaccurate and dated information. While the article correctly reported that TikTok's U.S. application does not censor political content or "take instructions from its parent company," and that no content moderators for the TikTok platform in the United States are based in China, the article inaccurately states that content moderators based in Beijing have the final call on

---

[2] https://newsroom.tiktok.com/en-us/introducing-the-tiktok-content-advisory-council

5

"whether flagged videos were approved."[3]  As noted above, I have final day-to-day responsibility regarding the removal or approval of any video flagged under our content moderation policy (subject to supervision by Vanessa Pappas), and only the members of my U.S. Safety team are authorized to remove content using our content moderation software tools.

20.     The Commerce Memo also cites a Guardian article from September 2019 regarding our content moderation practices.  The article describes a policy banning "criticism/attack towards policies, social rules of any country, such as constitutional monarchy, monarchy, parliamentary system, separation of powers, socialism system, etc."[4]  This language comes from our early content moderation policy described above, before the policy was localized to reflect regional norms and customs.  As the Commerce Memo notes, we have clarified that this policy is no longer in force.

21.     The Commerce Memo also identifies two anecdotal examples of content removal in support of its claim that TikTok is "exercising a CCP-aligned censorship campaign." (Commerce Memo at 12-13).  That claim is untrue and, in any event, these examples do not support such a conclusion:

- The Commerce Memo cites a Washington Post article from September 2019 reporting that there were fewer Hong Kong protest videos on TikTok than the reporters would have expected to see.
    - Our U.S. Safety team took the concerns raised in this article very seriously.  We conducted an internal review, including a broad review of available content on the platform and constructing searches with key words to see whether the platform delivered expected results.
    - The investigation concluded that there was no removal of Hong Kong protest videos based on political speech filtering, and our review of facts and circumstances revealed no evidence that the Chinese government asked TikTok to restrict U.S. content relating to Hong Kong protests and the company has not

---

[3] Commerce Memo at 12, https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.
[4] Commerce Memo at 12, https://www.theguardian.com/technology/2019/sep/25/revealed-how-tiktok-censors-videos-that-do-not-please-beijing.

    done so in response to any such request. At present, there are millions of views of videos about the Hong Kong protests on TikTok.

    o Our review determined that Hong Kong protest videos that were removed were done so because they ran afoul of basic provisions in the content moderation policies and Community Guidelines and not because of the nature of the political content. For example, videos could be moderated because they showed guns being used and/or graphic violence, which were against the community guidelines that were in place at the time of the protests. TikTok has also removed videos depicting other types of protests around the world for the same reasons.

- The Commerce Memo refers to allegations of censorship made by an individual TikTok user, Feroza Aziz, whose video about China's human rights abuses was removed from the platform.

    o The Commerce Memo states that, in response to an accusation of censorship in November 2019, TikTok "did not explain in detail" its decision to remove the content.[5] This is not accurate. I personally drafted a public statement that was published on our company website on the same day that the content was erroneously removed.[6]

    o My statement explained the full timeline of events that led to the human error that resulted in the removal of the video in question—including that the user had posted a separate video (not about China) that was flagged as a violation of TikTok's policies against content that includes imagery related to terrorist figures, that the China-related video was mistakenly removed from the platform after the user's unrelated video had been flagged, and that the China-related video was reinstated on TikTok within 50 minutes of being removed after a senior member of the content moderation team identified the error.

22. Our content moderation practices will not operate perfectly in every instance, and it is true that our human moderators will sometimes make mistakes. In particular, mistakes are possible when the flagged content could be construed to violate our content moderation policy if not viewed in the proper context—for example, videos of a protest against a hate group may appear to an unknowing moderator to include hate speech, harassment, graphic or violent images, or dangerous individuals or organizations, each of which is included in our Community Guidelines.

---

[5] Commerce Memo at 13.
[6] https://newsroom.tiktok.com/en-us/an-update-on-recent-content-and-account-questions.

DocuSign Envelope ID: E0D378CE-AC74-429A-905F-348FC300A714

But these mistakes result from human error, not from any direction from China. When such mistakes happen, our commitment is to quickly address and fix them, undertake trainings or make changes to reduce the risk of the same mistakes being repeated, and fully own the responsibility for our errors.

23. Finally, the government's opposition brief (pages 25-26) also raised a question about if or how TikTok would become aware of a request from the Chinese government regarding content moderation, or how TikTok and ByteDance could successfully resist such a request, given that ByteDance has operations in China with employees based in that country. As explained above, only my U.S. Safety team is authorized to use our software tools to remove videos from the TikTok in the United States, so any such request must come through my team. Additionally, the appeal process and quality assurance process described above provide another check by which my team would be made aware if a video was somehow removed without my team's permission. These processes help ensure that my team is aware of any efforts to moderate U.S. content.

24. In particular, these processes provide an additional means of verifying that the Chinese government has never sought to moderate U.S. content. Because I ultimately have responsibility on whether to remove a video, moreover, I can confirm that I would not comply with any request from the Chinese government to censor or otherwise moderate content on TikTok, unless the content independently qualified for moderation under our Community Guidelines and the moderation policies that are overseen by my U.S.-based team.

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, I affirm that the foregoing facts are true and correct to the best of my knowledge.

Executed this 13th day of October, 2020.

*[DocuSigned by: A0619A72534D4B1...]*

Eric Han