**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TIKTOK INC. and BYTEDANCE LTD.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce; and U.S. DEPARTMENT OF COMMERCE,<br><br>*Defendants*. | Civil Case No. 20-cv-2658 |

**SUPPLEMENTAL DECLARATION OF PROFESSOR STEVEN WEBER**

I, Steven Weber, under penalty of perjury, hereby declare as follows:

1.  I am Professor and Associate Dean of the School of Information, and Professor of Political Science, at the University of California, Berkeley. I have been retained by the plaintiffs in this case to analyze President Trump's Executive Order of August 6, 2020 relating to the TikTok software application ("the August 6 order") and the Department of Commerce's subsequent actions pursuant to that order, which identified specific prohibited transactions in regards to TikTok.

2.  I submitted a declaration in this case on September 21, 2020 that analyzed the stated justifications for the August 6 order. I now submit this supplemental declaration to provide a further assessment of the administrative record submitted by the government on October 5, 2020 in defense of the August 6 order, including in particular the Commerce Department memorandum prepared by Deputy Assistant Secretary John Costello on September 17, 2020 regarding "Proposed

Prohibited Transactions Related to TikTok Pursuant to Executive Order 13942" (the "Commerce Memo").

3. As noted in my initial declaration, I have also reviewed the declaration of Roland Cloutier, TikTok's Chief Security Officer, as well as other data security-related materials the company has made public. I have also reviewed Mr. Cloutier's supplemental declaration executed on October 12, 2020. In reviewing the government's brief in this case (page 25 footnote 6), I see that the government has observed that my initial declaration did not specifically list these materials. I mentioned these materials because they have informed my understanding of how TikTok operates, and I provided specific references to my sources in my initial declaration where relevant for particular points. That said, to the extent it is helpful, I have also attached as Exhibit 1 a list of all the public TikTok materials that I recall reviewing.

4. In the same footnote, the government also notes that it is "rather curious that Plaintiffs hired a purported cybersecurity expert … but then affirmatively chose not to provide that individual with access to any non-public material." As to my qualifications, as noted in my original declaration, I am the founder and faculty director of the Center for Long Term Cybersecurity at UC Berkeley, where I lead a multi-disciplinary research group that works on cybersecurity issues. I am a political scientist by training with a specialization in the national security dimensions of digital technology, however, not a software engineer, and the focus of my declaration is accordingly on a high-level assessment of TikTok's data and algorithm security protections vis-à-vis industry standards and in the context of national security risk. Like many fields, data security is a subject that can be analyzed from a number of perspectives, and many senior data security professionals, notably including Chief Information Security Officers ("CISOs") at major companies, have multi-disciplinary backgrounds that are not first and foremost technical. For this

type of qualitative analysis, review of the computer code comprising TikTok's security safeguards is neither necessary nor appropriate, though I note that Mr. Cloutier's declaration states that TikTok leverages other third-party experts to conduct security assessments and code reviews (as is best practice for such firms).

5. With the foregoing background, I will turn to addressing several points raised by the government in the Commerce Memo.

6. First, on page 3 of the Memo, it states that "ByteDance successes have been attributed to its algorithm, which tailors content for users. The Company has kept its algorithm mostly shrouded; however, Yiming has explained that it is powered through AI and machine learning." The use of the word "shrouded" suggests that there is something nefarious about a company maintaining confidentiality over AI and machine learning algorithms for user content recommendation. But this is simply standard industry practice, for virtually all social media (and many other technology) companies, where AI-enabled algorithms are a core piece of intellectual property. The fact that ByteDance has not publicly disclosed its recommendation algorithm is evidence of a common commercial strategy, not a suspicious activity. What's more, as noted in my original declaration, TikTok's newly-announced "Transparency and Accountability Center" will enable researchers to examine the code that drives the TikTok recommendation algorithm, which is an unprecedented step for social media companies.

7. Second, on pages 13-14 of the Memo, The Commerce Department describes TikTok's practices with respect to the collection of data from its users. In this section, the memorandum makes several points that reinforce observations made in my initial declaration, and undercut the rationale for the August 6 executive order. For example, the memorandum acknowledges that TikTok's practices on data collection are "similar to other major social media

platforms." (Commerce Memo at 14.) The memorandum also states that data collection practices that have been subject to criticism (such as scanning of information stored on a device's clipboard) may be "pretty standard" practices that relate to efforts to combat automated bot and spam behavior. (*Id.* & n. 115).[1] Lastly, the memorandum states that "TikTok collected far more data in the past," which is of course yet another industry-wide trend, as new regulations such as Europe's General Data Protection Regulation ("GDPR") and California's Consumer Privacy Act ("CCPA") impose new obligations with respect to data privacy on firms throughout the economy. These acknowledgments in the Commerce Memo undercut the rationale for the Administration's decision to single out and ban TikTok.

8. The apparent concern in the Commerce Memo with regard to TikTok's collection of user data is the possibility that such data could be shared with ByteDance and ultimately with the Chinese government. It is conspicuous, however, that the Commerce Memo does not address the safeguards that TikTok has in place to protect user data, including in particular its encryption of data in storage as described in Mr. Cloutier's declaration. As I discussed in my initial declaration, encryption of stored data is a common best practice for mitigating data security risk. The value of encryption is that if stored data is somehow accessed without authorization, the data will be indecipherable without the encryption key. Discussing perceived vulnerabilities in TikTok's data security safeguards without discussing its encryption practices would be like discussing the security of money in a bank without considering whether or not the bank kept the money in a vault.

---

[1] TikTok provided a detailed explanation of this practice in a blog post in June 2020. https://newsroom.tiktok.com/en-gb/updates-on-our-security-roadmap-uk/

9.      The same issue pervades the Commerce Memo's discussion of TikTok's storage of some user data in Singapore through Alibaba Cloud and in the United States through China Unicom (Americas) Operations Ltd. ("CUA"). The Commerce Memo seems to assume that if TikTok stores data on a server owned or leased by a Chinese company, that means there is a significant risk that the company and by implication the Chinese government would have access to that data.[2] But this assumption misunderstands the commoditized market for cloud storage. Technology companies like TikTok can contract for data storage from a range of providers. While some forms of cloud-based services involve the cloud provider accessing the customer's data (for example, a company might contract with Google to provide not just storage space, but also the Gmail email service), often times a company is simply contracting for "raw hardware" storage space, where the customer provides its own software environment, including security controls. In the latter scenario, the cloud provider may have physical access to the datacenter premises, but industry-standard security protections help guard against any unauthorized access to the customer's software environment. Mr. Cloutier addresses several of these protections in his declaration, including logical controls and data sharding.

10.     The final respect in which the Commerce Memo misrepresents basic data security principles pertains to the principle, discussed in my initial declaration, that data security is not a binary switch that can be toggled on or off—it is always an exercise in risk mitigation in response to an evolving threat landscape. It is a truism to state, as the Commerce Memo does, that

---

[2] Based on Mr. Cloutier's supplemental declaration, it also appears that the Commerce Memo misunderstood the precise nature of the services that TikTok purchased from CUA. According to Mr. Cloutier's declaration, CUA does not supply any servers or software, but rather only the building and utilities such as electricity, in a leased facility with restricted physical access. As Mr. Cloutier explains, this is an additional reason why the relationship with CUA does not present the security risk asserted by the Commerce Memo.

"ByteDance cannot account for surveillance that may be conducted on its operations without its explicit knowledge or awareness at a corporate level." No organization can account for surveillance that it does not know about. Data security is about mitigating the risk that is always posed by the potential of unknown surveillance from whatever source, through the implementation of safeguards, like encryption.

11. Relatedly, the government faults TikTok (at page 25 of its brief) for its ongoing process of implementing additional protections to safeguard user data. The government states that this "new process only highlights the existing dangers in TikTok's data storage." This statement likewise misunderstands that data security is an ongoing mitigation process. It would be greatly concerning from a data security perspective if TikTok did not have and execute on a roadmap to continue to improve its data security safeguards. Such roadmaps are common throughout the industry and not an indication that existing safeguards are inadequate. The best CISOs operate under the motto that "security is always a journey and never a destination"; firms that are committed to best practice security are always evolving what they do in order to take account of changing technologies, circumstances, and risks. Accordingly, TikTok like any other firm should be evaluated on the basis of how quickly and efficiently its security practices evolve.

12. Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, I affirm that the foregoing facts are true and correct to the best of my knowledge.

Executed this 12th day of October, 2020.

*[signature]*

Steven Weber

# EXHIBIT 1

**List of Public TikTok Materials Consulted and Reviewed In Preparation of September 21, 2020, Declaration of Steven Weber**

Eric Han, *Countering Hate on TikTok* (Aug. 20, 2020), at https://newsroom.tiktok.com/en-us/countering-hate-on-tiktok

Michael Beckerman, Our H2 2019 Transparency Report (July 9, 2020), at https://newsroom.tiktok.com/en-us/our-h-2-2019-transparency-report

Michael Beckerman, *An Update on our Virtual Transparence and Accountability Center Experience* (Sept. 10, 2020), at https://newsroom.tiktok.com/en-us/an-update-on-our-virtual-transparency-and-accountability-center-experience

Roland Cloutier, *TikTok's Security and Data Privacy Roadmap* (June 9, 2020), at https://newsroom.tiktok.com/en-us/tiktoks-security-and-data-privacy-roadmap

Roland Cloutier, *Our Approach to Security* (April 28, 2020), at https://newsroom.tiktok.com/en-us/our-approach-to-security

*Statement on TikTok's Content Moderation and Data Security Practices* (Oct. 24, 2019), at https://newsroom.tiktok.com/en-us/statement-on-tiktoks-content-moderation-and-data-security-practices

Vanessa Pappas, *Combating Misinformation and Election Interference on TikTok* (Aug. 5, 2020), at https://newsroom.tiktok.com/en-us/combating-misinformation-and-election-interference-on-tiktok

Vanessa Pappas, *Explaining TikTok's Approach in the US* (Nov. 5, 2019), at https://newsroom.tiktok.com/en-us/explaining-tiktoks-approach-in-the-us

Vanessa Pappas, *Introducing the TikTok Content Advisory Council* (March 18, 2020), at https://newsroom.tiktok.com/en-us/introducing-the-tiktok-content-advisory-council

*Why We are Suing the Administration* (Aug. 24, 2020), at https://newsroom.tiktok.com/en-us/tiktok-files-lawsuit