**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
TIKTOK INC., *et al.*,                    )
                                          )
                    Plaintiffs,           )
                                          )
          v.                              )          Civil Action No. 1:20-CV-2658-CJN
                                          )
DONALD J. TRUMP, in his official capacity as )
President of the United States, *et al.*, )
                                          )
                    Defendants.           )
_____)


**<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' RENEWED
MOTION FOR A PRELIMINARY INJUNCTION AGAINST COMMERCE
DEPARTMENT PROHIBITIONS 2-5</u>**

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background ................................................................................................................ 2

I.      Statutory Framework ...................................................................................... 2

II.     Factual Background on the PRC, ByteDance, and TikTok ............................. 3

III.    The Government's Response to These Growing Threats ................................. 6

IV.     Procedural History .......................................................................................... 9

Standard of Review ..................................................................................................... 9

Discussion ................................................................................................................. 10

I.      Plaintiffs Have Not Established a Likelihood of Success on the Merits ......................... 10

        A.      The Prohibitions Are Fully Consistent with IEEPA ................................................. 10

                1.      The Prohibitions Do Not "Indirectly Regulate" User Content on
                        TikTok ...................................................................................................... 10

                2.      The Prohibitions Do Not Regulate "Personal Communications" or
                        "Informational Materials" Within the Meaning of IEEPA ...................... 18

        B.      The Government's Actions Are Consistent with the APA ................................... 24

                1.      Plaintiffs' Arbitrary and Capricious Claims Are Not Reviewable ........... 24

                2.      The Secretary Acted Rationally in Identifying the Prohibited
                        Transactions ............................................................................................. 27

                3.      The Secretary Did Not Fail to Consider or Address Reasonable
                        Alternatives .............................................................................................. 31

                4.      The Stated Justification Was Not Pretextual ........................................... 32

        C.      Plaintiffs' First Amendment Claim Is Meritless ................................................... 33

                1.      The Prohibitions Do Not Trigger First Amendment Scrutiny .................. 33

                2.      At Most, Some Form of Intermediate Scrutiny Would Apply, Which
                        the Prohibitions Amply Satisfy ............................................................... 34

        D.      The Challenged Actions Do Not Violate Procedural Due Process ...................... 36

1.     The Prohibitions Do Not Deprive Plaintiffs of a Protected Interest ......... 36

2.     Individualized Process Is Not Required for Legislative Judgments ......... 37

3.     Plaintiffs Received All the Process to Which They Were Entitled ........... 38

E.     The President's Actions Are Otherwise Consistent with IEEPA .......................... 41

II.     Plaintiffs Have Not Proven Immediate, Urgent Irreparable Harm Justifying a Preliminary Injunction ..................................................................................... 42

III.    The Balance of the Equities and Public Interest Strongly Favor the Government ........... 43

IV.     Any Relief Should Be Appropriately Limited .................................................. 44

Conclusion ............................................................................................................. 45

# INTRODUCTION

Plaintiffs here seek to overturn the national security and foreign affairs judgment of the President and the Secretary of Commerce, both of whom concluded—after consultation with the U.S. Intelligence Community and the Department of Homeland Security (DHS)—that the mobile application TikTok poses unacceptable risks to the United States based on its bulk collection of U.S. user data and susceptibility to the control and influence of the Chinese Communist Party ("CCP") and the government of the People's Republic of China ("PRC").  Based on those determinations, the President and the Secretary prohibited certain transactions supporting TikTok's operations within the United States.  Specifically, as relevant here, the President and the Secretary prohibited the provision of internet hosting services to the TikTok mobile application; services that optimize the speed of the TikTok mobile application; certain agreements between TikTok and internet service providers; and the use of TikTok's code or functions in other software.

These prohibitions on business dealings with TikTok are well within the broad authority granted to the President by the International Emergency Economic Powers Act (IEEPA).  The identified prohibitions mitigate TikTok's national-security risks by regulating TikTok's business relationships; the prohibitions do not regulate the underlying content shared by third-party users on the platform itself.  Indeed, the underlying content shared by users is wholly irrelevant to the prohibitions here—by virtue of TikTok's relationship to the CCP and the PRC, the national-security risks would be the same even if TikTok did not host any expressive activity whatsoever.

For these reasons, the prohibitions do not run afoul of the statutory exceptions to the President's authority in IEEPA, and the Court should reconsider its prior analysis suggesting otherwise.  The President should not be prevented from regulating national-security threats simply because a foreign adversary cloaks its activities within a media company.  That severe curtailment of the President's authority is contrary to the plain text of IEEPA, binding precedent recognizing

the President's broad discretion to respond to emergent national-security threats, the overall statutory scheme and purpose, and longstanding Executive Branch practice. Accordingly, the Court should reconsider its prior analysis and conclude that the prohibitions here may lawfully be implemented under IEEPA.

Even apart from likelihood of success on the merits, Plaintiffs have also failed to carry their burden with respect to the other elements for a preliminary injunction. Plaintiffs have not proven any irreparable harm that would be redressed by a temporary injunction. And the public interest is decidedly against infringements on the President's authority to block economic transactions with a foreign entity in the midst of a declared national-security emergency. Plaintiffs' motion should thus be denied.

## BACKGROUND

### I.    Statutory Framework

The National Emergencies Act (NEA), 50 U.S.C. § 1601 *et seq.*, and the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*, authorize the President to declare a national emergency and provide extensive authorities to address such an emergency. Specifically, IEEPA provides the President with authorities that "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Under that statute, the President may "regulate, direct and compel, nullify, void, prevent or prohibit, any . . . transactions involving[] any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B).

Congress has also provided certain exceptions to the President's IEEPA authority. *See* 50 U.S.C. § 1702(b). As relevant here, Section 1702(b) provides that:

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly—
>
> (1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;
>
> . . .
>
> (3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. . . .

*Id.* Section 1702(b)(3) was first enacted in 1988 in the Berman Amendment. *See United States v. Amirnazmi*, 645 F.3d 564, 583-86 (3d Cir. 2011) (summarizing the history). Congress enacted Section 1702(b)(3) on "the principle that no prohibitions should exist on imports to the United States of ideas and information if their circulation is protected by the First Amendment." H.R. Rep. No. 100-40, pt. 3, at 113 (1987).

Identical statutory language regarding informational materials also appears in the Trading With the Enemy Act (TWEA), *see* 50 U.S.C. § 4305(b)(4), which is a predecessor statute to IEEPA and generally applies in times of war, *id.* § 4305(b)(1). When the Executive Branch invokes its authority under IEEPA or TWEA, its actions are entitled to a "great[] measure of deference because they relate to the exercise of the Executive's authority in the realm of foreign affairs." *Emerg. Coal. To Defend Educ. Travel v. Dep't of Treasury*, 498 F. Supp. 2d 150, 166 n.10 (D.D.C. 2007), *aff'd*, 545 F.3d 4 (D.C. Cir. 2008).

## II.    Factual Background on the PRC, ByteDance, and TikTok

The communist government of the People's Republic of China is a significant and growing national security threat. According to the United States Intelligence Community, "China presents a persistent cyber espionage threat and a growing attack threat to our core military and critical infrastructure systems." AR-220. In particular, "China remains the most active strategic

competitor responsible for cyber espionage against the US Government, corporations, and allies," and "Chinese intelligence and security services [may] use Chinese information technology firms as routine and systemic espionage platforms against the United States and allies." *Id.* The Director of the FBI has said that "the counterintelligence and economic espionage threat from China" is "[t]he greatest long-term threat to our nation's information and intellectual property, and to our economic vitality[.]" AR-204.

One of the tools that the PRC uses to further its goals is bulk data collection. *See* AR-30. These large data sets "can reveal patterns and trends in human behavior, providing a 'pattern of life' that can be used to facilitate intelligence and surveillance targeting, particularly when aggregated with other data sets." AR-31. And the PRC is specifically "building massive databases of Americans' personal information," as part of a "tactic used by the Chinese government to further its intelligence-gathering and to understand more about who to target for espionage[.]" *Id.*

In China, even purportedly privately owned companies are not fully private. The PRC exercises "authority and supervision over nominally private or non-governmental organizations," including through Party Committees or Corporate CCP Committees at those entities. AR-32. "Within private enterprises, the Party Committee implements CCP's policies" and are a "source of political pressure around the boardroom." *Id.* Moreover, several laws increase the PRC's influence "over all Chinese companies, and citizens[.]" AR-34. For example, in 2017, the PRC enacted the National Intelligence Law, which "obliges individuals, organizations, and institutions to assist Public Security and State Security officials in carrying out a wide array of intelligence work." AR-35. The law expressly "permits Chinese intelligence institutions to request citizens and organizations to provide necessary support, assistance, and cooperation," as well as "take control of an organization's facilities, which includes communications equipment." *Id.* Without

an independent judiciary, there is no meaningful legal recourse for companies to challenge orders or requests from PRC intelligence or security agencies.  *Id.*

As relevant here, TikTok Inc. is wholly owned by ByteDance Ltd., which has its headquarters in Beijing and was founded in 2012 by entrepreneur Zhang Yiming.  *See* AR-28. "ByteDance has significant and close ties to the CCP which could potentially be leveraged to further their agenda and exact pressure on ByteDance."  AR-32.  In April 2018, the CCP forced ByteDance to shut down one of its other platforms, and Zhang issued a public apology for "fail[ing] to live up to the guidance and expectations supervisory organs have demanded all along," AR-851, and pledged to cooperate with the CCP—what some have described as "political abjection," AR-849, and being "forced to bend the knee to party authority."  AR-802.  Following this public atonement, ByteDance underwent organizational restructuring with CCP infrastructure now built into it.  AR-33.

And since April 2018, ByteDance has hosted several CCP-themed events at the company and demonstrated its commitment to CCP directives.  AR-33-36.  ByteDance has also signed an official cooperation agreement with a PRC security agency, with an intent to "strengthen the creation and production of public security new media works . . . and enhance public security propaganda, guidance, influence, and credibility."  AR-36 (quotation marks omitted).

TikTok has tens of millions of users within the United States.  AR-29.  When a user signs up for a TikTok account, they agree to TikTok's Terms of Service, including its Privacy Policy. *See* TikTok, Legal, Terms of Service ("TikTok ToS") (ECF No. 21-7); AR-955.  Under this Privacy Policy, *see* AR-955-958, TikTok collects a broad range of data from users, including:

> 1) registration information, such as age, username and password, language, and email or phone number; 2) profile information, such as name, social media account information, and profile image; 3) user-generated content, including comments, photographs, videos, and virtual item videos that you choose to upload or broadcast

on the platform; 4) payment information, such as PayPal or other third-party payment information (where required for the purpose of payment); 5) phone and social network contacts (names and profiles); 6) opt-in choices and communication preferences; 7) information in correspondence users send to TikTok; and 8) information sent by users through surveys or participation in challenges, sweepstakes, or contests such as gender, age, likeness, and preferences.

AR-38.  TikTok also collects data on users' locations, their browsing and search histories, as well as "information from third parties, such as advertising and analytics partners." *Id.*  In other words, TikTok's data "allows a very detailed picture of an individual user to be created."  AR-40.

TikTok's Privacy Policy expressly states that TikTok "may share your information with a parent, subsidiary, or other affiliate of our corporate group," AR-959, which would allow TikTok to share user data with its parent company ByteDance.  The Privacy Policy also states that TikTok may disclose user data "to respond to . . . law enforcement requests, legal claims, or government inquiries." *Id.*  Regardless of these policies, "ByteDance is subject to PRC jurisdiction, [and] PRC laws can compel cooperation from ByteDance, regardless of whether ByteDance's subsidiaries are located outside the territory of the PRC."  AR-44.

The technical infrastructure supporting the TikTok application is not wholly separate from ByteDance, as some functionality "is still 'partially shared across other ByteDance products.'" AR-40.  Additionally, TikTok stores U.S. user data on servers leased from China Unicom (Americas) Operations Ltd. ("CUA"), which "is wholly owned and controlled by a single Chinese entity that is directly owned by the PRC Government."  AR-41.  TikTok also maintains a backup of U.S. user data in Singapore with the company Alibaba, which "is a Chinese company and, like ByteDance, is similarly beholden to PRC laws that require assistance in surveillance and intelligence operations."  AR-40.

## III.   The Government's Response to These Growing Threats

On May 15, 2019, the President declared a national emergency under the NEA and IEEPA,

finding that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services, which store and communicate vast amounts of sensitive information, facilitate the digital economy, and support critical infrastructure and vital emergency services, in order to commit malicious cyber-enabled actions."  Exec. Order No. 13,873, 84 Fed. Reg. 22,689  ("ICTS Order"), pmbl.  In the ICTS Order, the President found that "the unrestricted acquisition or use in the United States of information and communications technology or services designed, developed, manufactured, or supplied by persons owned by, controlled by, or subject to the jurisdiction or direction of foreign adversaries augments" those risks.  *Id.*  The President has since renewed this national-emergency declaration.  *See* 85 Fed. Reg. 29,321 (May 13, 2020).

On August 6, 2020, the President issued the Executive Order at issue here concerning TikTok.  *See* Exec. Order No. 13,942, 85 Fed. Reg. 48,637 ("TikTok Order").  The President found that "additional steps must be taken to deal with the national emergency" declared in the ICTS Order, as "the spread in the United States of mobile applications developed and owned by companies in [the PRC] continues to threaten the national security, foreign policy, and economy of the United States." *Id.*, pmbl.  In particular, the President determined that "TikTok automatically captures vast swaths of information from its users," including "location data and browsing and search histories."  *Id.*  The President further found that TikTok's "data collection threatens to allow the [CCP] access to Americans' personal and proprietary information," which would allow the Chinese government "to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage."  *Id.*  Accordingly, the President prohibited certain transactions with ByteDance or its subsidiaries, and delegated authority to the Secretary of Commerce to identify the prohibited transactions within 45 days of

the Order.  *Id.* §§ 1, 4.[1]

Consistent with the TikTok Order, on September 18, 2020, the Secretary of Commerce published a list of six transactions prohibited with respect to ByteDance, which the Secretary revised and re-published the next day.  *See* Dep't of Commerce, *Identification of Prohibited Transactions to Implement Exec. Order No. 13,942* ("*Commerce Identification*"), ECF No. 15-35. The Secretary's identified prohibitions "only apply to the parties to business-to-business transactions," where one of the parties is ByteDance or a subsidiary.  *Id.* at 6-7.  The prohibitions expressly do not apply to "[t]he exchange between or among TikTok mobile application users of personal or business information using the TikTok mobile application."  *Id.* at 7-8.  The prohibitions also apply only to services supporting "the TikTok mobile application," *id.* at 6-7, not to other forms of TikTok such as TikTok's website accessible through an Internet browser.  *See* https://www.tiktok.com.

The Secretary first prohibited online mobile app stores from providing "services to distribute or maintain the TikTok mobile application," effectively preventing new U.S. users from downloading the app and preventing existing U.S. users from receiving automatic updates to the app.  *Commerce Identification* at 6, ¶ 1.  The Secretary determined that, because this prohibition "directly limits the availability of the app to new users . . . and thus limits the growth of U.S. user data at risk," it should be implemented first.  AR-47.  The Secretary initially determined to implement this prohibition on September 20, 2020, but at the direction of the President extended the deadline by one week to September 27, 2020.  *See* ECF No. 15-32.

---

[1] In August, the President separately ordered ByteDance to divest certain assets and interests in the U.S. operation of TikTok, pursuant to Committee on Foreign Investment in the United States (CFIUS) authorities.  *See Order of August 14, 2020 Regarding the Acquisition of Musical.ly by ByteDance Ltd.*, 85 Fed. Reg. 51297 (Aug. 19, 2020).  That order is not at issue in this litigation.

The Secretary also identified as prohibited several other transactions "enabling the functioning or optimization of the TikTok mobile application" within the United States—*i.e.*, transactions involving Internet hosting services, content delivery network services, and Internet transit or peering services—as well as any use of TikTok's code or functions in other software. *See Commerce Identification* at 6-7, ¶¶ 2-5. The effect of these prohibitions will likely be to "significantly reduce the functionality and usability of the app in the United States." AR-48. The Secretary decided to implement these prohibitions effective 11:59 p.m. on November 12, 2020. AR-47. This "phased approach" for implementing the prohibitions would "reduce[] national security risk substantially" while also "allow[ing] the U.S. government additional time to evaluate the effectiveness of and negotiate mitigations in the context of CFIUS." *Id.*

## IV.    Procedural History

Plaintiffs here are two companies—TikTok Inc. and ByteDance Ltd.—suing to enjoin both the President's TikTok Order and the Secretary's identified prohibitions. Plaintiffs filed this suit on September 18, 2020, *see* Compl. (ECF No. 1), and moved for a preliminary injunction on September 23, 2020. *See* ECF No. 15. This Court granted the motion as to the first prohibitions pertaining to removal of TikTok from mobile app stores, but otherwise denied Plaintiffs' requested relief. *See* Order (ECF No. 29); Mem. Op. (ECF No. 30) ("PI Op."). The Government has appealed that decision. *See* No. 20-5302 (D.C. Cir.). This Court then permitted Plaintiffs to file a renewed motion for a preliminary injunction as to the November 12 prohibitions, *see* Minute Order of Oct. 1, 2020; ECF No. 32, which Plaintiffs then filed. *See* ECF No. 43-1 ("Pls.' Br.").

## STANDARD OF REVIEW

Plaintiffs have moved for a preliminary injunction, which is "an extraordinary and drastic remedy[.]" *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence

of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Injunctive relief that "deeply intrudes into the core concerns of the executive branch" may be awarded only upon "an extraordinarily strong showing" as to each element.  *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978).

**DISCUSSION**

I.      **Plaintiffs Have Not Established a Likelihood of Success on the Merits**

      A.      **The Prohibitions Are Fully Consistent with IEEPA**

This Court previously granted an injunction against the September 27 prohibitions, concluding that "Plaintiffs have demonstrated that they are likely to succeed on their claim that the prohibitions constitute *indirect* regulations of 'personal communications' or the exchange of 'information or informational materials.'"  PI Op. at 14.  The Government respectfully believes that conclusion was incorrect.  For the reasons explained more fully below, the Government respectfully requests that the Court reconsider its statutory analysis.

        1.      **The Prohibitions Do Not "Indirectly Regulate" User Content on TikTok**

The prohibitions here regulate only transactions related to TikTok Inc.'s business operations in the United States; this regulation of commercial transactions is a foundational, well-established element of the President's authority under IEEPA.  *See* 50 U.S.C. § 1702(a)(1)(B).  Any ancillary effects that these prohibitions may have on third-party users does not transform the regulation of TikTok Inc.'s commercial services into an indirect regulation of the underlying content shared by users on the platform.  This conclusion is supported by the plain text of § 1702(b), binding precedent, IEEPA's purpose, and past Executive Branch practice.

        a.  The plain text of § 1702(b) confirms that an incidental effect is not the same thing as

-10-

indirect regulation.  As transitive verbs, "regulate" and "prohibit" both require a direct object to express a complete thought:  The verb indicates "what action the subject exerts on the object." The Chicago Manual of Style ¶ 5.98 (17th ed. 2017).  Moreover, "regulate" and "prohibit" are both active verbs with strong meanings, generally requiring a purposeful connection to a specific, definite object.  *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "prohibit" as "[t]o forbid by law," and "regulate" as "[t]o control (an activity or process) esp. through the implementation of rules"); Oxford English Dictionary 379, 1441 (1933, republished 1978) (defining "prohibit" as "[t]o forbid (an action or thing) by or as by a command or statute," and "regulate" as "[t]o control, govern, or direct by rule or regulations").

The exceptions in § 1702(b) are thus concerned with the intended *object* of the regulation, not the range of other possible activities that might be incidentally affected by the regulation.  *See, e.g.*, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987) ("A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry."). That interpretation is also consistent with § 1702(b)'s structure:  When Congress intends for the § 1702(b) exceptions to extend more broadly to incidental effects, Congress says so expressly.  *See* 50 U.S.C. § 1702(b)(4) (withholding authority to prohibit or regulate "any transactions *ordinarily incident to* travel to or from any country" (emphasis added)).  The omission of similar language in §§ 1702(b)(1) and (3) was thus an intentional choice to limit the scope of those exceptions and apply them only to the intended object of the regulation.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (modifications omitted)).

That the § 1702(b) exceptions are preceded by the language "directly or indirectly" does not fundamentally change the analysis.  Such language makes clear that § 1702(b) applies regardless of the *manner* in which a regulation seeks to accomplish its objective (directly or indirectly).  The fundamental question, however, remains the same—*i.e.*, whether the relevant IEEPA restrictions have the *intended object* of regulating "personal communications" and/or the import or export of "informational materials."

Here, the intended object of the prohibitions are TikTok's commercial transactions and data vulnerabilities, not any exchange of "personal communications" or "informational materials" by third-party users on the TikTok app.  The Secretary's decision memorandum makes that plain:

> The below prohibitions on certain business-to-business transactions . . . [have] the objective of preventing collection, transmission, and aggregation of U.S. user data by the TikTok app, ByteDance Ltd., and [the PRC]. Note that these transactions do not directly prohibit the downloading or use of the TikTok app and are not directly targeted at users of the TikTok app. While these prohibitions may ultimately make the application less effective and may be challenging for U.S.- based TikTok users, they are necessary for the protection of U.S. national security.

AR-47.

Focusing on the intended object of a regulation (and not its incidental effects) is consistent with the D.C. Circuit's decision in *Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991).  In describing the history preceding the Berman Amendment's enactment, the D.C. Circuit helpfully provided an example of an "indirect" regulation that § 1702(b) excepted from the President's IEEPA authority.  Specifically, before the Berman Amendment, "the regulations explicitly allowed the importation of informational materials, but undermined the permission indirectly—by requiring that payment be made into a blocked bank account in the United States," essentially prohibiting the seller from actually receiving payment.  *Id.* at 1232.[2]  Those payment restrictions, although they regulated the

---

[2] The regulations at issue in *Walsh* were promulgated pursuant to TWEA, not IEEPA.  As discussed

import of informational materials only indirectly, still had their intended object as restricting the import of the informational materials themselves, and thus would have been unlawful following the Berman Amendment.

In contrast, the D.C. Circuit held that restrictions on travel-related payments to Cuba remained valid, even though the restrictions meant that the plaintiff could not "travel to Cuba for the sole purpose of arranging for the importation of Cuban posters to the United States," and even though such travel was "a normal and perhaps a necessary incident . . . to arrange for imports of political posters into the United States." *Id.* at 1231. Notwithstanding that the "travel transactions [were] linked to importation" and the restrictions "may in practice burden informational imports," the restrictions were nonetheless valid because their object was "to deprive Cuba of hard currency" and "to make a political statement against the Cuban regime." *Id.* at 1233-34; *see also Emerg. Coal. To Defend Educ. Travel*, 498 F. Supp. 2d at 165 (upholding amended travel restrictions, notwithstanding TWEA's statutory language "restrict[ing] the President's authority to regulate the import and export of certain informational materials"), *aff'd*, 545 F.3d at 12-13.

This Court previously distinguished *Walsh*, stating that "the relationship between the Secretary's prohibitions and the informational materials U.S. users post on TikTok is neither 'tangential' nor generic." PI Op. at 11 n.1. Respectfully, that conclusion misunderstands both the basis and purpose of the prohibitions at issue here. The underlying communications and informational materials exchanged by TikTok's users are irrelevant to the President's Order and the Secretary's identified prohibitions: By virtue of the company's relationship with the PRC, the national-security and foreign affairs concerns would be the same if TikTok were a weather app or

---

above, however, both TWEA and IEEPA contain identical exemptions for informational materials. *Compare* 50 U.S.C. § 1702(b)(3), *with id.* § 4305(b)(4); *see also Regan v. Wald*, 468 U.S. 222, 228 (1984) (the authorities granted by IEEPA "are essentially the same as those" granted by TWEA).

a ride-sharing app.  The President should not be disabled from mitigating a national-security threat simply because a foreign adversary exploits a vulnerability by way of a media company.

**b.**    Construing the statutory language to reach incidental burdens on third-party communications or import/export of informational materials would "create an IEEPA-free zone," as this Court previously acknowledged.  PI Op. at 12.  That is an independent reason why this Court should not interpret the plain text of § 1702(b) in such a broad manner.  *See Amirnazmi*, 645 F.3d at 579 ("Mindful of the heightened deference accorded the Executive in this field, we decline to interpret the legislative grant of authority parsimoniously.").

Indeed, the D.C. Circuit in *Walsh* specifically rejected an expansive interpretation of the relevant statutory language.  In rejecting the plaintiff's interpretation of the statute—that the President lacks authority "to impose *any* regulation that 'significantly burdens' trade in informational materials"—the D.C. Circuit explained that "[t]he potential reach of [that] view is extraordinary," and would afford a foreign government adversary "considerable power to sap" the President's authority to regulate international transactions that pose a threat to national security. 927 F.2d at 1232.  Similarly here, this Court should not severely curtail IEEPA's broad grant of authority to the President even if the prohibitions "in practice burden[]" personal communications or the import/export of informational materials.  *Id.*

Plaintiffs make no meaningful effort to cabin the scope of their interpretation of § 1702(b). They simply assert that the President may still "regulate transactions involving information technology companies . . . so long as the exercise of that authority does not directly or indirectly impinge on the limitations set forth in Section 1702(b)."  Pls.' Br. at 20.  Of course, that tautology says nothing about what Plaintiffs believe is the appropriate scope of § 1702(b).

At the prior hearing, Plaintiffs relied on the second sentence of § 1702(b)(3), which

clarifies that IEEPA's informational materials exception does not extend to, *inter alia*, the transmission of classified information prohibited by criminal laws. Plaintiffs suggested that this provision preserves the Government's authority to regulate "the transmission of certain information that . . . ha[s] a pronounced national security component to it." Sept. 27 Hr'g Tr. at 20. But even that authority is severely curtailed under Plaintiffs' interpretation of § 1702(b), which precludes the President from regulating *any* platform's operations as long as *some* protected communications occur on that platform. *Cf.* Pls.' Br. at 16-17 (conceding that "some communications on TikTok" may not constitute "personal communications," but arguing that the Secretary's prohibitions should nonetheless be invalidated in their entirety). Thus, under Plaintiffs' approach, even if a foreign adversary built a data network within the United States specifically designed to transmit classified and other national-defense information, the President would be disabled from invoking IEEPA to regulate that network if the network was also used to transmit personal communications or to import or export informational materials.

Plaintiffs also contend that the President has other tools at his disposal to respond to national-security threats. *See* Pls.' Br. at 20 n.7. But that argument only highlights how Plaintiffs' interpretation of § 1702(b) would "considerabl[y] . . . sap" the President's authority under IEEPA. *Walsh*, 927 F.2d at 1232. Moreover, because the relevant statutory language appears in both IEEPA and TWEA, *see* note 2, *supra*, Plaintiffs' interpretation would preclude the President from invoking these authorities even with respect to wartime enemies. This remarkable restriction on the President's authority is contrary to the D.C. Circuit's recognition that "IEEPA delegates broad authority to the President" to act in times of national emergency. *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1154 (D.C. Cir. 2010). And it is contrary to the canon that, because § 1702(b) operates as exceptions to the broad authority granted in § 1702(a), those exceptions must be

construed narrowly.  *See Comm'r v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision.").  A broad construction of § 1702(b) would also raise "serious questions about the constitutionality" of the statute.  *Cernuda v. Heavey*, 720 F. Supp. 1544, 1553 (S.D. Fla. 1989); *cf. The Brig Amy Warwick (The Prize Cases)*, 67 U.S. 635, 670 (1862) ("[T]he President in fulfilling his duties[] as Commander-in-chief . . . must determine what degree of force the crisis demands.").

    **c.**  Interpreting "regulate . . . indirectly" as focusing on the *object* of the prohibitions (and not potential incidental effects on third parties) would also align the scope of the Berman Amendment with First Amendment doctrine, which Plaintiffs agree was Congress's intent, *see* Pls.' Br. at 14.  The Supreme Court has repeatedly emphasized that even though government regulation of certain nonexpressive conduct may incidentally burden protected expressive activities, those incidental burdens do not cause the regulation to trigger First Amendment scrutiny—or here, implicate the Section 1702(b) IEEPA exceptions.

    In *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), for example, a city sought to close a bookstore because the store was violating a public-health nuisance law by allowing the solicitation of prostitution on the store's premises. The bookstore challenged the closure, arguing that "the effect of the statutory closure remedy impermissibly burdens its First Amendment protected bookselling activities." *Id.* at 705.  The Supreme Court rejected that argument, explaining that "every civil and criminal remedy imposes *some* conceivable burden on First Amendment protected activities," and booksellers may not assert "First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises."  *Id.* at 706-07 (emphasis added); *see also, e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 123 (2003) (upholding a state trespass policy even as to

those who trespass for First Amendment purposes, because "it is Hicks' nonexpressive *conduct*—his entry in violation of the notice-barment rule—not his speech, for which he is punished as a trespasser"); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) ("[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news.").

The same reasoning demonstrates that incidental effects on expressive activity are not indirect regulations of communications or information, and thus do not implicate the IEEPA exceptions in § 1702(b).  Just like in the First Amendment context, basically *every* IEEPA regulation is likely to impose some incidental burden on the activities described in § 1702(b).  Yet such incidental burdens do not implicate First Amendment concerns.  *See Arcara*, 478 U.S. at 708 (O'Connor, J., concurring) (suggesting that requiring the Court to consider downstream burdens on speech regulations "would lead to [an] absurd result," subjecting "the arrest of a newscaster for a traffic violation" to First Amendment scrutiny).  Likewise, IEEPA regulations should not implicate the § 1702(b) exceptions just because they incidentally burden one of the listed activities.

Indeed, any other interpretation would threaten to render toothless a hallmark of IEEPA authority: asset freezing.  *See Dames & Moore v. Regan*, 453 U.S. 654, 672-73 (1981).  Freezing a party's assets significantly curtails that party's ability to produce and import various informational materials.  *Cf. Arcara*, 478 U.S. at 706 ("One liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes[.]").  But a broad interpretation of "indirectly regulating" that extended to those types of incidental burdens would effectively gut the President's authority under IEEPA.  *See Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) ("There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.").  There is no reason to believe that Congress rendered all

blocking orders—the quintessential IEEPA regulation—vulnerable to challenge under § 1702(b) *sub silentio*.  *See Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

**d.**  Finally, certain Treasury regulations implementing Executive Orders issued pursuant to IEEPA additionally reflect the Government's understanding of the statute.  *Cf.* Pls.' Br. at 20-21 n.8 (relying on "the executive branch's historical practice of implementing its IEEPA authority" as instructive).  Specifically, those regulations recognize the IEEPA exception for import/export of informational materials, *see, e.g.*, 31 C.F.R. § 560.210(c)(1), but they expressly provide that the President may "prohibit[] transactions" under IEEPA, including the "provision of services to market, produce or co-produce, create, or assist in the creation of information or informational materials," *id.* § 560.210(c)(2); *see also Amirnazmi*, 645 F.3d at 587-88 (holding that the regulation is entitled to deference as a reasonable construction of IEEPA); *cf. Foreign Assets Control Regulations*, 54 Fed. Reg. 5229, 5230-31 (Feb. 2, 1989) (regulations promulgated under TWEA shortly after Berman Amendment's enactment).  Here, the prohibitions do not regulate the underlying communications or informational materials themselves—*i.e.*, the content exchanged by individual users on TikTok.  Instead, the prohibitions regulate only distinct services pertaining to TikTok's technical operations, which is consistent with the interpretation reflected in those regulations.  *See Amirnazmi*, 645 F.3d at 586.  Thus, § 1702(b)'s exceptions are not implicated because the prohibitions here regulate only TikTok's business operations.

### 2.  The Prohibitions Do Not Regulate "Personal Communications" or "Informational Materials" Within the Meaning of IEEPA

Even if § 1702(b) were implicated, Plaintiffs' claim still fails because the prohibitions do not regulate "personal communications" or the import/export of "informational materials."

**a.** IEEPA's personal communications exception applies only if the communication "does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1). But communications on TikTok (indeed, all user interactions on TikTok) necessarily involve an exchange of value.

First, under TikTok's Terms of Service, when a user creates an account, he or she grants TikTok an "unconditional irrevocable . . . worldwide licence" that permits TikTok "to use, modify, adapt, reproduce, make derivative works of, publish and/or transmit" that user's content however TikTok chooses. TikTok ToS at 8. Thus, every time a user sends a message (or takes any other action on TikTok), that interaction inherently involves an exchange of value because the parties' legal rights have been altered. Based on this "unconditional . . . licence," TikTok necessarily gains legal rights and value from every interaction on its platform, including personal communications.

Second, TikTok's entire business model is based on its users' communications having value. TikTok specifically collects information about users' communications on the app:

> We collect and process . . . information you provide in the context of composing, sending, or receiving messages . . . includ[ing] the content of the message and information about when the message has been sent, received and/or read, as well as the participants of the communication.

AR-957. TikTok then monetizes this information harvested from users' communications (and other activity on the app), using it to model each user's preferences and provide a tailored advertising experience for each user, generating substantial revenue. *See* AR-46; *see also* TikTok ToS at 6 ("You acknowledge and agree that we may generate revenues, increase goodwill or otherwise increase our value from your use of the Services[.]"). Indeed, Plaintiffs' theory of this case is that their users' mere presence on TikTok is commercially valuable. *See* Pappas Decl. (ECF No. 15-3) ¶ 17 ("New users are the lifeblood of a social media application like TikTok[.]"). Moreover, TikTok's algorithm is beneficial to individual users as well, allowing them to reach tailored audiences for their content. *See* AR-4, AR22; *see also* Compl. ¶ 25 ("TikTok is an

economic lifeline for many of its users[.]"); Pls.' Br. at 16-17 (noting that "some communications on TikTok may be commercially valuable—for example, a user's posts that are sponsored by an advertiser"). Thus, users' communications on TikTok necessarily involve a transfer of value.

This Court previously rejected this argument as proving too much, comparing TikTok to a delivery service, where "even the letter a person drops in the mail adds some value to the mail carrier[.]" PI Op. at 14. Even accepting the assumption that a postage stamp does not reflect a "transfer of . . . value," however, this analogy is wholly inapt given the way TikTok extracts value from its users. As explained above, TikTok harvests a substantial amount of user data from each communication (including the contents of each communication), which powers TikTok's algorithms and allows the company to provide targeted advertising for its own commercial purposes. Applied to the Court's analogy, that would be as if the Postal Service collected and stored personal information on the sender, recipient, and content of every piece of mail, and placed personalized, paid advertisements on each piece of mail based on that personal information. Of course, the Postal Service does no such thing. *Cf.* 39 U.S.C. § 404(c) (providing privacy protections for the content of mail). Nor does the Postal Service acquire an irrevocable license to reproduce and redistribute the contents of every letter that it delivers. Indeed, the Court's analogy only further supports the Government's argument above: Just as the Postal Service's transactions for the sale of stamps are entirely independent from the communications it transports through the mails, similarly here the prohibitions pertaining to TikTok's business operations are entirely independent from the underlying user content transmitted via TikTok.

**b.** The prohibitions here also do not regulate the import/export of "informational materials" on TikTok. 50 U.S.C. § 1702(b)(3). To the extent the prohibitions regulate TikTok as a platform at all, they only do so as a "medium of transmission," which the statute recognizes as distinct from

the underlying informational materials. *Id.*

TikTok itself distinguishes between the services it provides—a platform to share content—and the underlying content that users generate and exchange on the platform. *See* Compl. ¶ 18 ("TikTok serves as a host for the content created by its users."); *see also* TikTok ToS at 7 ("We make no representations, warranties or guarantees, whether express or implied," as to content); *id.* at 9 ("We do not guarantee the accuracy, integrity, appropriateness or quality of any User Content, and under no circumstances will we be liable in any way for any User Content."). In this respect, this Court erred by analogizing TikTok to a "news wire feed." PI Op. at 10-11. As noted, TikTok does not describe itself as a purveyor of the underlying user content comprising the purported "informational materials." And quite different from a news wire feed, TikTok does not guarantee the "accuracy" or "integrity" of information shared on its platform. TikTok ToS at 9.

In any event, TikTok is, at most, analogous to the news wire itself, which is essentially a medium of transmission, *i.e.*, a service that transmits news coverage. *See, e.g.*, *Newswire*, Random House Unabridged Dictionary of the English Language 1295 (2d ed. 1987) ("a service transmitted . . . and providing late-breaking news stories . . . or other up-to-the minute information"). But Congress's use of the term "news wire *feed*" suggests an intent to exempt from IEEPA only the underlying *information* transmitted on the news wire as part of the feed (that is, news stories). Indeed, the other examples of "information and informational materials" identified in the statute include publications, films, CD ROMs, and artworks—confirming that Congress intended to circumscribe the President's authority to regulate the *content* of a news wire feed, but not the transmission mechanism itself. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (describing the principle that "a word is known by the company it keeps (the doctrine of *noscitur a sociis*)").

IEEPA thus permits the President to regulate the means by which information is imported

or exported when the means itself poses a national security risk, even if those means may be used to transmit otherwise-excepted "informational materials." For example, shutting down an import-export business that smuggles illegal drugs alongside foreign movies would not amount to a ban on importing and exporting the movies. That is especially true where, as here, the IEEPA prohibition does not foreclose any informational material from entering or leaving the country— users may still access TikTok's website, and may still post the same short-form videos on numerous other platforms. *Cf.* Pappas Decl. (ECF No. 15-3) ¶ 19 (discussing similar platforms).

Subsequent legislative action underscores that Congress must have intended for IEEPA to permit the President to regulate internet companies and data platforms like TikTok, as well as the mediums by which informational materials are imported/exported. In 2014, Congress specifically made clear that IEEPA may be used to "block and prohibit all transactions in all property and interests" of persons and entities who knowingly "engage[] in . . . economic or industrial espionage in cyberspace, of technologies or proprietary information developed by United States persons." Pub. L. No. 113-291, § 1637 (Dec. 19, 2014) (*codified at* 50 U.S.C. § 1708(b)(1), (b)(2)). Congress thus ostensibly afforded the President authority under IEEPA to regulate software applications and platforms that otherwise facilitate the exchange of information and informational materials. *See, e.g.*, Exec. Order No. 13,694 (Apr. 1, 2015). And Section 1708 is "highly relevant in the looser sense of indicating congressional acceptance of a broad scope for executive action in circumstances such as those presented in this case." *Dames & Moore*, 453 U.S. at 677; *see also* No TikTok on Government Devices Act, S. 3455, 116th Cong. § 2(b) (2020) (pending legislation that prohibits TikTok from being installed on federal government devices); S. Rep. No. 116-250, at 2 (2020). It beggars understanding why Congress would specifically afford the President authority under IEEPA to take action against foreign criminals operating in cyberspace if IEEPA

also precluded the President from taking action against the means by which those individuals engage in their crimes—that is, through the software and computer networks that serve as mediums of international transmission for informational materials.  *See FDA v. Brown & Williamson*, 529 U.S. 120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.").

Finally, certain Treasury regulations clarify that "informational materials not fully created and in existence at the date of the transactions" do not implicate the § 1702(b)(3) exemption.  *See, e.g.*, 54 Fed. Reg. at 5231; *Amirnazmi*, 645 F.3d at 587-88 (upholding regulation codified in 31 C.F.R. § 560.210(c)(2)); *see also* Section I.A.1.d, *supra*.  This Court previously rejected the applicability of this regulation based on TikTok's assertion that users can also upload pre-recorded videos to TikTok.  *See* PI Op. at 12 n.2.  Plaintiffs' own statements, however, suggest that such content is only a small fraction of TikTok videos.  *Cf.* Compl. ¶ 18 ("TikTok operates much like other digital application platforms such as Snapchat, YouTube, and Instagram, in that users *create and post content on the platform*.  TikTok offers features such as background music and augmented reality effects, but users control which features to pair with the content of their self-directed videos[.]" (emphasis added)); Pappas Decl. ¶ 16 ("To survive, we need to be able to do two related things: grow our users and continue to *enable the development of* good content." (emphasis added)).  There is no support for assuming that there is any meaningful portion of TikTok users who want to continue using the app solely to upload unmodified, pre-existing videos.

Indeed, the factual record submitted by TikTok now confirms that any time a user uploads a video to TikTok, that action necessarily generates *new* content (regardless of when the video was created).  The video that TikTok submitted to this Court demonstrates, *see* ECF No. 43-4, that even when a user uploads a pre-existing video, that user then has options to modify the video's content,

and is required to determine a number of settings associated with how the video is described, displayed, and shared on the platform:




Screenshots from TikTok Video (ECF No. 43-4) at 0:45 – 1:20.   Even pre-recorded videos, therefore, necessarily become new content when they are uploaded to the TikTok platform.   *See* 31 C.F.R. § 560.210(c)(2) ("This section does not exempt from regulation or authorize transactions related to . . . the substantive or artistic alteration or enhancement of informational materials[.]").   This new content is not protected by § 1702(b)(3), as confirmed by *Amirnazmi*, 645 F.3d at 587.

**B.      The Government's Actions Are Consistent with the APA**

**1.      Plaintiffs' Arbitrary and Capricious Claims Are Not Reviewable**

Plaintiffs seek to challenge the prohibitions as arbitrary and capricious, but they continue to fail to grapple with binding authority holding that their claims are not reviewable.   The President directed the Secretary of Commerce to identify prohibited transactions pursuant to the President's

delegated IEEPA powers.  *See* TikTok Order § 4.  In effect, Plaintiffs are arguing that the Secretary acted arbitrarily in determining which transactions to prohibit in order to mitigate the declared "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).  The D.C. Circuit has held that these decisions are precisely the kind over which judicial review is inappropriate.  In *Ralls Corp. v. CFIUS*, 758 F.3d 296 (D.C. Cir. 2014), for example, the D.C. Circuit held that any challenges to "the President's determination that [a particular transaction] threatens the national security" or "the President's prohibition of the transaction in order to mitigate the national security threat" would be barred as political questions because such determinations "would require us to exercise judgment in the realm of foreign policy and national security."  *Id.* at 314; *see also People's Mojahedin Org. of Iran (PMOI) v. Dep't of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003) (holding that the question whether activity is "terrorist activity" that "threaten[s] the security of the United States or its nationals" is nonjusticiable).

Rather than address these authorities, Plaintiffs instead rely on other IEEPA cases.  *See* Pls.' Br. at 22 (citing, *e.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003)).  But the type of judicial review there is fundamentally different:  There is a significant difference between (1) making a general determination of how best to address a national emergency, like whether and how best to take action against a particular group such as Hamas; and (2) making a specific, factual determination of whether  a particular entity "act[ed] for or on behalf of Hamas."  *Holy Land Found.*, 333 F.3d at 161.  In reviewing the latter type of narrow, factual determination, which the Court conducted in *Holy Land Foundation*, a Court is capable of reviewing an agency's factual determination under the standards set forth in the APA.  Conversely, review of the former type determination, which the Plaintiffs seek here, would necessarily require a Court to substitute its judgment on how best to address a national emergency for that of the

Executive, which the Court may not do.  *See PMOI*, 327 F.3d at 1244.

Plaintiffs assert that IEEPA does not signal any intent to preclude judicial review.  Pls.' Br. at 22 (citing 50 U.S.C. § 1702(c) (providing express statutory authorization for *ex parte*, *in camera* submission of classified information)).  But Plaintiffs ignore the second sentence of § 1702(c), which provides "[t]his subsection does not confer or imply any right to judicial review."[3]

Finally, Plaintiffs wholly ignore the overall statutory scheme in which the President's IEEPA designation occurred.  The NEA and IEEPA confer highly discretionary authority upon the President to act quickly and decisively to address threats to the United States, and the statutory structure suggests that Congress assigned itself sole oversight authority of the Executive's actions. *See* 50 U.S.C. §§ 1621, 1622, 1641 (providing mechanisms for Congressional oversight).  The lack of APA reviewability is buttressed by the national-security context in which Congress legislated. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and President.").  Nothing in the NEA or IEEPA suggests an intent by Congress to invert the constitutional order by permitting judicial review of a national security determination, based solely on a third party's complaints, particularly where Congress itself has not exercised its authority to terminate the relevant declaration.  *See Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[U]nless Congress *specifically* has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in . . . national security affairs." (emphasis added)); *see also Palmieri v. United States*, 896 F.3d 579, 590 (D.C. Cir. 2018) (Katsas, J.,

---

[3] Plaintiffs also point to a discovery letter filed by the Government in a different case.  A fair reading of that letter makes clear that the Government did not concede the availability of APA review, particularly for arbitrary-and-capricious claims.  *See U.S. WeChat Users All. v. Trump*, No. 3:20-cv-5910 (N.D. Cal. Sept. 3, 2020), ECF No. 18 at 2 (explaining that certain "matters are not reviewable" but that in any event "the proper course is to await final action by the Secretary of Commerce and thereafter bring *any viable claims* pursuant to" the APA (emphasis added)).

concurring) ("*Egan* . . . barred challenges under the Administrative Procedure Act.").

**2.    The Secretary Acted Rationally in Identifying the Prohibited Transactions**

Even if some form of judicial review were permitted, it would be highly deferential given the national-security context here.  Regardless, the Secretary's decision satisfied even the typical standard governing arbitrary and capricious review.

Under that standard, "[t]he scope of review . . . is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Agency action must be upheld as long as the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.*

Here, the Secretary's identified prohibitions are justified not only by the detailed twenty-five page decision memorandum, but also by the President's determinations set forth in the TikTok Order, as well as the lengthy Administrative Record that has now been submitted to the Court. Particularly now that the Administrative Record has been submitted, the Court should wholly disregard Plaintiffs' extra-record evidence.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review [in APA cases] should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision.").

In any event, Plaintiffs' challenges to the Secretary's actions are meritless.  Plaintiffs choose snippets of the Secretary's decision memorandum to attack, but those issues are largely on the margins.  Perhaps most notable is what Plaintiffs do *not* challenge—the Secretary's findings

that go to the root of the identified national-security risks:

- TikTok's collection of a significant amount of user data "allows a very detailed picture of an individual user to be created and potentially tracked across other digital contexts."  AR-40.

- "ByteDance has significant and close ties to the CCP which could potentially be leveraged to further their agenda and exact pressure on ByteDance."  AR-32.

- "ByteDance, as a company, and its subsidiaries are subject to PRC national security laws that require or compel the assistance of any Chinese citizen or entity in surveillance and intelligence operations."  AR-44.

- There is a "possibility that the PRC government could, through lawful authority, extralegal influence (Communist Party) influence, or [PRC intelligence and security services], compel TikTok to provide systemic access to U.S. user's sensitive personal information."  AR-44.

- "Given ByteDance's history of cooperation with PRC officials, the extensive amount of sensitive personal data collected by their apps both inside and outside of China, and their strong ties to the CCP and supporting its agenda, the TikTok app could expand the PRC's ability to conduct espionage on millions of U.S. persons."  AR-45.

It bears emphasizing that ByteDance itself is a named Plaintiff in this case, *see* Compl. ¶ 13, and yet Plaintiffs have not attempted to dispute any of the above history regarding ByteDance and its susceptibility to CCP coercion.

 The above findings themselves should be dispositive.  Even if TikTok's U.S. structure were currently the most secure operation imaginable, and even if TikTok were currently operating without any ByteDance influence at all, none of that is guaranteed to continue into the future. Plaintiffs do not—and cannot—dispute that the CCP, acting through ByteDance, could compel TikTok to provide all of its U.S. user data to the PRC at any moment.  Indeed, the CCP's authority over ByteDance is highlighted by the 2018 episode in which the PRC "demanded the permanent shut down" of one of ByteDance's other applications, after which ByteDance's founder and CEO issued a public apology "in which he signaled his intent to correct his products to comply with State and Party directives[.]"  AR-34.  So regardless of how TikTok may operate today, there is no

guarantee that U.S. user data will be secure tomorrow. The Secretary's actions were rational for that reason alone.

Plaintiffs' attempts to undermine the decision memorandum and Administrative Record do not change the analysis. To begin, the Secretary acknowledged, as Plaintiffs assert, that other social media companies also collect large amounts of user data. *See* Pls.' Br. at 24. But other social media companies do not have the same vulnerability to coercion from the CCP, or the absence of recourse with an independent judiciary. And even if other companies also pose similar risks, that hardly impugns the rationality of the Secretary's actions in addressing this particular risk. *Cf. McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026, 1035 (D.C. Cir. 1997) ("[A]gencies are entitled, just as courts, to proceed case by case.").

Plaintiffs also criticize the Secretary for relying on the fact that TikTok previously accessed users' clipboard data, portraying the Secretary as having to decided to "ban[] the app" based solely on this "standard feature common to dozens of apps." Pls.' Br. at 25. But the Secretary did no such thing. The Secretary simply relied on the clipboard issue as one of many instances in which TikTok appears to have "evad[e]d privacy safeguards," AR-43, which is undisputedly relevant to the overall analysis of TikTok's data security and privacy controls.

Plaintiffs acknowledge that a prior study documented that approximately 37% of the IP addresses that TikTok connected to were based in China, *see* AR-41 & nn.132-33, but assert that this study is "outdated" because the current version of TikTok no longer has active connections to IP addresses based in China. Pls.' Br. at 25. Of course, Plaintiffs do not dispute that this issue persisted across "a significant range of past versions" of the application. Suppl. Cloutier Decl. (ECF No. 43-2) ¶ 13. And even if the issue has been corrected now, ByteDance's numerous other connections to the PRC still justify the Secretary's action. *See* AR-8-12.

Notably, Plaintiffs effectively concede the vulnerability of their data, admitting that "some underlying technology is used for multiple ByteDance products" and that "some China-based ByteDance engineers need access to TikTok U.S. user data."  Pls.' Br. at 26-27.  Plaintiffs just respond that TikTok's security precautions are sufficient.  *See id.*  But that does not undermine the actions here.  The Secretary did not ignore TikTok's claimed data precautions.  *See, e.g.*, AR-39 (noting TikTok's attempts to minimize cross-regional access to data); AR-40 (acknowledging structure "similar to engineering projects in other global organizations").  Rather, the Secretary reasonably concluded that the use of overlapping ByteDance technology, and use of China-based personnel, created a risk that the PRC could obtain access to TikTok's U.S. user data.  *See* AR-45 (PRC intelligence and security agencies "could compel the assistance of TikTok's engineering team or other personnel located in the PRC and involved in software development and engineering to directly compromise the app through routine app updates"); *see also* AR-1599 (DHS assessment that "[m]alicious code, if inserted through TikTok . . . , could allow the Chinese government or other malicious actors to compromise the device on which the application is installed").  The Secretary's reasoned consideration of the point proves that he did not act arbitrarily or capriciously.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (simply requiring that an agency's decision "consider an important aspect of the problem" to be valid).

Of the same ilk is Plaintiffs' assertion that the Secretary mischaracterized the nature of TikTok's data storage with the PRC state-owned enterprise CUA.  Pls.' Br. at 27.  The characterization Plaintiffs provide now, *see id.*, differs significantly from what Plaintiffs described in response to the Commerce subpoena.  *See* AR-1805 & n.7.  In any event, all Plaintiffs do is rely on their data-security techniques.  That does not refute the underlying conclusion reasonably reached by the Secretary:  TikTok's storage of U.S. user data with two Chinese companies—CUA

and Alibaba—inherently increases the risk of PRC access to that data because of the PRC's control over those companies.  *See, e.g.*, AR-40 ("U.S. user data being stored outside of the United States presents significant risks in this case. . . .  [A]ny Chinese citizens with direct access to the data could be similarly compelled to assist [PRC intelligence and security agencies].");  AR-41-42 (discussing risks inherent in state-owned enterprises).

In short, Plaintiffs provide no evidence, much less evidence in the Administrative Record, that the Secretary acted arbitrarily or capriciously.  Rather, the record establishes the fundamental logic of the Secretary's analysis:  TikTok collects a massive amount of U.S. user data; TikTok's parent company ByteDance is susceptible to PRC coercion; and the PRC could employ TikTok's user data for purposes detrimental to the United States' national security and foreign policy.

### 3.   The Secretary Did Not Fail to Consider or Address Reasonable Alternatives

Plaintiffs also assert that the Secretary did not adequately address potential alternatives. First, Plaintiffs rely on the CFIUS negotiations.  Pls.' Br. at 29.  Even if the Secretary of Commerce is a member of CFIUS, 50 U.S.C. § 4565(k)(2)(C), the Secretary does not control the Committee's decision making, and the CFIUS negotiations are part of a separate regulatory process, independent of the President's authority under IEEPA to direct the Secretary to identify prohibited transactions. *Cf. Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978) ("[T]he concept of alternatives must be bounded by some notion of feasibility.").  Regardless, the Secretary *did* expressly consider the CFIUS negotiations, and neither "rejected" nor "abandoned" such alternatives—instead, the Secretary sought to achieve the "biggest impact in mitigating national security risks" while also "allowing the USG the latitude to further evaluate the viability of national security mitigations in the context of CFIUS negotiations."  AR-47.

Plaintiffs also question why the Secretary did not consider implementing "transparent user

data privacy and user data protection frameworks that apply to all social media networks."  AR-1099; Pls.' Br. at 29.  That potential solution would likely require legislative action, however, so the Secretary could not impose it.  Moreover, it would not achieve immediate mitigation of the national-security threat posed by TikTok, so in no event does it undermine the Secretary's action here.  *Cf. Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (agencies are only required to consider "reasonable" alternatives, and "the proposed alternative is reasonable only if it will bring about the ends of the federal action").  Even domestic U.S. legislation would not change the legal regime of the PRC, under which ByteDance and TikTok currently operate.

Finally, Plaintiffs point out that the DHS assessment recommended that TikTok "not be permitted on the devices of State, Local, Tribal, and Territorial (SLTT) partners and critical infrastructure operators."  AR-1600; Pls.' Br. at 30.  But DHS made that recommendation only *after* noting that "[t]o reduce the national security risks associated with these applications, the federal government can leverage the authorities noted in Executive Orders 13942 and 13943, including the prohibition of transactions with TikTok's . . . parent organization[]."  And removing TikTok from government devices would not address the full risks identified by the Secretary, *see* AR-45 (TikTok's data could be used by the PRC to "build dossier's on millions U.S. persons"), or the President, *see* TikTok Order, pmbl. (the data could be used to "build dossiers of personal information for blackmail, and conduct corporate espionage").  Thus, the Secretary's approach was rational, and "the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

### 4.    The Stated Justification Was Not Pretextual

Plaintiffs again contend that the Secretary's decision should be invalidated as pretextual. Pls.' Br. at 30.  But they ignore the Supreme Court's recent admonition that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated

reasons." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019).  Here, because Plaintiffs have not proven that the stated purpose for the prohibitions (national security) was pretext, there is no occasion to consider the issue further.

That is especially true given that none of Plaintiffs' allegations relate to the actual decisionmaker for the challenged prohibitions: the Secretary of Commerce.  *See Ramos v. Wolf*, -- F.3d ----, 2020 WL 5509753, at *19 (9th Cir. Sept. 14, 2020) (rejecting a similar claim since there is no evidence that alleged animus "played any role in the [agency] decision-making process").  Moreover, the Secretary's decision is supported by the presumption of regularity, and Plaintiffs bear the burden of rebutting that presumption.  *See United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926); *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978).  And Plaintiffs have offered no evidence or reason to impugn the Secretary's actions, which were fully consistent with the APA.

## C. Plaintiffs' First Amendment Claim Is Meritless

### 1. The Prohibitions Do Not Trigger First Amendment Scrutiny

Consistent with IEEPA's grant of authority to the President to regulate economic transactions, *see* 50 U.S.C. § 1702(a)(1)(B), the prohibitions here regulate only certain business transactions, not protected First Amendment activity.  Plaintiffs do not claim a First Amendment right to engage in any of the regulated economic transactions themselves—*e.g.*, a right to obtain "internet hosting services . . . enabling the functioning or optimization of the TikTok mobile application." *Commerce Identification*, ¶ 2.  Nor do Plaintiffs claim a First Amendment right for TikTok itself to serve as a platform for others' speech. *See U.S. Telecomm. Ass'n v. FCC*, 825 F.3d 674, 741 (D.C. Cir. 2016).  Instead, Plaintiffs claim that the company itself has First Amendment rights as a speaker on the platform, just like individual users of TikTok.  *See* Pls.' Br. at 34 ("Plaintiffs are speakers themselves on the application"); Sept. 27 Hr'g Tr. at 23 (agreeing that "our rights [as] speakers . . . are the same as the rights of any speaker on the platform").

But as the Supreme Court has made clear, general regulations with only a downstream effect on expressive activity do not trigger First Amendment scrutiny. *See Arcara*, 478 U.S. at 705-07; Section I.A.1.c, *supra*. Unlike a law that directly prohibits speech, *see Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020) (ordinance that "prohibits unlicensed tour guides from leading paid tours—in other words, speaking to visitors"), here the fact that TikTok is a platform for expressive activity is irrelevant. Just like the bookseller in *Arcara* whose protected activity did not "confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises," 478 U.S. at 707, the expressive activity on TikTok does not give rise to a First Amendment challenge to a regulation aimed at protecting national security.

### 2. At Most, Some Form of Intermediate Scrutiny Would Apply, Which the Prohibitions Amply Satisfy

Even if the Court concluded that the economic prohibitions sufficiently implicate expressive activity to warrant First Amendment scrutiny, the prohibitions would be analyzed, at most, under some form of intermediate scrutiny. This standard is appropriate for analyzing a regulation of conduct that incidentally burdens speech, *see United States v. O'Brien*, 391 U.S. 367, 376 (1968), *United States v. Albertini*, 472 U.S. 675, 687-88 (1985), as well as "time, place, or manner" restrictions, *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984), and regulations of commercial speech, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563-64 (1980).

Plaintiffs' argument that strict scrutiny applies rests on mislabeling the Secretary's regulations as a "prior restraint." Pls.' Br. at 34-35. But "prior restraint" is a term of art in the First Amendment context, "used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). Here, there is no direct, advance prohibition

on any communications.   Plaintiffs are not prohibited from doing or saying anything; the prohibitions apply only to business transactions involving TikTok.  And Plaintiffs can always choose to speak on one of the many alternate platforms available to them.[4]

At most, then, intermediate scrutiny would apply, which the prohibitions here satisfy. Plaintiffs' only dispute is on whether the prohibitions are narrowly tailored to serve a significant government interest.   Pls.' Br. at 36-37.   First, as detailed above, the threats to U.S. national security interests from TikTok's data collection practices, connection with ByteDance, and the PRC's control over ByteDance are far from "conjecture," *id.* at 36; they are reality.   Regardless, in assessing risks to national security, "conclusions must often be based on informed judgment rather than concrete evidence," and there is no requirement that the President prove his findings with detail or evidence.   *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999).

Second, the Secretary's regulations are narrowly tailored to address that reality.   In the First Amendment context, narrow tailoring is satisfied "so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Albertini*, 472 U.S. at 689.   Here, the Government's interests in data security would obviously be achieved less effectively if TikTok could continue operating in an unrestricted manner, sending mass amounts of sensitive information about U.S. persons to a foreign entity aligned with the PRC and subject to its data collection authorities.   Plaintiffs simply fail to grapple with that fact, and so

---

[4] The prohibitions also cannot be characterized as a prior restraint akin to a licensing scheme governing access to a public forum.  Pls.' Br. at 34-35.  Legally, TikTok is not the equivalent of "the modern public square," *id.* at 33, because TikTok is a private platform, not a public forum. *See Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) ("We have previously used what we have called 'forum analysis' to evaluate government restrictions on purely private speech *that occurs on government property*." (emphasis added)); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930-31 (2019).

cannot establish a First Amendment violation.  *See Clark*, 468 U.S. at 297 ("[I]f the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment[.]"); *Albertini*, 472 U.S. at 688 ("[F]ocusing on whether there were conceivable alternatives" to the government's regulation provides "an answer to the wrong question[.]").  That is especially so in the area of national security, where the President must have significant discretion to respond to an emerging threat.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2421 (2018) ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").

### D.    The Challenged Actions Do Not Violate Procedural Due Process

### 1.    The Prohibitions Do Not Deprive Plaintiffs of a Protected Interest

Plaintiffs bear the burden of establishing a protected property or liberty interest for their due process claim, and here their motion is expressly premised on only two such interests: (1) a claimed "liberty interest in avoiding the damage to their reputation and business caused by a stigmatizing suspension"; and (2) "a liberty interest in their free speech rights."  Pls.' Br. at 38.  On the latter, even assuming it is cognizable, there has been no deprivation of that interest, as explained above.  *See* Section I.C, *supra*.

As for the former interest, it is black-letter law that an interest in reputation, standing alone, cannot support a due process claim.  *See Paul v. Davis*, 424 U.S. 693, 711-12 (1976).  A plaintiff may establish a "stigma-plus" claim, showing that "in addition to reputational harm,. . . the government has deprived them of some benefit to which they have a legal right[.]"  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010).  Plaintiffs have made no such showing here.

Nor have they shown that the Government itself is the source of the reputational harm— another necessary requirement.  *See Doe v. Dep't of Justice*, 753 F.2d 1092, 1108 (D.C. Cir. 1985)

("This circuit . . . has consistently interpreted *Paul*'s 'stigma plus' test to require . . . [that] the government must be the source of the defamatory allegations."). As the Administrative Record amply demonstrates, there was widespread public reporting about TikTok's user data risks well *before* the President's Executive Order or the Secretary's challenged restrictions. *See, e.g.*, AR-806; AR-813; AR-849; AR-880; AR-915; AR-1095. Plaintiffs cannot establish that any claimed stigma or harm to their reputation came from the Government, as opposed to private individuals.

### 2.    Individualized Process Is Not Required for Legislative Judgments

"The Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy." *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283 (1984); *see also Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). Plaintiffs here are claiming a right to individualized process regarding the President's Executive Order and the Secretary's prohibitions. Pls.' Br. at 38 (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). But there is no support for individualized process as to these broad, policy-based judgments regarding national-security risks and how best to mitigate those risks.

In May 2019, the President determined that "foreign adversaries are increasingly creating and exploiting vulnerabilities in information and communications technology and services," and declared a national emergency as such. ICTS Order, pmbl. In August 2020, the President determined that "additional steps must be taken to deal with th[at] national emergency," due to "the spread in the United States of mobile applications developed and owned by companies in [China]," and particularly with respect to TikTok. TikTok Order, pmbl. Accordingly, the President prohibited transactions with ByteDance (or a subsidiary) and delegated his authority under IEEPA to the Secretary of Commerce to further identify prohibited transactions. *Id.* §§ 1, 4.

The prohibitions identified by the Secretary of Commerce—exercising the President's own IEEPA authority—thus represent a determination about how best to mitigate the identified

"unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).  Such determinations constitute "the formulation of a basically legislative-type judgment, for prospective application only, rather than in adjudicating a particular set of disputed facts."  *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 246 (1973).  Indeed, the Secretary's identified prohibitions target a broad set of transactions—namely, five different categories of business transactions supporting or involving the TikTok mobile application—to which any number of persons or entities may be parties.  *See Commerce Identification*, at 6 (prohibiting "[a]ny transaction by any person, or with respect to any property, subject to the jurisdiction of the United States" with ByteDance or a subsidiary); *see id.* ("*Person* means an individual or entity.").  Individualized process is not required before establishing these kinds of broad rules governing the classes of permissible economic transactions.

This distinction is also why Plaintiffs gain nothing from relying on cases like *Holy Land Foundation*.  *See* Pls.' Br. at 39.  That case is a paradigmatic example of individualized adjudication, asking a narrow factual question about a discrete set of past facts, applicable to a single entity.  Here, the Secretary's (and President's) judgments are fundamentally legislative— broadly prohibiting classes of transactions with respect to numerous entities, seeking to prospectively mitigate a national-security threat.

Plaintiffs' own claims further prove the point.  Plaintiffs characterize the prohibitions as "barring [TikTok's] millions of users—including Plaintiffs themselves—from engaging in speech."  Pls.' Br. at 34.  But the Constitution does not require that each of those "millions of users" receive individualized process in connection with the identified prohibitions.

### 3.    Plaintiffs Received All the Process to Which They Were Entitled

Even assuming Plaintiffs' were entitled to individualized process, they received all the process that was due, especially given the sensitive national-security context.  *Cf. Morrissey v.*

*Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

To begin, Plaintiffs' claim is that they were entitled to *pre*-deprivation process.  *See* Pls.' Br. at 38.  But they provide no "analysis of the governmental and private interests that are affected" by the Secretary's decision—as they must to show constitutionally inadequate process.  *Mathews*, 424 U.S. at 334.  And that makes sense, as most courts have concluded in the IEEPA context that the Government "need not provide pre-deprivation notice and hearing, given the government's compelling interest in the immediate blocking of assets upon designation." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 127 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015).

Regardless, the Plaintiffs *did* in fact receive pre-deprivation process.  First, they received notice.  The President's Executive Order, issued August 6, 2020, plainly put Plaintiffs on notice that IEEPA prohibitions were forthcoming within the next 45 days.  *See* TikTok Order, § 1(c). Moreover, the Secretary publicly issued the identified prohibitions on September 18, 2020— almost two months prior to the effective date of November 12.

Second, Plaintiffs had an "opportunity to be heard."  *Mathews*, 424 U.S. at 333.  Plaintiffs baldly assert that they "were provided no opportunity to be heard at all," Pls.' Br. at 39, but this is incorrect.  Plaintiffs received an Administrative Subpoena from Commerce dated September 3, 2020, which provided Plaintiffs an opportunity to submit factual information for Commerce's consideration in connection with the prohibitions.  *See* AR-1830 to AR-1836.  Plaintiffs did in fact submit substantial information in response.  *See* AR-1800 to AR-1828.

Moreover, Plaintiffs themselves describe extensive engagement with Government officials in connection with the ongoing CFIUS matter, including on the specific issues of whether ByteDance and TikTok pose a national-security risk.  *See, e.g.*, Pls.' Br. at 5 ("For almost a year

before the ban, TikTok provided information to CFIUS and made extensive efforts to fully address any national security concerns." (capitalization changed)); *id.* ("From October 2019 through August 2020, Plaintiffs provided voluminous documentation in response to CFIUS's questions, including about Plaintiffs' data security safeguards."); Compl. ¶¶ 39-47 (describing back-and-forth between Plaintiffs and CFIUS).[5]  This engagement demonstrates that no due process violation occurred.

Plaintiffs have also now received the unclassified Administrative Record in this action, including the Secretary's decision memorandum explaining the reasons for the prohibitions. Plaintiffs complain that they received this decision memorandum only in the context of litigation. *See* Pls.' Br. at 39.  Of course, it was Plaintiffs who filed their first lawsuit on August 24, 2020—almost a month before the prohibitions were issued—thus making it inevitable that Plaintiffs would receive this information in the context of litigation.  *See TikTok Inc. v. Trump*, No. 2:20-cv-07672 (C.D. Cal.), Compl. (ECF No. 1).  Indeed, given Plaintiffs' decision to file their lawsuit in August, already declaring that Commerce's actions were necessarily unlawful, Plaintiffs can hardly complain about a lack of process in connection with the subsequent crafting of the prohibitions. *See id.* ¶ 5 ("The executive order and, necessarily, any implementing regulations are unlawful and unconstitutional[.]"); *cf. Ralls Corp.*, 758 F.3d at 317 ("[A] party who has foregone due process

---

[5] To be sure, the CFIUS process is separate from the IEEPA action at issue here.  But Plaintiffs' due process claim is directed against the Government as a whole, including because Plaintiffs challenge the President's Executive Order itself as having violated due process, *see* Compl. ¶ 107. Thus, unlike the APA claim (challenging only the Secretary of Commerce's actions), the broader CFIUS process *is* relevant to the due process claim (challenging the Government's actions as a whole).  The Court need not (and should not) consider the adequacy of the CFIUS process as it pertains to the ongoing CFIUS actions themselves.  *Cf.* 50 U.S.C. § 4565(e) (vesting exclusive jurisdiction over CFIUS challenges in the Court of Appeals).  Plaintiffs' description of the CFIUS process is relevant here, however, as demonstrating Plaintiffs' ample opportunities for engagement with Government decisionmakers on the underlying issue of TikTok's national-security risk.

procedures may not then complain that he was accorded inadequate process[.]").

Finally, even if Plaintiffs established a lack of adequate *pre*-deprivation process, they make no attempt to demonstrate a lack of adequate *post*-deprivation process (which, as noted, is the norm in IEEPA cases). *See Zinermon v. Burch*, 494 U.S. 113, 128 (1990) ("The necessity of quick action by the State or the impracticality of providing any predeprivation process may mean that a postdeprivation remedy is constitutionally adequate." (modifications omitted)). Here, nothing is stopping Plaintiffs from contacting Commerce to discuss the prohibitions or submit additional factual information for Commerce's consideration in connection with the prohibitions. Plaintiffs appear to have chosen to litigate rather than engage with Commerce regarding the substance of the identified prohibitions; Plaintiffs are free to make that choice, but it does not establish a constitutional due process violation.

### E.    The President's Actions Are Otherwise Consistent with IEEPA

Plaintiffs bring a final claim asserting that the prohibitions are *ultra vires* because the President did not declare a national emergency sufficient to invoke his IEEPA authorities. This claim fails at the outset: there is no cause of action available for enforcing IEEPA in this manner; Plaintiffs cannot obtain relief directly against the President, *see Mississippi v. Johnson*, 71 U.S. 475, 501 (1866); and national emergency declarations are "nonjusticiable political questions," *California v. Trump*, 407 F. Supp. 3d 869, 890-91 (N.D. Cal. 2019), *aff'd sub nom., Sierra Club v. Trump*, --- F.3d ---, 2020 WL 5989377 (9th Cir. Oct. 9, 2020).

In any event, Plaintiffs' argument is meritless. The TikTok Order expressly states that the "additional steps" being ordered are in connection with "the national emergency . . . declared in Executive Order 13873 of May 15, 2019." TikTok Order, pmbl. The fact that the President determined that the TikTok restrictions were encompassed within his prior declaration of emergency should be the end of the matter. Moreover, this result is confirmed by the ICTS Order

itself, which applies to "information and communications technology or services" and then defines that term broadly: "any hardware, software, or other product or service primarily intended to fulfill or enable the function of information or data processing, storage, retrieval, or communication by electronic means, including transmission, storage, and display[.]" ICTS Order, § 3(c). TikTok plainly qualifies as a "product or service primarily intended to fulfill . . . communication by electronic means." *Id.*

Plaintiffs also claim that the prohibitions do not identify a threat that TikTok poses to national security, and so the prohibitions are not rooted in "a *bona fide* national emergency." Pls.' Br. at 42. But as detailed above, that assertion is incorrect. There was more than enough evidence justifying TikTok's threat to national security.

## II.   Plaintiffs Have Not Proven Immediate, Urgent Irreparable Harm Justifying a Preliminary Injunction

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Such injury must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins*, *Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015). Plaintiffs' claimed harms are insufficient here for at least two reasons.

First, despite Plaintiffs' repeated assertions that the November 12 restrictions will "ban" TikTok, they have submitted no evidence proving as much. As discussed above, although the restrictions will likely "reduce functionality and usability of the app for users within the United States," the app will likely continue to function in at least some form in the short-term due to "data centers . . . operating outside of the United States." AR-48. Additionally, the prohibitions apply only to the TikTok mobile application, not the TikTok website. Plaintiffs have not proven that they

will suffer immediate, irreparable harm from reduced functionality of the app standing alone.

Second, even accepting Plaintiffs' assertions at face value, they still cannot demonstrate that a temporary preliminary injunction would redress their claimed harms. Plaintiffs' harms stem from the independent decisions of third parties not before the Court, such as their advertising partners, prospective employees, and prospective and existing third-party users. Indeed, Plaintiffs assert that they began suffering injuries "[e]ven before the Prohibitions were announced," Pls.' Br. at 43, which raises the obvious question whether a preliminary injunction against the prohibitions would even redress their claimed injuries. Plaintiffs have submitted no evidence demonstrating that this Court's entry of a temporary preliminary injunction would cause independent third parties not before this Court to change their behavior. Such speculative theories generally are insufficient for Article III standing, *see Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-46 (1976), much less the significantly higher burden of proving irreparable harm.

## III.    The Balance of the Equities and Public Interest Strongly Favor the Government

Even if Plaintiffs succeeded in demonstrating some form of harm, the most they can claim is potentially lost business revenue associated with the TikTok mobile app. On the other side of the balance is a formal national security and foreign affairs determination made by the President, pursuant to an emergency declaration, as authorized by Congress. Specifically, the President explained that TikTok's data-collection practices "threaten[] to allow the Chinese Communist Party access to Americans' personal and proprietary information," which could permit that foreign government to "build dossiers of personal information for blackmail, and conduct corporate espionage." TikTok Order, pmbl. And as the Secretary explained—after consulting with the U.S. Intelligence Community and the Department of Homeland Security—the Chinese government may "compel TikTok to provide systemic access to U.S. user's sensitive personal information," which would enable a foreign adversary to use TikTok for "foreign intelligence and surveillance."

AR-44.  Based on these considerations, "the proper determination of where the public interest lies" is not a close question.  *Winter*, 555 U.S. at 26.

This Court previously held that the Government and the public have no interest "in the perpetuation of unlawful agency action," and thus an injunction was warranted.  PI Op. at 17.  Respectfully, that determination erroneously conflated the balance of the equities prong with the likelihood of success prong, *both* of which must be met for Plaintiffs to obtain relief.  Indeed, given that a preliminary injunction assesses only a party's *likelihood* of success, it is error to conclude that a plaintiff satisfying that prong has necessarily also satisfied the balance of the equities.  Given the strong national-security harms implicated here, Plaintiffs' request for emergency relief should be denied on the basis of the balance of the equities alone.

## IV.    Any Relief Should Be Appropriately Limited

Based on the foregoing, Defendants respectfully submit that the Court should deny Plaintiffs' motion for a preliminary injunction as to the November 12 prohibitions.  Additionally, the Court should issue an indicative ruling pursuant to Fed. R. Civ. P. 62.1 stating that, for the same reasons, the Court has now concluded that the injunction as to the September 27 prohibitions was erroneous and thus, if the Court of Appeals were to remand the appeal, this Court would vacate its prior injunction.

To the extent the Court disagrees and is inclined to grant relief, any remedy "must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see* PI Op. at 17-18.  For example, a statutory violation under 50 U.S.C. § 1702(b) would justify relief only as to user content within the scope of those provisions—*i.e.*, personal communications having no value and/or *international* transmissions of content on TikTok.[6]  Similarly, any Due

---

[6] Plaintiffs, as the party seeking preliminary relief and bearing the burden to prove their entitlement to it, cannot avoid this result by arguing that personal communications and/or international

Process Clause violation would not justify an injunction against enforcement of the prohibitions; it would only justify an order directing the Government to provide Plaintiffs with adequate post-deprivation process. *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 209 (D.C. Cir. 2001). And because Plaintiffs' First Amendment claims are based only on their own speech—not the speech of anyone else on the platform—success on that claim would justify relief only as to the named Plaintiffs here as speakers, not to the entire universe of current (or hypothetical future) TikTok users.

Even if the Court determines to enter some form of relief, therefore, it should not enjoin the November 12 prohibitions in their entirety. Any relief here should be limited to only the named Plaintiffs' own speech activities; only to communications on the platform that are personal communications having no value or involve international transmission of informational materials; and/or only requiring post-deprivation process but still allowing the prohibitions to go into effect.

Finally, given the significant national-security concerns at stake, the Government respectfully requests a decision from this Court as soon as practicable, to allow for orderly appellate proceedings prior to the prohibitions' November 12 effective date in the event the party against whom the Court rules seeks further review.

## CONCLUSION

This Court should deny Plaintiffs' motion for a preliminary injunction.


Dated: October 23, 2020                             Respectfully submitted,

                                                    JEFFREY BOSSERT CLARK
                                                    Acting Assistant Attorney General

---

transmissions are commingled with other data transmissions. Plaintiffs' choice to structure their business operations in that manner does not justify entering an injunction against the United States that provides greater relief than what is justified for the particular violation established.

JOHN V. COGHLAN
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
Assistant Branch Director

*/s/  Daniel Schwei*
DANIEL SCHWEI
Special Counsel
SERENA M. ORLOFF
MICHAEL DREZNER
AMY E. POWELL
STUART J. ROBINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Ben Franklin Station, P.O. Box No. 883
Washington, DC 20044
Phone: (202) 305-8693
Fax: (202) 616-8470
E-mail: daniel.s.schwei@usdoj.gov

*Counsel for Defendants*