# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIKTOK INC., et al.,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, in his official capacity
as President of the United States, et al.,

        *Defendants*.

Case No. 20-cv-02658 (CJN)

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
RENEWED MOTION FOR PRELIMINARY INJUNCTION
AGAINST COMMERCE DEPARTMENT PROHIBITIONS 2-5**

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    Plaintiffs Are Likely to Succeed on Their Claims That Prohibitions 2-5 Are Unlawful. ............................................................................................................. 2

    A.    The Remaining Prohibitions Violate Sections 1702(b)(1) and 1702(b)(3). ........... 2

        1.    The Remaining Prohibitions Violate Section 1702(b)(1) by, at a Minimum, Indirectly Regulating "Personal Communication." ................. 2

        2.    The Remaining Prohibitions Violate Section 1702(b)(3) by, at a Minimum, Indirectly Regulating the Flow of "Information or Informational Materials." ........................................................................... 4

        3.    The Government's Non-Textual Arguments Fail. ...................................... 7

    B.    The Remaining Prohibitions Are Arbitrary and Capricious. ............................... 13

        1.    Plaintiffs' Claims Under the APA Are Subject to Judicial Review.......... 13

        2.    The Commerce Department's Explanation for the Prohibitions is Inadequate and Unsupported by the Evidence......................................... 14

        3.    The Commerce Department Failed to Address Reasonable Alternatives. ............................................................................................ 17

        4.    The Stated Justification Was Pretextual. .................................................. 18

    C.    The Remaining Prohibitions Violate the First Amendment. ............................... 18

    D.    The Remaining Prohibitions Violate Due Process................................................ 20

    E.    The Remaining Prohibitions Violate IEEPA in Other Respects........................... 23

II.    The Remaining Factors Require Injunctive Relief. ....................................................... 23

    A.    Plaintiffs Face Immediate Irreparable Harm If Relief Is Not Granted. ............... 23

    B.    The Balance of Equities And Public Interest Require Injunctive Relief. ............. 24

CONCLUSION................................................................................................................ 25

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acc. Council v. DeVos*,
   303 F. Supp. 3d 77 (D.D.C. 2018) ........................................................................... 14

*Affiliated v. United States*,
   406 U.S. 128 (1972) ................................................................................................... 3

*Arcara v. Cloud Books, Inc.*,
   478 U.S. 697 (1986) ................................................................................................. 20

*Ass'n of Colleges v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) .................................................................................. 3

*Bilski v. Kappos*,
   561 U.S. 593 (2010) ................................................................................................... 6

*Chamber v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ................................................................................ 23

*City of Alexandria v. Slater*,
   198 F.3d 862 (D.C. Cir. 1999) .......................................................................... 17, 18

*Clark Cnty. v. FAA*,
   522 F.3d 437 (D.C. Cir. 2008) ................................................................................ 14

*Clark v. Martinez*,
   543 U.S. 371 (2005) ................................................................................................. 12

*D.C. Hosp. Ass'n v. D.C.*,
   224 F.3d 776 (D.C. Cir. 2000) ................................................................................ 12

*DeJonge v. Oregon*,
   299 U.S. 353 (1937) ................................................................................................. 21

*Dist. Hosp. Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015) .................................................................................. 17

*El-Shifa v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) ................................................................................ 13

*Elrod v. Burns*,
   427 U.S. 347 (1976) ...................................................................................... 8, 19, 24

*Fares v. Smith*,
    901 F.3d 315 (D.C. Cir. 2018) ........................................................................22

*Gomez v. United States*,
    490 U.S. 858 (1989) ........................................................................................13

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) .....................................................................................7, 11

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ........................................................................25

*Gray v. Schweiker*,
    652 F.2d 146 (D.C. Cir. 1980) ........................................................................21

*Griffin v. Oceanic Contractors*,
    458 U.S. 564 (1982) ........................................................................................11

*Henson v. Santander*,
    137 S. Ct. 1718 (2017) ......................................................................................9

*Holder v. Hum. Law Proj.*,
    561 U.S. 1 (2010) ............................................................................................25

*\*Holy Land v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ........................................................................13

*Japan Whaling Ass'n v. Am. Cetacean*,
    478 U.S. 221 (1986) ........................................................................................23

*\*Kalantari v. NITV*,
    352 F.3d 1202 (9th Cir. 2003) .....................................................................9, 10

*\*League of Women v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................25

*\*Marland v. Trump*,
    No. 20-cv-4591 (E.D. Pa. Oct. 30, 2020) ..........................................................6

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ........................................................................................22

*NCRI v. State*,
    251 F.3d 192 (D.C. Cir. 2001) ........................................................................22

*Packingham v. N. Carolina*,
    137 S. Ct. 1730 (2017) ....................................................................................19

*Pilot Life Ins. Co. v. Dedeaux*,
  481 U.S. 41 (1987)......................................................................................8

*R.I.L-R v. Johnson*,
  80 F. Supp. 3d 164 (D.D.C. 2015).........................................................25

*Ralls v. CFIUS*,
  758 F.3d 296 (D.C. Cir. 2014).................................................................21

*Reno v. ACLU*,
  521 U.S. 844 (1997)..................................................................................19

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985).....................................................................14

*Serono v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998)...............................................................25

*Sorrell v. IMS*,
  564 U.S. 552 (2011)..................................................................................19

*Stephan v. United States*,
  319 U.S. 423 (1943).....................................................................................3

*Summer Hill v. Johnson*,
  603 F. Supp. 2d 35 (D.D.C. 2009).........................................................18

*Thompson v. W. States*,
  535 U.S. 357 (2002)..................................................................................20

*Trifax v. Dist. of Columbia*,
  314 F.3d 641 (D.C. Cir. 2003)..................................................................21

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)....................................................................................12

*U.S. WeChat Users v. Trump*,
  2020 WL 5592848 (N.D. Cal. Sep. 19, 2020) .......................................20

*United States v. Albertini*,
  472 U.S. 675 (1985)..................................................................................19

*United States v. Fla. E. Coast*,
  410 U.S. 224 (1973)..................................................................................21

*United States v. Gonzales*,
  520 U.S. 1 (1997).........................................................................................3

iv

*United States v. Robel*,
   389 U.S. 258 (1967) ..................................................................................25

*United States v. Stevens*,
   559 U.S. 460 (2010) ...................................................................................7

*Veterans Peace Convoy v. Schultz*,
   722 F. Supp. 1425 (S.D. Tex. 1988) ..........................................................7

*\*Walsh v. Brady*,
   927 F.2d 1229 (D.C. Cir. 1991) .........................................................10, 11

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*,
   139 S. Ct. 361 (2018) ................................................................................13

*Whitman-Walker v. HHS*,
   2020 WL 5232076 (D.D.C. Sept. 2, 2020) ........................................24, 25

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ..................................................................13

*Wis. Cent. Ltd. v. United States*,
   138 S. Ct. 2067 (2018) ................................................................................3

*Zivotofsky v. Clinton*,
   566 U.S. 189 (2012) ..................................................................................13

**Statutes**

50 U.S.C. §§ 1621 .............................................................................................14

50 U.S.C. §§ 1622 .............................................................................................14

50 U.S.C. §§ 1641 .............................................................................................14

50 U.S.C. § 1702(b)(1) .................................................................................2, 3, 4

50 U.S.C. § 1702(b)(2) ...............................................................................7, 11, 12

50 U.S.C. § 1702(b)(3) ............................................................................... *passim*

50 U.S.C. § 1702(b)(4) .......................................................................................10

50 U.S.C. 1702(c) ..............................................................................................14

50 U.S.C. § 1708 .............................................................................................6, 7

Pub. L. No. 113-291, § 1637, 128 Stat. 3292, 3644-3647 (2014) ....................6

v

Pub. L. No. 95-223, § 203(b), 91 Stat. 1627 (1977) .......................................................3

**Other Authorities**

31 C.F.R. § 515.542(h) .......................................................................................................6

31 C.F.R. § 560.210(c) .......................................................................................................7

First Amendment ....................................................................................................... *passim*

Fifth Amendments ...............................................................................................................1

Fed. R. Civ. P. 65(a)(2) ......................................................................................................2

H.R. Conf. Rep. No. 95-459, at 15 (1977).........................................................................4

H.R. Conf. Rep. No. 103-482, at 239 (1994).................................................................10

**INTRODUCTION**

The government's repeated invocation of national security cannot mask what this case is fundamentally about:  limitations that Congress imposed on the executive through the plain language of a statute.  Here, the executive violated those limitations, claiming powers that Congress explicitly and deliberately withheld.  Since this Court's previous ruling that Defendants' position "does not find support in the text of the statute," ECF No. 30 at 12, neither the government's position nor the IEEPA statute has changed.  The Remaining Prohibitions, just like the first Prohibition, should be enjoined as a violation of IEEPA.

The Remaining Prohibitions are unlawful for other, independent reasons as well.  They are arbitrary and capricious in violation of the APA because the Commerce Department offered an explanation for its decision that runs counter to the evidence before it and failed to explain its rejection of reasonable alternatives.  Defendants' belated attempt to meet these standards in their opposition brief is unavailing; the *post hoc* rationales offered by the government are factually and legally insufficient.  The Prohibitions also impermissibly infringe on Plaintiffs' constitutional rights under the First and Fifth Amendments, banning a massively popular communications platform without constitutionally-adequate process.

In addition to failing to counter Plaintiffs' showing of a likelihood of success on the merits, Defendants offer nothing to alter this Court's previous findings in Plaintiffs' favor on the other elements of injunctive relief.  The government's strained argument that no irreparable harm has been proven—despite the Commerce Secretary's pronouncement that the effect of the Remaining Prohibitions would be to "shutdown" TikTok—is difficult to take seriously.  The government likewise fails meaningfully to dispute that it would not be harmed—and the public interest would be served—by a temporary injunction of the Remaining Prohibitions while their legality is tested.

**ARGUMENT**

I.      **Plaintiffs Are Likely to Succeed on Their Claims That Prohibitions 2-5 Are Unlawful.**

    A.      **The Remaining Prohibitions Violate Sections 1702(b)(1) and 1702(b)(3).**

As this Court previously concluded, Plaintiffs are likely to succeed on their claim that both the first Prohibition already enjoined, and the Remaining Prohibitions, violate IEEPA, specifically 50 U.S.C. §§ 1702(b)(1) and (b)(3) by, at a minimum, indirectly regulating "personal communication[s]" and the flow of "information or informational materials." The government acknowledges that for it to prevail on this renewed motion, the Court would need to "reconsider its statutory analysis." Opp'n 10. Yet it offers no adequate justification for doing so.[1]

        1.      The Remaining Prohibitions Violate Section 1702(b)(1) by, at a Minimum, Indirectly Regulating "Personal Communication."

The President's IEEPA authority "does not include the authority ***to regulate or prohibit, directly or indirectly any*** postal, telegraphic, telephonic, ***or other personal communication***, which does not involve a transfer of anything of value." 50 U.S.C. § 1702(b)(1) (emphasis added). As this Court correctly concluded, the Prohibitions will "prevent[] Americans from sharing personal communications on TikTok," including "communications with no economic value at all." ECF No. 30 at 13. They, therefore, violate Section 1702(b)(1). *Id.*

The government's argument that the Court should now reconsider its ruling on the plain meaning of Section 1702(b)(1), in favor of what the government calls a "narrow[]" interpretation, Opp'n 16, is contrary to the text of the statute. Indeed, "Congress phrased the relevant provision broadly—employing words and phrases like 'any' and 'directly or indirectly.'" *Ass'n of Colleges*

---

[1] Indeed, although the government resisted moving forward to summary judgment as the Court had suggested and Plaintiffs preferred on the ground that the record was incomplete, *see* ECF No. 32, it has now produced the complete administrative record and fails to identify any disputed issue of fact material to this statutory claim that would preclude this Court from entering judgment. *See* Fed. R. Civ. P. 65(a)(2) ("before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing").

*v. Duncan*, 681 F.3d 427, 444 (D.C. Cir. 2012) (phrase "directly or indirectly" is "extremely broad language").  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  *United States v. Gonzales*, 520 U.S. 1, 5 (1997).  Section 1702(b)(1)'s protections are "broad" and, "[by] use of the word 'any,' [are] obviously meant to be inclusive."  *Affiliated v. United States*, 406 U.S. 128, 151 (1972).[2]

Defendants also repeat their earlier argument that users' personal communications on TikTok are not protected by Section 1702(b)(1) because they "necessarily involve an exchange of value."  Opp'n 19.  But as this Court correctly found, millions of private messages shared *every day* on TikTok involve no "transfer of anything of value."  ECF No. 30 at 13.  Defendants again press their points that "when a user creates an account, he or she grants TikTok an 'unconditional irrevocable worldwide license'" to use that content, and that the aggregated data collected by Plaintiffs as a byproduct of those communications is valuable for data-mining purposes.  Opp'n 19.  But these arguments are no stronger the second time around.

The notion that these asserted aspects of TikTok put user communications outside the reach of Section 1702(b)(1) cannot be squared with the statute's language—either today, or at the time it was enacted.  *See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (words should be "interpreted as taking their ordinary, contemporary, common meaning" at the time statute was enacted).  Section 1702(b)(1) was enacted in 1977, when the Internet did not exist.  At that time, personal communications occurred face-to-face, or through the mail, a telegraph, or over the

---

[2] The government argues that "because § 1702(b) operates as exceptions to the broad authority granted in § 1702(a), those exceptions must be construed narrowly."  Opp'n 15-16.  But Congress did not enact 50 U.S.C. § 1702(b) as an "exception" to some preexisting authority.  To the contrary, Congress, when it first created IEEPA authority, chose from the outset not to extend this authority to the protected materials, specifying that "[t]he authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly," the protected materials, Pub. L. No. 95-223, § 203(b), 91 Stat. 1627 (1977).  The "exceptions" heading, which was added when Title 50 (a non-positive law title of the Code) was codified, is immaterial to the statute's proper construction.  *See Stephan v. United States*, 319 U.S. 423, 426 (1943) (per curiam).

phone.  Considered in that context, the plain meaning of the words "transfer of anything of value" cannot be contorted to mean the collection, aggregation, and monetization of data by a service provider.  Nor can it reasonably mean a term of service that grants a royalty-free license to transmit digital content over an Internet platform.  Instead, "anything of value" meant then what it means today: the transfer of money as part of a personal communication.  *See* H.R. Conf. Rep. No. 95-459, at 15 (1977) ("[IEEPA authority] does not extend to the . . . hindrance, direct or indirect, of private communications, which are not *commercial or financial transactions.*" (emphasis added)).[3]

Moreover, as the Court previously determined, "such an expansive reading of the phrase 'anything of value' would write the personal-communications limitation out of the statue."  ECF No. 30 at 13-14.  That an individual sending a personal communication allows a provider access to information, or provides a payment in exchange for use of its service—a license to content posted on an app, a monthly payment for telephone usage, or a stamp to send a letter—does not mean that the personal communication *itself* "involve[s] a transfer of [something] of value."  If it did, the only form of communication the statute would have protected in 1977 was face-to-face communication, which cannot be reconciled with the statute's identification of "postal, telegraphic, [and] telephonic" messages as examples of protected personal communications.

2.  The Remaining Prohibitions Violate Section 1702(b)(3) by, at a Minimum, Indirectly Regulating the Flow of "Information or Informational Materials."

Section 1702(b)(3) has similarly broad language as Section 1702(b)(1), providing that the executive lacks authority under IEEPA to "***directly or indirectly***" regulate or prohibit—"regardless of format or medium of transmission," and "whether commercial or otherwise"—the importation

---

[3] The fact that certain users make money indirectly through their use of the app, *see* Opp'n 19-20, does not mean that their personal communications on the app "involve a transfer of [something] of value."  Regardless, the Court need not resolve that question here because, as the Court found, there are millions of messages each day on TikTok that do not, even indirectly, generate any revenue for the user.

or exportation of "*any* information or informational materials." 50 U.S.C. § 1702(b)(3) (emphasis

added).  The Remaining Prohibitions "will have the intended effect of stopping U.S. users from

communicating (and thus sharing data) on TikTok," and therefore constitute, at a minimum, the

indirect regulation of the exchange of informational materials.  ECF No. 30 at 14.[4]

The government does not contest that materials shared over TikTok constitute "information

or informational materials."  Instead, it argues that "[t]o the extent the prohibitions regulate TikTok

as a platform at all, they only do so as a 'medium of transmission,' which the statute recognizes as

distinct from the underlying informational materials."  Opp'n 20-21.  But nothing in Section

1702(b)(3) implies that regulation of "mediums of transmission" is a carve-out to the prohibition

against indirect regulation of information or informational materials.  The phrase "medium of

transmission" was added as an amendment to IEEPA as a way to *broaden* the limitations and

protect information materials even from indirect regulation, "regardless of" the medium of

transmission.  The argument that Section 1702(b)(3) imposes no limit on the government's ability

to regulate "mediums of transmission," regardless of the impact on informational materials, is

inconsistent with the statute's prohibition on the "direct[] or *indirect*[]" regulation of the flow of

information.  At a minimum, the *direct prohibition* of a medium of transmission—especially like

the one here, which is aimed at banning the import and export of all informational materials

transmitted—may *indirectly* prohibit that flow of informational materials.

This Court's analogy to a news wire feed—expressly identified in Section 1702(b)(3)—

reinforces this conclusion.  *See* ECF No. 30 at 11 (like a news wire feed, TikTok "is inextricably

---

[4] On October 30, 2020, a few hours before Plaintiffs filed this memorandum, the U.S. District
Court for the Eastern District of Pennsylvania preliminarily enjoined the Prohibitions.  The court
held that "[b]ecause the Commerce Identification constitutes, at minimum, an indirect regulation
on the importation and exportation of these materials, Plaintiffs have shown that they are likely to
succeed in their argument that the Commerce Identification is ultra vires under IEEPA's
informational materials exception."  *Marland v. Trump*, No. 20-cv-4591, at *21 (E.D. Pa. Oct. 30,
2020).  A copy of the court's opinion is attached as Exhibit A hereto.

bound up with and exists primarily to share protected informational materials").  The government argues that this Court "erred by analogizing TikTok to a 'news wire feed,'" because it "is, at most, analogous to the news wire itself ... *i.e.*, a service that transmits news coverage," while a "news wire feed" is the "news stories" themselves.  Opp'n 21.  Even putting aside that the government's characterization of "news wire feed" conflicts with OFAC's definition of that term, *see* 31 C.F.R. § 515.542(h) ("the term 'telecommunications services' includes ... news wire feeds"), the direct regulation of a news wire *still* constitutes indirect regulation of content shared over it.

The government further argues that a separate statute addressing cyber-enabled espionage, 50 U.S.C. § 1708, demonstrates that "Congress must have intended for IEEPA to permit the President" to regulate mediums of transmission.  Opp'n 22.  This later-enacted statute did not amend IEEPA,[5] does not use the term "medium of transmission," and offers nothing legally relevant to interpretation of that text in IEEPA.  *See Bilski v. Kappos*, 561 U.S. 593, 607 (2010) (later-enacted statute "cannot change the meaning of a prior-enacted statute").  Indeed, Section 1708(c) expressly negates any such inference, instructing that "[n]othing in this section shall be construed to affect the application of ... any authority provided for under any other provision of law."  50 U.S.C. § 1708(c).

In any event, Section 1708 on its face plainly has no impact on IEEPA's prohibition against the regulation of informational materials.  Rather, it addresses the President's authority to sanction a foreign actor who executes malicious computer code to infiltrate and steal trade secrets—i.e., *not* one of the categories of "informational materials" protected by Section 1702(b)(3).  There is a world of difference between the government's authority to sanction under Section 1708 "a foreign

---

[5] Section 1708 of Title 50 was enacted as Section 1637 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 1637, 128 Stat. 3292, 3644-3647 (2014), not as an amendment to IEEPA.

person" who "knowingly" participates in "economic or industrial espionage in cyberspace," and a government prohibition against U.S. users posting videos on a mobile entertainment platform. This conclusion is underscored by the purpose animating Section 1702(b)(3)—protection of expressive material under the First Amendment—which has no relevance in the cyberespionage context regulated by Section 1708.  *See United States v. Stevens*, 559 U.S. 460, 480 (2010) (First Amendment does not protect speech integral to criminal conduct).

Defendants seek to rewrite the plain language of Section 1702(b)(3) by citing to an OFAC regulation, 31 C.F.R. § 560.210(c), which parrots large parts of Section 1702(b) but "does not exempt from regulation … transactions related to information or informational materials not fully created and in existence at the date of the transactions, … or to the provision of marketing and business consulting services."  This is improper.  *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) ("existence of a parroting regulation does not change … the meaning of the statute"); *Veterans Peace Convoy v. Schultz*, 722 F. Supp. 1425, 1431 (S.D. Tex. 1988) ("[N]either of those two [OFAC] regulations furnish any interpretation of § 1702(b)(2).  They simply parrot the language of the statute.").  Moreover, the regulation is not legally operative here, as it was adopted by a different agency (OFAC) in the context of a different exercise of IEEPA authority (the Iran sanctions program).  Even if it were, Defendants' argument that pre-recorded videos "become new content when they are uploaded to the TikTok platform," Opp'n 24, would still be both wrong and irrelevant: the inquiry for purposes of the OFAC regulation is whether a video is "fully created and in existence" before it is posted on the app, not whether its posting adds "new content" to TikTok.  *See* ECF No. 30 at 12 n.2.

### 3.   The Government's Non-Textual Arguments Fail.

Unable to challenge this Court's straightforward reading of Section 1702(b), Defendants strain to make the words seem different from what Congress enacted.  The government's non-

textual arguments, which largely repeat points made in its earlier briefing, are meritless.

*First*, the government argues that the Remaining Prohibitions are lawful because regulating personal communications or informational materials was not the "intended object" or "purpose" of the Prohibitions. Opp'n 11, 13. Yet Section 1702(b) self-evidently contains no intent or purpose requirement. Moreover, it is well-established that "indirect[]" regulations of speech include those that have the "unintended but inevitable result" of affecting speech. *Elrod v. Burns*, 427 U.S. 347, 362 (1976).[6] Otherwise, the government could evade Section 1702(b)'s limitations by reciting an "intended object" for whatever prohibition or regulation it wanted to impose that is anything other than those expressly forbidden under Section 1702(b).

Furthermore, even if the purpose behind the Remaining Prohibitions were relevant to the application of Section 1702(b)(3), which it is not, the government's argument still fails because, as this Court correctly found, "the purpose and effect of the Secretary's prohibitions is to limit, and ultimately reduce to zero, the number of U.S. users who can comment on the platform and have their personal data on TikTok." ECF No. 30 at 10-11; *see also* Commerce Memo at 22. While the government gamely attempts to reframe the purpose of the Remaining Prohibitions— arguing that their "objective" is "preventing collection, transmission, and aggregation of U.S. user data," Opp'n 12 (quoting AR-47)—this contortion fails because it ignores the *other* express objective of the Prohibitions: to stop alleged "disinformation campaigns that benefit the Chinese Communist Party." Ex. 12; AR-35-38. For that objective, there can be no *post hoc* recasting of purpose: the way that the Prohibitions seek to stop the claimed "disinformation campaigns" is, indisputably, by stopping the flow of *all* information and personal communications. In any event,

---

[6] By contrast, in the case the government cites in support of its argument, Opp'n 11, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987), the court considered only the meaning of "regulation"— not "direct *or indirect* regulation."

Defendants themselves make clear that their purported data collection concerns are inextricably bound up with the personal communications and informational materials shared over the platform. *See, e.g.*, Opp'n 19 (TikTok "collects information about users' communications … in the context of *composing, sending, or receiving messages* … includ[ing] *the content of the message*"); *id.* at 5 (similar). Thus, the Remaining Prohibitions are readily distinguishable from the hypothetical regulation of a weather or ride-sharing app posited in the government's brief. *See* Opp'n 13-14.

*Second*, Defendants argue that the Remaining Prohibitions fall outside Section 1702(b) because they regulate TikTok's "commercial transactions," and have only an "incidental effect" on personal communications and informational materials. Opp'n 10-11. As this Court previously found, the government's argument "fails to grapple with IEEPA's text," ECF No. 30 at 10, because it improperly conflates "indirect" and "incidental." The Remaining Prohibitions plainly have more than an "incidental effect" on personal communications and informational materials: "the purpose and effect of the Secretary's prohibitions is to limit, and ultimately reduce to zero, the number of U.S. users who can comment on the platform and have their personal data on TikTok." *Id.* at 10-11. Even if the Prohibitions *directly prohibit* only commercial transactions, they still violate Section 1702(b) by, at a minimum, *indirectly regulating* personal communications and informational materials. *See Henson v. Santander*, 137 S. Ct. 1718, 1723 (2017) (courts must "presume differences in language like this convey differences in meaning"). The text of Section 1702(b)(3) also forecloses the government's argument about commercial transactions because Congress specified that Section 1702(b)(3)'s limitation on executive authority applies to any information or informational materials, "whether commercial or otherwise." This language would be superfluous if, as Defendants argue, information exchanged in connection with a "commercial" transaction could not constitute "information or informational materials." ECF No. 30 at 11; *see*

*also Kalantari v. NITV*, 352 F.3d 1202, 1207 (9th Cir. 2003).

The government's argument that labeling something an "incidental effect" removes it from Section 1702(b)(3)'s limitation against "indirect regulation," Opp'n 17, has been rejected by the courts. *Kalantari*, 352 F.3d at 1209 ("transfer of intellectual property rights" for film is protected under Section 1702(b)(3), even though agreements transferring rights "are 'ordinarily incident' to the importation" of the film). Indeed, the drafters of the IEEPA amendment that broadened Section 1702(b)(3) in 1994 "underst[ood] that it was not necessary to include any explicit reference in the statutory language to 'transactions incident' to the importation or exportation of information or informational materials, because *the conferees believe that such transactions are covered by the statutory language*." *Id.* (quoting H.R. Conf. Rep. No. 103-482, at 239 (1994)).

The government claims that Section 1702(b)(4)—which removes the President's authority to regulate "any transactions ordinarily incident to travel"—demonstrates that "[w]hen Congress intends for the § 1702(b) exceptions to extend more broadly to incidental effects, [it] says so expressly." Opp'n 11. But the activities protected by Section 1702(b)(4) do *not* fall within the plain meaning of "indirectly regulate." *See, e.g.*, 50 U.S.C. § 1702(b)(4) ("transactions ordinarily incident to travel … include[e] the importation of accompanied baggage for personal use"). Thus, if anything, this provision *undermines* the government's argument by illustrating the kinds of activities that are truly "incidental" to protected conduct. *See* H.R. Conf. Rep. No. 103-482, at 239 (1994) (Section 1702(b)(4) "prohibit[s] restrictions *of any kind* … on travel").

*Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991), on which Defendants rely, in fact cuts against their arguments and reinforces that the Prohibitions here exceed the government's IEEPA authority. In *Walsh*, a businessman who wanted to import Cuban posters alleged that OFAC regulations violated the identical informational materials limitation in the Trading with the Enemy

Act by restricting his ability to travel to Cuba to set up business contacts and view the posters.  The court rejected his claim, deferring to the agency's assessment that his travel was "too tangential" to the actual importation of informational materials to fall within the limitation.  But, at the same time, the court recognized the breadth of the limitation on the executive and noted an example of "indirect regulation" that would be barred under the statute: "'regulations [that] explicitly allow[] the importation of informational materials, but *undermine[] the permission indirectly*—by requiring that payment be made into a blocked bank account in the United States.'"  Opp'n 12 (emphasis added) (quoting *Walsh*, 927 F.2d at 1232).  Similarly, the Remaining Prohibitions against the various listed transactions with TikTok "undermine[] … indirectly" TikTok users' ability to import and export informational materials on the app, in violation of Section 1702(b)(3). If anything, the example in *Walsh* is an even *less* direct regulation than the Remaining Prohibitions, because it prohibited only payment for imported materials—not, as here, their method of importation entirely.

*Third*, the government resorts to policy arguments to try to override the statutory text, insisting that the plain meaning of Section 1702(b) "would effectively gut the President's authority under IEEPA." Opp'n 17.  But the executive is not permitted to "transform the carefully described limits on [its] authority … into mere suggestions." *Gonzales*, 546 U.S. at 260-61.  Likewise, the fact that adhering to a statute means the tools available to the executive are more limited obviously is no reason to disregard it.  *See Griffin v. Oceanic Contractors*, 458 U.S. 564, 576 (1982).

The statutory framework also refutes Defendants' policy-based arguments.  In Section 1702(b)(2), immediately preceding Section 1702(b)(3), Congress stated that the President may not use IEEPA authority to regulate humanitarian donations *unless* (among other things) he "determines that such donations (A) would seriously impair his ability to deal with any national

emergency." 50 U.S.C. § 1702(b)(2).  Section 1702(b)(2) confirms that Congress knew how to

narrow a limitation on IEEPA authority when it intended to do so, and it did not do so in Section

1702(b)(3).  *D.C. Hosp. Ass'n v. D.C.*, 224 F.3d 776, 780 (D.C. Cir. 2000) (inclusion of words in

one provision and not another is "compelling evidence" of Congressional intent).[7]  Accordingly,

the government's contention that the "plain language approach would create an IEEPA-free zone,"

Opp'n 14, is not only inaccurate but a quarrel with Congress, not with Plaintiffs.

In fact, abiding by the plain meaning of the statute leaves ample room for executive

regulation where it is warranted.  For example, the President has authority to prohibit or regulate

digitally-encoded malware, which has no expressive content and is markedly different in kind from

the films, photographs, artworks, and news wire feeds enumerated in Section 1702(b)(3) and

shared on TikTok.  *See supra* at 6.  Similarly, the executive has authority to employ the "hallmark

of IEEPA authority: asset freezing," Opp'n 17, to shape and deter the behavior of "foreign

adversaries [that] creat[e] and exploit[] vulnerabilities in information and communications

technology and services," Ex. 23, so long as it does not seek to "directly or indirectly" impinge on

the flow of informational materials across those services.  But what the President *cannot* do is use

his IEEPA authority to target speech itself, as here, preventing hundreds of millions of Americans

from accessing TikTok in order to silence communications and information sharing on the app.

The constitutional backdrop reinforces this conclusion.  Although the question before this

Court is one of statutory interpretation, IEEPA (like all statutes) must be construed to avoid

constitutional concerns.  Thus, even if Section 1702(b) were also susceptible to the government's

interpretation, which it is not, such ambiguity would have to be resolved in favor of the

---

[7] Section 1702(b)(3) specifies that it does not include certain exports and acts, which further
demonstrates that Congress did not impliedly include the exception that it set forth in Section
1702(b)(2).  *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (cautioning against finding implied
exceptions, particularly "[w]here Congress explicitly enumerates certain exceptions").

construction that preserves the statute's constitutionality. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). Here, Defendants' interpretation of Section 1702(b) raises a host of First Amendment concerns. *See infra* at 18-20. Under settled law, therefore, this Court should avoid such an interpretation. *Gomez v. United States*, 490 U.S. 858, 864 (1989).

**B.     The Remaining Prohibitions Are Arbitrary and Capricious.**

1.     Plaintiffs' Claims Under the APA Are Subject to Judicial Review.

There is a "strong presumption favoring judicial review" under the APA, *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 139 S. Ct. 361, 370 (2018), including of agency action taken pursuant to the IEEPA, *see, e.g.*, *Holy Land v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). The government's arguments against this Court's jurisdiction are meritless.

Defendants' new assertion that Plaintiffs' claims should be dismissed as non-justiciable political questions mischaracterizes Plaintiffs' claims. Applicability of the political question doctrine "turns not on the nature of the government conduct under review but more precisely on the question the plaintiff raises about the challenged action." *El-Shifa v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010). Plaintiffs allege that in issuing the Remaining Prohibitions, Commerce violated the APA because it "(1) provided an inadequate explanation"; "(2) failed to consider reasonable alternatives;" and "(3) offered a pretextual national security justification" for its political action. None of these claims challenge "any foreign policy or national security decisions entrusted to the Executive Branch." *Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008). Far from passing judgment on the wisdom of the agency's ultimate decision, they merely call on the Court to apply well-established APA standards to the process employed. This type of statutory analysis is a "familiar judicial exercise." *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).

The government also is incorrect in its assertion that "the overall statutory scheme" makes clear that courts lack jurisdiction to review executive action under IEEPA. Opp'n 26. The

government identifies nothing in the language of the statute itself to support this argument, and certainly nothing to meet the required and demanding standard of "clear and convincing evidence that Congress meant to take th[e] unusual step" of denying review.[8]  *Acc. Council v. DeVos*, 303 F. Supp. 3d 77, 99 (D.D.C. 2018).  The provisions of the NEA that the government cites are irrelevant to Plaintiffs' arbitrary and capricious claim, and do not preclude judicial review of the Prohibitions.  *See* 50 U.S.C. §§ 1621, 1622, 1641 (addressing executive authority to declare a national emergency).  Moreover, the mere fact that the "NEA and IEEPA confer highly discretionary authority" on the President, Opp'n 26, "does not render the agency's decisions completely nonreviewable … unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985).  Here, that is plainly not the case.

  2. <u>The Commerce Department's Explanation for the Prohibitions is Inadequate and Unsupported by the Evidence.</u>

   Defendants have consistently failed to explain how the evidence on which it relies justifies a ban of TikTok, and it now concedes that the agency banned TikTok based on a threat from China, not from TikTok itself.  As the government puts it, in terms that would apply to any Internet company with a significant presence in China: "TikTok collects a massive amount of U.S. user data; TikTok's parent company ByteDance is susceptible to PRC coercion; and the PRC could employ TikTok's user data for purposes detrimental to the United States' national security and foreign policy."  Opp'n 31.  Aside from singling out Plaintiffs for an industry-wide issue, the assertion has no support in the record.  *See Clark Cnty. v. FAA*, 522 F.3d 437, 441 (D.C. Cir. 2008)

---

[8] 50 U.S.C. § 1702(c), cited in both parties' briefs, states "[t]his subsection does not confer or imply any right to judicial review."  This provision does not suggest—let alone clearly demonstrate—Congressional intent to immunize IEEPA decisions from judicial review; indeed, it suggests the opposite.  50 U.S.C. 1702(c) ("In any judicial review of a determination made under this section…").

(agency action must be "adequately explained and supported by the record").

The government incorrectly asserts that Plaintiffs do not challenge the Secretary's findings "regarding ByteDance and its susceptibility to CCP coercion." Opp'n 28. To the contrary, Plaintiffs have made clear that "the record fails to substantiate" the Commerce Department's findings about risks posed by ByteDance's ties to the CCP. *See* ECF No. 43 at 26. For example, the evidence of ByteDance's purported "significant and close ties to the CCP," Opp'n 28 (citing AR-32), includes these assertions in the Commerce Memo:

- founder Zhang Yiming received an award as an "outstanding private entrepreneur;"

- ByteDance's 60,000 employees include 130 CCP members;

- ByteDance has a legally required party committee; and

- a Chinese cabinet member has visited a ByteDance factory in Fujian.

AR-32-34. While the AR contains more than 1,000 pages describing Chinese law and intelligence activity with no connection to TikTok, *see* ECF No. 43-1 at 11, there is nothing showing that the risk of ByteDance being coerced by the CCP to compromise TikTok is anything but speculation.

Similarly, the government incorrectly asserts that "Plaintiffs do not—and cannot—dispute that the CCP, acting through ByteDance, could compel TikTok to provide all of its U.S. user data to the PRC at any moment." Opp'n 28. Even assuming that Chinese law would permit such control over ByteDance, which Plaintiffs dispute, Plaintiffs have demonstrated that the U.S.-based executives in charge of securing U.S. TikTok user data "would not provide any data if [they] did receive such a request." ECF No. 15-2 ¶ 12; *see also* ECF No. 43-5 ¶ 24 ("I ultimately have responsibility on whether to remove a video [and] would not comply with any request from the Chinese government to censor or otherwise moderate content on TikTok …."). Effectively acknowledging that U.S. user data is not at immediate risk of being misappropriated, the government argues that the Prohibitions are nevertheless justified because "there is no guarantee

that U.S. user data will be secure tomorrow."  Opp'n 28-29; *see id.* at 29 ("[E]ven if the issue has been corrected now, ByteDance's numerous other connections to the PRC still justify the Secretary's action.").  But such forward-looking protection is *precisely* what is contained in the mitigation proposals that Plaintiffs have submitted to the government and that the Commerce Department ignored without explanation.  *See infra* at 17-18.

Nor do Plaintiffs "concede the vulnerability of their data."  Opp'n 30.  To the contrary, as Plaintiffs demonstrated in their opening brief, Commerce entirely failed to address TikTok's robust data protections, including its encryption of U.S. user data, which is a common best practice for mitigating data security risk.  *See* Br. 27.  And in its opposition, the government fails even to mention encryption.  "Discussing perceived vulnerabilities in TikTok's data security safeguards without discussing its encryption practices would be like discussing the security of money in a bank without considering whether or not the bank kept the money in a vault."  ECF No. 43-6 (Supp. Weber Decl.) ¶ 8.  The government's opposition also fails to explain how Plaintiffs' lease of data center rack space, power and network connections in the United States from CUA, a state-owned reseller, poses a national security risk when CUA, contrary to the Commerce Department's conclusions, in fact does *not* have "direct access to the data."  Opp'n 30-31; *see* ECF No. 43-2 ¶ 8 (explaining that CUA "does not actually provide any server machines" and "CUA personnel must apply for one-time badge access each time.").[9]  Because the Commerce Department has failed to explain its conclusions in light of this evidence, the Prohibitions must be set aside.

---

[9] The government contends that Plaintiffs submitted declarations that "differ significantly" from their response to Commerce's administrative subpoena.  *See* Opp'n 30-31.  But both submissions are entirely consistent.  *Compare* AR-1800 ("ByteDance owns the servers and other hardware within the data centers and contracts … for server rack space, power, and network connections") *with* ECF No. 43-2 ("CUA provides only … the building itself and electricity …. ByteDance owns and operates all servers that are stored within the CUA facility.").

3.      The Commerce Department Failed to Address Reasonable Alternatives.

The Remaining Prohibitions are arbitrary and capricious for the separate reason that the Commerce Department "fail[ed] to consider 'significant and viable and obvious alternatives,'" *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015), namely the mitigation of its concerns through CFIUS.  Defendants have no adequate response.

The government first argues that the Secretary does not need to consider the CFIUS negotiations because he is just one member of the Committee who does not control its actions. That the Secretary does not himself control CFIUS's decision-making is irrelevant.  "[W]ithin the context of a coordinated effort to solve a problem of national scope, a solution that lies outside of an agency's jurisdiction might be a 'reasonable alternative'; so might an alternative within that agency's jurisdiction that solves only a portion of the problem, given that other agencies might be able to provide the remainder of the solution."  *City of Alexandria v. Slater*, 198 F.3d 862, 869 (D.C. Cir. 1999).  The same principles apply here, where two overlapping executive agencies were concurrently attempting to address the purported concerns regarding TikTok.

Plaintiffs' mitigation proposals squarely addressed the government's purported concerns by having Oracle host all U.S. user data and secure associated computer systems to ensure that U.S. national security requirements are satisfied.  *See* ECF No. 15-28.  And even if the Secretary were free to ignore these specifics of Plaintiffs' mitigation proposal, the agency has *still* failed to articulate any reason why banning TikTok is necessary if, according to the Commerce Memo, "a complete divestiture of ByteDance from the TikTok application"—which the President has ordered—is sufficient to mitigate any national security risk.  AR-23.

Lastly, the Secretary failed to consider DHS's recommendation that the government's national security concerns could be addressed with another less-restrictive alternative:  that "TikTok not be permitted on the devices of State, Local, Tribal, and Territorial (SLTT) partners

17

and critical infrastructure operators."  Opp'n 32 (quoting AR-1600).  In fact, the Commerce Memo asserts that DHS reached "similar conclusions" as the Secretary but fails to mention the different remedy recommended by DHS.  AR-3.  The government now argues that this narrower prohibition "would not address the full risks identified by the Secretary."  Opp'n 32.  But "[n]owhere in the Secretary's decision is that rationale articulated, and the Court cannot accept the lawyers' *post hoc* rationalization as a substitute for the lack of explanation."  *Summer Hill v. Johnson*, 603 F. Supp. 2d 35, 39 (D.D.C. 2009).  As noted above, "an alternative within that agency's jurisdiction that solves only a portion of the problem" can still be reasonable "given that other agencies might be able to provide the remainder of the solution."  *City of Alexandria*, 198 F.3d at 869.  The Secretary, however, failed to conduct any such analysis.

### 4.    The Stated Justification Was Pretextual.

The Commerce Department's failure to explain why these alternatives were insufficient reflects the fact that the outcome of the Commerce Department's decision-making process was predetermined, and the invocation of national security concerns merely a pretext for the political motives for banning the app.  *See* Br. 30-33.  Defendants completely fail to address, let alone disprove, the substantial evidence of pretext, arguing only that Plaintiffs invoke statements by members of the Administration other than the Secretary.  These statements, however, are plainly relevant because they shine light on the Commerce Department process, making clear the Secretary decided that "banning TikTok" was a political, not a national security priority.

### C.    The Remaining Prohibitions Violate the First Amendment.

Similar to the predominant theme of its Section 1702 argument, the government portrays the Remaining Prohibitions as regulating "only certain business transactions, not protected First Amendment activity."  Opp'n 33.  The government seems to prefer a different reality from the one its Prohibitions will inevitably create.  These are not "general regulations with only a downstream

effect on expressive activity," Opp'n 34; rather, their express objective is to prevent Americans from sharing communications and expressive materials on TikTok so that this content cannot be mined for data or manipulated by the Chinese government.  Regardless, "[i]t is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny … even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct." *Elrod*, 427 U.S. at 362.  Silencing the speech of tens of millions of Americans, including Plaintiffs, is, at minimum, an "unintended but inevitable result of the government's conduct." *Id.*

The government's prior restraint argument fails for the same reason.  Regardless of whether it is business transactions that are prohibited, there can be no serious question that the Prohibitions are intended to serve as an "advance prohibition on any communications" by TikTok's U.S. users that could supposedly be mined for data.  Opp'n 34-35.  *See Sorrell v. IMS*, 564 U.S. 552 (2011) (burden on speech could not be justified by State's asserted interests in physician confidentiality). This prior restraint on speech is not saved by the "alternate platforms available"—as "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. ACLU*, 521 U.S. 844, 880 (1997).

The government contends that, under *United States v. Albertini*, 472 U.S. 675 (1985), a regulation withstands intermediate scrutiny any time the government's interest would be "achieved less effectively" without the regulation, thereby requiring that every regulation be upheld unless it was wholly irrational.  Defendants' interpretation, which reduces intermediate scrutiny to a rational basis standard, is not the law.  Rather, since *Albertini*, the Supreme Court has repeatedly confirmed that a law does not survive intermediate scrutiny if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Packingham v.*

19

*N. Carolina*, 137 S. Ct. 1730, 1736 (2017).  This analysis necessarily includes consideration of alternatives that do not burden speech.  *See Thompson v. W. States*, 535 U.S. 357, 371-72 (2002).[10]

Here, alternative approaches make clear that the Remaining Prohibitions burden substantially more speech than necessary to further the government's purported interests.  Another court recently held that the similar prohibitions targeting WeChat, an app owned by a Chinese company, violates the First Amendment.  There, the court recognized that the record reflected what a narrowly tailored approach might look like, including barring WeChat from government devices (as DHS recommended for both WeChat and TikTok, AR-1597), the mitigation proposal set forth by the company, and the proposed best practices set forth by the company's expert witness.  *U.S. WeChat Users v. Trump*, 2020 WL 5592848, at *10 (N.D. Cal. Sep. 19, 2020).  Each of these "obvious alternatives," *id.*, is available here and underscores that the Prohibitions are "greater than is essential" to serve the government's stated interest.  *See also* Ex. 23 (proposed regulations allowing for mitigation solution); Ex. 35 (same for Executive Order).

### D.    The Remaining Prohibitions Violate Due Process.

Defendants once again make the extraordinary claim that the government's ban of an American company implicates no legally protected interest, and that government action specifically targeting a single party is a "policy-based judgment" that requires no process.  *See* Opp'n 36-41.  These arguments are manifestly wrong.

It is absurd for the government to argue that Plaintiffs have asserted only a protectable "interest in reputation."  Opp'n 36.  As explained in their opening brief, the Remaining Prohibitions violate Plaintiffs' "rights to their chosen line of business and their rights to free speech," Br. 38,

---

[10] Defendants' reliance on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) is misplaced, as that case involved closure of a bookstore but the order targeted prostitution and thus "b[ore] absolutely no connection to any expressive activity."  *Id.* at 706 n.3

which are clearly protectable interests under the due process clause, *see Trifax v. Dist. of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003); *DeJonge v. Oregon*, 299 U.S. 353, 364 (1937).[11]

Nor can the government escape due process requirements by arguing that the Prohibitions are "fundamentally legislative—broadly prohibiting classes of transactions with respect to numerous entities." Opp'n 38. Defendants' only support for that proposition is a case where a plaintiff challenged a ratemaking that was "applicable across the board" to all regulated railroads, and "[n]o effort was made to single out any particular railroad for special consideration." *United States v. Fla. E. Coast*, 410 U.S. 224, 245-46 (1973). That situation is plainly distinguishable from the one here, where the government made a specific final ruling with particular respect to Plaintiffs' rights. *See Gray v. Schweiker*, 652 F.2d 146, 155 n.18 (D.C. Cir. 1980).

Defendants also are wrong that Plaintiffs received adequate process before being deprived of these rights. Even in the national security context, "due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence"—process that Plaintiffs plainly did not receive here. *Ralls v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014). The government argues that the August 6 order and the Prohibitions provided sufficient process, but neither disclosed "the factual basis for the action"—an "essential component[] of due process." *Id.* at 318. Nor did Plaintiffs have the opportunity to rebut Defendants' purported concerns. *Id.*

For similar reasons, the Commerce Department's September 3 administrative subpoena did not provide Plaintiffs with constitutionally-adequate process: A subpoena that orders Plaintiffs to provide a broad set of materials—the scope and content of which are dictated by Defendants'

---

[11] Similarly, the government's claim that Plaintiffs have not "shown that the Government itself is the source of the reputational harm," Opp'n 36, can easily be dismissed, as the Prohibitions, which will "shut[] down TikTok entirely," were imposed directly and exclusively by Defendants. ECF No. 30 at 15 (citing Pappas Decl., ECF No. 15-3); *see also* Pappas Decl. ¶¶ 18, 21.

enumerated demands—fails to provide Plaintiffs with sufficient notice of the factual basis for the action or any meaningful opportunity to rebut Defendants' concerns.   Indeed, gathering information through a subpoena would typically be a precursor to an assessment, with notice appropriate for an entity to rebut the agency's assessment, rather than leading directly to final action.[12]   And the government's assertion that the CFIUS process cured these process failures—after having insisted that "CFIUS negotiations are part of a separate regulatory process, independent of the President's authority under IEEPA," Opp'n 31—is both incoherent and legally wrong, as any process before this "separate" body could not cure the harms caused by the Commerce Department's abrupt deprivation of Plaintiffs' rights.  *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 346 (1976) (process must "enable the recipient to 'mold' his argument to respond to the precise issues which the decisionmaker regards as crucial").

The government's filing of the Commerce Memo and related materials in this litigation does not fix these problems.  *See NCRI v. State*, 251 F.3d 192, 209 (D.C. Cir. 2001) (remanding to give petitioners "the opportunity to file responses to the nonclassified evidence against them"). Indeed, the record now contains a classified document that was submitted *ex parte* without providing Plaintiffs even an unclassified summary—precisely the type of "one-sided" record that is constitutionally impermissible.  *See Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018); (reliance on "undisclosed classified evidence is permissible only in the most extraordinary circumstances").

---

[12] Plaintiffs' limited communications with Commerce reflected in the government's supplement to the Administrative Record do not undermine Plaintiffs' claims.  *See* ECF No. 46.  Those documents show that, although Plaintiffs "requested clarity on the scope of the Executive Order, the Department declined to discuss those issues."  AR-2321.  The parties instead discussed only the scope of the administrative subpoena and how Plaintiffs could continue to employ, pay and provide benefits to their employees.  AR-2330.  Those communications gave Plaintiffs no notice of or opportunity to rebut the evidence relied upon by Defendants.   The materials are also inadmissible under Rule 408.

### E.    The Remaining Prohibitions Violate IEEPA in Other Respects.

As explained in Plaintiffs' opening brief, the Remaining Prohibitions exceed the executive's IEEPA authority because they are not based on a *bona fide* national emergency and prohibit activities that have not been found to pose "an unusual and extraordinary threat," as IEEPA requires.  The government makes two arguments in response, each of which fails.  First, the government argues that "there is no cause of action available for enforcing IEEPA in this manner" because Plaintiffs "cannot obtain relief directly against the President."  Opp'n 41.  Binding precedent holds otherwise.  *See Chamber v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  Likewise, the government argues that the fact that "the President determined that the TikTok restrictions were encompassed within his prior declaration of emergency should be the end of the matter."  Opp'n 41.  But this is just another way of saying the Presidential actions are not subject to judicial review, which under *Reich* is not correct.  Second, the government argues that "national emergency declarations are 'nonjusticiable political questions.'"  *Id.*  But "purely legal question[s] of statutory interpretation"—as Plaintiffs raise here—are not political questions even if they "have significant political overtones."  *Japan Whaling Ass'n v. Am. Cetacean*, 478 U.S. 221, 230 (1986).

## II.    The Remaining Factors Require Injunctive Relief.

### A.    Plaintiffs Face Immediate Irreparable Harm If Relief Is Not Granted.

The government does not contest, nor could it, that shutting down TikTok in the U.S.— which is precisely what Secretary Ross told the public will happen when the Remaining Prohibitions take effect on November 12[13]—will cause irreparable harm to Plaintiffs.  Instead, in defiance of the Secretary's statement and common sense, the government now tries to argue that there is "no evidence" that TikTok will be shut down because the "the app will likely continue to

---

[13] *See* Steve Kovach, "Trump to block downloads of TikTok, WeChat on Sunday," CNBC (Sep. 18, 2020), https://rb.gy/2pznhu.

function in at least some form in the short-term," and the Prohibitions "apply only to the TikTok mobile application, not the TikTok website." Opp'n 42 (quoting AR-48). The Commerce Memo itself states that the Prohibitions are intended to "significantly reduce the functionality and usability of the app in the United States" in order to prevent users from posting content. AR-24. The evidence of the devastating harm these Prohibitions will cause Plaintiffs is unrebutted. *See, e.g.*, Pappas Decl. ¶ 21 (November 12 shutdown "will eliminate our user base entirely"). The plain terms of the Prohibitions ban the use of TikTok's "code, functions, or services" on *any* "software or services" developed or accessible within the United States. Ex. 29 at 7. The government's conjecture that some users might be able to access some content on the website for some temporary period of time after November 12 fails to account for this language in the Prohibitions.

In a similar vein, the government's argument that "Plaintiffs' harms stem from the independent decisions of third parties not before the Court, such as … prospective and existing third-party users," Opp'n 43, rather than from the Prohibitions themselves, is nonsense. The obvious reason that these "third parties" will no longer enter into commercial partnerships with Plaintiffs or post content on TikTok is because the app *will no longer be available in the United States*. *See, e.g.*, Pappas Decl. ¶ 21. The fact that this harm depends in part on third parties' predictable responses to Defendants' conduct does not make it any less immediate or irreparable. *See, e.g.*, *Whitman-Walker v. HHS*, 2020 WL 5232076, at *38, *44 (D.D.C. Sept. 2, 2020).

Finally, the government does not contest that the deprivation of Plaintiffs' First Amendment rights constitutes irreparable harm. *See Elrod*, 427 U.S. at 373.

### B.     The Balance of Equities And Public Interest Require Injunctive Relief.

The balance of equities and public interest require preliminary injunctive relief to maintain the status quo pending resolution of Plaintiffs' legal challenge. The government argues—without citing any authority—that this Court's prior ruling "erroneously conflated the balance of the

equities prong with the likelihood of success prong." Opp'n 44. But a party's likelihood of success weighs heavily in the evaluation of the public interest when the government is a party, as there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Serono v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (similar). And the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required," *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)—particularly where, as here, its delay in implementation negates any plausible assertion of urgency. The government's rote invocation of deference to the executive regarding "national security interests" does not change this conclusion, *see United States v. Robel*, 389 U.S. 258, 264 (1967), as even the cases cited in the government's brief make clear, *see Holder v. Hum. Law Proj.*, 561 U.S. 1, 34 (2010).

The government's arguments about the proper scope of injunctive relief are also misplaced. Courts are empowered to preliminarily enjoin unlawful agency action. *See League*, 838 F.3d at 10. And the determination of which personal communications have no value, or whether certain transmissions of user content cross international borders, Opp'n 44-45, are precisely the type of "fine tailoring" for which preliminary injunction hearings are "ill-suited." *Gordon v. Holder*, 721 F.3d 638, 654 (D.C. Cir. 2013). Finally, enjoining the Remaining Prohibitions only as to Plaintiffs' rights to speak on TikTok "would not provide … meaningful relief, let alone 'complete relief,'" as Plaintiffs would have no audience to address. *See Whitman-Walker*, 2020 WL 5232076, at *44.

## CONCLUSION

Plaintiffs respectfully urge the Court to grant the requested motion and issue a preliminary injunction preventing the Remaining Prohibitions from taking effect.

DATED: October 30, 2020

Respectfully submitted,

  _/s/ John E. Hall_____

| | |
|---|---|
| Anders Linderot (Pro Hac Vice) | John E. Hall (D.C. Bar. No. 415364) |
| COVINGTON & BURLING LLP | Beth S. Brinkmann (D.C. Bar. No. 477771) |
| The New York Times Building | Alexander A. Berengaut (D.C. Bar. No. 989222) |
| 620 Eighth Avenue | Megan A. Crowley (D.C. Bar. No. 1049027) |
| New York, New York 10018-1405 | Megan C. Keenan (D.C. Bar. No. 1672508) |
| Telephone: +1 (212) 841-1000 | COVINGTON & BURLING LLP |
| Facsimile: + 1 (212) 841-1010 | One CityCenter |
| Email:  alinderot@cov.com | 850 Tenth Street, NW |
| | Washington, DC 20001 |
| Mitchell A. Kamin (Pro Hac Vice) | Telephone: +1 (202) 662-6000 |
| COVINGTON & BURLING LLP | Facsimile: + 1 (202) 778-6000 |
| 1999 Avenue of the Stars, Suite 3500 | Email:  jhall@cov.com |
| Los Angeles, California 90067-4643 |                bbrinkmann@cov.com |
| Telephone: + 1 (424) 332-4800 |                aberengaut@cov.com |
| Facsimile: + 1 (424) 332-4749 |                mcrowley@cov.com |
| Email:  mkamin@cov.com |                mkeenan@cov.com |

*Attorneys for Plaintiffs*

26