### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

TIKTOK INC., et al.,

         *Plaintiffs*,

    v.

DONALD J. TRUMP, President of the United
States, et. al.,

       *Defendants*.

Civil Action No. 1:20-cv-02658 (CJN)

### MEMORANDUM OPINION

On September 24, 2020, the Secretary of Commerce published a list of five types of prohibited business transactions involving Plaintiffs.  If implemented, those prohibitions would effectively ban the operation of Plaintiff TikTok in the United States.  On September 27, the Court granted Plaintiffs' motion for a preliminary injunction with respect to the prohibitions that would have taken effect that day, but deferred judgment as to the others.  *See* ECF Nos. 29–30.  For the reasons discussed below, the Court now grants Plaintiffs' motion as to all the prohibitions.

## I.  BACKGROUND

### A.  International Emergency Economic Powers Act

The United States has long used economic sanctions to prohibit transactions that threaten national security.  In 1977, Congress enacted IEEPA, which grants the President peacetime authority "to deal with any unusual and extraordinary" foreign "threat" to U.S. "national security" so long as "the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  Once the President has declared such an emergency, IEEPA empowers the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, . . . or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States[.]

*Id*. § 1702(a)(1)(B).  The President may also "empower the head of any" executive agency to take those actions on his behalf.  3 U.S.C. §§ 301–02.

Although broad, the President's IEEPA authority is subject to certain limitations.  *See* 50 U.S.C. § 1702(b).  As relevant here, the statute expressly provides that "[t]he authority granted to the President . . . does *not* include the authority to regulate or prohibit, *directly or indirectly*":

> any . . . personal communication, which does not involve a transfer of anything of value;
>
> [or]
>
> the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, . . . artworks, and news wire feeds.

*Id.* § 1702(b)(1), (3) (emphasis added).

Since its enactment, IEEPA has included a limitation relating to personal communications.  Pub. L. No. 95-223, § 203(b)(1), 91 Stat. 1627 (1977).  In 1988, Congress added the limitation relating to the importation and exportation of informational materials "as a reaction to several seizures by the United States of shipments of magazines and books from embargoed countries and to the Treasury Department's restrictions on the permissible forms of payment for informational materials purchased from Cuba."  *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003).  In 1994, Congress expanded the "nonexclusive list of informational materials to include new media, such as compact discs and CD ROMs" and added the phrase "regardless of format or medium of transmission."  *Id.*

## B. Executive Orders Regarding Foreign-Controlled Technology Companies and TikTok

On May 15, 2019, the President invoked his authority under IEEPA (among other powers) and declared a national emergency regarding the "extraordinary threat" that foreign-controlled technology companies pose to U.S. national security.  Exec. Order No. 13873, *Securing the Information and Communications Technology and Services Supply Chain*, 84 Fed. Reg. 22689 (May 15, 2019) ("ICTS Order").  The President therefore determined to prohibit certain transactions with foreign countries or foreign nationals that pose national security risks to the United States.  *Id.*  On May 13, 2020, the President renewed that declaration, stressing the unique threat posed by China-based technology firms with close ties to the government of the People's Republic of China ("PRC").  *Continuation of the National Emergency With Respect to Securing the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 29321 (May 13, 2020).

On August 6, 2020, the President identified TikTok—a short-loop video sharing app presently used by over 100 million Americans, Compl., ECF No. 1, ¶ 1—as a technology firm that poses a risk to national security.  *See* Exec. Order No. 13942, *Addressing the Threat Posed by TikTok, and Taking Additional Steps To Address the National Emergency With Respect to the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 48637 (Aug. 6, 2020) ("TikTok Order").  The President determined that TikTok "automatically captures vast swaths of information from its users, including internet and other network activity information such as location data and browsing and search histories." *Id.*  The President concluded that because TikTok is owned by the China-based company ByteDance, the Chinese Communist Party ("CCP") might be able to "access . . . Americans' personal and proprietary information—potentially

allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage." *Id.*

The President also found that TikTok could be used to transmit CCP-approved propaganda. The CCP could, he determined, use TikTok to "censor[] content that the [CCP] deems politically sensitive," *id.*, and share "disinformation campaigns that benefit the [CCP], such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus." *Id.*

The President took two actions to mitigate those risks. First, he directed the Secretary of Commerce to identify a list of prohibited transactions with "ByteDance . . . or its subsidiaries," including TikTok. *Id.* at 48638. Second, he ordered ByteDance to divest itself of TikTok's U.S. operations, including any interest it might have in U.S. user data. *See Regarding the Acquisition of Musical.ly by ByteDance Ltd.*, 85 Fed. Reg. 51297 (Aug. 14, 2020) ("Divestment Order"). The Divestment Order directed the interagency Committee on Foreign Investment in the United States ("CFIUS") to ensure the sale by ByteDance of "any tangible or intangible assets . . . used to enable or support" its "operation of the TikTok application in the United States" by November 12, 2020, unless CFIUS extended that deadline "for a period not to exceed 30 days." *Id.*

### C. The Secretary's TikTok Prohibitions

Acting pursuant to the TikTok Order, on September 18, 2020, the Secretary of Commerce published a list of five sets of prohibited transactions. After revising one implementation date, the Secretary finalized the following set of unlawful transactions:

> 1. Any provision of services, occurring on or after 11:59 p.m. eastern standard time on September 27, 2020, to distribute or maintain the TikTok mobile application, constituent code, or application updates through an online mobile application store[;]
>
> 2. Any provision of internet hosting services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[;]

3. Any provision of content delivery network services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[;]

4. Any provision of directly contracted or arranged internet transit or peering services, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, enabling the functioning or optimization of the TikTok mobile application[; and]

5. Any utilization, occurring on or after 11:59 p.m. eastern standard time on November 12, 2020, of the TikTok mobile application's constituent code, functions, or services in the functioning of software or services developed and/or accessible within the land and maritime borders of the United States and its territories[.]

U.S. Dep't of Commerce, *Identification of Prohibited Transactions to Implement Executive Order 13942 and Address the Threat Posed by TikTok and the National Emergency with Respect to the Information and Communications Technology and Services Supply Chain*, 85 Fed. Reg. 60061, 60062 (Sept. 24, 2020) ("Commerce Identification").[1]

Before issuing those prohibited transactions, the Secretary reviewed and relied on an internal Memorandum assessing the threats posed by ByteDance and TikTok.  U.S. Dep't of Commerce, Mem. for the Sec'y, *Proposed Prohibited Transactions Related to TikTok Pursuant to Executive Order 13942* (Sept. 17, 2020), ECF No. 48-2, AR 27–50 ("Commerce Memorandum"); *see also* Defs.' Mem. Opp'n Pls.' P.I. Mot., ECF No. 22, 2 ("Defs.' Opp'n").  Like the President's TikTok Order, the Commerce Memorandum focuses on two threats:  exporting data and importing propaganda.  *See* Commerce Memorandum, ECF No. 48-2, AR 30–35 (data), AR 35–38 (propaganda).

---

[1] The Commerce Identification states that the prohibitions "only apply to the parties to business-to-business transactions."  Commerce Identification, 85 Fed. Reg. at 60062..  It also notes that the prohibitions "do not apply to . . . [t]he exchange . . . of personal or business information" shared among TikTok users on the app, *id.*, and that none of the prohibitions bars transactions related to restructuring TikTok in accordance with the President's Divestment Order.  *Id.*

*U.S. User Data.*  The Commerce Memorandum found that the PRC is "building massive databases of Americans' personal information" to help the "Chinese government to further its intelligence-gathering and to understand more about who to target for espionage, whether electronically or via human recruitment." *Id.* at AR 31.  It also concluded that the CCP will exploit "close ties" with ByteDance to further its foreign policy agenda.  *See id.* at AR 32–34.  ByteDance is headquartered in Beijing and remains subject to the PRC's National Intelligence Law, which "permits Chinese intelligence institutions" to "take control of" any China-based firm's "facilities" and "communications equipment."  *See id.* at AR 35.  ByteDance has already signed a cooperation agreement with a PRC security agency, closed one of its media platforms in response to CCP demands, and (as of August 2020) placed over 130 CCP committee members in management positions throughout the company.  *Id.* at AR 32, 45; *see also* Defs.' Opp'n, ECF No. 22, 7–8. And because "ByteDance is subject to PRC jurisdiction, [and] PRC laws can compel cooperation from ByteDance, regardless of whether ByteDance's subsidiaries are located outside the territory of the PRC," the data held by ByteDance's subsidiary companies may also be extracted by the PRC.  Commerce Memorandum, ECF No. 48-2, AR 44–45.

The Commerce Memorandum determined that, because ByteDance owns TikTok, TikTok's Terms of Service and Privacy Policy for new users allow TikTok to collect and share a user's information with both ByteDance and the PRC to respond to "government inquiries."  *Id.* at AR 38–40; *see also* Ex. 8, ECF No. 22-8, 6.  The information that TikTok gathers is substantial, including:

> 1) registration information, such as age, username and password, language, and email or phone number; 2) profile information, such as name, social media account information, and profile image; 3) user-generated content, including comments, photographs, videos, and virtual item videos that you choose to upload or broadcast on the platform; 4) payment information, such as PayPal or other third-party payment information (where required for the purpose of payment); 5) phone and

social network contacts (names and profiles); 6) opt-in choices and communication preferences; 7) information in correspondence users send to TikTok; and 8) information sent by users through surveys or participation in challenges, sweepstakes, or contests such as gender, age, likeness, and preferences.

Commerce Memorandum, ECF No. 48-2, AR, 38.  Indeed, TikTok's core value to users lies in its ability to transmit data like "text, images, video, and audio," all of which constitute "[b]ulk data" that the Secretary's Memorandum determined might be used by China "to train algorithms for facial and voice recognition."  *Id.* at AR 31.

The Commerce Memorandum also determined that the TikTok data of U.S. users are especially vulnerable because TikTok keeps a backup of all its U.S. data in Singapore with a China-based company called Alibaba.  *Id.* at AR 40.  "Alibaba is a Chinese company . . . beholden to PRC laws that require assistance in surveillance and intelligence operations."  *Id.*

*Propaganda.*  Like the President's TikTok Order, the Commerce Memorandum highlights the risk that the CCP will leverage TikTok to spread propaganda and censor disfavored content in the United States.  *Id.* at AR 35–38; *see also* TikTok Order, 85 Fed. Reg. at 48637 (describing pro-CCP "disinformation campaigns . . . , such as when TikTok videos spread debunked conspiracy theories about the origins of the 2019 Novel Coronavirus").

In particular, the CCP has a track record of using the media platforms owned by ByteDance as a "mouthpiece for the Party and State."  Commerce Memorandum, ECF No. 48-2, AR 35. "Through Douyin," for example, "ByteDance has actively assisted and complied with CCP domestic directives in surveillance, censorship, and propaganda efforts."  *Id.* at AR 36.  As a 2018 media report (relied on by the Commerce Memorandum) put it:  "Chinese government agencies are turning to the country's viral video app Douyin, known as TikTok outside China, to create entertaining short-form music videos."  Meng Jing, *Government Agencies Jump on Short-video Bandwagon to Ensure Chinese Youth Still Hears "Official Voice,"* South China Morning Post

(June 15, 2018, 8:01 AM), https://www.scmp.com/tech/china-tech/article/2150837/government-agencies-jump-short-video-bandwagon-ensure-chinese-youth ("Official Voice"); *see also* Commerce Memorandum, ECF No. 48-2, AR 36 n.95 (citing Official Voice).

The Commerce Memorandum also observes that "more than 500 government agencies, Communist Party organizations, and official media" outlets had "Douyin accounts." *Id.* at AR 36. Those accounts were used to create and spread "government videos" that "had been seen over 1.6 billion times as of June 2018." *Id.*  And in 2019, "ByteDance signed a strategic cooperation agreement with the Ministry of Public Security's Press and Publicity Bureau in Beijing aiming to give full play to the . . . platform advantages of . . . TikTok in big data analysis" and advance "public security propaganda, guidance, influence, and credibility." *Id.* (internal quotation marks omitted). The Commerce Memorandum cited numerous media reports showing that "ByteDance has [already] censored or restricted TikTok content globally that is critical of or relevant to issues the CCP deems controversial" as well. *Id.* at AR 37–38.

The Memorandum recognized that ByteDance is negotiating "a potential divestiture of TikTok" with CFIUS and that "the President has established a deadline of November 12, 2020, for any deal or agreement to be reached," but concluded that "[b]arring a complete divestiture of ByteDance from the TikTok application, TikTok presents an immitigable risk to the national security . . . of the United States."  Commerce Memorandum, ECF No. 48-2, AR 47.

The Secretary scheduled the prohibitions in paragraph one (which in part ban TikTok from U.S. app stores) to go into effect by "11:59 p.m. eastern standard time on September 27, 2020." Commerce Identification, 85 Fed. Reg. at 60061.  But he delayed the prohibitions listed in paragraphs two through five until 11:59 p.m. on November 12, 2020. *Id.*  He adopted that "phased" approach to "mitigate some national security risk immediately while allowing the [government]

the latitude to further evaluate the viability of national security mitigations in the context of CFIUS negotiations." Commerce Memorandum, ECF No. 48-2, AR 47.  He also suggested that "[t]o the extent the dates for the CFIUS process are extended, the dates for the secondary phase [of the TikTok prohibitions] may also be extended." *Id.*

### D. Procedural History

On September 18, 2020, Plaintiffs TikTok and ByteDance filed this lawsuit alleging that the government's actions violate the Administrative Procedure Act (Count One), the First Amendment (Count Two), and the Due Process Clause of the Fifth Amendment (Count Three); exceed the President and Secretary's authority under IEEPA (Counts Four through Six); and violate the Takings Clause of the Fifth Amendment (Count Seven).  Compl., ECF No. 1, ¶¶ 80–141.  On September 23, Plaintiffs moved for preliminary injunctive relief, arguing that they have a likelihood of success on some of these claims and that, absent an injunction, they would suffer irreparable harm.  Pls.' P.I. Mot., ECF No. 15-1, 15–36.  Following expedited briefing on the Motion, ECF Nos. 15, 21–22, 26, the Court heard oral argument on September 27, 2020.

After oral argument, the Court granted the Plaintiffs partial relief by preliminarily enjoining the prohibitions in paragraph 1, which threatened to irreparably harm Plaintiffs by banning TikTok from all U.S. app stores by 11:59 p.m. that night.  *See* Mem. Op., ECF No. 30, 17–18.  The Court then approved expedited briefing to consider Plaintiffs' Renewed Motion for a Preliminary Injunction as to the prohibitions listed in paragraphs 2–5.  *See* ECF Nos. 43–44, 47–48.  The Court heard oral argument on Plaintiffs' Renewed Motion on November 4, 2020.

On October 30, 2020, another federal court in a suit brought by TikTok users preliminary enjoined all the prohibitions listed in the Commerce Identification.  *See Marland v. Trump*, 2020 WL 6381397, at *14–15 (E.D. Pa. Oct. 30, 2020).  Although it declined to reach most of the

TikTok users' claims, the Court held that those plaintiffs had established that the Secretary's prohibitions likely violated IEEPA by indirectly regulating informational materials and that, without an injunction, plaintiffs would suffer irreparable harm.  *See id.* at *6, *8–12.

The Court's reasoning focused on the "effect" of the Secretary's prohibitions.  *See id.* at *9–10.  It held that Congress "insert[ed] the word 'indirectly' into IEEPA" to show that even regulations which "do not on their face regulate the exchange of informational materials" may "nevertheless" do so when they "have such an effect."  *Id.* at *9.  The Court concluded that because the Secretary's prohibitions "will have the effect of stopping over 100 million existing U.S. users from continuing to" share informational materials "posted on the app with each other and with over 600 million international TikTok users," the prohibitions indirectly regulate informational materials.  *Id.* at *10.  The Court acknowledged that not every regulation that tangentially burdens informational materials also indirectly regulates those materials.  *Id.* at *9.  But the Court determined that there was no "line-drawing problem" because "[t]he effect the Commerce Identification will have on the exchange of informational materials is in no way tangential."  *Id.* at *10.

On November 12, 2020, the government appealed that injunction to the Third Circuit. Notice of Appeal, ECF No. 55 (Nov. 12, 2020); *Marland v. Trump*, No. 20-3322, ECF No. 1 (3d Cir. Nov. 12, 2020).  Five days later, the Secretary of Commerce published a notice in the Federal Register acknowledging that all the prohibitions listed in the Commerce Identification had "been enjoined" and Commerce "is complying" with that injunction, so the TikTok prohibitions "will not go into effect, pending further legal developments."  85 Fed. Reg. 73191 (Nov. 17, 2020).

CFIUS also extended the deadline for the President's Divestment Order from November 12, 2020, to November 27, 2020, and that deadline was extended again to December 4, 2020 (the

Parties have not provided the Court with any further update on the CFIUS process). *See* Pls.'
Notice of CFIUS Extension, ECF No. 56 (Nov. 12, 2020); Pls.' Second Notice of CFIUS
Extension, ECF No. 58 (Nov. 25, 2020).

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy that should be granted only when the
party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*,
391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  A
plaintiff seeking such relief must demonstrate that (1) it has a likelihood of succeeding on the
merits, (2) it faces irreparable harm if an injunction does not issue, (3) the balance of equities
favors relief, and (4) an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7, 20 (2008).  When "the Government is the opposing party," the assessment of "harm to
the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs must make "a clear showing" that they are "entitled to such relief." *Winter*, 555
U.S. at 22.  And while the D.C. Circuit has not yet directly held that a plaintiff must make a clear
showing on each of the four *Winter* factors, considered dicta in this jurisdiction favors that
approach. *See In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (demanding proof on
all four prongs); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (Kavanaugh, J.,
concurring) (observing that, after *Winter*, "the old sliding-scale approach to preliminary
injunctions—under which a very strong likelihood of success could make up for a failure to show
a likelihood of irreparable harm, . . . is no longer . . . viable" (internal quotation and citation
omitted)).

III. A<small>NALYSIS</small>

**A. Likelihood of Success of the Merits**

The Court begins with the "most important factor"—Plaintiffs' likelihood of success on the merits. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). For the reasons discussed below, Plaintiffs have demonstrated that they are likely to succeed on their IEEPA and APA claims.

  1. *Plaintiffs' IEEPA Claim*

This Court must "set aside" an "agency action" that exceeds its statutory "authority" or "limitations." 5 U.S.C. § 706(2)(C). Here, the Secretary exercised the President's delegated authority to prohibit transactions under IEEPA. *See* Commerce Memorandum, ECF No. 48-2, AR 27 (citing the President's TikTok Order). But IEEPA contains several express limitations, two of which are relevant here: the "authority granted to the President . . . does not include the authority to regulate or prohibit, directly or indirectly" either "personal communication[s], which do[] not involve a transfer of anything of value," or the import or export of "information or informational materials." 50 U.S.C. § 1702(b)(1), (3).

Plaintiffs contend that the Secretary's prohibitions overstep both limitations by, at a minimum, indirectly regulating personal communications and the flow of informational materials. Renewed P.I. Mem., ECF No. 43-1, 13–21. The government, by contrast, frames the Secretary's prohibitions as a scheme to directly regulate commercial transactions, and nothing more. Renewed Opp'n Mem., ECF No. 44, 10–24. The Parties' dispute turns on the meaning of three phrases in § 1702(b): (i) "to regulate or prohibit, directly or indirectly," (ii) "personal communication," and (iii) "information or informational materials." As the Court examines each phrase, it will "begin with the text, turning as need be to the structure, purpose, and context of the statute." *S.C. Pub. Serv. Auth. v. Fed. Energy Regul. Comm'n*, 762 F.3d 41, 55 (D.C. Cir. 2014) (per curium).

i. <u>Indirect regulation</u>

Section 1702(b) expressly provides that the power granted to the President "does not include the authority to regulate or prohibit, directly or indirectly," several activities, including personal communications and the import or export of informational materials.   50 U.S.C. § 1702(b).   Regulate means "[t]o control (an activity or process) esp[ecially] through the implementation of rules." *Regulate*, Black's Law Dictionary (11th ed. 2019).   And prohibit means "[t]o forbid by law" or "[t]o prevent, preclude, or severely hinder." *Prohibit*, Black's Law Dictionary (11th ed. 2019).   Both verbs are transitive and require an object—like an activity, process, or action—to express a complete thought.   The Chicago Manual of Style ¶ 5.98 (17th ed. 2017) (noting that verbs describe the "action the subject exerts on the object").

"Regulate" or "prohibit" are also both modified by the adverbs "directly or indirectly," which describe the relationship between a prohibition or regulation and its object.   Directly means "[i]n a straightforward manner" or "[i]n a straight line or course." *Directly*, Black's Law Dictionary (11th ed. 2019).   Indirectly means "[n]ot in a straight line or with a straight course; circuitously" or "through some intervening . . . thing; mediately." *Indirectly*, Oxford English Dictionary (3d ed. 2009).   Both adverbs tell readers something about the path a regulator takes to reach an intended destination (*i.e.*, a straightforward or circuitous path).   And the inclusion of both adverbs demonstrates that, at least as used in IEEPA, prohibitions and regulations must have some object or goal.   Otherwise, it would be impossible to discern whether a regulator's path toward that object or goal is straightforward, circuitous, or mediate.  *Miller v. Clinton*, 687 F.3d 1332, 1347 (D.C. Cir. 2012) (we construe statutes "so that no provision is rendered inoperative").

In short, by modifying the verbs "regulate or prohibit" with the adverbs "directly or indirectly," Congress withdrew the President's authority to control or forbid certain ends (objects),

regardless of whether the means (prohibitions or regulations) aim to achieve those ends in a straightforward way (directly) or circuitously (indirectly).  *Ass'n of Colleges v. Duncan*, 681 F.3d 427, 444 (D.C. Cir. 2012) (phrase "directly or indirectly" is "extremely broad language").  Three of the Parties' arguments can therefore be easily resolved.

First, Plaintiffs contend that § 1702(b) contains no "purpose" requirement, while Defendants argue that transitive verbs like regulate and prohibit lack discernable meaning without an intended object.  Reply, ECF No. 47, 8; Renewed Opp'n Mem., ECF No. 44, 11.  Congress's decision to include the word "indirectly" shows that Defendants have the better argument.  A regulator cannot be said to indirectly (or mediately) control a primary object by regulating a secondary object, unless the regulator has some primary object in view.  In other words, a regulator must have a goal or object before the means selected to achieve that goal can be called indirect or circuitous.  By including the adverb indirectly, Congress precluded regulations that directly target permissible objects (like business-to-business transactions) but have the goal of indirectly controlling impermissible objects (like "personal communications" or "informational materials").  *See* 50 U.S.C. § 1702(b)(1), (3).

Second, Plaintiffs are right to object to the government's reliance in this litigation (but not in the Commerce Memorandum) on a Treasury regulation about the scope of the informational-materials limitation.  *Compare* Reply, ECF No. 47, 7, *with* Renewed Opp'n Mem., ECF No. 44, 18 (discussing 31 C.F.R. § 560.210(c)).  The Treasury regulation states that the President may always regulate (among other things) "transactions related to . . . informational materials not fully created and in existence at the date of the transactions, . . . [or the] provision of services to market, produce or co-produce, create, or assist in the creation of information or informational materials." 31 C.F.R. § 560.210(c)(2).  The regulation parrots rather than interprets § 1702(b).  *See id.*

§ 560.210(c)(1); *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (noting that the "existence of a parroting regulation does not change . . . the meaning of the statute").  Plus, the regulation unreasonably overlooks the possibility that some rules that directly target a permissible object—like the provision of marketing services—might also aim to mediately (or indirectly) control an impermissible one.  To be sure, many marketing regulations are likely permissible, but Treasury's interpretation oversteps the plain meaning of § 1702(b) by suggesting that all such regulations, regardless of their intended objects, are permissible under IEEPA.

Third, the Parties accuse one another of misunderstanding the words "indirect" and "incidental."  Reply, ECF No. 47, 9; Renewed Opp'n Mem., ECF No. 44, 14–15.  The Court does not doubt that the terms cover different ground, as only one of the four objects that Congress shields from indirect regulation in § 1702(b) explicitly references "transactions ordinarily incident to travel."  50 U.S.C. § 1702(b)(4); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) (noting that when Congress includes a term "in one section of a statute but omits it in another" courts generally presume that Congress "act[ed] intentionally and purposely").  But the Parties disagree about how to decide when a regulation indirectly regulates an activity, as opposed to burdening an activity incidentally.  Reply, ECF No. 47, 9; Renewed Opp'n Mem., ECF No. 44, 14–15.  The text, however, offers a simple distinction:  regulations (whether direct or indirect) target objects, whereas incidental burdens are effects regulations impose on something other than intended objects.  *See* 50 U.S.C. § 1702(b); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50 (1987) ("A common-sense view of the word 'regulates' would lead to the conclusion that in order to regulation insurance, a law must not just have an impact on the insurance industry, but must be specifically directed toward that industry.").

While those arguments are easily resolved, a central issue remains:  the phrase "regulate or prohibit, directly or indirectly" does not provide a method for identifying the objects of a regulation.  The phrase assumes that an action that directly regulates one object may circuitously or mediately (indirectly) regulate another object.  But it offers no clear method for sorting direct from indirect objects or for deciding when a single regulation aims at both.

Fortunately, the Court is not without guidance.  In *Walsh v. Brady*, 927 F.2d 1229 (D.C. Cir. 1991), a businessman claimed that certain travel restrictions exceeded the government's authority under the Trading With the Enemy Act ("TWEA"), IEEPA's war-time predecessor, because they indirectly regulated the importation of informational materials (posters from Cuba). *Id.* at 1231.  The Court rejected his claim, deferring to an agency assessment that the "travel was considered too tangential to the actual physical importation and exportation of informational materials to" trigger the informational materials limitation.  *Id.*  The Court found that assessment reasonable, in part, because the agency's "stated goals" in enacting the travel restrictions were "to deprive Cuba of hard currency, and to make a political statement against the Cuban regime."  *Id.* at 1234.  Neither goal focused on controlling the importation of political posters, so the Court deferred to the agency's assessment that the businessman's efforts to import posters were not indirectly regulated, even though he could not travel to Cuba ("a normal and perhaps necessary incident" to importing "political posters into the United States").  *Id.* at 1231, 1234.

The *Walsh* Court also provided an example of what an unlawful indirect regulation would look like:  "regulations [that] explicitly allow[] the importation of informational materials, but undermine[] that permission indirectly—by requiring that payment be made into a blocked bank account in the United States in the name of a Cuban seller."  *Id.* at 1232.  Importantly, those indirect regulations described "informational materials" as one of their objects, even though they controlled

16

that object indirectly by regulating banks and payments.  *See id.* at 1232 (citing 31 C.F.R. § 515.545(b) (1987)).

The Court of Appeals thus focused on the "primary purpose" and "stated goals" the agency articulated for the challenged regulations. *See id*. at 1230, 1234 (D.C. Cir. 1991).  Focusing on the regulatory goals (or objects) an agency articulates in its decision-making documents also accords with general principles of judicial review under the APA.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review [in APA cases] should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision."); Renewed Opp'n Mem., ECF No. 44, 27 ("[T]he Secretary's identified prohibitions are justified not only by the detailed twenty-five page decision memorandum, but also by the President's determinations set forth in the TikTok Order, as well as the lengthy Administrative Record that has now been submitted to the Court.").

Here, the regulatory objects (or goals) of the prohibitions are clearly stated in the President's TikTok Order and the Commerce Memorandum relied on by the Secretary.  Start with the President's TikTok Order.  There, the President concluded that "action must be taken to address the threat posed by . . . TikTok," and described two threats:  the risk that U.S. user data would be provided to China and the transmission of CCP propaganda into the United States.  TikTok Order, 85 Fed. Reg. at 48637.  The TikTok Order stressed that those two "risks are real" and directed the Secretary to issue a list of prohibited transactions for the express goal of mitigating them.  *Id.* at 48637–38.

As for the Secretary, the Memorandum on which he relied highlighted the same two goals: stopping TikTok from exporting data to China and stopping TikTok from disseminating in the United States propaganda created and curated by the CCP.  *See* Commerce Memorandum, ECF No. 48-2, AR 30–35 (data), AR 35–38 (propaganda).  Moreover, the Commerce Memorandum clarifies that "text, images, video, and audio" are among the "data" that threaten national security when exported to China because China might use "[b]ulk data, like images and voice data . . . to train algorithms for facial and voice recognition."  *Id.* at AR 31.

To be sure, in its briefs, the government has argued that the Secretary's decisional Memorandum limits the "intended object of the prohibitions" to "TikTok's commercial transactions" and "data vulnerabilities."  Renewed Opp'n Mem., ECF No. 44, 12.  The government relies on the following passage to support that claim:

> The below prohibitions on certain business-to-business transactions . . . [have] the objective of preventing collection, transmission, and aggregation of U.S. user data by the TikTok app, ByteDance Ltd., and [the PRC]. Note that these transactions do not directly prohibit the downloading or use of the TikTok app and are not directly targeted at users of the TikTok app. While these prohibitions may ultimately make the application less effective and may be challenging for U.S.- based TikTok users, they are necessary for the protection of U.S. national security.

Commerce Memorandum, ECF No. 48-2, AR 47.  At oral argument, the government went even further, claiming that the Secretary's prohibitions directly prohibit only commercial transactions but do not indirectly regulate anything, not even data.  *See* Hr'n Tr., Nov. 4, 2020 (forthcoming).

The Court disagrees.  That the Commerce Memorandum stresses the means (prohibition of certain commercial transactions) by which certain objects (transmission of U.S. user data to China and dissemination of propaganda) are to be controlled does not change the purpose of the prohibitions.  And the fact that the Memorandum highlights one goal (preventing the transmission of U.S. user data to China) near its end does not somehow erase the second goal (preventing the

18

dissemination of propaganda) previously emphasized by the same Memorandum and the President's TikTok Order. *See* Commerce Memorandum, ECF No. 48-2, AR 30–35 (data), AR 35–38 (propaganda); *see also* TikTok Order, 85 Fed. Reg. at 48637. Indeed, the *Walsh* Court considered the "stated goals" of the whole "embargo program," not just the regulatory objects listed in Treasury's summary of the "travel-related payment ban." 927 F.2d at 1234 (relating the disputed travel restrictions, "47 Fed. Reg. 17,030 (April 30, 1982)," to "the stated goals of the embargo program"). This Court follows the same course, assessing the regulatory objects described throughout the decision-making documents the Secretary considered at the time he issued the TikTok prohibitions.

To be sure, as the government has emphasized, the TikTok prohibitions directly prohibit certain business-to-business transactions. *See* Commerce Memorandum, ECF No. 48-2, AR 47– 49. But the two goals of those prohibitions are to halt U.S. user data from flowing to China and to stop CCP propaganda from spreading in the United States, and the Secretary seeks to achieve those goals indirectly (or mediately) by shutting down the TikTok app and thus limiting, and ultimately reducing to zero, the number of U.S.-based users who can communicate on the platform and keep their personal data on TikTok. At a minimum, then, the Secretary's prohibitions indirectly regulate, rather than incidentally burden,[2] TikTok communications that spread CCP

---

[2] There may be difficult cases in which it is hard to decide whether the government is indirectly regulating an activity, as opposed to incidentally burdening an activity to control some other regulatory object. *Cf. Marland*, 2020 WL 6381397, at *10 ("[T]he line demarcating an 'indirect regulation' from a merely 'tangential' effect may not always be clear."). But this is not such a case. The President and the Secretary designed a regulatory scheme to mitigate two threats: the exportation of U.S. user data to China and the importation of propaganda to the United States. The scheme mitigates those threats indirectly (or mediately) through prohibitions on commercial transactions. But the Secretary's decision-making documents identify those threats as regulatory objects too.

19

propaganda and the data all U.S. users share on TikTok, including "text, images, video, and audio." Commerce Memorandum, ECF No. 48-2, AR 31, 35–38.  The only remaining question is whether those are personal communications or informational materials under § 1702(b)(1) and (b)(3).

ii. <u>Personal communications</u>

IEEPA's grant of authority does not include the "authority to regulate or prohibit, directly or indirectly . . . any . . . personal communication, which does not involve a transfer of anything of value."  50 U.S.C. 1702(b)(1).  It is undisputed that the Secretary's prohibitions will prevent Americans from sharing personal communications on TikTok, including those that spread "disinformation" and "propaganda" (both indirect objects of the prohibitions).  *See* Commerce Memorandum, ECF No. 48-2, AR 35–38; *see also* TikTok Order, 85 Fed. Reg. at 48637.  As Plaintiffs put it, the prohibitions "will destroy this online community, first by requiring the removal of TikTok from . . . U.S. app stores, and, when the remaining Prohibitions come into effect on November 12, 2020, shutting down TikTok entirely."  Pls.' P.I. Mot., ECF No. 15-1, 18; *see also* Pappas Decl., ECF No. 15-3, ¶¶ 4, 17.

The government counters by arguing that some communications on TikTok do have economic value to users, Defs.' Opp'n, ECF No. 22, 16, and that (in any event) user communications are of extraordinary value to TikTok as a facilitator, Renewed Opp'n Mem., ECF No. 44, 19–20.  Fair enough.  But "a wide swath of TikTok videos, public comments . . . , and private messages between friends about TikTok videos" are "personal communications with no economic value at all."  Reply, ECF No. 26, 13.  And the Court is not persuaded that the value a platform derives by facilitating a communication falls within the plain meaning of the phrase "personal communication, which does not involve a transfer of anything of value."  *See Wis. Cent.*

*Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (noting that the words in a statute should be "interpreted as taking their ordinary, contemporary, common meaning" at the time of enactment).

Instead, this provision is best read as referring to the transfer of money (or other value) as a part of the personal communication itself, rather than the transfer of value to those who facilitate communications.  *See* Reply, ECF No. 47, 4.  Indeed, the government's contrary interpretation would read most of the personal-communications limitation out of the statute.  *See Miller*, 687 F.3d at 1347 (we construe statutes "so that no provision is rendered inoperative"); *King v. Burwell*, 576 U.S. 473, 494 (2015) (rejecting an interpretation because it was "implausible that Congress meant the Act to operate in this manner").

After all, § 1702(b)(1) applies to more than just "personal communication[s]."  50 U.S.C. § 1702(b)(1).  The full sub-paragraph reads:  "any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value."  *Id.*  The phrase "which does not involve a transfer of anything of value" modifies each of the four nouns that precede it. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series.").  All postal, telegraphic, and telephonic communications transfer some value to the networks that facilitate those communications.  *See* Mem. Op., ECF No. 30, 13–14.  Yet Congress still chose to protect those communications.  The phrase "anything of value" cannot be expanded to reach beyond the participants to the communication itself, without doing violence to the structure of § 1702(b)(1).

TikTok surely derives more value as a result of facilitating communications than 1977-era telephone networks and postal services.  But that is a difference in degree, not in kind.  To avoid

rendering most of the provision inoperative, the phrase "anything of value" must refer to the transfer of value between participants in a personal communication itself.[3]

As discussed above, the Secretary's prohibitions indirectly regulate any personal communication that takes the form of "text, images, video, and audio" (data that may be transmitted to China) or propaganda in the United States.  *See* Commerce Memorandum, ECF No. 48-2, AR 31, 35–38.  As every communication on TikTok is itself some combination of text, images, video, and audio, Plaintiffs have shown that they are likely to prove the prohibitions indirectly regulate personal communications.  *See* ECF No. 43-4 (describing how users create and share content on TikTok).  And as most of those personal communications do not "transfer anything of value," Plaintiffs are also likely to prove that the prohibitions exceed the authority granted by IEEPA.

       iii.  <u>Informational materials</u>

IEEPA's informational-materials limitation deprives the President of authority to regulate or prohibit—"directly or indirectly," "regardless of format or medium of transmission," and "whether commercial or otherwise"—the importation or exportation of "informational materials." 50 U.S.C. § 1702(b)(3).  The phrase "informational materials" is immediately followed by a non-exhaustive list of examples, "including but not limited to, publications, films, . . . photographs, . . . artworks, . . . and news wire feeds."  50 U.S.C. § 1702(b)(3).

Plaintiffs argue that the Secretary's prohibitions are covered by this express carveout because the prohibitions will prevent U.S. users from sharing and receiving content on TikTok.

---

[3] Even if the structure of the text were less clear, the legislative history surrounding the personal-communications limitation accords with this Court's interpretation of the phrase "anything of value":  The President's authority under IEEPA "does not extend to the . . . hindrance, direct or indirect, of private communications, which are not commercial or financial transactions." *See* H.R. Conf. Rep. No. 95-459, at 15 (1977); Reply, ECF No. 47, 4 (citing the same).

Pls.' P.I. Mot., ECF No. 15-1, 18–19; *see also* Pappas Decl., ECF No. 15-3, ¶¶ 4, 20.  They argue that over 100 million Americans currently use TikTok to share their films, photographs, art, and news with users across international borders, Pappas Decl., ECF No. 15-3, ¶ 20, and that "U.S. content can comprise as much as 60% of the content in TikTok's non-U.S. markets."  *Id.*  This content, Plaintiffs argue, constitutes "informational materials" the importation and exportation of which cannot be regulated, either indirectly or directly, pursuant to IEEPA.  Reply, ECF No. 26, 14.

The government does not claim that the information shared on TikTok falls outside the meaning of the phrase "information or informational materials."  *See* Renewed Opp'n Mem., ECF No. 44, 20–24.  Nor does it argue that those materials aren't exchanged between other countries and the United States on TikTok, a "medium of transmission."  *See id.*  Instead, the government argues that even direct prohibitions on TikTok "as a 'medium of transmission'" do not necessarily constitute an indirect regulation on the flow of informational materials traveling along that medium of transmission.  *See id.*  Perhaps, but that does not get the government very far.  Some direct regulations of a medium of transmission may indeed be permissible, especially when reasonably crafted to avoid burdening protected informational materials.  But others may not.

For example, it may be that shutting down the *New York Times* (a medium for making and transmitting news) for smuggling illegal drugs alongside its newspapers would not indirectly regulate the flow of news.  *See* Renewed Opp'n Mem., ECF No. 44, 22.  But the same action— shutting down the *Times*—if taken to achieve a different regulatory object (like stopping the flow of news, or of Russian propaganda into the United States) would overstep § 1702(b), even if the executive advanced its anti-propaganda object indirectly, by prohibiting banks, paper (or ink)

suppliers, or internet hosting services from doing business with the *Times*.  As here, the inquiry would turn on whether informational materials were among the targeted regulatory objects.

Consistent with the D.C. Circuit's decision in *Walsh*, the Court looks to the government's stated goals to identify the regulatory objects of the Secretary's prohibitions on TikTok.  And again, those intended objects include stopping the exportation of data (which the government itself defines as "text, images, video, and audio") to China and stopping the importation of propaganda into the United States.  *See* Commerce Memorandum, ECF No. 48-2, AR 31, 35–38.  As those regulatory objects are "informational materials"—pictures, art, and films are included in the statutory definition itself—the Secretary's prohibitions are efforts to control, through indirect (or mediate) means, the flow of information materials.[4]  *Cf.* Renewed Opp'n Mem., ECF No. 44, 22.

That Congress added language in 2014 allowing the President to use IEEPA to prohibit the transactions of those who "engage[] in . . . economic or industrial espionage in cyberspace" does not change the result.  *See* 50 U.S.C. § 1708(b)(1), (2).  Section 1708 demonstrates that curtailing cyber espionage is a permissible regulatory object.  And, to be sure, some mediums that transmit informational materials may be incidentally burdened by efforts to curtail cyber espionage.  But action directly regulating a permissible object may also (and simultaneously) overstep § 1702(b)(3) by indirectly regulating informational materials.  Nothing in § 1708 shows that Congress created a cyber-espionage exception to the informational-materials limitation.  Indeed,

---

[4] Plaintiffs point to out-of-circuit precedent that leans heavily on legislative history to show that Congress amended § 1702(b)(3) for the purpose of stopping the government from indirectly burdening transactions that are incident to the flow of informational materials.  *See* Reply, ECF No. 47, 9–10 (citing *Kalantari*, 352 F.3d at 1209).  As the Court concludes that the Secretary's prohibitions indirectly regulate, rather than incidentally burden, informational materials, the Court does not have occasion to decide how or if a reference to the word "incident" in a House Conference Report affects the plain meaning of § 1703(b)(3).  *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 279 (D.C. Cir. 2018) (No "reference to legislative history [is] necessary when the meaning of a statute is clear enough on its face.") (internal citations and quotation marks omitted).

§ 1708(c) suggests quite the opposite: "Nothing in this section shall be construed to affect the application of . . . any authority provided for under any other provision of law." 50 U.S.C. § 1708(c).

2. *Plaintiffs' APA Claim*

The APA directs courts to set aside agency actions that are "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs argue (among other things) that the Secretary acted arbitrarily and capriciously by identifying prohibited transactions without considering reasonable alternatives. *See* Reply, ECF No. 47, 13.

As an initial matter, the Court rejects the government's assertion that Plaintiffs' APA claims are unreviewable. *See* Renewed Opp'n Mem, ECF No. 44, 25. The APA explicitly authorizes judicial review of agency actions, 5 U.S.C. § 702, which buttresses the strong presumption of reviewability. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). Congress can, of course, shield specific agency actions from review. *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). But it has not done so here.

The government cites no IEEPA provision showing that Congress directly precluded APA review. *See* Renewed Opp'n Mem., ECF No. 44, 25–26. Instead, the government claims that statutory provisions describing congressional oversight of the President's national security declarations "suggest[] that Congress assigned itself sole oversight authority of the Executive's [IEEPA] actions." *Id.* at 26 (citing 50 U.S.C. §§ 1621, 1622, 1641). But those provisions are about the way national emergencies are declared (§ 1621), terminated (§ 1622), and communicated (§ 1641) to Congress. Plaintiffs do not challenge the President's national emergency declaration itself, or how Congress exercises its oversight responsibilities. Instead, they challenge *the*

*Secretary's* prohibitions and the decision-making process that led to them.  Reply, ECF No. 47, 13–18.

The D.C. Circuit has already held that the decision-making process an agency employs to effectuate an executive order issued under IEEPA is subject to arbitrary and capricious review. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (holding that OFAC's decision to label an entity a Specifically Designated Global Terrorist pursuant to an executive order issued under IEEPA was arbitrary and capricious).   Indeed, Plaintiffs' most persuasive APA claim—that the Secretary acted without considering reasonable alternatives— does not challenge the substance of the prohibited transactions at all.  *See* Reply, ECF No. 47, 17– 18.  Instead, Plaintiffs argue that by selecting those transactions without considering and rejecting reasonable alternatives, the Secretary acted in an arbitrary and capricious manner.  *See id.*  The Court will therefore take up the "familiar judicial exercise" of evaluating the Secretary's decision-making process under the APA.  *See Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). [5]

It is well established that the arbitrary and capricious standard does not invite courts "to undertake their own factfinding, but to review the agency record to determine whether the agency's decision was supported by a rational basis."  *Holy Land*, 333 F.3d at 162.  That is particularly true when reviewing agency actions that aim "to serve national security interests," as the judiciary "cannot substitute [its] own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex and involve large elements of prophecy.'"  *Trump v. Hawaii*,

---

[5]  Because Plaintiffs are not challenging the Secretary's determination that any particular transaction "threatens the national security," the government is wrong to characterize Plaintiffs' process-oriented APA claims as raising nonjusticiable political questions.  *See* Renewed Opp'n Mem., ECF No. 44, 25 (quoting *Ralls Corp. v. CFIUS*, 758 F.3d 296, 314 (D.C. Cir. 2014)); *cf. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).

138 S. Ct. 2392, 2421 (2018) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)).

But courts also "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). After all, an agency's conduct must reflect a "rational connection between the facts found and the choice made." *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). And when an agency action shows that it "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," courts should cast the action aside as arbitrary and capricious. *Id.*

An agency's failure to "consider significant alternatives to the course [it] ultimately cho[se]," is a telltale sign that its decision-making process cannot "be regarded as rational." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). An agency is only required to consider "reasonable" alternatives that "will bring about the ends of the federal action." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). But "the failure of an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36.

Here, the Secretary did not consider any alternatives before effectively banning TikTok from the United States, nor did the Secretary articulate any justification (rational or otherwise) for failing to consider any such alternatives. Indeed, one alternative is so obvious that it appears in the first sentence of the "Recommendation" section of the Secretary's decisional Memorandum: "[b]arring a complete divestiture of ByteDance from the TikTok application, TikTok presents an

immitigable risk to the national security . . . of the United States." Commerce Memorandum, ECF No. 48-2, AR 47.   Nevertheless, the Secretary did not consider making his prohibitions contingent upon the failure of the divestment process.   To be sure, the Secretary considered the CFIUS negotiations in the sense that he acknowledged they were happening.   The Secretary recognized that "the President has established a deadline of November 12, 2020, for any [divestiture] deal or agreement to be reached."   Commerce Memorandum, ECF No. 48-2, AR 47.   But instead of scheduling the prohibitions to take effect only after divestiture deals fell through, the Secretary opted to effectively ban TikTok on November 12, 2020.   As the government conceded at oral argument, the Secretary's prohibitions are in no way contingent on the CFIUS process failing, and thus would have taken effect on November 12, 2020, even if divestiture occurred.   *See* Hr'n Tr., Nov. 4, 2020 (forthcoming).

Plaintiffs have demonstrated they are likely to succeed on their claim that the Secretary violated the APA by preventing a company from operating in the United States on national security grounds without adequately considering whether those national security concerns could be fully resolved through a parallel divestment process.   *See* Reply, ECF No. 47, 17.   The Secretary is not in charge of the CFIUS process, *see* Renewed Opp'n Mem., ECF No. 44, 31, but he is not free to ignore an obvious alternative available to him simply because it has some relationship to proceedings before another executive agency.   *Cf. City of Alexandria v. Slater*, 198 F.3d 862, 869 (D.C. Cir. 1999) ("[W]ithin the context of a coordinated effort to solve a problem of national scope, a solution that lies outside of an agency's jurisdiction might be a 'reasonable alternative'; so might an alternative within that agency's jurisdiction that solves only a portion of the problem, given that other agencies might be able to provide the remainder of the solution.").

Plaintiffs raise a host of other alternatives that they allege were not adequately considered and rejected by the Secretary, such as "having Oracle host all U.S. user data and secure associated computer systems to ensure that U.S. national security requirements are satisfied."  Reply, ECF No. 47, 17–18 (discussing ECF No. 15-28).  Plaintiffs are correct that the Secretary does not appear to have considered those other alternatives, but in contrast to the CFIUS process and the possibility of divestiture, it is unclear whether such efforts would fully resolve the government's concerns. *Compare id.*, *with* Renewed Opp'n Mem., ECF No. 44, 31–32.  If not, then Plaintiffs' other proposals may constitute unreasonable alternatives that the Secretary was not obligated to consider.  *See Citizens Against Burlington, Inc.*, 938 F.2d at 195.  In any event, because the Secretary failed to consider an obvious alternative identified in the Secretary's Memorandum itself, the Court concludes that Plaintiffs are likely to succeed on their APA claims, which (even standing alone) are enough for preliminary injunctive relief.  *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015).

* * * * *

In sum, Plaintiffs have demonstrated that they are likely to prevail on their claims that the Secretary's prohibitions violate the limits set forth in IEEPA and the APA.  The President's TikTok Order and the Secretary's prohibitions aim to stop U.S. users from communicating and thus sharing data on TikTok.  The ultimate purpose (or intended object) of those prohibitions is to prevent China from accessing those data and spreading disinformation on TikTok.  While the government's actions may not constitute *direct* regulations or prohibitions of activities identified in 50 U.S.C. § 1702(b), they likely constitute *indirect* regulations of "personal communication[s]" or the exchange of "information or informational materials."  Plaintiffs have also shown that the

Secretary's failure to adequately consider an obvious and reasonable alternative before banning TikTok renders the Secretary's action arbitrary and capricious. [6]

## B. Irreparable Harm

The Court next considers whether Plaintiffs have made a showing of irreparable harm. "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain, great and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm.' " *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). In addition, "the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.' " *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The movant must "substantiate the claim that irreparable injury is likely to occur" and "provide proof . . . indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674. That is because "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The Court has already found that shutting down the TikTok application would inflict irreparable harm on Plaintiffs. *See* Mem. Op., ECF No. 30, 14–16. The government has not offered any reason to depart from that conclusion. It remains undisputed that as of the date of the

---

[6] Because the Court concludes that Plaintiffs have demonstrated a likelihood of success on their IEEPA and APA claims, it need not analyze Plaintiffs' other statutory and constitutional claims to decide whether Plaintiffs are entitled to preliminary relief. But the Court does note that Plaintiffs have presented at least serious questions on those other claims.

TikTok Order, TikTok was one of the fastest growing apps in the United States, adding 424,000 new users each day.  *See* Pappas Decl., ECF No. 15-3, ¶ 18.  Functionally shutting down TikTok in the United States would, of course, have the immediate and direct effect of driving all existing and potential users to alternative platforms and eroding TikTok's competitive position.  *Id.*  In fact, TikTok has proffered unrebutted evidence that uncertainty in TikTok's future availability has already driven, and will continue to drive, content creators and fans to other platforms.  *See* Pls.' P.I. Mot., ECF No. 15, 34.  The nature of social media is also such that users are unlikely to return to platforms that they have abandoned.  *See id.*  Thus, if the app was shut down (even briefly) but that shutdown was later held to be unlawful, TikTok would not be able to recover the harm to its user base.  Pls.' P.I. Mot., ECF No. 15-1, 33–35; *see also* Pappas Decl., ECF No. 15-3, ¶ 19.

Plaintiffs have also proffered evidence that they have been harmed, and will continue to be harmed, by the erosion of TikTok's attractiveness as a commercial partner.  Pappas Decl., ECF No. 15-3, ¶ 23.  TikTok's business relies on commercial partners and advertisers that work with it because of its robust user base and popularity as a video- and information-sharing platform.  *Id.*  Finally, TikTok has shown that, in the absence of injunctive relief, it will be unable to recruit and retain employees to build—or even maintain—its business.  Pappas Decl., ECF No. 15-3, ¶ 26.

For all those reasons, TikTok would suffer irreparable harm if the Secretary's prohibitions were to take effect.  *See* Pls.' Suppl. Mem., ECF No. 52, 1–3.  But on October 30, 2020, another federal court in a suit brought by TikTok users preliminary enjoined all the prohibitions listed in the Commerce Identification.  *See Marland v. Trump*, 2020 WL 6381397, at *14–15 (E.D. Pa. Oct. 30, 2020).  And on November 17, 2020, the Secretary of Commerce published a notice in the Federal Register acknowledging that all the prohibitions listed in the Commerce Identification had "been enjoined" and Commerce "is complying" with that injunction, so the TikTok prohibitions

"will not go into effect, pending further legal developments." 85 Fed. Reg. 73191 (Nov. 17, 2020).

As a result, the government argues, TikTok cannot demonstrate that it will suffer irreparable harm

absent an injunction *in this case*. *See* Defs.' Suppl. Mem., ECF No. 53, 1.

There is some strength to the government's argument. But the government has already

appealed the *Marland* injunction, and thus that injunction could be modified, stayed, or vacated at

any time. *See Marland v. Trump*, No. 20-3322, at ECF No. 1; *see also* Notice of Appeal, ECF No.

55 (Nov. 12, 2020); *Nw. Immigrant Rts. Project v. USCIS*, 2020 WL 5995206, at *31 (D.D.C. Oct.

8, 2020). In that circumstance, "[e]ven a temporary lag between the lifting" of the *Marland*

injunction "and the entry of an injunction by this Court would likely entail some irreparable harm

to Plaintiffs," as TikTok would not recover the users and business relationships lost to competitors

during the lapse in injunctive relief. *Whitman-Walker Clinic v. HHS*, 2020 WL 5232076, at *41

(D.D.C. Sept. 2, 2020).

Plaintiffs therefore need not wait for "Damocles's sword . . . to actually fall on" them

"before the court will issue an injunction." *League of Women Voters of U.S. v. Newby*, 838 F.3d

1, 8–9 (D.C. Cir. 2016).[7] In similar situations, "courts routinely grant follow-on injunctions

against the Government," even when "an earlier nationwide injunction has already provided

plaintiffs in the later action with their desired relief." *Whitman-Walker Clinic*, 2020 WL 5232076,

at *41 (collecting cases). This Court will do the same.

---

[7] In *League of Women Voters*, the D.C. Circuit held that an organization with the "primary mission of registering voters" could show that voter identification laws irreparably harmed its mission, even though "it [was] unclear whether Alabama and Georgia [were] currently enforcing their proof-of-citizenship laws." *League of Women Voters*, 838 F.3d at 8–9. That irreparable harm would result the moment Alabama and Georgia started enforcing their laws was enough. *Id.* As in *League of Women Voters*, TikTok faces certain and irreparable harm as soon as the Secretary's prohibitions are enforced.

### C. Balance of the Equities and Public Interest

The Court now turns to the final two *Winter* factors—the balance of the equities and the public interest. When the government is the nonmovant in a request for a preliminary injunction, the harm to the opposing party and public interest merge and are considered "one and the same." *Pursuing America's Greatness v. Fed. Election Comm.*, 831 F.3d 500, 511 (D.C. Cir. 2016). That is because "the government's interest *is* the public interest." *Id.* In assessing these factors, courts consider the impacts of the injunction on nonparties as well. *See id.* at 511–12.

The government argues that a preliminary injunction would displace and frustrate the President's decision on how to best address a national security threat—an area where the courts typically defer to the President's judgment. *See* Pls.' P.I. Mot., ECF No. 15-1, 43. The Court must, of course, give deference to the government's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002). Here, the government has provided ample evidence that China presents a significant national security threat, although the specific evidence of the threat posed by Plaintiffs, as well as whether the prohibitions are the only effective way to address that threat, remains less substantial. At a minimum, the Court cannot adopt Plaintiffs' argument that "the government will not face *any* harm if a preliminary injunction is granted." Pls.' P.I. Mot., ECF No. 15-1, 37.

But Plaintiffs have demonstrated that the Secretary likely overstepped IEEPA and acted in an arbitrary and capricious manner by failing to consider obvious alternatives. The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v.*

*Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  That is because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Rather, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  Moreover, the presence of at least one obvious alternative suggests that (if it pursues different regulatory objects) the government may have lawful paths available to advance its interests.

Weighing these interests together with Plaintiffs' likelihood of succeeding on their IEEPA and APA claims and the irreparable harm that Plaintiffs (and their U.S. users) will suffer absent an injunction, the Court concludes that a preliminary injunction is appropriate.

### IV. SCOPE OF RELIEF

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).  The government argues that any relief should be carefully tailored to go no further than necessary to grant Plaintiffs relief. Renewed Opp'n Mem., ECF No. 44, 44–45.  The Court agrees, of course.  The "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Here, Plaintiffs have established that the government likely exceeded IEEPA's express limitations as part of an agency action that was arbitrary and capricious.  When courts encounter an APA violation the ordinary remedy is to stop the "unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)). Moreover, any alternative remedy would force the Court to issue the kind of "detailed remedial

order" that is appropriate only in "extraordinary circumstances."  *See N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008).  Defendants have not argued that this case presents an extraordinary circumstance.  *See id.*  And in any event, identifying which personal communications have no value and which data transmissions cross international borders (as the government requests), is precisely the type of "fine tailoring" for which preliminary injunctions are "ill-suited."  *Gordon v. Holder*, 721 F.3d 638, 654 (D.C. Cir. 2013); *see also* Renewed Opp'n Mem., ECF No. 44, 44–45.  The Court will therefore preliminarily enjoin the Secretary's TikTok prohibitions in full.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is granted as to all the prohibitions listed in the Commerce Identification.  An Order will accompany this Memorandum Opinion.

DATE:  December 7, 2020

CARL J. NICHOLS
United States District Judge

35